UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

*Ex parte* Express Mobile, Inc.,
Patent Owner and Appellant.

Appeal 2022-003530
Examination Control 90/014,615
Patent 6,546,397 B1
Technology Center 3900

————————

## PATENT OWNER EXPRESS MOBILE, INC.'S NOTICE OF APPEAL

via Private PAIR
Patent Trial and Appeal Board

via Priority Mail Express
Director
Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

via CM/ECF
United States Court of Appeals for the Federal Circuit

Pursuant to 35 U.S.C. §§ 141(b) and 142, 37 C.F.R. §§ 90.2(a) and 90.3(a), Rule 4(a) of the Federal Rules of Appellate Procedure, and 28 U.S.C. § 1295(a)(4)(A), Patent Owner Express Mobile, Inc. hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the appeal decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office ("Office"), which was entered October 3, 2022 by the assigned panel of the Board in appeal No. 2022-003530 and received by the Patent Owner on October 6, 2022, on appeal from final rejections in the *ex parte* reexamination of U.S. Patent No. 6,546,397.

Patent Owner identifies the following issues as among those on appeal:

(i)     The erroneous reexamination and determination that claim 1 of U.S. Patent No. 6,546,397 has been shown to be unpatentable, including any underlying questions of law or fact;

(ii)    Any finding, determination, judgment, or order supporting or related to the patent reexamination, including the initiation thereof, and decided adversely to Patent Owner.

Patent Owner is concurrently filing true and correct copies of this Notice of Appeal, along with the required fees, with the United States Court of Appeals for the Federal Circuit, the Patent Trial and Appeal Board, and the Office's Director.

1

Date:  October 20, 2022          Respectfully submitted,

/s/ Kenneth Weatherwax

Kenneth Weatherwax, Reg. No. 54,528
LOWENSTEIN & WEATHERWAX LLP
1016  Pico Boulevard
Santa Monica, California 90405
weatherwax@lowensteinweatherwax.com

David L. Alberti, Reg. No. 43,465
Sal Lim, Reg. No. 45,706
KRAMER DAY ALBERTI LIM TONKOVICH &
BELLOLI LLP
577 Airport Boulevard, Suite 250
Burlingame, California 94010
dalberti@kramerday.com
slim@kramerday.com

*Counsel for Patent Owner*

## <u>CERTIFICATE OF SERVICE</u>

In compliance with 37 C.F.R. 1.550(f), the undersigned, on behalf of the Patent Owner, hereby certifies that copies of the following documents are being served on the Third-Party Requester by first class mail on October 20, 2022:

**PATENT OWNER EXPRESS MOBILE, INC.'S
NOTICE OF APPEAL**

The name and address of the party being served are as follows:

Ropes & Gray LLP
Prudential Tower
IPRM Docketing – Floor 43
800 Boylston Street
Boston, MA 02199-3600

Date:  October 20, 2022          Respectfully submitted

/Kenneth J. Weatherwax/
Kenneth J. Weatherwax

## CERTIFICATE OF FILING WITH USPTO

The undersigned hereby certifies that, pursuant to 37 C.F.R. § 90.2(a), two copies of the following document:

### PATENT OWNER EXPRESS MOBILE, INC.'S
### NOTICE OF APPEAL

were filed by Priority Mail Express or equivalent service with the Director of the United States Patent and Trademark Office on the date signed below at the following address:

> Director of the United States Patent and Trademark Office
> c/o Office of the General Counsel
> Mail Stop 8
> United States Patent and Trademark Office,
> P.O. Box 1450
> Alexandria, VA 22313-1450.

Date: October 20, 2022          Respectfully submitted,

/Kenneth J. Weatherwax/
Kenneth J. Weatherwax, Reg. No. 54,528
LOWENSTEIN & WEATHERWAX LLP
*Counsel for Patent Owner*

# Attachment A



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,615 | 11/25/2020 | 6546397 | XPR.001US0 Re Exam | 5892 |

167264        7590        10/03/2022
Lowenstein & Weatherwax LLP
1880 Century Park East
Suite 815
Los Angeles, CA 90067

| EXAMINER |
|---|
| DESAI, RACHNA SINGH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/03/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

*Ex parte* Express Mobile, Inc.
Patent Owner and Appellant

————————

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1
Technology Center 3900

————————

Before ALLEN R. MacDONALD, DANIEL J. GALLIGAN, and
MICHAEL J. ENGLE, *Administrative Patent Judges*.

ENGLE, *Administrative Patent Judge*.

DECISION ON APPEAL

STATEMENT OF THE CASE

Appellant appeals under 35 U.S.C. §§ 134(a) and 306 from the
Examiner's decision to reject claim 1 of U.S. Patent No. 6,546,397 B1
("'397 patent"). The Examiner previously confirmed all other challenged
claims as patentable over the cited art. A hearing was held by video on
August 25, 2022. We have jurisdiction over the appealed claim under
35 U.S.C. § 6(b).

We affirm.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

## THE '397 PATENT

The '397 patent relates to "designing and building a web page" using "a browser based build engine." Ex. 1001, '397 patent, Abstract. The application for the '397 patent was filed on December 2, 1999, so the '397 patent is now expired. *See* Appeal Br. 5.

Claim 1 of the '397 patent is reproduced below with certain limitations at issue emphasized:

> 1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:
>
> (a) presenting a viewable menu having a user selectable panel of *settings* describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;
>
> (b) generating a display in accordance with one or more user selected settings *substantially contemporaneously* with the selection thereof;
>
> (c) storing information representative of said one or more user selected settings *in a database*;
>
> (d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and
>
> (e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

## REFERENCES

The Examiner relies on the following references as prior art:

| Inventor | Short Name | Number | Issue Date |
|---|---|---|---|
| van der Meer | VDM '362 | US 6,289,362 B1 | Sept. 11, 2001 |
| van der Meer | VDM '316 | US 6,415,316 B1 | July 2, 2002 |

## REJECTION ON APPEAL

The Examiner rejects claim 1 under 35 U.S.C. § 103 as obvious over
VDM '316 and VDM '362. Final Act. 8–12.

## OTHER CLAIMS IN REEXAMINATION

In this reexamination, the Examiner previously confirmed
patentability of the other challenged claims because independent claims 2
and 37 included means-plus-function limitations under 35 U.S.C. § 112,
sixth paragraph, and VDM '316 and VDM '362 do not disclose those
means-plus-function limitations, e.g., "a build tool for
generating/constructing one or more webpages as in claim[s] 2 and 37 when
the build tool is construed to cover the corresponding structure described in
the Specification." Final Act. 6–7 (construing terms as means-plus-
function), 13–15 (addressing Appellant's challenges to the means-plus-
function constructions), 23–24 (addressing prior art given the means-plus-
function limitations). The only claim on appeal here (claim 1) does not
recite those means-plus-function limitations.

## RELATED PROCEEDINGS

*Proceedings on the '397 Patent*

Appellant lists over 100 prior and pending proceedings involving the
'397 patent before the PTAB and various federal district courts, including

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

the Western District of Texas, the Eastern District of Texas, the Northern District of California, the Central District of California, the District of Delaware, and the Middle District of Florida. Appeal Br. 6–14; Reply Br. 4–5. As discussed below, some of these proceedings have reached the claim construction stage.

IPR2021-01224 was instituted on January 14, 2022. It involves different prior art than this reexamination, but the sole challenged claim is claim 1. *See* IPR2021-01224, Paper 10, at 4 (Jan. 14, 2022). IPR2022-00570 and IPR2022-00598 raise the same grounds, and the petitioners in those proceedings have been joined as petitioners in IPR2021-01224. A final decision has not yet mailed in those proceedings.

Two other IPR proceedings were denied institution. They also involved different prior art than this reexamination but challenged claim 1. *See* IPR2021-00700, Paper 7, at 6–7 (Oct. 4, 2021); IPR2018-00750, Paper 10, at 6–7 (Aug. 30, 2018). One focused on different limitations than the present case. *E.g.*, IPR2018-00750, Paper 10, at 13 ("Patent Owner does not present arguments regarding steps (a) or (b)."), 15 ("But if [the prior art reference] stores and retrieves *pre-built* webpages from the database to meet steps (c) and (d) as Petitioner asserts, then Petitioner has not shown how [that reference] can also satisfy step (e)'s requirement of building those webpages." (emphasis added)). The other determined that the petitioner had not demonstrated sufficiently that the prior art's "drag-and-drop organizational changes" (akin to dragging and dropping icons into different folders) taught "settings," including "attributes of an object" that were "user

4

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

selectable" and "describing elements on a website." IPR2021-00700,
Paper 7, at 15–17.

*Proceedings on a Related Patent*

Appellant also states that a continuation of the '397 patent
(US 7,594,168 B2) has been involved in one *ex parte* reexamination
(Control No. 90/014,583); four *inter partes* review petitions (IPR2021-
01226, IPR2022-00518, IPR2022-00572, and IPR2022-00597); and one
further district court case in addition to the cases listed for the '397 patent.
Appeal Br. 14.

IPR2021-01226 was instituted on January 14, 2022. It too involves
different prior art than this reexamination. *See* IPR2021-01226, Paper 8, at 4
(Jan. 14, 2022). IPR2022-00518, IPR2022-00572, and IPR2022-00597 raise
the same grounds, and the petitioners in those proceedings have been joined
as petitioners in IPR2021-01226. A final decision has not yet mailed in
those proceedings.

In Reexamination Control No. 90/014,583, the examiner confirmed
the patentability of claims 1–6 of the '168 patent over the art cited in that
proceeding on July 30, 2021. That reexamination involved the same prior
art as the present reexamination but turned on claim limitations not present
in claim 1 of the '397 patent. *See* Control No. 90/014,583, Non-Final Act.
(Mar. 3, 2021); Notice of Intent to Issue Ex Parte Reexamination Certificate
(July 14, 2021).

ISSUES

Did the Examiner err in finding the combination of VDM '316 and
VDM '362 teaches or suggests (1) user selectable "*settings* describing

5

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

elements on a website," (2) "generating a display in accordance with one or more user selected settings *substantially contemporaneously* with the selection thereof," and (3) "storing information representative of said one or more user selected settings *in a database*" that is retrieved from the database to generate a website, as recited in claim 1?

## ANALYSIS

### *Level of Ordinary Skill*

Although Appellant's briefs do not address the level of ordinary skill in the art, Appellant's declarant Mr. Weadock asserts that "a POSITA would have included [someone] who had a bachelors or graduate degree in computer science, mathematics, engineering, or a similar discipline together with knowledge of software development and web design, together with approximately two or three years of experience in the field relating to web design and development," though a "sliding scale" could trade off less education for more industry experience or vice versa. Ex. A, Weadock Decl. ¶ 16. A substantially similar level of ordinary skill was applied in at least some of the prior proceedings.[1]

For purposes of this decision, we adopt Mr. Weadock's proposed level of ordinary skill.

### *Claim Construction*

"If, as is the case here, a reexamination involves claims of an expired patent, a patentee is unable to make claim amendments and the

---

[1] *E.g.*, IPR2021-00700, Paper 7, at 9–10 (Oct. 4, 2021); IPR2021-01224, Paper 10, at 10–12 (Jan. 14, 2022).

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

PTO applies the claim construction principles outlined by this court
in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)." *In re Rambus,
Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014) (citing MPEP § 2258(G)); *see
also* Appeal Br. 28 (acknowledging the '397 patent's expiration and the
resultant claim construction standard).

Appellant asks that we adopt the prior district court's constructions for
two terms: "setting" and "substantially contemporaneously." Appeal Br.
28–35. The Examiner adopts Appellant's requested constructions. Ans. 3.

First, in several prior proceedings, the term "setting" has been
construed as "an attribute of an object available for selection."[2] Although
this leads to some redundancy when inserted into claim 1 (e.g., "selectable
[attributes . . . available for selection]"), we agree with this construction's
requirements for a "setting" in claim 1.

Second, the term "substantially contemporaneously" has been
construed in two different ways. One district court construed "substantially
contemporaneously" as "happening at the same period of time from a human
perspective."[3] Appellant requested the same construction in another district

---

[2] Ex. C, *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-130 (E.D. Tex.),
Claim Construction Memorandum Opinion & Order (Feb. 7, 2018), at 6;
Ex. D, *X.Commerce, Inc. v. Express Mobile, Inc.*, No. 17-cv-02605 (N.D.
Cal.), Amended Order Construing Claims (Sept. 12, 2018), at 13; Ex. F,
*Shopify Inc. v. Express Mobile, Inc.*, 1:19-cv-439 (D. Del.), Order on Claim
Construction (June 30, 2020), at 1; Ex. G, *Express Mobile, Inc. v.
GoDaddy.com, LLC*, No. 19-cv-1937 (D. Del.), Memorandum Opinion (June
1, 2021), at 10; IPR2021-00700, Paper 7, at 7–8 (Oct. 4, 2021).
[3] Ex. C, *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-130 (E.D. Tex.),
Claim Construction Memorandum Opinion & Order (Feb. 7, 2018), at 16.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

court.[4] However, a third district court construed "substantially contemporaneously" as "occurring immediately after."[5] Nevertheless, that court explained, "The immediacy is, of course, still judged from a human perspective, but there is no particular need to specify that."[6] Appellant asserts that "either [construction] is appropriate for this reexamination" because both "reflect the duration between when a user selects a setting and when the preview is generated." Appeal Br. 35.

For claim construction, "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Given that the particular disputes in this case involve the time between selection and display rather than the order of the steps, we adopt the *Svanaco* court's construction of "substantially contemporaneously" as "happening at the same period of time from a human perspective." However, the outcome of our decision would be the same even if we applied the *X.Commerce* court's construction.

### Overview of VDM '316

VDM '316 "allows a user to create a 'diary' containing multimedia references to Websites," such as allowing the user's diary to "organize

---

[4] Ex. K, *Express Mobile, Inc. v. eGrove Sys. Corp.*, 1:17-cv-703 (D. Del.), Joint Claim Construction Chart (Apr. 6, 2018), at 1; Ex. L, *Shopify Inc. v. Express Mobile, Inc.*, No. 1:19-cv-00439 (D. Del.), Joint Claim Construction Brief (May 8, 2020), at 21.
[5] Ex. D, *X.Commerce, Inc. v. Express Mobile, Inc.*, No. 17-cv-02605 (N.D. Cal.), Amended Order Construing Claims (Sept. 12, 2018), at 11.
[6] *Id.* at 10.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

information about Web pages . . . by dates." Ex. 1005, VDM '316, 2:2–17.

"These references (also called 'content objects' or 'objects') can be

addresses or URLs of, for example, text, bookmarks, images, programs,

movies, etc." *Id.* at 2:3–6. "The diary owner can edit existing diary content

and layout by entering an edit mode . . . ." *Id.* at 2:57–60.

　　　An example of editing a diary page is shown in Figure 4(a), which is

reproduced below:



Figure 4(a)

"In FIG. 4(a), exemplary diary page 400 is being viewed with browser

110, and diary applet 112 has popped up a diary navigator bar window 402."

Ex. 1005, VDM '316, 9:28–30. "[T]he diary owner has previously added

one image of a car 410 to the diary page," and "diary page 400 was

generated by diary applet 112 in accordance with diary information 114 for

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

the diary page 400." *Id.* at 9:32–39. Other applet windows allow the diary owner to add new content and modify existing content, as discussed in more detail below. *Id.* at 11:42–13:37.

According to VDM '316, "diary information stores three basic types of data:" (1) "an AUA-database specifying the content of the diary page(s) that was gathered or created by the user"; (2) "a cover (also called a 'presentation context') for the diary"; and (3) "configuration information for the user." Ex. 1005, VDM '316, 8:59–64. "An AUA is an 'Annotated Universal Address,' as described in U.S. patent application Ser. No. 09/144,717 . . . ." *Id.* at 8:64–65.

### Overview of VDM '362

VDM '362 issued from the "09/144,717" application mentioned in VDM '316 and shares the same inventor. The Examiner relies on VDM '362 for providing additional details on the AUA database mentioned in VDM '316. *See* Final Act. 11; Appeal Br. 26.

### Limitation (a)

Limitation (a) of claim 1 recites "presenting a viewable menu having a user selectable panel of *settings describing elements on a website*" and "to accept one or more of said *selectable settings* in said panel as inputs."

Over the course of this reexamination, the Examiner and Appellant have discussed a variety of items in VDM '316 that might teach the claimed "settings," but the following four, focused on by the Examiner in the Answer, are sufficient to resolve the disputes currently before us:

10

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

    1)  "object weight" (e.g., button 482 in Figure 4(h));

    2)  "height/width"[7] of an object (e.g., areas 488–489 in Figure 4(h));

    3)  "position of the object" (e.g., buttons 491–494 in Figure 4(i)); and

    4)  "privacy level" (e.g., buttons 451–455 in Figure 4(d)).

Ans. 8–9 (emphasis omitted). We address each of these in turn.

<p align="center">Object Weight</p>

The Examiner relied on "object weight" as a claimed "setting" in the Final Office Action. Final Act. 10. The Appeal Brief acknowledges the Examiner's reliance on "object weight" but does not directly challenge "object weight" as a "setting." Appeal Br. 37, 44–45. In the Reply Brief, Appellant argues that "[t]he Examiner has never sufficiently explained even what 'object weight' is, let alone why it would allegedly affect the display generated." Reply Br. 8; *see also* Ex. A, Weadock Decl. ¶ 130.

To the extent Appellant's argument is not forfeited as a new argument in a reply brief, Appellant's argument is not persuasive. VDM '316 adequately explains what "object weight" is, and it teaches a "setting."

Figure 4(h) of VDM '316 is reproduced below and depicts several of the items that the Examiner associates with the claimed "settings":

---

[7] *See also* Appeal Br. 61 ("natural size (synonymous with width/height)").

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1



**Figure 4(h)**

"FIG. 4(h) shows a window 480 . . . to allow the diary owner to add his own image entries to his diary." Ex. 1005, VDM '316, 11:50–52. Although Figure 4(h) depicts adding a new content entry, a diary owner can change properties of an existing content object via a similar window. *Id.* at 12:24–28. In Figure 4(h), button 482 (the second button on the top row of buttons) is used "to set a weight." *Id.* at 11:54–61. "Image weights are used, for example, when a series of images are available . . . so that applet 112 can order the images if needed." *Id.* at 11:61–64.

We agree with the Examiner that the object weight in VDM '316 is "an attribute of an object" that is "available for selection." Ans. 8–9. The user selects the weight of an object via button 482 in Figure 4(h), and the applet uses the weights of each object to order them in the website. Accordingly, object weight teaches or suggests a user selectable "setting" describing an element on a website as required in claim 1.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

### Height & Width

In Figure 4(h) of VDM '316, reproduced in the previous section, window 480 is used "to allow the diary owner to add his own image entries to his diary." Ex. 1005, VDM '316, 11:50–52. "This requires specifying the address (such as the URL) of the image (in area 487), as well as *the real width and height of the image in areas 488 and 489*." *Id.* at 11:52–54 (emphasis added).

VDM '362 calls this an annotation storing "a natural size for the object." Ex. 1006, VDM '362, 7:10–13, 7:56–58. Figure 14 of VDM '362 shows a window very similar to Figure 4(h) of VDM '316, including boxes for "Width" and "Height." VDM '362 explains that the window in Figure 14 "includes box 1415 for inputting a width annotation and a box 1420 for inputting a height annotation." *Id.* at 8:12–14.

Appellant argues that "the height and width of an object (and therefore its natural size) are not 'user selectable settings' because these are fixed properties of the object ('the real width and height') that are not selectable by a user." Appeal Br. 62 (citing Ex. A, Weadock Decl. ¶ 153; Ex. 1005, VDM '316, 11:52–54); Reply Br. 8–9. According to Appellant, for a URL linking to a given image, "the diary owner must enter the fixed object dimensions because those are the known properties of the object that exists at the specified URL" and "[t]he diary owner cannot enter different numbers." Appeal Br. 63 (citing Ex. A, Weadock Decl. ¶ 153; Ex. 1005, VDM '316, 11:52–54).

Appellant's argument is not persuasive. We agree with the Examiner that "there is an explicit teaching that the user specifies the width and height of the image." Ans. 15. Figure 4(h) of VDM '316 and Figure 14 of

13

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

VDM '362 show text entry boxes for the user to enter a height and width.
Appellant has not pointed to anything that *requires* the user to enter the
image's *actual* height or width.  For example, Table 1 of VDM '316 shows
samples of what image height and width look like in HTML (e.g.,
<img src="product.jpg" width="200" height="120">).  *See also* Ex. A,
Weadock Decl. ¶ 154 (acknowledging same).  Whether an HTML width and
height match an image's actual width and height is not unique or special to
VDM '316 or VDM '362.  And given that Mr. Weadock concedes a person
of ordinary skill in the art would have had several years of experience in
web design (¶ 16), the prior art need not explain the basic functions of how
HTML or web browsers work for images, including how to upscale or
downscale the image when the HTML height and width differ from the
actual height and width (e.g., if the diary owner wants the image to appear in
the website as only half of the actual height and width).

    Appellant further argues that in VDM '316, the page design of the
cover/template and not the height and width entered in Figure 4(h)
determines the size and location of the "slots" within the page.  Appeal Br.
64–66 (citing Ex. A, Weadock Decl. ¶¶ 153, 155, 156; Ex. 1005, VDM '316,
5:16–17, Fig. 12).

    This is not persuasive because a "slot" or "bounding box" is not the
image.  Neither Appellant nor Mr. Weadock explain why they conflate the
image size with the slot size.  *See, e.g.*, Ex. A, Weadock Decl. ¶ 155.
Instead, VDM '316 explains that a "content object" such as an image "is
displayed *in* one of the slots provided by the page design of the page," not
that the image *is* that slot.  Ex. 1005, VDM '316, 5:19–22 (emphasis added).

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

Appellant has not provided any evidence or argument that the image size must equal the slot size. For example, if the user selected a height and width for an object that were smaller than the slot that image was in, there is no evidence that the image size would be expanded to fit the slot size and ignore the specific image height and width entered by the user.

Height and width are "an attribute of an object," and given that the user is able to type in the desired height and width, that attribute is "available for selection." Accordingly, the height and width teach or suggest a user selectable "setting" describing an element on a website as required in claim 1.

<u>Change the Position</u>

A sample window to change an object's position is shown in Figure 4(i) of VDM '316 and reproduced below:



**Figure 4(i)**

15

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

"FIG. 4(i) . . . enables a diary owner to modify content entries that are already in the diary." Ex. 1005, VDM '316, 12:12–15. "Window 490 offers an owner the ability to modify the position of the entry in the section: move to top position; move one position up; move one position down; move to bottom position (buttons 491, 492, 493, and 494) . . . ." *Id.* at 12:19–24. For example, "[i]f the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position," then the position of the smiley face in Figure 4(j) will be moved to the position in Figure 4(m). *Id.* at 13:11–25.

The Examiner relied on these changes in position as claimed "settings." Final Act. 10. The Appeal Brief acknowledges the Examiner's reliance on changing position but does not directly challenge changing position for limitation (a), instead arguing it under limitation (b) (i.e., "generating a display . . . substantially contemporaneously . . . "). Appeal Br. 37, 41, 42–43, 53–54. However, the Reply Brief argues, "The Examiner does not sufficiently explain how this is a user selectable attribute of the object, rather than of the diary." Reply Br. 8 (citing "*See* Appeal Br. 53-55"); *see also* Ex. A, Weadock Decl. ¶¶ 101, 104, 105.

To the extent Appellant's argument is not forfeited as a new argument in a reply brief, the argument is conclusory and not persuasive. The position of an object is an "attribute of an object" (e.g., the attribute of where that object is located) and that position is "available for selection" (e.g., top or bottom). Accordingly, the position of an object teaches or suggests a user selectable "setting" describing an element on a website as recited in claim 1.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

Privacy Level

A sample of the user interface to set the privacy level is shown in Figure 4(d), which is reproduced below:



**Figure 4(d)**

"FIG. 4(d) shows a window 450" that "allows a user of the diary to set a privacy level at which the diary is operating," including levels for (1) "world"; (2) "friend"; (3) "close friend"; (4) "best friend"; and (5) "owner," via buttons 451 to 455, respectively. Ex. 1005, VDM '316, 10:36–41. The privacy level "determines which sections and which objects will be visible during browsing through the diary." *Id.* at 10:43–45. In particular, "the diary applet generates HTML only for those portions of the diary that have a privacy level lower than or equal to the privacy level of the viewer who is viewing the diary." *Id.* at 18:15–20.

Appellant argues that the "privacy level setting is a privacy level for the entire diary, not a particular object." Reply Br. 7–8 (quotation marks

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

omitted for quotation from Appeal Br. 73) (citing Ex. A, Weadock Decl.
¶ 115; Ex. 1005, VDM '316, 10:29–31); Appeal Br. 73–77 (further citing
Ex. A, Weadock Decl. ¶¶ 116–17).

However, Appellant's argument is contradicted by the disclosures in
VDM '316. Ans. 17–18. Although the privacy button 438 in Figure 4(a)
does open the window 450 in Figure 4(d) to set a privacy level for the diary
as a whole (Ex. 1005, VDM '316, 10:29–37), VDM '316 discloses that a
privacy level can also be set for "pages, sections, or content objects." *Id.* at
18:13–15. For example, button 485 in Figure 4(h) is used to set the privacy
level for *an individual content object*, such as a single image. *Id.* at 11:59–
60. Even focusing on Figure 4(d), VDM '316 discloses that "FIG. 4(d)
shows an exemplary Privacy window that allows an owner to set the privacy
attributes of a diary section *or content object*." *Id.* at 3:57–59 (emphasis
added); *see also* Appeal Br. 74 (quoting same). Thus, VDM '316 is
unambiguous that a privacy level can be set for an individual content object.

The privacy level of an object is an "attribute of an object" and as
shown in the figures it is "available for selection." Accordingly, the privacy
level of an object teaches or suggests a user selectable "setting" describing
an element on a website as required in claim 1.

Accordingly, Appellant has not shown error in the Examiner's
determination that the cited art teaches or suggests limitation (a).

*Limitation (b)*

Limitation (b) of claim 1 recites "generating a display in accordance
with one or more user selected settings substantially contemporaneously
with the selection thereof."

18

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

Appellant argues that the Examiner's "settings" do not result in a display that is "substantially contemporaneous" with the selection of that setting because (A) the display is only updated after activating an accept button, (B) the display is only updated "eventually," or (C) no display is updated. *See* Appeal Br. 45–58, 62–83 (arguing limitation (b) under a heading for limitation (c)). We address each contention below.

<div align="center">The Accept Button</div>

Appellant argues that "[i]n all the figures from VDM '316 and VDM '362 that disclose accepting a user input in the Java diary applet window, the user must click an 'accept' button after making a selection or an edit, which precludes the recited substantially contemporaneous display." Appeal Br. 46 (citing Ex. 1005, VDM '316, Figs. 4(h)–(i); Ex. 1006, VDM '362, Figs. 14–15; Ex. A, Weadock Decl. ¶ 132). According to Appellant, "the screen is static when selections are made" and "if the accept button is never clicked, the user will never see the effects of the selection *at all*." *Id.* at 49 (citing Ex. A, Weadock Decl. ¶¶ 109, 132, 140, 147, 159).

Yet Appellant's argument does not accurately reflect the disclosures of VDM '316. An accept button 406 is shown in Figures 4(b)–(e), (h), and (i), amongst others. At a high level, VDM '316 states that "[i]n the window of FIG. 4(b) and others of the windows mentioned below, the user can click cancel 405 or accept 406 to cancel or accept any changes he has made." Ex. 1005, VDM '316, 10:13–15. But VDM '316 goes on to explain the accept button in more detail later in the disclosure:

> If the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will eventually regenerate the diary page to look like the diary page in FIG. 4(m). Note that the selected content object

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

> has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page). Applet 112 communicates with the browser to display the regenerated HTML of the diary page. *Once the diary owner clicks on accept button 406* of FIG. 4(i), applet 112 is caused to *exit edit mode* (via another executable program) *and regenerates the diary page without handle 499 to yield a page such as the page of FIG. 4(n), where content object 401 is again displayed in its new position, but without a handle*.

Ex. 1005, VDM '316, 13:22–35 (emphasis added). This paragraph explains that the display is regenerated *multiple* times. First, the display is regenerated when an edit is made (e.g., changing position of an item), which occurs *before* the accept button is pressed and while still in edit mode. Second, the display is again regenerated once the accept button is pressed, which will "exit edit mode" and remove the "handle" used to edit items while in edit mode.

This process is clearly illustrated in the drawings. Figure 4(j) shows an image of a smiley face begins in the upper left. *See* Ex. 1005, VDM '316, 13:11–16, 4:5–6. The smiley face has an "EDIT" button because the user is in edit mode. *Id.* After the user presses buttons to change the position of the image, the screen is regenerated in Figure 4(m) to move the smiley face to the lower right but still show the "EDIT" button due to still being in edit mode. *Id.* at 13:22–30, 4:13–15 ("FIG. 4(m) shows an exemplary diary page after a content object has been moved, but while the page is still in edit mode."). Finally, as shown in Figure 4(n), after accept button 406 is selected, the screen is again regenerated with the smiley face staying in the same location (lower right) but the "EDIT" button removed because the system has exited edit mode. *Id.* at 13:30–35, 4:16–17

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

("FIG. 4(n) shows an exemplary diary page after a content object has been moved, and after an exit from edit mode.").

Appellant's assertions that the accept button must be selected in order to see any change in the display is therefore contradicted by the record.

<u>Displaying "Eventually" vs. "At the Same Time"</u>

Appellant argues "VDM'316 expressly states . . . that display only occurs 'eventually' after HTML is generated," not "substantially contemporaneously" as claimed. Appeal Br. 46 (citing Ex. 1005, VDM '316, 13:22–25; Ex. A, Weadock Decl. ¶ 106). In particular, Appellant relies on the following sentence from VDM '316: "If the diary owner indicates via *several presses of button 494* of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will *eventually* regenerate the diary page to look like the diary page in FIG. 4(m)." Ex. 1005, VDM '316, 13:22–25 (emphasis added).

The Examiner, on the other hand, determines that "column 12, lines 44-column 13 and figure 4l . . . state[] the method of [Figure] 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and **at the same time**, uses the browser as a vehicle to handle the actual display and diary owner input." Ans. 10. In particular, a sentence one paragraph earlier in VDM '316 states that "[t]he method of FIG. 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, *at the same time*, uses the browser as a vehicle to handle the actual display and diary owner input." Ex. 1005, VDM '316, 13:3–7 (emphasis added).

We are not persuaded by Appellant's argument, which fails to adequately address that "substantially contemporaneously" is from the

21

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

*human user's* perspective, not the computer's perspective. For background, VDM '316 discloses that a "diary owner can edit existing diary content and layout by entering an edit mode" and a "[d]iary applet regenerates the page to reflect the editing changes and passes it to the browser for display." Ex. 1005, VDM '316, 2:57–62. More specifically, "diary applet 112 regenerates the HTML for the diary page to reflect the edit, after which the HTML is displayed by browser 110." *Id.* at 12:61–64.

The particular sentence relied on by Appellant discusses an example of moving an existing content object to the bottom (i.e., lower right) of the diary while in edit mode. Ex. 1005, VDM '316, 13:11–30. The browser and the applet have different roles, such as the browser notifying the applet (via an executable program in the HTML) that a handle of a content object has been clicked and the applet providing a window with buttons to edit the object. *Id.* at 13:11–21. After an edit has been made (using the window created by the applet), the applet regenerates the HTML and sends the regenerated HTML to the browser, which then displays a webpage from the HTML. *Id.* at 13:11–14, 13:22–30. The sentence relied upon by Appellant and the sentences that follow it are reproduced below:

> If the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will *eventually regenerate the diary page to look like the diary page in FIG. 4(m)*. Note that the selected content object has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page). *Applet 112 communicates with the browser to display the regenerated HTML of the diary page.*

Ex. 1005, VDM '316, 13:22–30 (emphasis added). Given this context, Appellant's declarant Mr. Weadock argues that the word "eventually" refers

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

to the amount of time it takes for the applet to regenerate the HTML for the
diary page that incorporates the edit (e.g., moving the smiley face to the
bottom) and then send that regenerated HTML to the browser for display:
"changes . . . would not have been immediately displayed after editing . . .
because of the delay from additional processing required to rebuild the
HTML and display it in the browser." Ex. A, Weadock Decl. ¶ 109; *see also
id.* ¶ 107 ("the delay involved in building and rebuilding the HTML");
Appeal Br. 57–58 ("VDM '316 . . . uses a divided browser and applet, which
necessitated jumping through the hoops in FIG. 4(l). And, as a result,
VDM '316 states that the display only can be updated 'eventually.'"
(citations omitted)).

As an initial matter, Appellant's argument that the separation between
the applet and the browser in VDM '316 creates an unacceptable delay is
moot because, as the Examiner correctly points out, VDM '316 discloses
this separation is not necessary. Ans. 13. "For example, diary applet 112
could[] instead be implemented *as a plug-in to browser 110.* This has the
advantage of being free of the Java 'sandbox' . . . ." Ex. 1005, VDM '316,
18:48–50 (emphasis added). "The functionality of the diary applet 112
could also be implemented *in the browser.*" *Id.* at 18:52–53 (emphasis
added). Thus, Appellant's argument that the '397 patent differs from
VDM '316 by teaching the settings and display "rendered in the *same user
interface*, rather than in a divided applet and browser" is not persuasive
because VDM '316 also teaches that alternative (e.g., implementing both "in
the browser"). Appeal Br. 56.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

Even narrowly considering the separated embodiment in VDM '316,
Appellant's argument is unsubstantiated. Ans. 12. To be sure, from the
*computer's* perspective, there will be some delay in VDM '316 after a button
is selected while the applet regenerates the HTML and sends the regenerated
HTML to the browser. But Appellant fails to provide sufficient evidence
that this delay will be significant or noticeable from the *human user's*
perspective. To the contrary, whereas VDM '316 immediately notifies the
applet of a button selection and begins responding, the '397 patent discloses
a slower method of polling for changes as little as every 100 milliseconds.
*E.g.*, Ex. 1001, '397 patent, Fig. 9, 23:30–32 ("In one implementation, the
polling loop is set at a poll rate of once every 100 milliseconds or less."); *see
also* Ans. 10–12. The '397 patent discloses that even this delay of up to 100
milliseconds from polling still qualifies as "near continuous, at least from a
human perception point of view." Ex. 1001, '397 patent, 23:21–24. Then
after waiting up to 100 milliseconds for the next polling, the '397 patent
itself does further processing, including calling a build engine if necessary to
process changes, using JavaScript or Java. *E.g.*, *id.* at 12:51–56 (in response
to a mouse click on a combo box), 12:49–50 (in response to a spin control),
11:40–43 (in response to inputting an image URL).

Beyond conclusory assertions that the '397 patent is "substantially
contemporaneous" but VDM '316 is not, neither Appellant nor
Mr. Weadock provide any substantive analysis of the actual amount of time
it would take to regenerate an HTML file and send that file to a browser, let
alone how that time compares to the '397 patent's up to 100 milliseconds for
polling followed by its own processing time. For example, Figures 4(a), (j),

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

(m), and (n) depict diary pages with only a single image, and it is unclear
whether or why Appellant and Mr. Weadock think a human user would even
notice the amount of time it would have taken to generate such simple pages.
"Lack of factual support for expert opinion going to factual determinations,
however, may render the testimony of little probative value in a validity
determination." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776
F.2d 281, 294 (Fed. Cir. 1985).

More perplexing, though only briefly discussed by either Appellant
(Appeal Br. 53–54) or Mr. Weadock (¶ 106), is the beginning portion of that
sentence: "If the diary owner indicates via *several* presses of button 494 of
FIG. 4(i) that the content object is to move to the bottom position, . . . ."
Ex. 1005, VDM '316, 13:22–24 (emphasis added). Button 494 is indicated
to be the "move to bottom position" button, and it is not clear why a user
would need to press the "move to bottom position" button multiple times in
a row rather than just once. *See id.* at 12:19–23. Several presses of the
"move *one* position down" button would make sense in order to move
multiple positions down, but that is indicated to be button 493 in Figure 4(i),
not button 494. *See id.* Regardless, even if several presses of a button were
required in order to activate the button once, "the selection" recited in
limitation (b) would not be complete until the *last* button press, and
Appellant provides no further analysis as to whether the regenerated display
would be substantially contemporaneous with the *last* button press. In an

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

analogous scenario, if a user wants to activate an icon by double clicking it, the user expects the icon to activate on the *last* click, not the *first*. [8]

Finally, it is important to keep in mind that the single sentence Appellant focuses on is only one example from VDM '316 and specific to changing position. *See* Ex. 1005, VDM '316, 13:11 (introducing that paragraph with "Thus, for example, . . ."). None of the other descriptions or examples in VDM '316 discuss pressing the same button multiple times or regenerating "eventually." *E.g.*, *id.* at 2:57–62, 9:10–14 ("diary applet 112 displays a navigator bar or some other appropriate user interface . . . and thereafter reacts to the actions of the user to view or change the diary"), 10:28–54 (setting privacy level), 11:50–62 (adding new content with height, width, privacy level, and object weight), 12:11–28 (modifying existing content), 12:44–64 (same), Fig. 4(l) (flowchart for editing existing content). Nor would a person of ordinary skill in the art have expected that a user would have to press the same privacy level button multiple times in a row or type in the same image height multiple times in a row.

To the extent Appellant makes a similar argument regarding the use of the word "Finally" in Figure 4(l), *see* Appeal Br. 53, that argument is even less persuasive. The relevant portion of Figure 4(l) is reproduced below:

---

[8] We also note that claim 1 is a method step so the prior art need only teach or suggest substantially contemporaneous with *any one* selection (e.g., the last press of button 494), not *all* selections.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

<div style="border: 1px solid black; padding: 10px;">

**Flowchart**

The above operations are implemented through control by means of dynamic HTML generation. A flowchart is given below in figure 11.

- By setting the W3Diary in edit mode, the HTML generator re-generates the page and adds object control handles (in this case of type "edit") to the page
- The user clicks on a control handle. The handle identification is passed on to the HTML generation engine (by JavaScript in the current embodiment)
- Any appropriate action is executed on the object identified by the handle and represented in HTML
- Finally, a new (updated) page is generated and displayed.

</div>

"FIG. 4(l) is a flow chart showing how an edit is performed on content during edit mode." Ex. 1005, VDM '316, 4:11–12; *see also id.* at 12:44–64. As seen above, Figure 4(l) includes four bullet points outlining the process, the last of which says, "Finally, a new (updated) page is generated and displayed." Here, on its face, the word "Finally" merely refers to being the last of the bullet points. It in no way implies that the time required to generate and display the "new (updated) page" is so long that it would not be substantially contemporaneous from a human user's perspective.

Thus, Appellant's narrow focus and assumptions on the word "eventually" fail to adequately address the claim construction that Appellant has asked for and fails to provide factual support for its conclusory assumptions.

<div align="center">Privacy Level</div>

Appellant makes two additional arguments specific to the privacy level in VDM '316. *See* Appeal Br. 73–83.

First, Appellant argues that the privacy level for objects "affects how the diary is displayed *to others*, not how it is displayed *to the user using the button*; only if a person not authorized to see all objects were to someday log in would it affect what is displayed." Reply Br. 7–8 (emphasis added) (citing Ex. A, Weadock Decl. ¶ 115); *see also* Appeal Br. 80–82 (citing

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

Ex. A, Weadock Decl. ¶ 122). Appellant argues that "[t]he only plausible way for a display . . . to be generated 'substantially contemporaneously' . . . is if the diary owner selects or enters the values *and perceives the display*." Appeal Br. 81–82 (emphasis modified). But neither the user's perception nor a change in the resulting image is recited in the claim. Limitation (b) recites "generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof." Thus, what is claimed is the generation of the display, not the user's perception of a noticeable difference. When a content object has had its privacy level changed and its page is regenerated, the diary owner can see that modified content object in the regenerated HTML precisely because the diary owner's security level meets or exceeds the object's modified privacy level. Put another way, the HTML is regenerated by comparing the diary owner's security level with the object's modified privacy level. The regenerated HTML therefore is generated "in accordance with" the modified privacy level, regardless whether the user notices any change in that display.

Second, VDM '316 requires entering a password to change the privacy level of an object. *E.g.*, Ex. 1005, VDM '316, 10:41–43, 10:45–48. In Figure 4(d), the user types a password in the text entry box of area 456, next to which is "OK" button 457.[9] Appellant argues that "[i]f the diary owner or user fails to click OK, nothing will happen to the display." Appeal

---

[9] VDM '316 initially introduces "a password supplied in area 456," but later mistakenly swaps the labels for 456 and 457 when referring to "OK button 456" and "password in area 457." *See* Ex. 1005, VDM '316, 10:41–49. However, a person of ordinary skill in the art would have understood from the text when the text meant an OK button rather than a password area.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

Br. 78 (citing Ex. 1005, VDM '316, 10:13–15, 10:45–49, 11:25–29).

However, it is unclear what Appellant's factual basis for this assertion is.

Appellant's first citation (10:13–15) discusses the buttons for "cancel 405 or

accept 406," not OK button 457. Appellant's third citation (11:25–29)

discusses entering a password but never mentions any button, let alone OK

button 457. Appellant's second citation discloses the following:

> If the user selects the owner privacy level (button 455) and can
> supply a correct password in area [456], after clicking OK button
> [457], buttons 440, 442, 444, and 446 of FIG. 4(a) become
> available to the owner. Otherwise these buttons are grayed out.

Ex. 1005, VDM '316, 10:45–49. This text says that clicking OK button 457

is required to make various buttons in Figure 4(a) available to the owner, but

it says nothing about whether clicking OK button 457 is required to

regenerate the display for buttons 451 through 455 in Figure 4(d).

Moreover, even leaving aside the OK button and focusing on the password,

Appellant fails to point to anything in VDM '316 requiring (A) entry of the

password *after* selecting the privacy level rather than *before* or (B) *re-*

*entering* the password if it had already been entered for a previous change.

Appellant therefore fails to provide an adequate factual basis for challenging

the Examiner's findings with respect to privacy level.

Accordingly, Appellant has not shown error in the Examiner's

determination that the cited art teaches or suggests limitation (b). [10]

---

[10] Given our determination above, we need not reach whether limitation (b)
may also be met by simply changing the display of a button when it is
selected (e.g., changing the color of a button when pressed or making the
button look depressed) or displaying text as it is typed in a text box (e.g., in
the text box for height or width).

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

*Limitation (c)*

Limitation (c) of claim 1 recites "storing information representative of said one or more user selected settings in a database."

Appellant argues that the AUA database stores "*addresses* to content," "not settings." Appeal Br. 60 (citing Ex. 1006, VDM '362, 2:3–5). According to Appellant, "user configurations are *not* stored in the AUA database, but rather in a distinct configuration file." *Id.* (citing Ex. 1005, VDM '316, 8:59–64, Fig. 10); *see also id.* at 79 (specifically addressing where privacy level is stored and further citing Ex. 1005, VDM '316, 9:2–4, 17:22–24).

The Examiner finds that "VDM '362 more clearly teaches that objects can be stored *with annotations* for controlling aspects of the objects." Ans. 14 (citing Ex. 1006, VDM '362, 2:18–23) (emphasis added). In particular, the Examiner finds "[t]he annotations may include settings such as . . . a privacy level [or] a width/height." *Id.* (citing Ex. 1006, VDM '362, 7:10–31, 8:12–23).

We agree with the Examiner. VDM '316 discloses that "[i]n the described embodiment, diary information stores three basic types of data:" (1) "an AUA-database specifying the content of the diary page(s) that was gathered or created by the user"; (2) "a cover (also called a 'presentation context') for the diary"; and (3) "configuration information for the user." Ex. 1005, VDM '316, 8:59–64. "An AUA is an 'Annotated Universal Address,' as described in U.S. patent application Ser. No. 09/144,717," which later issued as VDM '362. *Id.* at 8:64–65.

VDM '362 discloses that "AUAs . . . identify the location of the objects (the universal address part of the AUA) and have annotations for

30

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

controlling aspects of the objects." Ex. 1006, VDM '362, 2:18–21; *see also id.* at 2:39–41 (same). For instance, "AUA 300 further includes annotations 307, which indicate how to handle some aspect of the object information 132 or the universal address 305." *Id.* at 6:58–60. Examples of "annotations 307 may include . . . a natural size for the object, . . . a privacy level, a type of object indicator, etc." *Id.* at 7:10–13.

VDM '362 provides a more specific example of height and width as annotations. Figure 14 of VDM '362 shows a window very similar to Figure 4(h) of VDM '316 that allows the user to input an object such as an image, including boxes for height and width of the image. Ex. 1006, VDM '362, 8:6–9; Ex. 1005, VDM '316, 11:50–52. VDM '362 expressly refers to these boxes as inputting *annotations*: "Window 1400 further includes box 1415 for inputting a *width annotation* and a box 1420 for inputting a *height annotation.*" Ex. 1006, VDM '362, 8:12–14 (emphasis added).

VDM '362 also provides a more specific example involving privacy level as part of an AUA: "For example, the AUA 134 may include a privacy level indicating that the AUA 134 should not be presented unless the user has the same privacy level or higher. The privacy level . . . may be defined by the user based on a response to a query." Ex. 1006, VDM '362, 7:21–26.

VDM '316 does state that "privacy level" can be an example of the "configuration information." *See* Ex. 1005, VDM '316, 9:2–4 ("The configuration information, such as privacy level, passwords, or the full name of the user, is user-specific."). To the extent this refers to the privacy level of the *diary* as a whole (*see* Ex. 1005, VDM '316, 3:57–59), similar to how the "full name of the user" also would be the same for the entire diary, that

31

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

disclosure would still be consistent with the disclosure of VDM '362 that a privacy level of an *object* is part of the AUA, which is stored in the AUA database. Regardless, VDM '362 must be considered for all it teaches.

Appellant does not provide any further argument specific to object weight or object position for limitation (c). As with the other examples discussed above, object weight and object position are "for controlling aspects of the object," and therefore it would have been obvious to a person of ordinary skill in the art to store them as annotations to the object in the AUA database. *See also* Ex. 1005, VDM '316, 13:22–37 ("positional change is saved in the user's diary information 122").

Accordingly, Appellant has not shown error in the Examiner's determination that the cited art teaches or suggests limitation (c).

*Limitation (d)*

Limitation (d) of claim 1 recites "generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database."

Appellant argues that "none of the passages that the Final Office Action cites discloses retrieving information from a database." Appeal Br. 84. "And to the extent that certain *content* may be stored in an AUA database, content is different from user selected settings (object attributes)." *Id.*

We are not persuaded by Appellant's argument, which largely relies on the same "settings" arguments that we rejected above. *See* Ans. 18–19. As discussed above, the Examiner relies on changes to objects where the changes are stored and retrieved as annotations in the AUA database.

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

To the extent Appellant argues that VDM '316 only discloses retrieving *content* from the AUA database rather than *annotations* (*see* Ex. 1005, VDM '316, 9:7–9 ("In step 308 [of Figure 3], diary applet 112 generates one or more pages of the diary in HTML in accordance with the cover, *content*, and configuration information." (emphasis added))), this argues the references individually. The annotations of the AUA database are explained in VDM '362, not VDM '316.

Moreover, even VDM '316 is clear that the Examiner's "settings" are retrieved and displayed in regenerated HTML files. For example, VDM '316 discloses, "A Diary applet regenerates the page to reflect the editing changes and passes it to the browser for display." Ex. 1005, VDM '316, 2:60–62; *see also id.* at 12:61–64 (similar). More specifically, "[o]ne of the functions of diary applet 112 is to generate the HTML 111 for the Web pages of the user's diary (which preferably are displayed by browser 110 in the browser window)." *Id.* at 6:40–43. To do this, "[d]iary applet 112 reads diary information 114 received from the server and generates HTML 111 for one or more diary pages in accordance with diary information 114." *Id.* at 7:1–3. As discussed above, "diary information 114" "stores three basic types of data," one of which is "an AUA-database specifying the content of the diary page(s) that was gathered or created by the user." *Id.* at 8:57–66. "FIG. 10 lists exemplary files provided to generate the contents of diary pages," and the first file listed in Figure 10 is "AUA-Database." *Id.* at 4:42–44.

VDM '316 also discloses specific examples of generating HTML files using the privacy levels and positions of objects. *E.g.*, Ex. 1005, VDM '316,

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

18:15–25 ("the diary applet generates HTML only for those portions of the diary that have a privacy level lower than or equal to the privacy level of the viewer who is viewing the diary"), 11:25–29 ("diary applet 112 will generate HTML . . . of objects having those privacy levels"), 13:22–28 ("If the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will eventually regenerate the diary page to look like the diary page in FIG. 4(m). Note that the selected content object [in FIG. 4(m)] has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page)."). VDM '316 also shows drawings of displayed webpages with images having height, width, and position, all of which are stored as annotations in the AUA database. *E.g.*, *id.* at Figs. 4(a), 4(j), 4(m), 4(n).

Accordingly, Appellant has not shown error in the Examiner's determination that the cited art teaches or suggests limitation (d).

*Limitation (e)*

Limitation (e) of claim 1 recites "building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages."

Appellant argues that "none of the cited passages discloses 'generat[ing] virtual machine commands for the display of at least a portion of said one or more web pages' and the Final Office Action does not identify

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

any such virtual machine commands that are generated at runtime." Appeal
Br. 88.

The Examiner explains that "VDM '316 discloses a 'diary applet' that
runs in a browser and makes use of a Java Virtual Machine." Ans. 8 (citing
Ex. 1005, VDM '316, 6:52–56, 7:1–11); *see also* Final Act. 12. "VDM '316
discloses the buttons 482-486 within window 480 [in Figure 4(h)] and
buttons 491-494 within window 490 [in Figure 4(i)] correspond to
commands to said virtual machine" and "translate to instructions to the 'Java
Virtual Machine' running the diary applet." Ans. 8; *see also* Final Act. 12.

VDM '316 confirms that when the diary owner clicks on a control
handle, "[d]iary applet 112 executes appropriate action(s) on the selected
content object identified by the handle" and "diary applet 112 regenerates
the HTML for the diary page to reflect the edit." Ex. 1005, VDM '316,
12:44–64. Moreover, "the described embodiment uses a Java applet 112."
*Id.* at 6:53–56.

Like VDM '316, the Specification of the '397 patent also discloses
using "JAVA." *E.g.*, Ex. 1001, '397 patent, 1:52–67, 3:4–6. Outside of the
claims, the only appearance of the phrase "virtual machine" in the
Specification of the '397 patent is a single mention of a "JAVA Virtual
Machine" in a different context (involving a thread for user verification). *Id.*
at 35:34–38. VDM '316 similarly once mentions a "Java virtual machine."
Ex. 1005, VDM '316, 15:35–37.

Notably, Appellant does not challenge the Examiner's determination
that the prior art teaches or suggests the portion of limitation (a) reciting "at
least one of said user selectable settings in said panel corresponds to

35

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

commands to said virtual machine," where "said virtual machine" refers back to the preamble's introduction of "a virtual machine capable of generating displays." Appellant also does not challenge the Examiner's finding that a Java applet uses a virtual machine and virtual machine commands.

Given that VDM '316 discloses using a Java applet, Java uses a virtual machine, and Appellant does not dispute that VDM '316 teaches or suggests "commands to said virtual machine" in limitation (a), Appellant's argument here for limitation (e) is conclusory, unsupported, and unpersuasive.

Accordingly, Appellant has not shown error in the Examiner's determination that the cited art teaches or suggests limitation (e).

## Conclusion

For the reasons discussed above, we sustain the Examiner's rejection of claim 1.

## OUTCOME

The following table summarizes the outcome of the rejection:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1 | 103 | VDM '316, VDM '362 | 1 | |

## TIME TO RESPOND

Requests for extensions of time in this *ex parte* reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1

Patent Owner:

LOWENSTEIN & WEATHERWAX LLP
1880 CENTURY PARK EAST, SUITE 815
LOS ANGELES, CA 90067

Third Party Requester:

ROPES & GRAY LLP
IPRM DOCKETING - FLOOR 43 PRUDENTIAL TOWER, 800
BOYLSTON STREET
BOSTON, MA 02199-3600