**Docket No. 2023-1076**

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

In re: EXPRESS MOBILE, INC.,

*Appellant.*

*Appeal from the United States Patent and Trademark Office*
*in Case No. 90/014,615 · Michael James Engle, Administrative Patent Judge*
*Daniel J. Galligan, Administrative Patent Judge · Allen R. MacDonald, Administrative Patent Judge.*

## BRIEF FOR APPELLANT EXPRESS MOBILE, INC.

ROBERT F. KRAMER, ESQ.
DAVID ALBERTI, ESQ.
SAL LIM, ESQ.
JAMES P. BARABAS, ESQ.
KRAMER ALBERTI LIM & TONKOVICH LLP
577 Airport Boulevard, Suite 250
Burlingame, California 94010
Telephone: 650 825-4300
rkramer@kramerday.com
dalberti@kramerday.com
slim@kramerday.com
jbarabas@kramerday.com

KENNETH J. WEATHERWAX, ESQ.
LOWENSTEIN & WEATHERWAX LLP
1016 Pico Boulevard
Santa Monica, California 90405
Telephone: 310 307-4500
weatherwax@lowensteinweatherwax.com

*Attorneys for Appellant Express Mobile, Inc.*

COUNSEL PRESS · (213) 680-2300 PRINTED ON RECYCLED PAPER

## PATENT CLAIMS AT ISSUE

## Fed. Cir. R. 28(a)(12)

**U.S. Patent No. 6,546,397 – Claim 1**

1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:
(a) presenting a viewable menu having a user selectable panel of settings describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;
(b) generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;
(c) storing information representative of said one or more user selected settings in a database;
(d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and
(e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

## CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. Rule 47.4, counsel for the Appellant Express Mobile, Inc. certifies the following:

1. **Represented Entities**. The full name of all entities represented by me is: Express Mobile, Inc.

2. **Real Party in Interest**. The full name of the real party in interest for the entities is: None.

3. **Parent Corporations and Stockholders**. The full names of all parent corporations for the entity and any publicly held companies that own 10 percent or more stock in the entities represented by me are: None.

4. **Legal Representatives**. All law firms, partners, and associates that (a) appeared for the entity in the originating agency, or (b) are expected to appear in this court for the entity are: Bridget A. Smith, Lowenstein & Weatherwax LLP (no longer with firm).

5. **Related Cases**. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

*Express Mobile, Inc. v. Facebook, Inc.*, IPR2020-01224 (PTAB);
*Express Mobile, Inc. v. Google LLC*, No. 3:21-cv-08944 (N.D. Cal.);
*Express Mobile, Inc. v. Meta Platforms, Inc.*, No. 3:21-cv-06657 (N.D. Cal.);
*Express Mobile, Inc. v. Facebook, Inc.*, IPR2020-01226 (PTAB);
*Express Mobile, Inc. v. Atlassian Corp. PLC*, No. 3:21-cv-08942 (N.D. Cal.);
*Express Mobile, Inc. v. eBay Inc.*, No. 3:21-cv-06656 (N.D. Cal.);
*Express Mobile, Inc. v. Salesforce.com, Inc.*, No. 3-20-cv-08461 (N.D. Cal.);
*Express Mobile, Inc. v. SAP SE*, No. 3-20-cv-08492 (N.D. Cal.);
*Express Mobile, Inc. v. Oath Holdings Inc.*, No. 3-20-cv-08321 (N.D. Cal.);

*Shopify Inc. v. Express Mobile, Inc.*, No. 1-19-cv-00439 (D. Del.);
*Express Mobile, Inc. v. GoDaddy.Com, LLC*, No. 1-19-cv-01937 (D. Del.);
*Express Mobile, Inc. v. HubSpot, Inc.*, No. 1-20-cv-01162 (D. Del.);
*Express Mobile, Inc. v. Squarespace, Inc.*, No. 1-20-cv-01163 (D. Del.);
*X.Commerce, Inc. d/b/a Magento, Inc. v. Express Mobile, Inc.*, No. 3-17-cv-02605 (N.D. Cal.);
*Express Mobile, Inc. v. Wix.com, Ltd.*, No. 3-19-cv-06559 (N.D. Cal.);
*Express Mobile, Inc. v. Microsoft Corp.*, No. 3-20-cv-06152 (N.D. Cal.);
*Express Mobile, Inc. v. Adobe Inc.*, No. 3-20-cv-08297 (N.D. Cal.);
*Express Mobile, Inc. v. Pinterest, Inc.*, No. 3-20-cv-08335 (N.D. Cal.);
*Express Mobile, Inc. v. Amazon.com, Inc.*, No. 3-20-cv-08339 (N.D. Cal.);
*Express Mobile, Inc. v. Slack Technologies, Inc.*, No. 3-21-cv-02001 (N.D. Cal.);
*Express Mobile, Inc. v. Web.com Group, Inc.*, No. 3-20-cv-00839 (M.D. Fla.);
*Express Mobile, Inc. v. Expedia, Inc.*, No. 6-20-cv-00801 (W.D. Tex.).

6. Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal case and debtors and trustees in bankruptcy cases: None/Not applicable.

Dated: March 15, 2023

Respectfully submitted,

*/s/ Robert F. Kramer*
Robert F. Kramer
David Alberti
Sal Lim
James P. Barabas
**KRAMER ALBERTI**
**LIM & TONKOVICH LLP**
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Telephone: 650.825.4300

Kenneth J. Weatherwax
**LOWENSTEIN& WEATHERWAX**
1016 Pico Blvd.
Santa Monica, CA. 90405
Telephone: 310 307-4500

*Counsel for Appellant Express Mobile, Inc.*

# TABLE OF CONTENTS


PATENT CLAIMS AT ISSUE ........................................................................ I

CERTIFICATE OF INTEREST .................................................................... ii

TABLE OF CONTENTS ............................................................................ iv

TABLE OF AUTHORITIES ....................................................................... vii

STATEMENT OF RELATED CASES ......................................................... ix

JURISDICTIONAL STATEMENT ................................................................1

INTRODUCTION ........................................................................................2

STATEMENT OF THE ISSUES ..................................................................7

STATEMENT OF THE CASE......................................................................7

A. The Patent's What-You-See-Is-What-You-Get Technology ..............................................................7

B. Construction of "Substantially Contemporaneously" Term ...........................................10

1. The Prior Correct Constructions ..................................10

2. Substantially Contemporaneous Display In The Written Description Of The Invention ..................12

C. The VDM'316 and VDM'362 Prior Art.................................14

1. Van Der Meer '316—A Personal Diary Tool With Limited Editing Capabilities................................14

2. The Van Der Meer '362 Patent – A Secondary Reference Showing A Database ..................17

D. Procedural History .................................................................19

SUMMARY OF THE ARGUMENT .........................................................20

ARGUMENT .............................................................................................24

I. STANDARD OF REVIEW ....................................................24

A. Claim Construction Is Reviewed *De Novo*. ....................................................24

B. Obviousness Is Reviewed *De Novo*. ....................................................25

C. Factual Findings Are Reviewed For Substantial Evidence. ....................................................26

II. The PTAB Applied An Erroneous Construction of "Substantially Contemporaneous," Despite Purporting To Apply A Narrower One. ....................................................26

A. The Board's Analysis As To the "Accept" Button Was Flawed ....................................................30

B. The Board's Analysis of VDM'316 Displaying "Eventually" Versus "At the Same Time" Was Flawed. ....................................................35

1. VDM'316's Phrase "At the Same Time" Does Not Mean Literally At The Same Time, But "Additionally" Or "Meanwhile," And Does Not Even Suggest Substantially Contemporaneous Display. ....................................................36

2. VDM'316's Use of the Word "Eventually" and Description of Regenerated HTML Show That the Board Effectively Construed "Substantially Contemporaneously" To Merely Mean Occurring At Some Point Afterwards, Including After Additional User Interaction Such As Clicking A Button. ....................................................42

3. The Embodiments of the '397 Patent Did Not Need To Build And Rebuild HTML, and the '397 Patent Does Not Teach That Is What the Polling Technique Is For ....................................................46

4. The Board Ignored Express Mobile's Analysis As to Whether the Regenerated Display in VDM'316 Would Be "Substantially Contemporaneous" With The Last Button Press ....................50

C. The Board's Flawed Analysis Concerning "Privacy Level" ....................53

CONCLUSION ....................59

CERTIFICATE OF COMPLIANCE ....................62

ADDENDUM

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*CFMT, Inc. v. Yieldup Int'l Corp.*,
349 F.3d 1333 (Fed. Cir. 2003) ........................................................26

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) ........................................................27

*D'Agostino v. Mastercard Int'l Inc.*,
844 F.3d 945 (Fed. Cir. 2016) ........................................................ 24, 27

*Dickinson v. Zurko*,
527 U.S. 150 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) ..................................26

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) ........................................................24

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) ........................................................26

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
362 F.3d 1367 (Fed. Cir. 2004) ........................................................28

*Google LLC v. Lee*,
759 F. App'x 992, 996 (Fed. Cir. 2019) ..............................................27

*In re Abbott Diabetes Care Inc.*,
696 F.3d 1142 (Fed. Cir. 2012) ........................................................28

*In re CSB-Sys. Int'l, Inc.*,
832 F.3d 1335 (Fed. Cir. 2016) ........................................................24

*In re Imes*,
778 F.3d 1250 (Fed. Cir. 2015) ........................................................ 25, 26

*In re Lemay*,
660 F. App'x 919 (Fed. Cir. 2016) ......................................................29

*In re Rambus, Inc.*,
753 F.3d 1253 (Fed. Cir. 2014) ........................................................25

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ........................................................26

*Intervet Inc. v. Merial Ltd.*,
617 F.3d 1282 (Fed. Cir. 2010) ........................................................28

*Kaken Pharm. Co. v. Iancu*,
952 F.3d 1346 (Fed. Cir. 2020) ....................................................................24

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ....................................................................25

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009) ....................................................................28

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ......................................................................2

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................25

*Pride Mobility Prod. Corp. v. Permobil, Inc.*,
818 F.3d 1307 (Fed. Cir. 2016) ........................................................ 24, 25, 26

*Renishaw PLC v. Marposs Societá per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) ......................................................................6

*Respironics, Inc. v. Zoll Med. Corp.*,
656 F. App'x 531 (Fed. Cir. 2016) .......................................................... 27, 28

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
329 F.3d 823 (Fed. Cir. 2003) ......................................................................28

*Surgalign Spine Techs., Inc. v. LifeNet Health*,
No. 2021-1117, 2022 WL 1073606 (Fed. Cir. Apr. 11, 2022)......................27

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318, S. Ct. 831, 190 L.Ed.2d 719 (2015) .......................... 24, 25, 26

*TF3 Ltd. v. Tre Milano, LLC*,
894 F.3d 1366 (Fed. Cir. 2018) ....................................................................24

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ...............................................................7, 28

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ..............................................................................1

35 U.S.C. § 103(a) .........................................................................................25

35 U.S.C. § 6(b)(2)...........................................................................................1

## STATEMENT OF RELATED CASES

This is an appeal from a reexamination of U.S. Patent No. 6,546,397 ("the '397 patent") before the Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB" or "the Board"), with Express Mobile, Inc. ("Express Mobile") as patent owner. No appeal in or from this reexamination has previously been before an appellate court.

The patent claim-at-issue in this case has been the subject of three *inter partes* reviews in addition to the present reexamination. In *BigCommerce, Inc. v. Express Mobile Inc.*, IPR2018-00750, a panel of the Board, administrative patent judges ("APJs") Charles J. Boudreau, Amanda F. Wieker, and Jason M. Repko, entered a decision on August 30, 2018 (Paper 10) denying on the merits institution of *inter partes* review of, *inter alia*, the claim-at-issue. In *Google LLC v. Express Mobile, Inc.*, IPR2021-00700, another panel of the Board, APJs Jeffrey S. Smith, Amanda F. Wieker, and Kristi L.R. Sawert, also entered a decision on Oct. 4, 2021 (Paper 7) also denying on the merits institution of *inter partes* review of the claim-at-issue. Finally, in *Express Mobile, Inc. v. Facebook, Inc.*, IPR2021-01224, a third panel of the Board, APJs Jeffrey S. Smith, Mitchell G. Weatherly, and Daniel J. Galligan, entered a final written decision on January 11, 2023 (Paper 45), authored by Board Member Galligan, finding claim 1 of the '397 patent unpatentable. On the same date, in *Express Mobile, Inc. v. Facebook, Inc.*, IPR2020-01226, the Board entered a final

written decision, by the same Board panel and authored by the same Board Member Galligan, finding claims 1–4 and 6 of a continuation of the ’397 patent, U.S. Patent No. 7,594,168, unpatentable. It is noted that APJ Galligan is one of the three Board members on the panel (Galligan, Allen R. MacDonald, and Michael J. Engle) that rendered the decision appealed from in this case.

There are 20 currently stayed district court actions with allegations of infringement of the ’397 patent, as follows:

*Express Mobile, Inc. v. Google LLC*, No. 3:21-cv-08944 (N.D. Cal.)
*Express Mobile, Inc. v. Meta Platforms, Inc.*, No. 3:21-cv-06657 (N.D. Cal.)
*Express Mobile, Inc. v. Atlassian Corp. PLC*, No. 3:21-cv-08942 (N.D. Cal.)
*Express Mobile, Inc. v. eBay Inc.*, No. 3:21-cv-06656 (N.D. Cal.)
*Express Mobile, Inc. v. Salesforce.com, Inc.*, No. 3-20-cv-08461 (N.D. Cal.)
*Express Mobile, Inc. v. SAP SE*, No. 3-20-cv-08492 (N.D. Cal.)
*Express Mobile, Inc. v. Oath Holdings Inc.*, No. 3-20-cv-08321 (N.D. Cal.)
*Shopify Inc. v. Express Mobile, Inc.*, No. 1-19-cv-00439 (D. Del.)
*Express Mobile, Inc. v. GoDaddy.Com*, LLC, No. 1-19-cv-01937 (D. Del.)
*Express Mobile, Inc. v. HubSpot, Inc.*, No. 1-20-cv-01162 (D. Del.)
*Express Mobile, Inc. v. Squarespace, Inc.*, No. 1-20-cv-01163 (D. Del.)
*X.Commerce, Inc. v. Express Mobile, Inc.*, No. 3-17-cv-02605 (N.D. Cal.)
*Express Mobile, Inc. v. Wix.com, Ltd.*, No. 3-19-cv-06559 (N.D. Cal.)
*Express Mobile, Inc. v. Microsoft Corp.*, No. 3-20-cv-06152 (N.D. Cal.)
*Express Mobile, Inc. v. Adobe Inc.*, No. 3-20-cv-08297 (N.D. Cal.)
*Express Mobile, Inc. v. Pinterest, Inc.*, No. 3-20-cv-08335 (N.D. Cal.)
*Express Mobile, Inc. v. Amazon.com, Inc.*, No. 3-20-cv-08339 (N.D. Cal.)
*Express Mobile, Inc. v. Slack Techs., Inc.*, No. 3-21-cv-02001 (N.D. Cal.)
*Express Mobile, Inc. v. Web.com Group, Inc.*, No. 3-20-cv-00839 (M.D. Fla.)
*Express Mobile, Inc. v. Expedia, Inc.*, No. 6-20-cv-00801 (W.D. Tex.).

The above 20 actions also include allegations of infringement of the related ’168 patent mentioned above.

# JURISDICTIONAL STATEMENT

Express Mobile appeals the Board's October 3, 2022 decision an appeal of reexamination under 35 U.S.C. § 6(b)(2). Appx00001-00038. A timely notice of appeal was filed October 20, 2022. Appx03400-03404. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## INTRODUCTION

Before this reexamination, claim 1 of U.S. Pat. No. 6,546,397 ("the '397 patent") had survived two petitions for *inter partes* review, filed years apart, both of which were denied because they failed to show even a reasonable likelihood that Claim 1 was obvious. This third attack, with the benefit of those two prior unsuccessful petitions, and all-new Office personnel assigned to reconsidering the patent grant, succeeded. This third challenge was accepted, though, only because of a broad claim construction that erased the core of the invention—effectively eliminating the requirement for near-instantaneous What-You-See-Is-What-You-Get ("WYSIWYG") depiction of selected changes and, with it, the entire point of the inventor's years of handiwork.

Near the dawn of the internet age, the '397 patent brought together several disparate ideas and concepts to create a pioneering new paradigm for creating, storing, and building web pages, enabling WYSIWYG technology to be used to display selected changes nearly instantaneously. In 1999, defining a web page as a set of user-selected "objects" and/or "settings" was a pioneering way to make and display how the page would look during editing. Using a browser-employing, WYSIWYG environment for website construction for multimedia applications, the invention of the '397 patent required no native website builder software and allowed the website creator to view selected changes to a web page "substantially

contemporaneously" with selecting them—effectively "with the web designer working directly on and with the final web page" during creation and editing. Appx00145, col. 2:36-37. Unlike what was taught in the prior art, and unlike what was possible in the prior art, there was no wait for the browser to rebuild the changed page: what you saw was what you got *immediately*.

In the reexamination proceeding below, the Patent Trial and Appeal Board determinedly adhered to a broader view of the claim than the claimed invention—that has no footing in the written description of the invention, contradicts every district court construction of these claims, and results in claims that easily survived multiple prior attacks now being wrongly found unpatentable.

The claim language "substantially contemporaneously" is at the heart of this appeal. In its obviousness determination, the Board analyzed whether two prior art references by Van Der Meer, U.S. Patent No. 6,415,316 ("VDM'316") and U.S. Patent No. 6,289,362 ("VDM'362"), taught the ordinary artisan at the time of the '397 invention how to display changes to an Internet website "substantially contemporaneously" with their selection, as recited in the claim. The Board panel asserted that it applied the agreed-upon construction of "substantially contemporaneously," *i.e.*, "happening at the same period of time from a human perspective." Had it done so, it would have compared the prior art to the invention. But it did not.

Instead, the Board analyzed the term "substantially contemporaneously" as if it simply means occurring at some point afterwards, including after an additional user interaction (*e.g.*, clicking an accept button). This *much* broader interpretation of "substantially contemporaneously," which the Board applied, is not the invention. It is legal error, and the obviousness determination falls with it.

The proper interpretation of "substantially contemporaneously" sharply distinguishes the invention from prior art systems like Van Der Meer's. In such art, the screen was static when changes are made, or additional input was required from the user before changes were applied. In contrast, with the invention's near-instantaneous WYSIWYG technology, such web-page changes were, for the first time, displayed "substantially contemporaneously." As district courts have agreed, this means happening at the same period of time from a human perspective, much as the position of a character moves in an arcade game in response to movement of a joystick, or television volume changes in response to a television remote control. The Board's much broader interpretation leads to three main errors, which are evident both from the intrinsic evidence and from the unrebutted expert testimony of Glenn Weadock submitted to the Office, and which reflect a fundamental misunderstanding of the patent's detailed description of the invention-at-issue.

First, the erroneous construction led the Board to believe that passages in the Van Der Meer prior art like the following *support*, rather than *undercut*,

obviousness: "*If the diary owner indicates via several presses of button 494* of FIG. 4(i) that the content object is to move to the bottom position, *applet 112 will eventually regenerate the diary page* to look like the diary page in FIG. 4(m)."[1] Appx00020; Appx00457, col. 13:22-25. "Eventual" regeneration, however, is not substantially contemporaneous regeneration. It is the opposite. Saying something will be done eventually is the opposite of saying it will be done immediately. The Board effectively equated the two.

Second, the Board similarly improperly analyzed VDM'316's statement that "[t]he method of Figure 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, *at the same time*, uses the browser as a vehicle to handle the actual display and diary owner input." Appx00022; Appx00457, col. 13:3-7. Read in context, this passage does not even hint that display occurs "at the same time," temporally, with the selection of a setting. Nor does it suggest the display occurs immediately after selection of a setting. The phrase does not reference any sort of temporal relationship between features. Instead, "at the same time" is used the other way this phrase is very commonly used: to colloquially mean "as well as" or "in addition." Everything else VDM'316 says about its system refutes, rather than supports, the Board's contrary interpretation.

[1] Emphasis herein is added unless otherwise stated.

Third, despite claiming to construe "substantially contemporaneously" as "happening at the same period of time *from a human perspective*," the Board contradicted that assertion by finding that "[t]he regenerated HTML is generated 'in accordance with' the modified privacy level, *regardless of whether the user notices any changes in the display.*" The Board contends that "neither the user's perception nor a change in the resulting image is recited in the claim." But the construction *does* expressly require that whether the display happens at the same time, or *doesn't* happen at the same time, is decided "*from a human perspective*." The Board's insistence that it is irrelevant whether or when "the user notices any changes in the display" eliminates that express requirement.

It is also contrary to "the patent's description of the invention" and "what the inventors actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societá per Azioni*, 158 F.3d 1243, 1250-1252 (Fed. Cir. 1998). The claimed invention shows the user *immediately* how the website will be displayed upon the selection of an attribute of an object on the website. In contrast, it is undisputed that the VDM references did no more—and could do no more—than send users' revisions from an editing window to the browser for "eventual[]" display. The VDM references do not disclose, or even purport to disclose, displaying revisions "substantially contemporaneously" as that term is properly construed.

This Court reviews the claim interpretation the Board actually applied, not merely what it says it applied. *See, e.g., Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009). The Board's decision, based on the misapplication of an otherwise-correct claim construction, should be reversed.

Alternatively, at a minimum, the decision should be vacated and remanded for the Board to apply the proper construction.

## STATEMENT OF THE ISSUES

Whether the Board's obviousness analysis erred as a matter of law in failing to apply a proper construction of the "substantially contemporaneously" limitation.

## STATEMENT OF THE CASE

### A. The Patent's What-You-See-Is-What-You-Get Technology

At the time of the invention, as the '397 patent explains, it was "virtually impossible to write a web publishing application in HTML and JavaScript." Appx00145, col. 1:22-23. The '397 patent aimed to solve this problem and provide a novel method for building a web page. By, *inter alia*, defining the web page as a set of user-selected "objects" and/or "settings" and building a page using a WYSIWYG browser-based environment, the inventor eliminated the need for separate native website builder software, *and the page can be viewed as it is created or edited*:

> Aspects of the invention can include one or more of the following features. A browser based build engine is provided that includes a

> browser based interface. The entire web site build process is *WYSIWYG (what you see is what you get)*, with the web designer working directly on and with the final web page.

Appx00145, col. 2:32-37; *see, e.g.*, Appx00149, col. 10:16-53; Appx00155-00156, cols. 22:66-23:32.

The patent further describes how the capabilities of this WYSIWYG technology provide for substantially contemporaneous display:

> A technique is provided so that an applet's size (height and weight) can be set *in real time* under the control of either the interface or the build engine. At the same time a multi-level program animation model (threads) is activated for user interactions and time sensitive operations.

Appx00145, col. 2:45-50.

This "real time," "WYSIWYG" technology of the '397 patent improved upon the "crude preview capability" that the prior art could provide from a "conventional web publishing application":

> The browser based interface technologies create a set of interface objects with a look and feel that is identical to that of MS Windows, yet includes technologies that equal or occasionally surpass those of high end word processors, desk top publishers, and image processing software programs, particularly in the areas of interaction, animation, and timeline technologies. The run time engine includes multimedia capabilities often rivaling the digital processing capabilities seen on television and in the movies.

Appx00145, col. 2:51-59. Unlike the prior art, the result is not a complete markup language code file for the web page, but instead a collection of user-selected objects and object attributes. These can be saved in a database, for ease of access and efficient storage:

> In one aspect, the invention includes a multi-dimensional array structured database, that, in addition to storing the numeric and string data found in *conventional* databases, also stores multi-dimensional arrays of various multimedia objects. They include colors, fonts, images, audio clips, video clips, text areas, URLs and thread objects.

Appx00145, col. 2:5-10. Because complete code files for each page do not need to be stored in the invention, the page structure—the full HTML code itself—is newly created each time the page is loaded in a user's web browser, a result achieved in part through a device- and language-appropriate "run time engine" and related files:

> [A] run time generation procedure ... creates a compressed web site specific customized run time engine program file, with its associated database and a build engine generated HTML shell file.

Appx00145, col. 2:11-14. As a result, the designer could work "directly on and with the final web page," "in real time." Appx00145, col. 2:32-50; *see, e.g.*, Appx00149, col. 10:16-53; Appx00155-00156, cols. 22:66-23:32.

Each claim of the '397 patent reflects this pioneering new methodology and result. Claim 1, at issue in this appeal, recites (among other features) the following:

- Displaying a panel of settings within a browser, which a user can select to create the page Appx00177, col. 65:47-49;

- Storing information representative of those settings in a database Appx00177, col. 65:58-59; and

- Building web pages using a run time file from information stored in the database Appx00177, col. 65:64-66.

Claim 1 further recites, in addition to the features above, a "viewable menu" of user-selectable settings within a browser, each of which corresponds to commands

to a "virtual machine." Appx00177, col. 65:47-54. Critically, during the web site creation stage, the system *displays* the changes and edits "substantially contemporaneously" with user selected settings. Appx00177, col. 65:55-57. This "substantially contemporaneously" element ensures that a user, when creating a web site, can *immediately* see changes and edits as they would appear later when the page was rendered. Appx00145, col. 2:32-59. Finally, the "virtual machine" is recited again in the web rendering stage, as a mechanism for converting the user selections into the actual viewable page. Appx00177, cols. 65:64-66:2.

This same flexibility exists during the website creation process. Appx00145, col. 2:1-4. Thus, the invention of the '397 patent offers a consistent appearance for creating, editing, and viewing web pages, in the WYSIWYG sense, with changes appearing substantially contemporaneously, and with an interactive ease of use that allows for faster design and development over existing methods. The specification's description of this aspect of the invention is explained in further detail below in the context of its proper construction.

The '397 patent has expired. Appx00007-00008.

### B. Construction of "Substantially Contemporaneously" Term

#### 1. The Prior Correct Constructions

The term "substantially contemporaneously" has been construed by multiple District Courts. The Board asserts that its construction of the term is consistent with

the constructions in both the *Svanaco* litigation in the Eastern District of Texas (also adopted in the *eGrove* litigation in the District of Delaware) and the *X.Commerce* litigation in the Northern District of California. Appx00009.

In the *Svanaco* litigation, the District Court for the Eastern District of Texas construed "substantially contemporaneously" as "happening at the same period of time from a human perspective." Appx01812 (order dated Feb. 7, 2018).

About two months later, in the *eGrove* litigation in the District of Delaware, the parties stipulated to the *Svanaco* construction. Appx01954-01959 (filed April 6, 2018).

In September 2018, in the *X.Commerce* litigation, the District Court Northern District of California considered the *Svanaco* construction and adopted a slightly differently worded construction—construing the term to mean "occurring immediately after." Appx01826; Appx01840 (orders dated September 10 and 12, 2018). Express Mobile does not dispute these constructions. Indeed, to maintain consistency in the *Shopify* litigation (which, like *eGrove*, is in the District of Delaware), Express Mobile "propose[d] [that the Court in the *Shopify* case use] the [*Svanaco*] construction that was previously agreed to and entered by [the District] Court [in *eGrove*] ... ." Appx01989.

The *Svanaco* construction and *X.Commerce* construction, while worded slightly differently, both properly capture the extremely short duration from a human

perspective between when a user selects a setting and when the preview is generated consistent with the ’397 specification—not at literally the same time, but after 100 milliseconds or immediately after. Appx00149, col. 10:16-53; Appx00155-00156, cols. 22:66-23:32. (100 milliseconds after polling loop detects a selection); Appx01696-01697, ¶¶ 29, 30.

### 2. Substantially Contemporaneous Display In The Written Description Of The Invention

The term “substantially contemporaneously” is recited in an element of claim 1 relating to web site creation or editing. Specifically, as the user selects settings for the web site during the creation process, the system updates the display “substantially contemporaneously” with selection of the settings:

> generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof

Appx00179, col. 70:4-6; *accord* Appx01728, ¶ 90.

The ’397 patent specification describes this claimed process. In the preferred embodiment, a polling technique is used to determine if the user has made changes. Appx00155, col. 22:66-23:2; Appx00089. If so, then the system shows those changes. *See, e.g.,* Appx00156, cols. 24:32-36, 24:41-45, 24:52-54, 24:57-59. Importantly, this is not unseen data collection merely happening in a manner invisible to the user. Rather, it is perceived near-continuously by the user in real time. The specification discloses that the “build engine” dynamically links to the

interface "near-continuous[ly]" from a "*human perception* point of view" or in "real time" from an "*ergonomic*" point of view:

> A polling loop is defined in the panel's (panel 400) JavaScript that creates a near continuous, at least from a human perception point of view, dynamic real time link, in order to monitor events occurring inside the build engine. The result is a real time retrieval (from an ergonomic perception point of view) of necessary data and status settings from the build engine back to the interface.

Appx00156, col. 23:21-27; *see also* Appx00149, col. 10:16-53 ("results immediately processed"); *accord*, Appx01697, ¶ 32.

The District Court in *X.Commerce* carefully considered this specification disclosure when rendering its claim construction, and summed up the claims and specification as follows: "[T]he patentee did not use 'contemporaneously' in its ordinary sense of 'occurring at the *same* time'" but rather "the context makes clear that 'contemporaneously' means the second event occurs *immediately after the first, with no significant delay*." Appx01826 (first emphasis by Court); Appx01840; Appx01697-01698, ¶ 33.

The District Courts' correct constructions of "substantially contemporaneously" distinguish the invention from prior art systems in which the screen is static when changes are made or that require additional input from the user before the changes are applied. Appx01697-01698, ¶ 33. They construe "substantially contemporaneously" as characterizing the duration between when a user selects a setting and when the preview is generated, consistent with the

specification of the patent-in-suit. And they differ materially from a construction, like the one the Board effectively applied here, which, incorrectly, merely requires display to occur at some point afterwards, including after an additional user interaction such as clicking an accept button.

### C. The VDM'316 and VDM'362 Prior Art

The Office found obviousness based on a combination of VDM'316 and VDM'362. Appx01555.

#### 1. Van Der Meer '316—A Personal Diary Tool With Limited Editing Capabilities

VDM'316 allows a consumer to create a personal diary of items from other web sites, in other words a sort of bookmarking application—not a method and apparatus for producing Internet websites such as that taught by the '397 patent.

The system in VDM'316 uses a browser to display the hypertext mark-up language ("HTML") making up its diary and uses an applet to generate and regenerate the HTML before passing it to the browser for display. Appx00451-00459, cols. 2:60-62, 6:40-43, 7:1-3, 10:10-12, 10:24-27, 12:61-64, 13:1-2, 13:24-25, 13:30-35, 17:13-18; Appx00433-00439, FIGs. 4(a), 4(1). Specifically, VDM'316 describes using a "divided browser and applet" Appx01742-01752, ¶¶ 124, 131, 158, in which *the browser cannot generate the HTML, and the applet cannot display it, and both the browser and applet are needed to implement the system*. Appx00451-00457, cols. 2:60-62, 6:40-43, 7:1-3, 10:10-12, 10:24-27,

12:61-64, 13:1-2, 13:24-25, 13:30-35, 17:13-18; Appx00433-00439, FIGs. 4(a), 4(l).

VDM'316, directed at a personal diary tool, has limited editing capability, mostly for inserting content (*e.g.*, links to portions of other web pages and notes). Almost all the settings that affect the formatting and display are controlled by "covers" designed by a cover provider, not the diary owner. Appx00459, col. 17:14-18 ("This generation is performed by combining data from covers (also called 'presentation contexts') designed by a cover provider and the content that the user has gathered for his diary.").

In FIGs. 4(h) and 4(i) of VDM'316, reproduced below with added illustrative arrows and boxes, to the extent that VDM'316's updated display will be generated at all for a particular submitted edit, *no changes take effect*, and no updated display is (or even can be) generated, *unless and until a user affirmatively clicks on the accept button* (*i.e.*, the "check" button (406) some indefinite time *after making the edit*. Appx00457, col. 13:30-35 ("Once the diary owner clicks on accept button 406 of FIG. 4(i), applet 112 is caused to exit edit mode (via another executable program) and regenerates the diary page without handle 499 to yield a page such as the page of FIG. 4(n), where content object 401 is again displayed in its new position, but without a handle."):



Figure 4(e)




Figure 4(f)



Figure 4(j)



Figure 4(i)

* * *




VDM'316 nowhere discloses any capability of its divided browser and applet to immediately display changes to web pages. Instead, it says that if an "accept" button is pressed after settings are changed, "[f]inally" or "eventually" a display will "regenerate." Appx00457, col. 13:22-25; Appx00439.

### 2. The Van Der Meer '362 Patent – A Secondary Reference Showing A Database

VDM'362 discloses an Annotated Universal Address ("AUA") database. Appx00483-00484, cols. 2:3-3:22. As shown in FIG. 3 below, an AUA stores addresses (*i.e.*, URL's) and annotations such as expiration data, re-exportation data, and link data. Appx00485-00486, cols. 6:60-7:1.




**Figure 3**

VDM’362 is relied on merely for its disclosure of an AUA database, and its disclosures were not materially relied upon by the Office in connection with the issues on appeal.

### D. Procedural History

After two IPR petitions were considered (by different Board members than decided this case) and denied because both failed to show even a reasonable likelihood that this claim is unpatentable,[2] the petition for the present reexamination was filed on November 15, 2020, requesting reexamination of the patentability of claims 1-6, 8-15, 17, 19, 20, 23-25, 35, and 37 of the ’397 patent. Appx00226. The request was granted on April 28, 2021. On August 9, 2021, the Examiner confirmed the patentability of all challenged claims except claim 1, which is the subject of this appeal. Appx00064.

As to this claim, the Examiner entered an obviousness rejection. The Examiner found that VDM’316 “allows the contents to be edited and **at the same time** uses the browser as a vehicle to handle the actual display and diary owner input of the setting.” Appx00061 (emphasis in original). The Examiner found this to read on limitation (b) of claim 1 of the ’397 patent, “generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof.” *Id.*

---

[2] *See* Statement Of Related Cases, *supra.*

In the Examiner's Answer in the Board Appeal, the Examiner added the further assertion that "the VDM ['316] reference explicitly states and illustrates that the display occurs at the same time as the change to settings occurs." Appx03348.

In its Decision on Appeal, the Board panel upheld the Examiner's obviousness rejection. The Board rejected Express Mobile's argument that the accept button must be selected to see any change in the display in the cited references, disagreeing with Express Mobile over whether the record supports this argument. The Board also rejected Express Mobile's argument that "VDM '316 expressly states … that display only occurs 'eventually' after HTML is generated," not "substantially contemporaneously" as claimed, disagreeing with Express Mobile over whether the record supports this argument and whether the claim construction sought by Express Mobile is compatible with it. Appx00022.

## SUMMARY OF THE ARGUMENT

The Board improperly based its finding of obviousness on a broad interpretation of the "substantially contemporaneously" claim limitation to mean merely occurring at some point afterwards, and even after an additional user interaction (*e.g.*, clicking an accept button). The panel asserted in conclusory fashion, but did not demonstrate, that it had applied the agreed-upon construction of "substantially contemporaneously" from District Court proceedings, *i.e.*, "happening at the same period of time from a human perspective." The Board's

expressed reasoning makes clear that it failed to apply this construction, because the prior art does not meet, and indeed discloses no technology that *can* meet, that construction. In particular, the combination of VDM'316 and VDM'362 does not disclose generating a display in accordance with one or more user-selected settings at the same time as the selection from a human perspective. For at least this reason, the claim-at-issue is not shown to be obvious in view of these references.

The teachings on which the Board relied are indistinguishable from the "conventional" prior art that the inventor's "WYSIWYG" invention improved upon. VDM'316's editing process for a diary entry does not provide, or even suggest it can provide, substantially contemporaneous or immediate display as claimed. For settings modifiable through VDM'316's diary applet windows, VDM'316 teaches that the user *must* take the additional step of accepting any changes after making a selection or edit, before the process of eventually displaying the resulting change can even begin. This is unlike the WYSIWYG interface of the '397 patent, where changes to an object's settings are displayed to the user in real time, immediately upon the setting being selected, as discussed above.

To draw an analogy, a system cannot immediately, or substantially contemporaneously from a human perspective, display the changed position of a character on a videogame screen in response to input from a joystick, or change the volume on a television in response to tapping on a remote control, if it does not even

begin to change to the newly selected character position or volume level without some further, separate user input first being received.

To find the "substantially contemporaneous" limitation met, the Board relies on the VDM'316 disclosure of accepting a user input in the Java diary applet window. But in the VDM'316 disclosure concerning this input, the user must click an "accept" button or engage in some other interaction after making a selection or an edit. In the VDM references, the screen is static when selections are made, and before there is any change to the display, there must be an additional input from the diary owner, namely clicking through one or more "accept" buttons or engaging in some other interaction, before any selections are applied. VDM'316's accept button need never be clicked, and if it is not, VDM'316's user will never see the effects of the selection at all. And, unlike in the claimed invention, the VDM'316 applet must then "eventually" generate the changed web page from scratch. Thus, in the VDM references, no display is generated in accordance with one or more user selected settings "substantially contemporaneously" with the selection thereof, as claim 1 requires. The required intervening clicks, even measured from the last click, preclude setting selection and display from happening at the same period of time from a human perspective, and preclude the display generation from occurring immediately after the setting selection.

As VDM'316 provides, "[i]f the diary owner indicates *via several presses of*

*button 494* of FIG. 4(i) that the content object is to move to the bottom position, *applet 112 will eventually regenerate the diary page* in FIG. 4(m)." Appx00457, col. 13:22-25. Eventually is not immediately.

With respect to the privacy level setting of VDM'316, the Board points to VDM'316's disclosure regarding changing the privacy level of objects, which VDM'316 says affects how diary objects are displayed. Appx00029. But the privacy level for objects affects how VDM'316's diary is displayed *to others*, not how it is displayed *to the user* using the button; only if a person not authorized to see all objects were to *someday* log in would VDM'316's privacy level ever affect what VDM'316 displayed. The VDM references do not even contemplate, much less describe, a situation where the diary owner enters a privacy level, and then immediately after that a different user's computer receives a display. Instead, other users, who are not the diary owner, would not have their computers on and available for display until some hypothetical time in the future, when one of those users tries to access the owner's diary, assuming they enter the appropriate password.

The Board effectively construed the term "substantially contemporaneously" to mean occurring at some point afterwards, including after an additional user interaction (*e.g.*, clicking an accept button). This led the Board to improperly analyze the VDM teachings, which do not allow display immediately reflecting changes of settings. "Because the decisive aspect of the Board's reasoning is contrary to the

claim as reasonably construed," the Court should therefore reverse the decision below. *D'Agostino v. Mastercard Int'l Inc.*, 844 F.3d 945, 950 (Fed. Cir. 2016); *see Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1346 (Fed. Cir. 2020) (reversing-in-part where Board's determination of unpatentability was predicated on improper claim construction); *TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1373-1374 (Fed. Cir. 2018) (holding that because under "the undisputed evidence" at the "PTAB trial" "[t]he [challenged] claims, construed in light of the specification, do not read on the prior art," reversal rather than vacatur was appropriate); *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1375 (Fed. Cir. 2018) (similar); *Pride Mobility Prod. Corp. v. Permobil, Inc.*, 818 F.3d 1307, 1314-1315 (Fed. Cir. 2016) (similar).

# ARGUMENT

## I. STANDARD OF REVIEW

### A. Claim Construction Is Reviewed *De Novo*.

The ultimate question of proper claim construction is a question of law, and accordingly this Court reviews claim construction *de novo*. *See, e.g., Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1350 (Fed. Cir. 2020); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331, 135 S. Ct. 831, 190 L.Ed.2d 719 (2015). "We review the [PTAB]'s ultimate claim construction in a reexamination *de novo*." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1340 (Fed. Cir. 2016) (citing *Teva*

*Pharmaceuticals USA, Inc.,* 574 U.S. 318). Where, as here, nothing in the case implicates deference to claim construction fact findings under *Teva*, this Court reviews *de novo*. *In re Imes*, 778 F.3d 1250, 1252 (Fed. Cir. 2015). Under a *de novo* standard, claim terms are given their ordinary and customary meanings as would be understood by a person of ordinary skill in the art at the time of the invention, having considered the language of the claims, the specification, and the prosecution history of record. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).

"If, as is the case here, a reexamination involves claims of an expired patent, a patentee is unable to make claim amendments and the PTO applies the claim construction principles outlined by this [C]ourt in *Phillips*[.]" *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014).

### B. Obviousness Is Reviewed *De Novo*.

This Court reviews "de novo the ultimate determination of obviousness and compliance with legal standards[.]" *Pride Mobility Products Corp.,* 818 F.3d at 1314. This Court and the PTAB apply the same standards for obviousness under 35 U.S.C. § 103(a). To find obviousness, there must have been a reason for a person of ordinary skill in the art, at the time of the invention, to have combined the various teachings of the prior art to arrive at the patent claim. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366 (Fed. Cir. 2012). If the combined disclosures of the prior art lack and do not suggest a claim limitation, then those disclosures do

not show obviousness. *See, e.g., Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1301-1302 (Fed. Cir. 2009); *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003).

### C. Factual Findings Are Reviewed For Substantial Evidence.

Subsidiary factual findings by the Board underlying either claim construction or obviousness receive substantial evidence review. *Teva Pharmaceuticals USA, Inc.*, 574 U.S. at 331; *Dickinson v. Zurko*, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (appeals from PTAB); *In re Imes*, 778 F.3d at 1252; *Pride Mobility Products Corp.*, 818 F.3d at 1314. The Court reverses when a PTAB factual finding about the disclosures of the prior art is not based on substantial evidence. *See Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013) (reversing *inter partes* reexamination because PTAB erroneously found that prior art disclosed claim limitation).

## II. The PTAB Applied An Erroneous Construction of "Substantially Contemporaneous," Despite Purporting To Apply A Narrower One.

Limitation (b) of claim 1 recites "generating a display in accordance with one or more user selected settings *substantially contemporaneously* with the selection thereof." Appx00177, col. 65:55-57. The Board's Decision explicitly states that, "[g]iven that the particular disputes in this case involve the time between selection and display rather than the order of steps, we adopt the *Svanaco* court's construction of 'substantially contemporaneously' as 'happening at the same period of time from

a human perspective.'" Appx00009. However, a review of the Board's actual reasoning shows that the Board did not, in fact, apply that construction, but instead applied and relied upon a considerably broader meaning of simply occurring an unclear time afterwards, including after an additional user interaction (*e.g.*, clicking an accept button). This was error.

This Court reviews not just the Board's express construction, but the Board's "application of a construction" when it deviates from the express construction. *E.g.*, *Respironics, Inc. v. Zoll Med. Corp.*, 656 F. App'x 531, 535 (Fed. Cir. 2016). As this Court explains, what matters is not the Board's original *stated* construction, but its "*effective* constru[ction]" which is whatever "the Board made clear that it understood its construction to require" "[w]hen evaluating [patentability]":

> "We have reversed or vacated and remanded final written decisions of the Board when the Board departs from the proper construction [of a claim term] when assessing patentability in view of the prior art." *Google LLC v. Lee*, 759 F. App'x 992, 996 (Fed. Cir. 2019) (*citing Corning v. Fast Felt Corp.*, 873 F.3d 896, 900–01 (Fed. Cir. 2017), and *D'Agostino v. MasterCard Int'l Inc.*, 844 F.3d 945, 950 (Fed. Cir. 2016)). In *Corning*, the Board construed the claim term "roofing or building cover material" in a manner that would "not require an asphalt-coated substrate." 873 F.3d at 900. When evaluating obviousness, however, the Board made clear that it understood its construction to require materials that either had been or would eventually be coated with asphalt. *Id.* We determined this was error. *Id.* at 901.

*Surgalign Spine Techs., Inc. v. LifeNet Health*, No. 2021-1117, 2022 WL 1073606, at *6 (Fed. Cir. Apr. 11, 2022) (nonprecedential) (reversing obviousness determination, holding "that it was error for the Board to effectively construe

'generally flat' to exclude consideration of the horizontal plane"); *see also Respironics, Inc.*, 656 F. App'x at 535; *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148, 1150-51 (Fed. Cir. 2012) (vacating Board's decision and remanding for application of "original construction" where the Board first correctly construed a disputed term, but then actually applied an incorrect "modified construction" in its analysis). This Court reviews the claim construction actually applied as a matter of law. *See Vita-Mix Corp.*, 581 F.3d at 1324.

This principle is not confined to the patentability context. It is also routinely invoked to reverse infringement analyses where district courts misapply their express constructions. In *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1289-90 (Fed. Cir. 2010), this Court reversed a judgment of non-infringement where the district court improperly added a limitation to its "otherwise correct claim construction" in analyzing infringement. *See also Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1380-81 (Fed. Cir. 2004) (reversing judgment of non-infringement where construction "as applied" was "incorrect," although claim was properly construed in Claim Construction Order); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 834 (Fed. Cir. 2003) (vacating non-infringement judgment where "district court correctly construed claim 18 in its Markman order" but "misapplied its claim construction in deciding ... summary judgment"). In *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1065 (Fed. Cir. 2009), this Court vacated a

finding of non-infringement by the International Trade Commission that turned on a limitation that, according to the Commission's own construction, was not required by the claim. *Cf. In re Lemay*, 660 F. App'x 919, 926 (Fed. Cir. 2016) (reversing Board determination resting on "internally inconsistent" reasoning).

Here, the same thing happened as in the many cases just listed above: the Board stated one construction but applied another. The Board stated it adopted a construction from the *Svanaco* litigation, Appx00009, but it did not apply the construction it said it applied. [3] The construction of "substantially contemporaneously" to mean "happening at the same period of time from a human perspective" reflects that, as far as a human user is concerned, the inventive display looks like it is updated in real time as changes are made to a web page during creation or editing. Appx01697-01698, ¶ 33. This expressed distinction in the construction is critical in distinguishing the invention from the prior art the invention improved upon—systems in which the screen is static when changes are made, or in which the user must perform some type of "refresh" command, or even open a separate preview

[3] The Board stated that "the outcome of our decision would be the same even if we applied the *X.Commerce* court's construction," *i.e.,* "occurring immediately after." Appx00009. Express Mobile agrees that the *X.Commerce* court's construction would also be acceptable if correctly applied, but as the analysis below demonstrates, the Board did not actually apply the *X.Commerce* construction any more than it actually applied the *Svanaco* construction.

window, to see the effect of those changes. *Id.* The Board failed to apply this construction.

### A. The Board's Analysis As To the "Accept" Button Was Flawed

As Express Mobile argued before the PTAB, "[i]n all the figures from VDM'316 and VDM'362 that disclose accepting a user input in the Java diary applet window, the user must click an 'accept' button after making a selection or an edit, which precludes the recited substantially contemporaneous display." Appx03288. As Express Mobile further noted before the Board, "the screen is static when selections are made" and "if the accept button is never clicked, the user will never see the effects of the selection *at all*." Appx03291. The Board rejected this argument, stating that "Appellant's assertions that the accept button must be selected in order to see any change in the display is ... contradicted by the record" and "does not adequately reflect the disclosures of VDM'316." Appx00020-00022. The Board's rejection of this position is incorrect, and its conclusion finds no support in VDM'316's disclosure. Ironically, the passages of VDM'316 cited by the Board as supporting its conclusion in fact ***undermine*** the Board's conclusion and confirm that the display of changes in VDM'316 was ***not*** "happening at the same period of time from a human perspective."

As the Board notes, "[a]n accept button 406 is shown in [VDM'316's] Figures 4(b)-(e), (h), and (i) amongst others." *Id.* VDM'316's cited disclosure regarding these buttons, however, ***undercuts*** the Board's argument, rather than supports it:

> If the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, *applet 112 will eventually regenerate the diary page* to look like the diary page in FIG. 4(m). Note that the selected content object has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page). Applet 112 communicates with the browser to display the regenerated HTML of the diary page. *Once the diary owner clicks on accept button 406* of FIG. 4(i), applet 112 is caused to exit edit mode (via another executable program) *and regenerates the diary page without handle 499 to yield a page such as the page of FIG. 4(n), where content object 401 is again displayed in its new position, but without a handle.*

Appx00457, col. 13:22-35. As the Board notes, "the display is *regenerated* multiple times." Appx00021. But this "regeneration" was known in the prior art and is distinct from the WYSIWYG display of the '397 patent. Appx00145, col. 2:34-37. ("The entire web site build process is WYSIWYG (what you see is what you get), with the web designer working directly on and with the final web page."). The WYSIWYG invention of the '397 patent, in contrast to this conventional "regeneration," "provides a real time, dynamic linkage between JAVA and HTML including two-way communications, *in real time*, between JAVA and JavaScript." Appx00146, col. 3:4-6.

The Board proceeds to note how this "regeneration" in VDM'316 occurs, but these teachings only still further undermine its own conclusion:

> First, the display is regenerated when an edit is made (e.g., changing position of an item), which occurs *before* the accept button is pressed and while still in edit mode. Second, the display is again regenerated once the accept button is pressed, which will "exit edit mode" and remove the "handle" used to edit items while in edit mode.

Appx00021. The construction of "substantially contemporaneously" that the Board purports to be applying—"happening at the same period of time from a human perspective," reflecting the dynamic WYSIWYG invention of the '397 patent—cannot be reconciled with constant "regeneration" of displays using HTML each time a change is made, which would lead to delay in display even *assuming*, *arguendo*, that not every change requires pressing the "accept" button.

The Board's own description of figures 4(j), 4(m), and 4(n) all describe prior art "regeneration" of web pages, rather than dynamic WYSIWSG changes. As the Board explains:

> Figure 4(j) shows an image of a smiley face begins in the upper left. *See* Ex. 1005, VDM'316, 13:11-16, 4:5-6. The smiley face has an "EDIT" button because the user is in edit mode. *Id. After the user presses buttons to change the position of the image, the screen is regenerated in Figure 4(m)* to move the smiley face to the lower right but still show the "EDIT" button due to still being in edit mode. *Id.* at 13:22-30, 4:13-15 ("FIG. 4(m) shows an exemplary diary page after a content object has been moved, but while the page is still in edit mode."). Finally, *as shown in Figure 4(n), after accept button 406 is selected, the screen is again regenerated* with the smiley face staying in the same location (lower right) but the "EDIT" button removed because the system has exited edit mode. *Id.* at 13:30-35, 4:16-17 ("FIG. 4(n) shows an exemplary diary page after a content object has been moved, and after an exit from edit mode.").

Appx00021-00022. This constant "regeneration" of images, regardless of whether it is in response to selection of the "accept" button, does not fall within the meaning of "substantially contemporaneously" as construed: "happening at the same period of time from a human perspective." VDM'316 never says, or suggests, that this happens immediately or in real time. And nothing in the record suggests that VDM'316 is capable of it.

VDM'316 makes clear throughout its disclosure, including in the section entitled "Overview of Viewing and/or Editing a Diary," that changes in VDM'316's applet are not made "*substantially contemporaneously*" in a web page as that term has been construed. As VDM'316 explains, "[i]n step 310 diary applet 112 sends changes (if any) for the user's diary to the diary server (*periodically or at user's instruction*)." Appx00455, col. 9:14-16. As an example of a "user's instruction," in the "Modifying Content Entries" section of VDM'316 cited repeatedly by the Board in its decision, "*[o]nce the diary owner clicks on accept button 406 of FIG. 4(i), applet 112 is caused to exit edit mode* (via another executable program) and regenerates the diary page without handle 499 to yield a page such as the page of FIG. 4(n), where content object 401 is again displayed in its new position, but without a handle." Appx00457, col. 13:30-35. Neither "periodically" or at a "user's instruction" is WYSIWYG or in real time, and these time frames for updating are not "substantially contemporaneously," as that term has been construed.

The testimony of Express Mobile's reexamination expert witness Mr. Weadock supports this conclusion that the VDM references fail to disclose generating a display "substantially contemporaneously," and is not addressed by the Board in any adequate way. As Mr. Weadock explained:

> [C]hanges to the position are not said to be immediately displayed after editing, *id.*, 13-24-25 ("eventually regenerate the diary page"), and would not have been immediately displayed after editing at the time of VDM or the '397 patent *because of the delay from additional processing required to rebuild the HTML and display it in the browser.* VDM'362 does not warrant a different conclusion, because VDM'362 does not describe the editing embodiment at all. In sum, VDM's screen is static when changes are made.

Appx01736, ¶ 109. As Mr. Weadock explained, if an indefinitely later event must take place first before display of a selected edit, and there is no guarantee a display will be generated at all after an edit, any display that may be eventually generated cannot be "substantially contemporaneous" with the selection of one or more user-selectable settings. Appx01733-1749, ¶¶ 104, 125, 132, 147. No evidence in the record contradicts Mr. Weadock's opinion. As shown above, VDM'316, on which the Board relies, supports rather than contradicts it.

In summary, the Board's discussion of the "Accept Button" in its Decision on Appeal makes clear that the Board erroneously construed the term "substantially contemporaneously" to mean occurring at some point afterwards, including after an additional user interaction (*e.g.*, clicking an accept button). Appx00020-00022. The entire point of the construction of "substantially contemporaneously," however, is

to distinguish the present invention from prior art systems in which the screen is static when changes are made, or that require additional input from the user before the changes are applied. Appx01697-01698, ¶ 33.

### B. The Board's Analysis of VDM'316 Displaying "Eventually" Versus "At the Same Time" Was Flawed.

The Board erroneously rejected Express Mobile's argument that "VDM'316 expressly states . . . that display only occurs 'eventually' after HTML is generated," not "substantially contemporaneously" as claimed. Appx00022. As the Board notes, Express Mobile relies on the following sentence from VDM'316: "If the diary owner indicates via *several presses of button 494* of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will *eventually* regenerate the diary page to look like the diary page in FIG. 4(m)." Appx00457, col. 13:22-25. Then, VDM'316 explains, "[a]pplet 112 communicates with the browser to display the *regenerated* HTML of the diary page." Appx00457, col. 13:28-30. The Board concluded that Express Mobile's "narrow focus and assumptions on the word 'eventually' fail to adequately address the claim construction that Appellant has asked for." Appx00028. However, the Board's reasoning shows that the Board based this conclusion on its *modification* of (*i.e.*, departure from) its original construction—effectively construing the term "substantially contemporaneously" to merely mean occurring at some point afterwards, including after an additional user interaction (*e.g.*, clicking an accept button).

### 1. VDM'316's Phrase "At the Same Time" Does Not Mean Literally At The Same Time, But "Additionally" Or "Meanwhile," And Does Not Even Suggest Substantially Contemporaneous Display.

The Board cites a sentence in VDM'316 stating that "the method of [Figure] 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, *at the same time*, uses the browser as a vehicle to handle the actual display and diary owner input." Appx00022. The Board also relies on a sentence one sentence prior to that one, which states that "[t]he method of FIG. 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, *at the same time*, uses the browser as a vehicle to handle the actual display and diary owner input." *Id.*

As an initial matter, it would be unreasonable to conclude that the "at the same time" language could be taken literally, *i.e.*, temporally. As the constructions of the district courts of "substantially contemporaneously" expressly recognize, and as the '397 patent discloses, the user's selection of a setting and the generation of a display in accordance with that selection do not occur literally, *i.e.*, temporally, "at the same time." The duration between when a user selects a setting and when the preview is generated consistent with the specification – whether it is after 100 milliseconds or immediately after – is not at the same time. And even if it did have a temporal meaning, it does not even hint at immediate display.

The ’397 patent explains that “[t]he polling technology is essential for creating the necessary two-way real time communication between the JavaScript/HTML interface and the JAVA build engine.” Appx00155-00156, col. 22:66-23:2. With this technology, “[t]he result is a real time retrieval (from an ergonomic perception point of view) of necessary data and status settings from the build engine back to the interface.” Appx00156, col. 23:25-27. For this reason, the ’397 patent recites that the near-immediate preview of how the webpage will be displayed in accordance with the user’s selection will be generated, ***not*** at the same time as that selection, but “substantially contemporaneously” with that selection. Appx00155, col. 21:23-27 (“near-continuous”). Just as the Northern District of California emphasized in its analysis of the correct construction of the claims, “the patentee did not use ‘contemporaneously’ in its ordinary sense of ‘occurring at the *same* time’” but rather “the context makes clear that ‘contemporaneously’ means the second event occurs immediately after the first, with no significant delay.” Appx01826 (emphasis by Court); Appx01840; Appx01697-01698, ¶ 33.

The Board contends that “neither Appellant nor Mr. Weadock provide any substantive analysis of the actual amount of time it would take to generate an HTML file and send that file to a browser, let alone how that time compares to the ’397 patent’s up to 100 milliseconds for polling followed by its own processing time.” Appx00025. However, that is not correct: the ’397 patent itself makes clear that the

prior art technology, including VDM'316 and VDM'362, performed at a much slower rate.

As the '397 patent explains, "[c]onventional web site construction tools operate on traditional operating system platforms and generate as output HTML (hyper text mark-up language) and Script Code (e.g., JavaScript)." Appx00145, col. 1:11-14. The '397 patent explains that "conventional mark-up and scripting languages include numerous inherent limitations" and that they "have not been designed for serious multimedia applications." *Id.*, col. 1:16-19. This is because the prior art (like VDM'316 and VDM'362) "have almost no file handling ability and very little computational power," and are "*remarkably slow* and inefficient." *Id.*, col. 1:19-21. As a result, the '397 patent explains that "it is virtually impossible to write a web publishing application in HTML and JavaScript." *Id.*, col. 1:22-23. Accordingly, the Board's argument that "it is unclear whether or why Appellant or Mr. Weadock think a human user would even notice the amount of time it would have taken to generate such simple pages" shows that the Board cannot be applying the agreed-upon construction of "substantially contemporaneously" in analyzing the prior art VDM references: "happening at the same period of time from a human perspective." Appx00026.

In analyzing the prior art VDM references, the Board failed to meaningfully address the fact that the phrase "at the same time" in VDM'316 does not suggest two

physical actions actually occurring simultaneously. It is undisputed that this phrase "at the same time" is sometimes used literally and sometimes used figuratively. For example, it can literally mean temporally simultaneous (*e.g.*, "a tree can provide a windbreak and at the same time shade"), and can figuratively mean, for example, that a single principle is compatible with two different goals (*e.g.*, "tolerating hateful speech helps preserve liberty; at the same time, freedom of speech is not inconsistent with punishing harassing or threatening conduct that includes spoken words").

Critically, although VDM'316 includes the phrase "at the same time," it is in a completely different context, divorced from a user's selection of settings and any resulting display, let alone the speed of such display. Specifically, the phrase "at the same time" as it relates to FIG. 4(l) appears in context as follows:

> The reason that diary applet 112 must generate an executable program associated with each handle is that there is no other way for applet 112 to learn when the diary owner has clicked on a handle 499. The HTML for a diary page is actually displayed by browser 110, and the browser would not otherwise notify applet 112 of a handle click. *The method of FIG. 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, at the same time, uses the browser as a vehicle to handle the actual display and diary owner input.* Using the browser avoids having to duplicate the browser functions that interface to the user and that display pages in accordance with HTML.

Appx00456-00457, cols. 12:65-13:10.

This passage does not disclose, or even hint, that display occurs literally at the same time, from a human perspective, that a setting is selected. In context, the phrase

"at the same time" does not reference any sort of temporal relationship between features. Instead, it uses the phrase "at the same time" in the way one uses the language "meanwhile" or "as well as" or "in addition." The passage simply teaches that VDM'316's method of FIG. 4(l) enables embodiments to display and manipulate contents within an HTML document and, "at the same time" (*i.e.*, additionally), this method also uses the browser to handle the actual display and diary owner input. *Id.*

The point of this passage regarding "at the same time" is summarized in the sentence immediately following it: "Using the browser avoids having to duplicate the browser functions that interface to the user and that display pages in accordance with HTML." Appx00457, col. 13:7-10. In context, the phrase "at the same time" relates to avoiding duplicative work, not contemporaneity.

Even if the Court *were* to read "at the same time" to mean occurring temporally at the same time, that sentence still would not disclose that any display happens at the same period of time, from a human perspective, as setting selection, or that the display occurs immediately after a setting selection. This passage merely expresses what the functionality in FIG. 4(l) can support "at the same time." Specifically, it enables embodiments to display and manipulate contents within an HTML document and uses the browser to handle display and diary owner input. Appx00456-00457, cols. 12:65-13:10.

Indeed, to interpret this "at the same time" language to mean that display can occur literally at the same time as a setting is selected cannot be reconciled with VDM'316's other teachings. VDM'316 explains that the applet is unable to display any HTML; only the browser can do this. Appx00457, col. 13:1-2. ("The HTML for a diary page is actually displayed by browser 110...."). Indeed, in the section "Overview of Viewing and/or Editing a Diary," VDM'316 explains that "diary applet 112 sends changes (if any) for the user's diary to the diary server (*periodically or at user's instruction*)." Appx00455, col. 9:14-16. Periodically or at user's instruction is not literally "at the same time." And it does not even suggest "substantially contemporaneously" as construed. Instead, VDM'316 describes additional steps to notify the applet as to when a user has clicked on an object on the browser, and which object was clicked. Appx00456-00457, col. 12:66-13:1. ("there is no other way for applet 112 to learn when the diary owner has clicked on a handle 499"). Accordingly, the prior art does not disclose WYSIWYG "substantially contemporaneous" changes.

The method of FIG. 4(l), entitled "HTML Control (Editing Content)," explains how VDM'316's additional steps work:

- By setting the W3Diary in edit mode, *the HTML generator re-generates the page* and adds object control handles (in this case of type "edit") to the page
- *The user clicks on a control handle.* The handle identification is passed on to the HTML generation engine (by JavaScript in the current embodiment)

- Any appropriate action is executed on the object identified by the handle and represented in HTML
- *Finally, a new (updated) page is generated* and displayed.

Appx00439.

### 2. VDM'316's Use of the Word "Eventually" and Description of Regenerated HTML Show That the Board Effectively Construed "Substantially Contemporaneously" To Merely Mean Occurring At Some Point Afterwards, Including After Additional User Interaction Such As Clicking A Button.

The Board asserts that Express Mobile failed to adequately address that "substantially contemporaneously" is from the human user's perspective, not the computer's perspective. Appx00022-00023. In doing so, the Board misstates Express Mobile's argument. The point is that there is no genuine dispute that the prior art technology of Van Der Meer, unlike the present invention, would lead a human user to notice that the HTML is regenerated "at some point afterwards," and ***not*** substantially contemporaneously. This is particularly so where the diary applet sends changes "periodically or at user's instruction." Appx00455, col. 9:16.

Ironically, the VDM'316 passages cited by the Board concerning regeneration of HTML confirm Express Mobile's point rather than contradict it:

- A "diary owner can edit existing diary content and layout by entering an edit mode . . ."
- A "[d]iary applet *regenerates the page* to reflect the editing changes and passes it to the browser for display."
- A "diary applet 112 *regenerates the HTML* for the diary page to reflect the edit, *after which* the HTML is displayed by browser 110."

Appx00451, col. 2:57-62; Appx00456, col. 12:62-64. The Board's citations to the "regeneration" described in VDM'397 simply further prove that VDM'316's display occurs at some point afterwards, not "at the same time from a human perspective." In the Board's words, in VDL'316 "[a]fter an edit has been made (using the window created by the applet), *the applet regenerates the HTML and sends the regenerated HTML* to the browser, which *then* displays a webpage from the HTML." Appx00457, col. 13:11-14, 13:22-30. That further supports Express Mobile's argument, rather than the Board's position. So does the next passage the Board cites from VDM'316:

> *If the diary owner indicates via several presses of button 494* of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will *eventually regenerate the diary page to look like the diary page in FIG. 4(m)*. Note that the selected content object has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page). *Applet 112 communicates with the browser to display the regenerated HTML of the diary page*.

Appx00457, col. 13:22-30. These passages make clear that the HTML must be "regenerated," *i.e.*, built and rebuilt—indeed "*eventually* regenerate[d]"—in the prior art VDM'316 system. "Eventually regenerated" does not even suggest substantially contemporaneous from a human perspective. This stands in contrast to the practically instantaneous video game or TV remote-style "WYSIWYG"

technology that the claim term "substantially contemporaneously" is intended to represent. Appx00451, col. 2:34-37.

Unrebutted expert testimony from Mr. Weadock bolsters this intrinsic evidence. Indeed, the Board fails to grapple with the fact that Mr. Weadock reasonably explains how the ordinary artisan would have understood the ordinary meaning of this language in view of VDM'316 and the '397 patent:

> No person of ordinary skill would have understood "eventually" to mean "immediately after" or "at the same period of time." This is because these editing changes would not occur immediately or at the same time period in the implementation in either VDM reference *owing to the delay involved in building and rebuilding the HTML* at the time of VDM or the '397 patent.

Appx01735, ¶ 107. Mr. Weadock further explains that "*changes to the position are not said to be immediately displayed after editing*, *id.*, 13:24-25 ('eventually regenerate the web page') *and would not have been immediately displayed after editing at the time of VDM or the '397 patent because of the delay from additional processing required to rebuild the HTML* and display it in the browser." Appx01736, ¶ 109.

The Board responds that whether "the separation between the applet and the browser in VDM'316 creates an unacceptable delay is moot because, as the Examiner correctly points out, VDM'316 discloses this separation is not necessary." Appx00024. That ignores the evidence of record. Mr. Weadock explains the delay

inherent in this applet-browser prior art disclosure regardless of whether it is implemented in a divided format:

> VDM’316 differs from the inventive embodiments of the ’397 patent that *do* allow for immediate display in accordance with user selected settings so that the display is updated as changes are made to a web page during creation or editing. Unlike the applet and browser in VDM, the patent’s embodiments utilize a WYSIWYG environment with its own interface that is capable of displaying a user’s changes immediately from a user’s point of view. *See* ’397 patent, 22:66-37. For example, FIG. 42 of the patent shows the interface displaying a text object with a font size 24 and the text “Dual Spin Control Operations.” In FIG. 44, the user selects a new font size (60) from a drop-down menu. In FIG. 45, the change is displayed immediately afterward on the interface, as far as the user is concerned:




**FIG. 42**




**FIG. 44**




**FIG. 45**

Appx01736, ¶ 110 (emphasis in original). Mr. Weadock further explains that “the implementation of VDM’316, which requires the applet to render everything in HTML before display on the browser, does not describe displaying such changes immediately and only describes doing so ‘eventually,’ after multiple button presses, as stated at VDM’316, 13:24-25.” Appx01737, ¶ 111. The Board did not address this unrebutted evidence, which shows that the browser and applet of VDM’316,

whether or not separated, will not allow for "substantially contemporaneous" display.

### 3. The Embodiments of the '397 Patent Did Not Need To Build And Rebuild HTML, and the '397 Patent Does Not Teach That Is What the Polling Technique Is For

The Board next found that even though the VDM prior art undisputedly will have delay, the delay must be ignored for obviousness purposes because the Board finds that the '397 patent is even *slower* than the VDM art. No evidence supports this finding.

The Board concludes that "[t]o be sure, from the *computer's* perspective, there will be some delay in VDM'316 after a button is selected while the applet regenerates the HTML and sends the regenerated HTML to the browser." Appx00025. The Board continues that "whereas VDM'316 immediately notifies the applet of a button selection and begins responding, the '397 patent discloses a *slower* method of polling for changes as little as every 100 milliseconds." The Board notes that "[t]he '397 patent discloses that even this delay of up to 100 milliseconds from polling still qualifies as 'near continuous, at least from a human perception point of view.'" Appx00025. The Board concludes that "it is unclear whether or why Appellant or Mr. Weadock think a human user would even notice the amount of time it would have taken to generate such simple pages." Appx00026. The Board's

assertions above again reflect its failure to apply the agreed-upon construction of "substantially contemporaneously," and are unsupported by any evidence.

The '397 patent embodiments with the polling technique implement a user interface with a "build frame" that is "operable to receive user input and present a WYSIW[Y]G representation of the web page" and a "panel" with "one or more menus for controlling the form of content to be placed on the web page." Appx00076, Abstract. FIG. 45 of the '397 patent shows an example where the panel of settings (in the box annotation) and the build frame display (indicated by the arrow annotation) are created in the same user interface, rather than in a divided applet and browser:



This configuration allows the build frame display to be updated in "real time." Appx00146, col. 3:4-7; Appx00152, col. 15:12-15; Appx00155-00156, cols. 22:66-23:27; Appx01697, ¶ 32.

VDM'316 plainly teaches that it did not work this way, and did not use this polling technique. Instead, VDM'316 teaches that "[t]he reason that diary applet 112 must generate an executable program associated with each handle is that there is no other way for applet 112 to learn when the diary owner has clicked on a handle 499." Appx00150-00151; Appx00456-00457, cols. 12:65-13:37. As a result, as VDM'316 states, its display updates "eventually," not immediately. Appx00151, col. 13:22-13:30. Accordingly, no evidence supports applying the polling technique disclosed in the '397 patent's embodiments to VDM'316, and no evidence suggests that VDM'316 achieved the ability to update the display "substantially contemporaneously" with setting selection, as described and claimed in the '397 patent. In fact, VDM'316 never discloses the '397 patent polling technique, nor does it include any equivalent to the polling technique. Instead, VDM'316 expressly taught using the approach of FIG. 4(l), which precludes updating the display "substantially contemporaneously" with setting selection.

In contrast to the substantially contemporaneous polling technique of the '397 patent, in VDM'316 the HTML must be generated and regenerated using the applet before the display can be rendered in the browser. Appx00457, col. 13:30-35.

VDM'316 does not disclose that this happens in real time, and affirmatively teaches that it does not. *Id.*, col. 13:22-30. The example embodiments in the '397 patent, in contrast, need not build and rebuild HTML before displaying it, nor does the '397 patent teach that is what the polling technique is for.

Mr. Weadock testified that results of selecting settings are perceived "contemporaneously" from a "human perception" or in "real time" from an "ergonomic perception" point of view:

> *A polling loop is defined* in the panel's (panel 400) JavaScript *that creates a near continuous, at least from a human perception point of view, dynamic real time link, in order to monitor events occurring inside the build engine. The result is a real time retrieval (from an ergonomic perception point of view) of necessary data and status settings from the build engine back to the interface.*

Appx00156, col. 23:21-27; *see also* Appx00149, col. 10:16-53 ("results immediately processed").

According to the Board, its decision comports with the *X.Commerce* construction. Appx00009 ("the outcome of our decision would be the same even if we applied the *X.Commerce* court's construction."). But as Mr. Weadock testified, that construction requires that the user perceive the display to be updated *in real time* when settings change:

> The District Court correctly appreciated that, as far as the human user is concerned, the inventive display looks like it is updated in real time as changes are made to a web page during creation or editing. *This distinguishes the inventions from systems in which the screen is static when changes are made, or in which the user must perform some type*

> *of "refresh" command, or even open a separate preview window, to see the effect of those changes.*

Appx01697-01698, ¶ 33. Systems like VDM'316 that update "eventually" cannot satisfy the "substantially contemporaneous" limitation, whether construed as "happening at the same period of time from a human perspective," or, as in *X.Commerce*, "occurring immediately after."

#### 4. The Board Ignored Express Mobile's Analysis As to Whether the Regenerated Display in VDM'316 Would Be "Substantially Contemporaneous" With The Last Button Press

The Board Decision contends that Express Mobile provided no "analysis as to whether the regenerated [VDM'316] display would be substantially contemporaneous with the *last* button press." Appx00026 (emphasis in original). But Express Mobile *did* provide that analysis, and the Board ignored it.

Mr. Weadock explained that VDM'316 teaches that the diary owner must press a button several times to make a change, and that the change is not immediate:

> If the diary owner indicates via *several presses of button 494 of FIG.4(i)* that the content object is to move to the bottom position, applet 112 will *eventually regenerate* the diary page to look like the diary page in FIG. 4(m).

Appx00457, col. 13:22-25. VDM'316 therefore teaches that the diary owner must press this button "several" times to cause a change. Appx01734, ¶ 106. And even after several button presses, VDM'316 display still does not change immediately afterwards or at the same period of time (from a human perspective), but rather only

does so "eventually." *Id.* Even measured from the *last* button press, there is no "substantially contemporaneous" change in the teachings of VDM'316. *Id.*

The Board stated that "the single sentence Appellant focuses on is only one example from VDM'316 and specific to changing position," and that "[n]one of the other descriptions or examples in VDM'316 discuss pressing the same button multiple times or regenerating 'eventually.'" Appx00027. But that is not the point. The point, which the Board ignores, is that nothing in VDM'316 states or even hints that changes to the web page are generated in response to user input "substantially contemporaneously."

Nothing in the Board's citations to VDM'316 indicates otherwise. The first citation, Appx00451, col. 2:60-62 and Appx00455, col. 9:9-14, merely indicates that "[a] Diary applet *regenerates* the page and passes it to the browser for display," and that "[t]he HTML is displayed as a diary page by browser 110. After generating a first page of the diary, diary applet 112 displays a navigator bar or some other appropriate user interface, such as that shown in FIG. 4(*a*), *and thereafter reacts to the actions of the user to view or change the diary*, as described below." This is just eventual regeneration. Nowhere does it suggest immediate display.

The Board's second citation, Appx00455, col. 10:28-54 ("Privacy Level of a Diary Page"), describes setting the privacy level of a diary page by the owner, so that others (world, friend, close friend, best friend, and owner) may (or may not) be

able to view pages. Again, that is mere eventual regeneration, this time for third parties who later access the page.

The next citations, Appx00456, col. 11:50-62 ("Adding Content Entries") and Appx00456, col. 12:11-28 ("Modifying Content Entries") are specific descriptions of adding and modifying content entries, in which "[a] Diary applet *regenerates* the page to reflect the editing changes and passes it to the browser for display," to "edit existing diary content and layout." Appx00451, col. 2:57-62. Again, this does not in any way depart from eventual regeneration.

The Board's final citation to the flowchart of FIG. 4(l), "*Finally,* a new (updated) page is generated and displayed" Appx00439, confirms, rather than departs from, eventual regeneration. The Board waves away "the word '[f]inally'" as "merely refer[ring] to being the last of the bullet points," arguing that the word "in no way implies that the time required to generate and display the 'new (updated) page' is so long that it would not be substantially contemporaneous from a human user's perspective." Appx00028. But that not only reverses the burden of proof, it also is wrong.

As an initial matter, FIG. 4(l) indicates that "the HTML generator *re-generates* the page". FIG. 4(l) is found in the section of VDM'316 entitled "Modifying Content Entries," and later in that same section VDM'316 explains as follows:

> If the diary owner indicates via *several presses of button 494 of FIG. 4(i)* that the content object is to move to the bottom position, applet 112 will *eventually regenerate* the diary page to look like the diary page in FIG. 4(*m*).

Appx00457, col. 13:22-25. As this passage makes clear, and as Mr. Weadock's testimony confirms, VDM'316 therefore teaches that the diary owner must press this button "several" times to cause a change. *Id.*; Appx01734, ¶ 106. Even after several button presses, the display still does not change immediately afterwards or at the same period of time (from a human perspective), but rather only does so "eventually." *Id.* No evidence rebuts this testimony: the Board simply disregards it.

In summary, nothing in the teachings of the VDM references shows that this art could generate a display substantially contemporaneously with selection of user settings, Rather, as VDM'316 states, it could only generate displays "eventually" after making changes to a page using the applet. Appx01734-01752, ¶¶ 106-107, 109, 111, 131, 140, 146, 158; Appx00457, col. 13:24-25.

### C. The Board's Flawed Analysis Concerning "Privacy Level"

Express Mobile explained that VDM'316's "privacy level" for objects affects how the diary is displayed to others, not how it is displayed to the user using the button; and only if a person not authorized to see all objects were to later log in would it affect what is displayed. Express Mobile further explained that the only plausible way for this display to be generated "substantially contemporaneously," as that term is properly construed, is if the diary owner selects and enters the values

and immediately perceives the display, which is not disclosed or contemplated by VDM'316. The Board rejected these arguments on the basis that "neither the user's perception nor a change in the resulting image is recited in the claim." Appx00029.

The Board's analysis is wrong for two reasons. First, the privacy level affects how the diary is displayed *to others*, not how it is displayed to *the user*, which is the focus of the WYSIWYG technology of the '397 patent. Second, if the diary owner or user fails to take some additional action, like click OK, *nothing will happen to the display* in the VDM references. Accordingly, the Board's positions directly conflict with the claim construction the Board alleges that it applied, *i.e.*, "happening at the same period of time *from a human perspective*." Nothing changes from the perspective of *the user* when a change in a privacy setting is made, without some further action.

Turning to the first argument, again, the privacy level affects how the diary is displayed *to others*, not how it is displayed to *the user* who is selecting the settings in real-time, which is the focus of the WYSIWYG technology of the '397 patent. Only if a person *not authorized* to see all objects were to someday log in would the privacy level affect what is displayed. Appx00455-00456, cols. 10:36-54, 11:25-29, 11:54-61; Appx00459, col. 18:8-28; Appx01737, ¶ 114.

Mr. Weadock's testimony supports this conclusion. As he explained, "if the diary owner sets or updates the privacy level, VDM'316 does not disclose that the

resulting display is *affected in any way."* Appx01741, ¶ 122. He further explained that "[t]he privacy level setting relates to what other users – who are not the diary owner – can see at some hypothetical time in the future when one of those users tries to access the owner's diary. See VDM'316, 11:25-29." *Id.* Mr. Weadock concluded "[t]hat hypothetical future time is not *substantially/contemporaneous* with the selection." *Id.*

This testimony makes clear that the Board's positions directly conflict with the claim construction the Board alleges that it applied, *i.e.*, "happening at the same period of time *from a human perspective*." Appx00009. The Board's analysis shows that it erroneously construed "substantially contemporaneously" to effectively mean occurring at some point afterwards, including after an additional user interaction (*e.g.*, clicking an accept button). Despite contending that it was construing "substantially contemporaneously" as "*happening at the same period of time from a human perspective*," the Board simultaneously argued that "[t]he regenerated HTML is therefore generated 'in accordance with' the modified privacy level, *regardless of whether the user notices any change in the display*." Appx00029. Both cannot be true.

Something cannot happen at the same time from a human perspective "regardless of whether the user notices any change in the display." As the abstract of the '397 patent explains, the entire point of the invention is to provide a build

frame "operable to receive user input and present a WYSIW[Y]G [What you see is what you get] representation of the web page." Appx00076, Abstract.

The claimed invention of the '397 patent immediately shows the user how the website would be displayed upon the selection of an attribute of an object on the website, by generating that display *separately* from the HTML. The VDM references took the opposite approach – expressly choosing a method that "avoid[ed] having to duplicate the browser functions that interface to the user and that display pages in accordance with HTML." Appx00457, col. 13:8-10, 13:22-25. Instead, the VDM references used an applet with no functionality to "display pages in accordance with HTML" at all, let alone in response to user's selections – and which could do no more than send user's revisions to the browser for "eventual[]" display. *Id*.

Turning to the second argument, if the diary owner or user fails to take some other action, like click OK, *nothing will happen to the display* in the VDM references. The Board fails to understand this point. The Board notes that VDM'316 requires entering a password to change the privacy level of an object, but concludes that taking some other action, such as pressing the OK button, is not required to change the display, rejecting Express Mobile's position that if the diary owner or user fails to click OK, nothing will happen to the display. Appx00029. The Board's position is unsupported by VDM'316's disclosure.

The Board found that the following three citations did not support Express Mobile's position. Appx00030:

- In the window of FIG. 4(*b*) and others of the windows mentioned below, the user can click cancel 405 or accept 406 to cancel or accept any changes he has made. Appx00455, col. 10:13-15.

- If the user selects the owner privacy level (button 455) and can supply a correct password in area 457, after clicking OK button 456, buttons 440, 442, 444, and 446 of FIG. 4(*a*) become available to the owner. Otherwise these buttons are grayed out. Appx00455, col. 10:45-49.

- All users must enter an appropriate password before diary applet 112 will generate HTML (for content objects) or otherwise reveal the existence of objects having those privacy levels (e.g., for named sections in the named section list 404). Appx00456, col. 11:25-29.

The Board is wrong as to all three citations.

The first citation supports rather than contradicts the point Express Mobile had made in the previous sentence of the Appeal Brief: "[A] diary owner or user needs to click accept button 406 . . . before . . . selecting a button or entering the password." Appx03319.

The third citation supports the next point, made in the next sentence: "That VDM'316 requires a user to take the additional step of accepting any changes after changing the privacy level or entering a password renders any resulting display not substantially contemporaneous with the selection." Appx03320.

As to the second citation, the Board concedes that "[t]his text says that clicking OK button 457 is required to make various buttons in Figure 4(a) available

to the owner." Appx00030. The Board counters that this sentence says nothing expressly about whether clicking OK button 457 is required to regenerate the display for buttons 451 through 455 in Figure 4(d). *Id.* The Board also contends that neither this citation nor the other two above provides any evidence that VDM'316 "require[s] (A) entry of the password *after* selecting the privacy level rather than *before* or (B) *reentering* the password if it had already been entered for a previous change." *Id.*

However, these contentions are not on point as to whether display is "substantially contemporaneous." VDM'316 teaches that "[a]ll users must enter an appropriate password [for FIG. 4(d)] before diary applet 112 will generate HTML (for content objects) or otherwise reveal the existence of objects having those privacy levels (e.g., for named sections in the named section list 404)." Appx00456, col. 11:25-29; Appx00459, col. 18:10-28. Thus, VDM'316 teaches that FIG. 4(d) cannot satisfy the "substantially contemporaneously" requirement of claim 1 because no display is generated in accordance with any setting substantially contemporaneously with its selection.

A diary owner or user needs to take some other action, before anything can happen after selecting a button or entering the password. Appx00455, col. 10:45-49. If the diary owner fails to click OK, nothing will happen to the display. Appx00455-00456, cols.10:13-15, 10:45-49, 11:25-29 ("All users must enter an appropriate

password before diary applet 112 will generate HTML (for content objects) or otherwise reveal the existence of objects having those privacy levels (e.g., for named sections in the named section list 404).”). Requiring a user to perform an additional user interaction (*e.g.*, clicking an accept button) *after* selecting a setting cannot be at the same time from a human perspective because a human user would perceive the events taking place at different moments in time—*i.e.*, first, the user selects the settings and second, the user clicks the accept button.

All of these findings by the Board simply confirm that, despite contending that it was construing “substantially contemporaneously” as “happening at the same period of time from a human perspective,” the Board instead effectively construed the term to mean merely happening at some point afterwards, including after some additional user interaction. Analysis of these disclosures in VDM’316 shows that they do not even suggest substantially contemporaneous display as that term is purportedly construed by the Board.

## CONCLUSION

The Board analyzed the term “substantially contemporaneously” as if it simply means occurring at some point afterwards, including after an additional user interaction (*e.g.*, clicking an accept button). This *much* broader interpretation of “substantially contemporaneously,” which the Board actually applied, is not the invention. It is legal error, and the obviousness determination falls with it.

Regarding the Board's argument as to the "accept" button, the constant "regeneration" of images in VDM'316, regardless of whether it is in response to selection of the "accept" button, does not fall within the meaning of "substantially contemporaneously" as construed: "happening at the same period of time from a human perspective." VDM'316's accept button need never be clicked, and if it is not, VDM'316's user will never see the effects of any selection at all.

The Board's interpretation of the "at the same time" language in VDM'316 to mean that display can occur *literally* at the same time as a setting is selected cannot be reconciled with VDM'316's other teachings. Although VDM'316 includes the phrase "at the same time," it is in a completely different context, divorced from a user's selection of settings and any resulting display, let alone the speed of such display.

Finally, as to privacy, the Board's decision misses the fundamental point that the privacy level affects how the diary is displayed *to others*, not how it is displayed to *the user* using the button. Furthermore, the Board's decision also misses the point that if the diary owner or user fails to take some other action, like click OK, *nothing will happen to the display* in the VDM references.

The Board's analysis of the privacy levels again shows that it erroneously construed "substantially contemporaneously" to effectively mean occurring at some point afterwards, including after an additional user interaction (*e.g.*, clicking an

accept button). Contrary to the Board's conclusions, something cannot happen at the same time from a human perspective "regardless of whether the user notices any changes in the display."

Accordingly, the Court should reverse the Board's decision and hold that the challenged claims are not obvious. Alternatively, the Court should vacate the Board's decision and remand with instructions to apply the proper construction of "substantially contemporaneously" in its obviousness analysis.

Dated: March 15, 2023

Respectfully submitted,

*/s/ Robert F. Kramer*
Robert F. Kramer
David Alberti
Sal Lim
James P. Barabas
**KRAMER ALBERTI**
**LIM & TONKOVICH LLP**
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Telephone: 650.825.4300

Kenneth J. Weatherwax
**LOWENSTEIN&**
**WEATHERWAX**
1016 Pico Blvd.
Santa Monica, CA. 90405
Telephone: 310 307-4500

*Counsel for Appellant Express Mobile, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A). The brief contains 13,606 words excluding the portions exempted by Federal Circuit Rule 27(d).

2. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2019 in 14-point Times New Roman.

*<u>/s/ Robert F. Kramer</u>*
Robert F. Kramer
**KRAMER ALBERTI**
**LIM & TONKOVICH LLP**
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Telephone: 650.825.4300

*Counsel for Appellant*
*Express Mobile, Inc.*

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,615 | 11/25/2020 | 6546397 | XPR.001US0 Re Exam | 5892 |

167264 7590 10/03/2022
Lowenstein & Weatherwax LLP
1880 Century Park East
Suite 815
Los Angeles, CA 90067

| EXAMINER | |
|---|---|
| DESAI, RACHNA SINGH | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/03/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

*Ex parte* Express Mobile, Inc.
Patent Owner and Appellant

Appeal 2022-003530
Reexamination Control 90/014,615
Patent 6,546,397 B1
Technology Center 3900

Before ALLEN R. MacDONALD, DANIEL J. GALLIGAN, and MICHAEL J. ENGLE, *Administrative Patent Judges*.

ENGLE, *Administrative Patent Judge*.

## DECISION ON APPEAL

## STATEMENT OF THE CASE

Appellant appeals under 35 U.S.C. §§ 134(a) and 306 from the Examiner's decision to reject claim 1 of U.S. Patent No. 6,546,397 B1 ("'397 patent"). The Examiner previously confirmed all other challenged claims as patentable over the cited art. A hearing was held by video on August 25, 2022. We have jurisdiction over the appealed claim under 35 U.S.C. § 6(b).

We affirm.

THE '397 PATENT

The '397 patent relates to "designing and building a web page" using "a browser based build engine." Ex. 1001, '397 patent, Abstract. The application for the '397 patent was filed on December 2, 1999, so the '397 patent is now expired. *See* Appeal Br. 5.

Claim 1 of the '397 patent is reproduced below with certain limitations at issue emphasized:

> 1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:
>
> (a) presenting a viewable menu having a user selectable panel of *settings* describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;
>
> (b) generating a display in accordance with one or more user selected settings *substantially contemporaneously* with the selection thereof;
>
> (c) storing information representative of said one or more user selected settings *in a database*;
>
> (d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and
>
> (e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

## REFERENCES

The Examiner relies on the following references as prior art:

| Inventor | Short Name | Number | Issue Date |
|---|---|---|---|
| van der Meer | VDM ’362 | US 6,289,362 B1 | Sept. 11, 2001 |
| van der Meer | VDM ’316 | US 6,415,316 B1 | July 2, 2002 |

## REJECTION ON APPEAL

The Examiner rejects claim 1 under 35 U.S.C. § 103 as obvious over VDM ’316 and VDM ’362. Final Act. 8–12.

## OTHER CLAIMS IN REEXAMINATION

In this reexamination, the Examiner previously confirmed patentability of the other challenged claims because independent claims 2 and 37 included means-plus-function limitations under 35 U.S.C. § 112, sixth paragraph, and VDM ’316 and VDM ’362 do not disclose those means-plus-function limitations, e.g., “a build tool for generating/constructing one or more webpages as in claim[s] 2 and 37 when the build tool is construed to cover the corresponding structure described in the Specification.” Final Act. 6–7 (construing terms as means-plus-function), 13–15 (addressing Appellant’s challenges to the means-plus-function constructions), 23–24 (addressing prior art given the means-plus-function limitations). The only claim on appeal here (claim 1) does not recite those means-plus-function limitations.

## RELATED PROCEEDINGS

### *Proceedings on the ’397 Patent*

Appellant lists over 100 prior and pending proceedings involving the ’397 patent before the PTAB and various federal district courts, including

the Western District of Texas, the Eastern District of Texas, the Northern District of California, the Central District of California, the District of Delaware, and the Middle District of Florida. Appeal Br. 6–14; Reply Br. 4–5. As discussed below, some of these proceedings have reached the claim construction stage.

IPR2021-01224 was instituted on January 14, 2022. It involves different prior art than this reexamination, but the sole challenged claim is claim 1. *See* IPR2021-01224, Paper 10, at 4 (Jan. 14, 2022). IPR2022-00570 and IPR2022-00598 raise the same grounds, and the petitioners in those proceedings have been joined as petitioners in IPR2021-01224. A final decision has not yet mailed in those proceedings.

Two other IPR proceedings were denied institution. They also involved different prior art than this reexamination but challenged claim 1. *See* IPR2021-00700, Paper 7, at 6–7 (Oct. 4, 2021); IPR2018-00750, Paper 10, at 6–7 (Aug. 30, 2018). One focused on different limitations than the present case. *E.g.*, IPR2018-00750, Paper 10, at 13 ("Patent Owner does not present arguments regarding steps (a) or (b)."), 15 ("But if [the prior art reference] stores and retrieves *pre-built* webpages from the database to meet steps (c) and (d) as Petitioner asserts, then Petitioner has not shown how [that reference] can also satisfy step (e)'s requirement of building those webpages." (emphasis added)). The other determined that the petitioner had not demonstrated sufficiently that the prior art's "drag-and-drop organizational changes" (akin to dragging and dropping icons into different folders) taught "settings," including "attributes of an object" that were "user

selectable" and "describing elements on a website." IPR2021-00700, Paper 7, at 15–17.

*Proceedings on a Related Patent*

Appellant also states that a continuation of the '397 patent (US 7,594,168 B2) has been involved in one *ex parte* reexamination (Control No. 90/014,583); four *inter partes* review petitions (IPR2021-01226, IPR2022-00518, IPR2022-00572, and IPR2022-00597); and one further district court case in addition to the cases listed for the '397 patent. Appeal Br. 14.

IPR2021-01226 was instituted on January 14, 2022. It too involves different prior art than this reexamination. *See* IPR2021-01226, Paper 8, at 4 (Jan. 14, 2022). IPR2022-00518, IPR2022-00572, and IPR2022-00597 raise the same grounds, and the petitioners in those proceedings have been joined as petitioners in IPR2021-01226. A final decision has not yet mailed in those proceedings.

In Reexamination Control No. 90/014,583, the examiner confirmed the patentability of claims 1–6 of the '168 patent over the art cited in that proceeding on July 30, 2021. That reexamination involved the same prior art as the present reexamination but turned on claim limitations not present in claim 1 of the '397 patent. *See* Control No. 90/014,583, Non-Final Act. (Mar. 3, 2021); Notice of Intent to Issue Ex Parte Reexamination Certificate (July 14, 2021).

## ISSUES

Did the Examiner err in finding the combination of VDM '316 and VDM '362 teaches or suggests (1) user selectable "*settings* describing

elements on a website," (2) "generating a display in accordance with one or more user selected settings *substantially contemporaneously* with the selection thereof," and (3) "storing information representative of said one or more user selected settings *in a database*" that is retrieved from the database to generate a website, as recited in claim 1?

## ANALYSIS

### *Level of Ordinary Skill*

Although Appellant's briefs do not address the level of ordinary skill in the art, Appellant's declarant Mr. Weadock asserts that "a POSITA would have included [someone] who had a bachelors or graduate degree in computer science, mathematics, engineering, or a similar discipline together with knowledge of software development and web design, together with approximately two or three years of experience in the field relating to web design and development," though a "sliding scale" could trade off less education for more industry experience or vice versa. Ex. A, Weadock Decl. ¶ 16. A substantially similar level of ordinary skill was applied in at least some of the prior proceedings.[1]

For purposes of this decision, we adopt Mr. Weadock's proposed level of ordinary skill.

### *Claim Construction*

"If, as is the case here, a reexamination involves claims of an expired patent, a patentee is unable to make claim amendments and the

---

[1] *E.g.*, IPR2021-00700, Paper 7, at 9–10 (Oct. 4, 2021); IPR2021-01224, Paper 10, at 10–12 (Jan. 14, 2022).

PTO applies the claim construction principles outlined by this court in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)." *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014) (citing MPEP § 2258(G)); *see also* Appeal Br. 28 (acknowledging the '397 patent's expiration and the resultant claim construction standard).

Appellant asks that we adopt the prior district court's constructions for two terms: "setting" and "substantially contemporaneously." Appeal Br. 28–35. The Examiner adopts Appellant's requested constructions. Ans. 3.

First, in several prior proceedings, the term "setting" has been construed as "an attribute of an object available for selection."[2] Although this leads to some redundancy when inserted into claim 1 (e.g., "selectable [attributes . . . available for selection]"), we agree with this construction's requirements for a "setting" in claim 1.

Second, the term "substantially contemporaneously" has been construed in two different ways. One district court construed "substantially contemporaneously" as "happening at the same period of time from a human perspective."[3] Appellant requested the same construction in another district

---

[2] Ex. C, *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-130 (E.D. Tex.), Claim Construction Memorandum Opinion & Order (Feb. 7, 2018), at 6; Ex. D, *X.Commerce, Inc. v. Express Mobile, Inc.*, No. 17-cv-02605 (N.D. Cal.), Amended Order Construing Claims (Sept. 12, 2018), at 13; Ex. F, *Shopify Inc. v. Express Mobile, Inc.*, 1:19-cv-439 (D. Del.), Order on Claim Construction (June 30, 2020), at 1; Ex. G, *Express Mobile, Inc. v. GoDaddy.com, LLC*, No. 19-cv-1937 (D. Del.), Memorandum Opinion (June 1, 2021), at 10; IPR2021-00700, Paper 7, at 7–8 (Oct. 4, 2021).

[3] Ex. C, *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-130 (E.D. Tex.), Claim Construction Memorandum Opinion & Order (Feb. 7, 2018), at 16.

court.[4] However, a third district court construed "substantially contemporaneously" as "occurring immediately after."[5] Nevertheless, that court explained, "The immediacy is, of course, still judged from a human perspective, but there is no particular need to specify that."[6] Appellant asserts that "either [construction] is appropriate for this reexamination" because both "reflect the duration between when a user selects a setting and when the preview is generated." Appeal Br. 35.

For claim construction, "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Given that the particular disputes in this case involve the time between selection and display rather than the order of the steps, we adopt the *Svanaco* court's construction of "substantially contemporaneously" as "happening at the same period of time from a human perspective." However, the outcome of our decision would be the same even if we applied the *X.Commerce* court's construction.

*Overview of VDM '316*

VDM '316 "allows a user to create a 'diary' containing multimedia references to Websites," such as allowing the user's diary to "organize

---

[4] Ex. K, *Express Mobile, Inc. v. eGrove Sys. Corp.*, 1:17-cv-703 (D. Del.), Joint Claim Construction Chart (Apr. 6, 2018), at 1; Ex. L, *Shopify Inc. v. Express Mobile, Inc.*, No. 1:19-cv-00439 (D. Del.), Joint Claim Construction Brief (May 8, 2020), at 21.
[5] Ex. D, *X.Commerce, Inc. v. Express Mobile, Inc.*, No. 17-cv-02605 (N.D. Cal.), Amended Order Construing Claims (Sept. 12, 2018), at 11.
[6] *Id.* at 10.

information about Web pages . . . by dates." Ex. 1005, VDM '316, 2:2–17. "These references (also called 'content objects' or 'objects') can be addresses or URLs of, for example, text, bookmarks, images, programs, movies, etc." *Id.* at 2:3–6. "The diary owner can edit existing diary content and layout by entering an edit mode . . . ." *Id.* at 2:57–60.

An example of editing a diary page is shown in Figure 4(a), which is reproduced below:




Figure 4(a)

"In FIG. 4(a), exemplary diary page 400 is being viewed with browser 110, and diary applet 112 has popped up a diary navigator bar window 402." Ex. 1005, VDM '316, 9:28–30. "[T]he diary owner has previously added one image of a car 410 to the diary page," and "diary page 400 was generated by diary applet 112 in accordance with diary information 114 for

the diary page 400." *Id.* at 9:32–39. Other applet windows allow the diary owner to add new content and modify existing content, as discussed in more detail below. *Id.* at 11:42–13:37.

According to VDM '316, "diary information stores three basic types of data:" (1) "an AUA-database specifying the content of the diary page(s) that was gathered or created by the user"; (2) "a cover (also called a 'presentation context') for the diary"; and (3) "configuration information for the user." Ex. 1005, VDM '316, 8:59–64. "An AUA is an 'Annotated Universal Address,' as described in U.S. patent application Ser. No. 09/144,717 . . . ." *Id.* at 8:64–65.

*Overview of VDM '362*

VDM '362 issued from the "09/144,717" application mentioned in VDM '316 and shares the same inventor. The Examiner relies on VDM '362 for providing additional details on the AUA database mentioned in VDM '316. *See* Final Act. 11; Appeal Br. 26.

*Limitation (a)*

Limitation (a) of claim 1 recites "presenting a viewable menu having a user selectable panel of *settings describing elements on a website*" and "to accept one or more of said *selectable settings* in said panel as inputs."

Over the course of this reexamination, the Examiner and Appellant have discussed a variety of items in VDM '316 that might teach the claimed "settings," but the following four, focused on by the Examiner in the Answer, are sufficient to resolve the disputes currently before us:

1) "object weight" (e.g., button 482 in Figure 4(h));
2) "height/width"[7] of an object (e.g., areas 488–489 in Figure 4(h));
3) "position of the object" (e.g., buttons 491–494 in Figure 4(i)); and
4) "privacy level" (e.g., buttons 451–455 in Figure 4(d)).

Ans. 8–9 (emphasis omitted). We address each of these in turn.

Object Weight

The Examiner relied on "object weight" as a claimed "setting" in the Final Office Action. Final Act. 10. The Appeal Brief acknowledges the Examiner's reliance on "object weight" but does not directly challenge "object weight" as a "setting." Appeal Br. 37, 44–45. In the Reply Brief, Appellant argues that "[t]he Examiner has never sufficiently explained even what 'object weight' is, let alone why it would allegedly affect the display generated." Reply Br. 8; *see also* Ex. A, Weadock Decl. ¶ 130.

To the extent Appellant's argument is not forfeited as a new argument in a reply brief, Appellant's argument is not persuasive. VDM '316 adequately explains what "object weight" is, and it teaches a "setting."

Figure 4(h) of VDM '316 is reproduced below and depicts several of the items that the Examiner associates with the claimed "settings":

[7] *See also* Appeal Br. 61 ("natural size (synonymous with width/height)").




**Figure 4(h)**

"FIG. 4(h) shows a window 480 . . . to allow the diary owner to add his own image entries to his diary." Ex. 1005, VDM '316, 11:50–52. Although Figure 4(h) depicts adding a new content entry, a diary owner can change properties of an existing content object via a similar window. *Id.* at 12:24–28. In Figure 4(h), button 482 (the second button on the top row of buttons) is used "to set a weight." *Id.* at 11:54–61. "Image weights are used, for example, when a series of images are available . . . so that applet 112 can order the images if needed." *Id.* at 11:61–64.

We agree with the Examiner that the object weight in VDM '316 is "an attribute of an object" that is "available for selection." Ans. 8–9. The user selects the weight of an object via button 482 in Figure 4(h), and the applet uses the weights of each object to order them in the website. Accordingly, object weight teaches or suggests a user selectable "setting" describing an element on a website as required in claim 1.

Height & Width

In Figure 4(h) of VDM '316, reproduced in the previous section, window 480 is used "to allow the diary owner to add his own image entries to his diary." Ex. 1005, VDM '316, 11:50–52. "This requires specifying the address (such as the URL) of the image (in area 487), as well as *the real width and height of the image in areas 488 and 489*." *Id.* at 11:52–54 (emphasis added).

VDM '362 calls this an annotation storing "a natural size for the object." Ex. 1006, VDM '362, 7:10–13, 7:56–58. Figure 14 of VDM '362 shows a window very similar to Figure 4(h) of VDM '316, including boxes for "Width" and "Height." VDM '362 explains that the window in Figure 14 "includes box 1415 for inputting a width annotation and a box 1420 for inputting a height annotation." *Id.* at 8:12–14.

Appellant argues that "the height and width of an object (and therefore its natural size) are not 'user selectable settings' because these are fixed properties of the object ('the real width and height') that are not selectable by a user." Appeal Br. 62 (citing Ex. A, Weadock Decl. ¶ 153; Ex. 1005, VDM '316, 11:52–54); Reply Br. 8–9. According to Appellant, for a URL linking to a given image, "the diary owner must enter the fixed object dimensions because those are the known properties of the object that exists at the specified URL" and "[t]he diary owner cannot enter different numbers." Appeal Br. 63 (citing Ex. A, Weadock Decl. ¶ 153; Ex. 1005, VDM '316, 11:52–54).

Appellant's argument is not persuasive. We agree with the Examiner that "there is an explicit teaching that the user specifies the width and height of the image." Ans. 15. Figure 4(h) of VDM '316 and Figure 14 of

VDM '362 show text entry boxes for the user to enter a height and width. Appellant has not pointed to anything that *requires* the user to enter the image's *actual* height or width. For example, Table 1 of VDM '316 shows samples of what image height and width look like in HTML (e.g., <img src="product.jpg" width="200" height="120">). *See also* Ex. A, Weadock Decl. ¶ 154 (acknowledging same). Whether an HTML width and height match an image's actual width and height is not unique or special to VDM '316 or VDM '362. And given that Mr. Weadock concedes a person of ordinary skill in the art would have had several years of experience in web design (¶ 16), the prior art need not explain the basic functions of how HTML or web browsers work for images, including how to upscale or downscale the image when the HTML height and width differ from the actual height and width (e.g., if the diary owner wants the image to appear in the website as only half of the actual height and width).

Appellant further argues that in VDM '316, the page design of the cover/template and not the height and width entered in Figure 4(h) determines the size and location of the "slots" within the page. Appeal Br. 64–66 (citing Ex. A, Weadock Decl. ¶¶ 153, 155, 156; Ex. 1005, VDM '316, 5:16–17, Fig. 12).

This is not persuasive because a "slot" or "bounding box" is not the image. Neither Appellant nor Mr. Weadock explain why they conflate the image size with the slot size. *See, e.g.*, Ex. A, Weadock Decl. ¶ 155. Instead, VDM '316 explains that a "content object" such as an image "is displayed *in* one of the slots provided by the page design of the page," not that the image *is* that slot. Ex. 1005, VDM '316, 5:19–22 (emphasis added).

Appellant has not provided any evidence or argument that the image size must equal the slot size. For example, if the user selected a height and width for an object that were smaller than the slot that image was in, there is no evidence that the image size would be expanded to fit the slot size and ignore the specific image height and width entered by the user.

Height and width are "an attribute of an object," and given that the user is able to type in the desired height and width, that attribute is "available for selection." Accordingly, the height and width teach or suggest a user selectable "setting" describing an element on a website as required in claim 1.

<u>Change the Position</u>

A sample window to change an object's position is shown in Figure 4(i) of VDM '316 and reproduced below:




Figure 4(i)

"FIG. 4(i) . . . enables a diary owner to modify content entries that are already in the diary." Ex. 1005, VDM '316, 12:12–15. "Window 490 offers an owner the ability to modify the position of the entry in the section: move to top position; move one position up; move one position down; move to bottom position (buttons 491, 492, 493, and 494) . . . ." *Id.* at 12:19–24. For example, "[i]f the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position," then the position of the smiley face in Figure 4(j) will be moved to the position in Figure 4(m). *Id.* at 13:11–25.

The Examiner relied on these changes in position as claimed "settings." Final Act. 10. The Appeal Brief acknowledges the Examiner's reliance on changing position but does not directly challenge changing position for limitation (a), instead arguing it under limitation (b) (i.e., "generating a display . . . substantially contemporaneously . . . "). Appeal Br. 37, 41, 42–43, 53–54. However, the Reply Brief argues, "The Examiner does not sufficiently explain how this is a user selectable attribute of the object, rather than of the diary." Reply Br. 8 (citing "*See* Appeal Br. 53-55"); *see also* Ex. A, Weadock Decl. ¶¶ 101, 104, 105.

To the extent Appellant's argument is not forfeited as a new argument in a reply brief, the argument is conclusory and not persuasive. The position of an object is an "attribute of an object" (e.g., the attribute of where that object is located) and that position is "available for selection" (e.g., top or bottom). Accordingly, the position of an object teaches or suggests a user selectable "setting" describing an element on a website as recited in claim 1.

<u>Privacy Level</u>

A sample of the user interface to set the privacy level is shown in Figure 4(d), which is reproduced below:




Figure 4(d)

"FIG. 4(d) shows a window 450" that "allows a user of the diary to set a privacy level at which the diary is operating," including levels for (1) "world"; (2) "friend"; (3) "close friend"; (4) "best friend"; and (5) "owner," via buttons 451 to 455, respectively. Ex. 1005, VDM '316, 10:36–41. The privacy level "determines which sections and which objects will be visible during browsing through the diary." *Id.* at 10:43–45. In particular, "the diary applet generates HTML only for those portions of the diary that have a privacy level lower than or equal to the privacy level of the viewer who is viewing the diary." *Id.* at 18:15–20.

Appellant argues that the "privacy level setting is a privacy level for the entire diary, not a particular object." Reply Br. 7–8 (quotation marks

omitted for quotation from Appeal Br. 73) (citing Ex. A, Weadock Decl. ¶ 115; Ex. 1005, VDM '316, 10:29–31); Appeal Br. 73–77 (further citing Ex. A, Weadock Decl. ¶¶ 116–17).

However, Appellant's argument is contradicted by the disclosures in VDM '316. Ans. 17–18. Although the privacy button 438 in Figure 4(a) does open the window 450 in Figure 4(d) to set a privacy level for the diary as a whole (Ex. 1005, VDM '316, 10:29–37), VDM '316 discloses that a privacy level can also be set for "pages, sections, or content objects." *Id.* at 18:13–15. For example, button 485 in Figure 4(h) is used to set the privacy level for *an individual content object*, such as a single image. *Id.* at 11:59–60. Even focusing on Figure 4(d), VDM '316 discloses that "FIG. 4(d) shows an exemplary Privacy window that allows an owner to set the privacy attributes of a diary section *or content object*." *Id.* at 3:57–59 (emphasis added); *see also* Appeal Br. 74 (quoting same). Thus, VDM '316 is unambiguous that a privacy level can be set for an individual content object.

The privacy level of an object is an "attribute of an object" and as shown in the figures it is "available for selection." Accordingly, the privacy level of an object teaches or suggests a user selectable "setting" describing an element on a website as required in claim 1.

Accordingly, Appellant has not shown error in the Examiner's determination that the cited art teaches or suggests limitation (a).

*Limitation (b)*

Limitation (b) of claim 1 recites "generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof."

Appellant argues that the Examiner's "settings" do not result in a display that is "substantially contemporaneous" with the selection of that setting because (A) the display is only updated after activating an accept button, (B) the display is only updated "eventually," or (C) no display is updated. *See* Appeal Br. 45–58, 62–83 (arguing limitation (b) under a heading for limitation (c)). We address each contention below.

<u>The Accept Button</u>

Appellant argues that "[i]n all the figures from VDM'316 and VDM'362 that disclose accepting a user input in the Java diary applet window, the user must click an 'accept' button after making a selection or an edit, which precludes the recited substantially contemporaneous display." Appeal Br. 46 (citing Ex. 1005, VDM '316, Figs. 4(h)–(i); Ex. 1006, VDM '362, Figs. 14–15; Ex. A, Weadock Decl. ¶ 132). According to Appellant, "the screen is static when selections are made" and "if the accept button is never clicked, the user will never see the effects of the selection *at all.*" *Id.* at 49 (citing Ex. A, Weadock Decl. ¶¶ 109, 132, 140, 147, 159).

Yet Appellant's argument does not accurately reflect the disclosures of VDM '316. An accept button 406 is shown in Figures 4(b)–(e), (h), and (i), amongst others. At a high level, VDM '316 states that "[i]n the window of FIG. 4(b) and others of the windows mentioned below, the user can click cancel 405 or accept 406 to cancel or accept any changes he has made." Ex. 1005, VDM '316, 10:13–15. But VDM '316 goes on to explain the accept button in more detail later in the disclosure:

> If the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will eventually regenerate the diary page to look like the diary page in FIG. 4(m). Note that the selected content object

> has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page). Applet 112 communicates with the browser to display the regenerated HTML of the diary page. *Once the diary owner clicks on accept button 406* of FIG. 4(i), applet 112 is caused to *exit edit mode* (via another executable program) *and regenerates the diary page without handle 499 to yield a page such as the page of FIG. 4(n), where content object 401 is again displayed in its new position, but without a handle.*

Ex. 1005, VDM '316, 13:22–35 (emphasis added). This paragraph explains that the display is regenerated *multiple* times. First, the display is regenerated when an edit is made (e.g., changing position of an item), which occurs *before* the accept button is pressed and while still in edit mode. Second, the display is again regenerated once the accept button is pressed, which will "exit edit mode" and remove the "handle" used to edit items while in edit mode.

This process is clearly illustrated in the drawings. Figure 4(j) shows an image of a smiley face begins in the upper left. *See* Ex. 1005, VDM '316, 13:11–16, 4:5–6. The smiley face has an "EDIT" button because the user is in edit mode. *Id.* After the user presses buttons to change the position of the image, the screen is regenerated in Figure 4(m) to move the smiley face to the lower right but still show the "EDIT" button due to still being in edit mode. *Id.* at 13:22–30, 4:13–15 ("FIG. 4(m) shows an exemplary diary page after a content object has been moved, but while the page is still in edit mode."). Finally, as shown in Figure 4(n), after accept button 406 is selected, the screen is again regenerated with the smiley face staying in the same location (lower right) but the "EDIT" button removed because the system has exited edit mode. *Id.* at 13:30–35, 4:16–17

("FIG. 4(n) shows an exemplary diary page after a content object has been moved, and after an exit from edit mode.").

Appellant's assertions that the accept button must be selected in order to see any change in the display is therefore contradicted by the record.

Displaying "Eventually" vs. "At the Same Time"

Appellant argues "VDM'316 expressly states . . . that display only occurs 'eventually' after HTML is generated," not "substantially contemporaneously" as claimed. Appeal Br. 46 (citing Ex. 1005, VDM '316, 13:22–25; Ex. A, Weadock Decl. ¶ 106). In particular, Appellant relies on the following sentence from VDM '316: "If the diary owner indicates via *several presses of button 494* of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will *eventually* regenerate the diary page to look like the diary page in FIG. 4(m)." Ex. 1005, VDM '316, 13:22–25 (emphasis added).

The Examiner, on the other hand, determines that "column 12, lines 44-column 13 and figure 4l . . . state[] the method of [Figure] 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and **at the same time**, uses the browser as a vehicle to handle the actual display and diary owner input." Ans. 10. In particular, a sentence one paragraph earlier in VDM '316 states that "[t]he method of FIG. 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, *at the same time*, uses the browser as a vehicle to handle the actual display and diary owner input." Ex. 1005, VDM '316, 13:3–7 (emphasis added).

We are not persuaded by Appellant's argument, which fails to adequately address that "substantially contemporaneously" is from the

*human user's* perspective, not the computer's perspective. For background, VDM '316 discloses that a "diary owner can edit existing diary content and layout by entering an edit mode" and a "[d]iary applet regenerates the page to reflect the editing changes and passes it to the browser for display." Ex. 1005, VDM '316, 2:57–62. More specifically, "diary applet 112 regenerates the HTML for the diary page to reflect the edit, after which the HTML is displayed by browser 110." *Id.* at 12:61–64.

The particular sentence relied on by Appellant discusses an example of moving an existing content object to the bottom (i.e., lower right) of the diary while in edit mode. Ex. 1005, VDM '316, 13:11–30. The browser and the applet have different roles, such as the browser notifying the applet (via an executable program in the HTML) that a handle of a content object has been clicked and the applet providing a window with buttons to edit the object. *Id.* at 13:11–21. After an edit has been made (using the window created by the applet), the applet regenerates the HTML and sends the regenerated HTML to the browser, which then displays a webpage from the HTML. *Id.* at 13:11–14, 13:22–30. The sentence relied upon by Appellant and the sentences that follow it are reproduced below:

> If the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will *eventually regenerate the diary page to look like the diary page in FIG. 4(m)*. Note that the selected content object has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page). *Applet 112 communicates with the browser to display the regenerated HTML of the diary page.*

Ex. 1005, VDM '316, 13:22–30 (emphasis added). Given this context, Appellant's declarant Mr. Weadock argues that the word "eventually" refers

to the amount of time it takes for the applet to regenerate the HTML for the diary page that incorporates the edit (e.g., moving the smiley face to the bottom) and then send that regenerated HTML to the browser for display: "changes . . . would not have been immediately displayed after editing . . . because of the delay from additional processing required to rebuild the HTML and display it in the browser." Ex. A, Weadock Decl. ¶ 109; *see also id.* ¶ 107 ("the delay involved in building and rebuilding the HTML"); Appeal Br. 57–58 ("VDM'316 . . . uses a divided browser and applet, which necessitated jumping through the hoops in FIG. 4(l). And, as a result, VDM'316 states that the display only can be updated 'eventually.'" (citations omitted)).

As an initial matter, Appellant's argument that the separation between the applet and the browser in VDM '316 creates an unacceptable delay is moot because, as the Examiner correctly points out, VDM '316 discloses this separation is not necessary. Ans. 13. "For example, diary applet 112 could[] instead be implemented *as a plug-in to browser 110*. This has the advantage of being free of the Java 'sandbox' . . . ." Ex. 1005, VDM '316, 18:48–50 (emphasis added). "The functionality of the diary applet 112 could also be implemented *in the browser*." *Id.* at 18:52–53 (emphasis added). Thus, Appellant's argument that the '397 patent differs from VDM '316 by teaching the settings and display "rendered in the *same user interface*, rather than in a divided applet and browser" is not persuasive because VDM '316 also teaches that alternative (e.g., implementing both "in the browser"). Appeal Br. 56.

Even narrowly considering the separated embodiment in VDM '316, Appellant's argument is unsubstantiated. Ans. 12. To be sure, from the *computer's* perspective, there will be some delay in VDM '316 after a button is selected while the applet regenerates the HTML and sends the regenerated HTML to the browser. But Appellant fails to provide sufficient evidence that this delay will be significant or noticeable from the *human user's* perspective. To the contrary, whereas VDM '316 immediately notifies the applet of a button selection and begins responding, the '397 patent discloses a slower method of polling for changes as little as every 100 milliseconds. *E.g.*, Ex. 1001, '397 patent, Fig. 9, 23:30–32 ("In one implementation, the polling loop is set at a poll rate of once every 100 milliseconds or less."); *see also* Ans. 10–12. The '397 patent discloses that even this delay of up to 100 milliseconds from polling still qualifies as "near continuous, at least from a human perception point of view." Ex. 1001, '397 patent, 23:21–24. Then after waiting up to 100 milliseconds for the next polling, the '397 patent itself does further processing, including calling a build engine if necessary to process changes, using JavaScript or Java. *E.g.*, *id.* at 12:51–56 (in response to a mouse click on a combo box), 12:49–50 (in response to a spin control), 11:40–43 (in response to inputting an image URL).

Beyond conclusory assertions that the '397 patent is "substantially contemporaneous" but VDM '316 is not, neither Appellant nor Mr. Weadock provide any substantive analysis of the actual amount of time it would take to regenerate an HTML file and send that file to a browser, let alone how that time compares to the '397 patent's up to 100 milliseconds for polling followed by its own processing time. For example, Figures 4(a), (j),

(m), and (n) depict diary pages with only a single image, and it is unclear whether or why Appellant and Mr. Weadock think a human user would even notice the amount of time it would have taken to generate such simple pages. "Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value in a validity determination." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985).

More perplexing, though only briefly discussed by either Appellant (Appeal Br. 53–54) or Mr. Weadock (¶ 106), is the beginning portion of that sentence: "If the diary owner indicates via *several* presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, . . . ." Ex. 1005, VDM '316, 13:22–24 (emphasis added). Button 494 is indicated to be the "move to bottom position" button, and it is not clear why a user would need to press the "move to bottom position" button multiple times in a row rather than just once. *See id.* at 12:19–23. Several presses of the "move *one* position down" button would make sense in order to move multiple positions down, but that is indicated to be button 493 in Figure 4(i), not button 494. *See id.* Regardless, even if several presses of a button were required in order to activate the button once, "the selection" recited in limitation (b) would not be complete until the *last* button press, and Appellant provides no further analysis as to whether the regenerated display would be substantially contemporaneous with the *last* button press. In an

analogous scenario, if a user wants to activate an icon by double clicking it, the user expects the icon to activate on the *last* click, not the *first*.[8]

Finally, it is important to keep in mind that the single sentence Appellant focuses on is only one example from VDM '316 and specific to changing position. *See* Ex. 1005, VDM '316, 13:11 (introducing that paragraph with "Thus, for example, . . . "). None of the other descriptions or examples in VDM '316 discuss pressing the same button multiple times or regenerating "eventually." *E.g.*, *id.* at 2:57–62, 9:10–14 ("diary applet 112 displays a navigator bar or some other appropriate user interface . . . and thereafter reacts to the actions of the user to view or change the diary"), 10:28–54 (setting privacy level), 11:50–62 (adding new content with height, width, privacy level, and object weight), 12:11–28 (modifying existing content), 12:44–64 (same), Fig. 4(l) (flowchart for editing existing content). Nor would a person of ordinary skill in the art have expected that a user would have to press the same privacy level button multiple times in a row or type in the same image height multiple times in a row.

To the extent Appellant makes a similar argument regarding the use of the word "Finally" in Figure 4(l), *see* Appeal Br. 53, that argument is even less persuasive. The relevant portion of Figure 4(l) is reproduced below:

---

[8] We also note that claim 1 is a method step so the prior art need only teach or suggest substantially contemporaneous with *any one* selection (e.g., the last press of button 494), not *all* selections.

**Flowchart**

The above operations are implemented through control by means of dynamic HTML generation. A flowchart is given below in figure 11.

- By setting the W3Diary in edit mode, the HTML generator re-generates the page and adds object control handles (in this case of type "edit") to the page
- The user clicks on a control handle. The handle identification is passed on to the HTML generation engine (by JavaScript in the current embodiment)
- Any appropriate action is executed on the object identified by the handle and represented in HTML
- Finally, a new (updated) page is generated and displayed.

"FIG. 4(l) is a flow chart showing how an edit is performed on content during edit mode." Ex. 1005, VDM '316, 4:11–12; *see also id.* at 12:44–64. As seen above, Figure 4(l) includes four bullet points outlining the process, the last of which says, "Finally, a new (updated) page is generated and displayed." Here, on its face, the word "Finally" merely refers to being the last of the bullet points. It in no way implies that the time required to generate and display the "new (updated) page" is so long that it would not be substantially contemporaneous from a human user's perspective.

Thus, Appellant's narrow focus and assumptions on the word "eventually" fail to adequately address the claim construction that Appellant has asked for and fails to provide factual support for its conclusory assumptions.

<u>Privacy Level</u>

Appellant makes two additional arguments specific to the privacy level in VDM '316. *See* Appeal Br. 73–83.

First, Appellant argues that the privacy level for objects "affects how the diary is displayed *to others*, not how it is displayed *to the user using the button*; only if a person not authorized to see all objects were to someday log in would it affect what is displayed." Reply Br. 7–8 (emphasis added) (citing Ex. A, Weadock Decl. ¶ 115); *see also* Appeal Br. 80–82 (citing

Ex. A, Weadock Decl. ¶ 122). Appellant argues that "[t]he only plausible way for a display . . . to be generated 'substantially contemporaneously' . . . is if the diary owner selects or enters the values *and perceives the display*." Appeal Br. 81–82 (emphasis modified). But neither the user's perception nor a change in the resulting image is recited in the claim. Limitation (b) recites "generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof." Thus, what is claimed is the generation of the display, not the user's perception of a noticeable difference. When a content object has had its privacy level changed and its page is regenerated, the diary owner can see that modified content object in the regenerated HTML precisely because the diary owner's security level meets or exceeds the object's modified privacy level. Put another way, the HTML is regenerated by comparing the diary owner's security level with the object's modified privacy level. The regenerated HTML therefore is generated "in accordance with" the modified privacy level, regardless whether the user notices any change in that display.

Second, VDM '316 requires entering a password to change the privacy level of an object. *E.g.*, Ex. 1005, VDM '316, 10:41–43, 10:45–48. In Figure 4(d), the user types a password in the text entry box of area 456, next to which is "OK" button 457.[9] Appellant argues that "[i]f the diary owner or user fails to click OK, nothing will happen to the display." Appeal

[9] VDM '316 initially introduces "a password supplied in area 456," but later mistakenly swaps the labels for 456 and 457 when referring to "OK button 456" and "password in area 457." *See* Ex. 1005, VDM '316, 10:41–49. However, a person of ordinary skill in the art would have understood from the text when the text meant an OK button rather than a password area.

Br. 78 (citing Ex. 1005, VDM ’316, 10:13–15, 10:45–49, 11:25–29). However, it is unclear what Appellant’s factual basis for this assertion is. Appellant’s first citation (10:13–15) discusses the buttons for “cancel 405 or accept 406,” not OK button 457. Appellant’s third citation (11:25–29) discusses entering a password but never mentions any button, let alone OK button 457. Appellant’s second citation discloses the following:

> If the user selects the owner privacy level (button 455) and can supply a correct password in area [456], after clicking OK button [457], buttons 440, 442, 444, and 446 of FIG. 4(a) become available to the owner. Otherwise these buttons are grayed out.

Ex. 1005, VDM ’316, 10:45–49. This text says that clicking OK button 457 is required to make various buttons in Figure 4(a) available to the owner, but it says nothing about whether clicking OK button 457 is required to regenerate the display for buttons 451 through 455 in Figure 4(d). Moreover, even leaving aside the OK button and focusing on the password, Appellant fails to point to anything in VDM ’316 requiring (A) entry of the password *after* selecting the privacy level rather than *before* or (B) *re-entering* the password if it had already been entered for a previous change. Appellant therefore fails to provide an adequate factual basis for challenging the Examiner’s findings with respect to privacy level.

Accordingly, Appellant has not shown error in the Examiner’s determination that the cited art teaches or suggests limitation (b).[10]

---

[10] Given our determination above, we need not reach whether limitation (b) may also be met by simply changing the display of a button when it is selected (e.g., changing the color of a button when pressed or making the button look depressed) or displaying text as it is typed in a text box (e.g., in the text box for height or width).

*Limitation (c)*

Limitation (c) of claim 1 recites "storing information representative of said one or more user selected settings in a database."

Appellant argues that the AUA database stores "*addresses* to content," "not settings." Appeal Br. 60 (citing Ex. 1006, VDM '362, 2:3–5). According to Appellant, "user configurations are *not* stored in the AUA database, but rather in a distinct configuration file." *Id.* (citing Ex. 1005, VDM '316, 8:59–64, Fig. 10); *see also id.* at 79 (specifically addressing where privacy level is stored and further citing Ex. 1005, VDM '316, 9:2–4, 17:22–24).

The Examiner finds that "VDM '362 more clearly teaches that objects can be stored *with annotations* for controlling aspects of the objects." Ans. 14 (citing Ex. 1006, VDM '362, 2:18–23) (emphasis added). In particular, the Examiner finds "[t]he annotations may include settings such as . . . a privacy level [or] a width/height." *Id.* (citing Ex. 1006, VDM '362, 7:10–31, 8:12–23).

We agree with the Examiner. VDM '316 discloses that "[i]n the described embodiment, diary information stores three basic types of data:" (1) "an AUA-database specifying the content of the diary page(s) that was gathered or created by the user"; (2) "a cover (also called a 'presentation context') for the diary"; and (3) "configuration information for the user." Ex. 1005, VDM '316, 8:59–64. "An AUA is an 'Annotated Universal Address,' as described in U.S. patent application Ser. No. 09/144,717," which later issued as VDM '362. *Id.* at 8:64–65.

VDM '362 discloses that "AUAs . . . identify the location of the objects (the universal address part of the AUA) and have annotations for

controlling aspects of the objects." Ex. 1006, VDM '362, 2:18–21; *see also id.* at 2:39–41 (same). For instance, "AUA 300 further includes annotations 307, which indicate how to handle some aspect of the object information 132 or the universal address 305." *Id.* at 6:58–60. Examples of "annotations 307 may include . . . a natural size for the object, . . . a privacy level, a type of object indicator, etc." *Id.* at 7:10–13.

VDM '362 provides a more specific example of height and width as annotations. Figure 14 of VDM '362 shows a window very similar to Figure 4(h) of VDM '316 that allows the user to input an object such as an image, including boxes for height and width of the image. Ex. 1006, VDM '362, 8:6–9; Ex. 1005, VDM '316, 11:50–52. VDM '362 expressly refers to these boxes as inputting *annotations*: "Window 1400 further includes box 1415 for inputting a *width annotation* and a box 1420 for inputting a *height annotation*." Ex. 1006, VDM '362, 8:12–14 (emphasis added).

VDM '362 also provides a more specific example involving privacy level as part of an AUA: "For example, the AUA 134 may include a privacy level indicating that the AUA 134 should not be presented unless the user has the same privacy level or higher. The privacy level . . . may be defined by the user based on a response to a query." Ex. 1006, VDM '362, 7:21–26.

VDM '316 does state that "privacy level" can be an example of the "configuration information." *See* Ex. 1005, VDM '316, 9:2–4 ("The configuration information, such as privacy level, passwords, or the full name of the user, is user-specific."). To the extent this refers to the privacy level of the *diary* as a whole (*see* Ex. 1005, VDM '316, 3:57–59), similar to how the "full name of the user" also would be the same for the entire diary, that

disclosure would still be consistent with the disclosure of VDM '362 that a privacy level of an *object* is part of the AUA, which is stored in the AUA database. Regardless, VDM '362 must be considered for all it teaches.

Appellant does not provide any further argument specific to object weight or object position for limitation (c). As with the other examples discussed above, object weight and object position are "for controlling aspects of the object," and therefore it would have been obvious to a person of ordinary skill in the art to store them as annotations to the object in the AUA database. *See also* Ex. 1005, VDM '316, 13:22–37 ("positional change is saved in the user's diary information 122").

Accordingly, Appellant has not shown error in the Examiner's determination that the cited art teaches or suggests limitation (c).

*Limitation (d)*

Limitation (d) of claim 1 recites "generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database."

Appellant argues that "none of the passages that the Final Office Action cites discloses retrieving information from a database." Appeal Br. 84. "And to the extent that certain *content* may be stored in an AUA database, content is different from user selected settings (object attributes)." *Id.*

We are not persuaded by Appellant's argument, which largely relies on the same "settings" arguments that we rejected above. *See* Ans. 18–19. As discussed above, the Examiner relies on changes to objects where the changes are stored and retrieved as annotations in the AUA database.

To the extent Appellant argues that VDM '316 only discloses retrieving *content* from the AUA database rather than *annotations* (*see* Ex. 1005, VDM '316, 9:7–9 ("In step 308 [of Figure 3], diary applet 112 generates one or more pages of the diary in HTML in accordance with the cover, *content*, and configuration information." (emphasis added))), this argues the references individually. The annotations of the AUA database are explained in VDM '362, not VDM '316.

Moreover, even VDM '316 is clear that the Examiner's "settings" are retrieved and displayed in regenerated HTML files. For example, VDM '316 discloses, "A Diary applet regenerates the page to reflect the editing changes and passes it to the browser for display." Ex. 1005, VDM '316, 2:60–62; *see also id.* at 12:61–64 (similar). More specifically, "[o]ne of the functions of diary applet 112 is to generate the HTML 111 for the Web pages of the user's diary (which preferably are displayed by browser 110 in the browser window)." *Id.* at 6:40–43. To do this, "[d]iary applet 112 reads diary information 114 received from the server and generates HTML 111 for one or more diary pages in accordance with diary information 114." *Id.* at 7:1–3. As discussed above, "diary information 114" "stores three basic types of data," one of which is "an AUA-database specifying the content of the diary page(s) that was gathered or created by the user." *Id.* at 8:57–66. "FIG. 10 lists exemplary files provided to generate the contents of diary pages," and the first file listed in Figure 10 is "AUA-Database." *Id.* at 4:42–44.

VDM '316 also discloses specific examples of generating HTML files using the privacy levels and positions of objects. *E.g.*, Ex. 1005, VDM '316,

18:15–25 ("the diary applet generates HTML only for those portions of the diary that have a privacy level lower than or equal to the privacy level of the viewer who is viewing the diary"), 11:25–29 ("diary applet 112 will generate HTML . . . of objects having those privacy levels"), 13:22–28 ("If the diary owner indicates via several presses of button 494 of FIG. 4(i) that the content object is to move to the bottom position, applet 112 will eventually regenerate the diary page to look like the diary page in FIG. 4(m). Note that the selected content object [in FIG. 4(m)] has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page)."). VDM '316 also shows drawings of displayed webpages with images having height, width, and position, all of which are stored as annotations in the AUA database. *E.g.*, *id.* at Figs. 4(a), 4(j), 4(m), 4(n).

Accordingly, Appellant has not shown error in the Examiner's determination that the cited art teaches or suggests limitation (d).

*Limitation (e)*

Limitation (e) of claim 1 recites "building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages."

Appellant argues that "none of the cited passages discloses 'generat[ing] virtual machine commands for the display of at least a portion of said one or more web pages' and the Final Office Action does not identify

any such virtual machine commands that are generated at runtime." Appeal Br. 88.

The Examiner explains that "VDM '316 discloses a 'diary applet' that runs in a browser and makes use of a Java Virtual Machine." Ans. 8 (citing Ex. 1005, VDM '316, 6:52–56, 7:1–11); *see also* Final Act. 12. "VDM '316 discloses the buttons 482-486 within window 480 [in Figure 4(h)] and buttons 491-494 within window 490 [in Figure 4(i)] correspond to commands to said virtual machine" and "translate to instructions to the 'Java Virtual Machine' running the diary applet." Ans. 8; *see also* Final Act. 12.

VDM '316 confirms that when the diary owner clicks on a control handle, "[d]iary applet 112 executes appropriate action(s) on the selected content object identified by the handle" and "diary applet 112 regenerates the HTML for the diary page to reflect the edit." Ex. 1005, VDM '316, 12:44–64. Moreover, "the described embodiment uses a Java applet 112." *Id.* at 6:53–56.

Like VDM '316, the Specification of the '397 patent also discloses using "JAVA." *E.g.*, Ex. 1001, '397 patent, 1:52–67, 3:4–6. Outside of the claims, the only appearance of the phrase "virtual machine" in the Specification of the '397 patent is a single mention of a "JAVA Virtual Machine" in a different context (involving a thread for user verification). *Id.* at 35:34–38. VDM '316 similarly once mentions a "Java virtual machine." Ex. 1005, VDM '316, 15:35–37.

Notably, Appellant does not challenge the Examiner's determination that the prior art teaches or suggests the portion of limitation (a) reciting "at least one of said user selectable settings in said panel corresponds to

commands to said virtual machine," where "said virtual machine" refers back to the preamble's introduction of "a virtual machine capable of generating displays." Appellant also does not challenge the Examiner's finding that a Java applet uses a virtual machine and virtual machine commands.

Given that VDM '316 discloses using a Java applet, Java uses a virtual machine, and Appellant does not dispute that VDM '316 teaches or suggests "commands to said virtual machine" in limitation (a), Appellant's argument here for limitation (e) is conclusory, unsupported, and unpersuasive.

Accordingly, Appellant has not shown error in the Examiner's determination that the cited art teaches or suggests limitation (e).

### *Conclusion*

For the reasons discussed above, we sustain the Examiner's rejection of claim 1.

## OUTCOME

The following table summarizes the outcome of the rejection:

| **Claim(s) Rejected** | **35 U.S.C. §** | **Reference(s)/Basis** | **Affirmed** | **Reversed** |
|---|---|---|---|---|
| 1 | 103 | VDM '316, VDM '362 | 1 | |

## TIME TO RESPOND

Requests for extensions of time in this *ex parte* reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

Patent Owner:

LOWENSTEIN & WEATHERWAX LLP
1880 CENTURY PARK EAST, SUITE 815
LOS ANGELES, CA 90067

Third Party Requester:

ROPES & GRAY LLP
IPRM DOCKETING - FLOOR 43 PRUDENTIAL TOWER, 800
BOYLSTON STREET
BOSTON, MA 02199-3600

US006546397B1

(12) **United States Patent**
**Rempell**

(10) **Patent No.: US 6,546,397 B1**
(45) **Date of Patent: Apr. 8, 2003**

(54) **BROWSER BASED WEB SITE GENERATION TOOL AND RUN TIME ENGINE**

(76) Inventor: **Steven H. Rempell**, 38 Washington St., Novato, CA (US) 94947

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/454,061**

(22) Filed: **Dec. 2, 1999**

(51) **Int. Cl.**[7] .......................... **G06F 17/00**; G06T 13/00
(52) **U.S. Cl.** ................ **707/102**; 707/104.1; 707/501.1; 345/700; 345/473
(58) **Field of Search** ................................ 707/102, 103, 707/104, 501, 513, 517, 530, 104.1, 501.1; 345/333, 967, 326, 339, 348, 352, 700, 473

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,428,731 A * 6/1995 Powers, III ................. 707/501
5,842,020 A * 11/1998 Faustini ...................... 395/701
5,870,767 A * 2/1999 Kraft, IV .................... 707/501
6,035,119 A * 3/2000 Massena et al. ............ 717/100
6,081,263 A * 6/2000 LeGall et al. ............... 345/327
6,083,276 A * 7/2000 Davidson et al. .............. 717/1
6,148,311 A * 11/2000 Wishnie et al. ............. 707/513
6,191,786 B1 * 2/2001 Eyzaguirre et al. ......... 345/853

OTHER PUBLICATIONS

Piero Fraternali, "Tools and Approaches for Developing Data–Intensive Web Applications: A Survey", ACM Sep. 1999, pp. 226–263.*

Balusubramanian et al A Large–Scale Hypermedia Application using Document Management and Web Technologies, ACM 1997, pp. 134–145.*

* cited by examiner

*Primary Examiner*—Safet Metjahic
*Assistant Examiner*—Uyen Le
(74) *Attorney, Agent, or Firm*—Coudert Brothers LLP

(57) **ABSTRACT**

A method and apparatus for designing and building a web page. The apparatus includes a browser based build engine including build tools and a user interface. The build tools are operable to construct a single run time file and an associated database that describe, and when executed, produce the web page. The user interface includes a build frame and a panel. The build frame is operable to receive user input and present a WYSIWIG representation of the web page. The panel includes one or more menus for controlling the form of content to be placed on the web page.

**39 Claims, 68 Drawing Sheets**






Fig. 1 PRIOR ART


START
6
USER
INPUT
7
THE BROWSER BASED
BUILD TOOL CREATES AN
OBJECT DATABASE
8
HTML SHELL FILE AND
CAB/JAR FILE WITH
CUSTOMIZED RUN ENGINE
AND DATA BASE
9
UPLOAD TO
USER'S WEB SITE
10
BROWSER CALLS
THE RUN ENGINE
11
RUN ENGINE READS
DATABASE AND
EXECUTES THE ENTIRE
WEB SITE

Fig. 2




*Fig. 3a*

**BUILD TOOL COMPONENTS**




*Fig. 3b* **THE BUILD TOOL & BUILD PROCESS**




*Fig. 4a*

**RUN GENERATION AND RUNTIME COMPONENTS**




*Fig. 4b*

# RUN GENERATION & THE RUNTIME PROCESS




*Fig . 5* **INITIALIZATION**




*Fig. 6*

## COMMUNICATION OF USER INPUT DATA AND STATUS BETWEEN THE ENGINE AND THE INTERFACE.




*Fig. 7a*

**POPUP WINDOW AND PANEL INTERFACE AND COLOR TECHNOLOGY**




*Fig. 7b*

# IMPLEMENTATION OF PANEL INTERFACE OBJECTS




*Fig. 7c*

# IMPLEMENTATION OF TABBED POPUP WINDOWS




*Fig. 8*

**UPDATE INTERNAL DATA BASE AND SET FEATURE FLAGS**




*Fig. 9* **POLLING METHODS**




*Fig. 10*

**ANALYZE INPUT: ERROR CHECKING**




*Fig. 11*

**DIRECT WEB PAGE DATA ENTRY AND TEXT PROCESSING**




*Fig. 12* **IMAGE PROCESSING**




*Fig. 13*

**BUTTON, IMAGE AND PARAGRAPH STYLE SETTINGS AND TECHNOLOGY**




*Fig. 14*

## VIDEO AND AUDIO FILE/CHANNEL PROCESSING




*Fig. 15*

**FRAMES, TABLES, FORMS AND DRAW OBJECTS**




*Fig. 16*

**USER INTERACTION SETTINGS AND TECHNOLOGY**




*Fig. 17*

**ANIMATION SETTINGS AND TECHNOLOGY**




*Fig. 18*

**TRANSFORMATION SETTINGS AND TECHNOLOGY**




*Fig. 19*

**OBJECT TIME LINES AND TECHNOLOGY**




*Fig. 20*

**WEB PAGE TRANSITION ANIMATIONS, TIME LINE SETTINGS AND TECHNOLOGY**




*fig. 21a*

## FILE OPERATIONS




*fig. 21b*

# VIEW OPERATIONS




*Fig. 22*

**DYNAMIC WEB PAGE RESIZING PROCESS**

Fig. 23


Image Animation Specifications:
backgrounds
Competition
Corel
Databases
DOS Prompts for DOS only Programs
Gamedisk
html
All Files (*.*)




*Fig. 24*

**EXTERNAL DATA BASE CREATION: SECURITY AND OPTIMIZATION TECHNIQUES**




*Fig. 25*

# CREATE CUSTOMIZED AND OPTIMIZED RUNTIME ENGINE




*Fig. 26*

# CREATE THE HTML SHELL FILE




*Fig. 27*

# CREATE THE CAB/JAR FILES




*Fig. 28*

**WEB PAGE SIZE GENERATION TECHNOLOGY**




*Fig. 29*

**READ DATA BASE AND GENERATE NECESSARY OBJECTS.**




*Fig. 30*

# WEB PAGE GENERATION WITH SCALING TECHNOLOGY




*Fig. 31*

# THE MULTILEVEL WEB PAGE AND OBJECT THREAD TECHNOLOGY




*Fig. 32*

# WEB PAGE TRANSITION ANIMATION




*Fig. 33* **OBJECT TIME LINE TECHNOLOGY**




*Fig. 34*

**CHILD TIME LINES FOR TEXT BUTTON AND IMAGE OBJECTS**




*Fig. 35*

# COMPLETE WEB PAGE AND OBJECT THREAD LOOP




*Fig. 36*

**RESPOND TO USER INTERACTIONS**



400 THE PANEL
410 The Menu Bar
440 Tool Bar
The Panel's Interface Objects
An Image Object below.
This is a paragraph.
500 THE BUILD FRAME
480 Popup Window
470 Drop-Down Lists
A Popup Menu: This is a Button


Fig. 37



Fig. 38



Fig. 39

Fig. 40





Fig. 41




Fig. 42




Fig. 43




Fig. 44




Fig. 45


C:\WWWebmart\bridget\.htm
Change a Text Button Style.
Mouse Over Button Style
Mouse Click Button Style
Transitional Button Style
Time Line Button Style

Fig. 46


Change a Text Button Style.
Define the Text Button Style's Interactions
Mouse Over Button Style
Mouse Click Button Style
Transform Button Style
Define the Text Button Style's Time Line
Appearance
Departure
2 Seconds
Zoom In
4 Seconds
None
Immediate
Shrink NE
Shrink SE
Shrink SW
Exit N
Exit NE
Exit E
Exit SE
Text Button ...

Fig. 47


Color Interface Technology
Headline
Body Text
No Style
None
Button
Up
Text Color

Fig. 48


Image Animation Specifications
None
2 Seconds
No Style
Body Text
Normal

Fig. 49




Fig. 50

Fig. 51






Fig. 52




Fig. 53




Fig. 54



Fig. 55



Fig. 56

Fig. 57


Animating a Text Button.
Text Button Animation - Microsoft Internet Explorer
Text Button Animation Specifications
Zoom In
Zoom Out
Grow NW
Grow NE
Grow SE
2.5 Seconds
3 Seconds
3.5 Seconds
4 Seconds
4.5 Seconds
Animation Cycles


Image Animation Specifications
Fade In
Fade Out
Zoom In
Zoom Out
Rotate
Grow NW
Grow NE
2.5 Seconds
3 Seconds
3.5 Seconds
4 Seconds
4.5 Seconds
5 Seconds
6 Seconds
None
Body Text
No Style

Fig. 58

*Fig. 59*


Transforming a Text Button.
Initial Delay:
2 Seconds
Mouse Over Button
Mouse Off Button
Mouse Click Button
Popup Button
Mouse Off Button
During Animation


C:\WWWWebeserv\bedgefl.html
Define the Transformation for the Current Image
Initial Delay
2 Seconds
Speed
Delay
Over Image
Off Image
Click Image
4 Seconds
1 Second
Off Image
4 Seconds
1 Second
Body Text
No Style
None

Fig. 60


An Animated Text Button
Text Button Time Line - Microsoft Internet Explorer
Define the Time Line for the Text Button:
Appearance
Time
Method
Speed
Frames
Immediate
None
Immediate
10
Departure
Delay
Method
Speed
Frames
Stay
None
Immediate
10
Define the Time Line for the Child Image
Define the Time Line for the Child Button:
5 Seconds

Fig. 61


Animated Image
Image Time Line - Microsoft Internet Explorer
Define the Time Line for the Child Image:
Appearance
Departure
Define the Time Line for the Image:
Define the Time Line for the Child Button:
Delay
Method
Speed
Frames
Time
None
Immediate
5 Seconds
Stay
Paint Shop Pro...

*Fig. 62*


Define Web Page - Microsoft Internet Explorer
Zoom Out
Body Text
No Style
0.1 Second
0.5 Second
1 Second
2 Seconds
4 Seconds
Fade In
Zoom In
Zoom Out
Zoom to Upper Left
Zoom to Lower Right
Rotate to the Left

Fig. 63

# BROWSER BASED WEB SITE GENERATION TOOL AND RUN TIME ENGINE

## FIELD OF THE INVENTION

The present application is directed to computing systems, and more particularly to methods and apparatus for building a web site using a browser-based build engine.

## BACKGROUND

Conventional web site construction tools operate on traditional operating system platforms and generate as output HTML (hyper text mark-up language) and Script Code (e.g., JavaScript). A browser draws a web page associated with the web site by interpreting the HTML and JavaScript Code. However, conventional mark-up and scripting languages include numerous inherent limitations. Conventional mark-up and scripting languages have not been designed for serious multimedia applications. They have almost no file handling ability and very little computational power. In addition, they are remarkably slow and inefficient.

As such it is virtually impossible to write a web publishing application in HTML and JavaScript. All conventional implementations must, and do, utilize a full-featured programming language, such as C++ or Visual Basic. Since the current popular browsers do not support these languages, by necessity, conventional web publishing applications run on platforms other than the World Wide Web (WWW) and its browsers. Therefore, at best, a conventional web publishing application can offer only a crude preview capability of what a real web page will look like.

Although C++ and Visual Basic are very capable languages, the conventional web publishing applications written in these languages are still necessarily limited by the limitations inherent in their form of output, which as described above is typically HTML and scripting code. As such, a conventional web publishing application written in one of these languages suffers from the severe performance problems inherent in these languages.

For example, HTML and JavaScript are incapable of reformatting text and scaling buttons or images dynamically. In addition, most conventional web publishing applications design a web page layout to fit into a 640 pixel wide screen. This means that the ability for higher resolution screens to display more data horizontally is lost. Since capability is wasted on the horizontal plane, unnecessary vertical scrolling may be required. Further, on higher output resolution devices (screens), unsightly extra white space or background may be prevalent.

## SUMMARY

In one aspect the invention includes a Browser Based build engine that is written entirely in a web based full featured programming language (e.g., JAVA). A Browser Based Interface (the “Interface”) between the web designer and the build engine is included. The browser-based interface can be written in the World Wide Web’s (WWW) Hypertext Markup Language (HTML) and its Extensions (Dynamic HTML, JavaScript and Cascading Style Sheets). The Interface includes a unique set of communication techniques. One technique allows for effective two-way communications between a JAVA engine and JavaScript. Another technique allows for communications between a JAVA applet object inside a JavaScript window, with the JAVA engine, which permits the implementation of advanced intelligent interface objects, such as a “slider” or a “dial”.



In one aspect the invention includes a screen resolution sensing mechanism that causes a build engine (i.e. build tools) to adopt its interface to the web designer’s screen resolution.

In one aspect, the invention includes a multi-dimensional array structured database, that, in addition to storing the numeric and string data found in conventional databases, also stores multi-dimensional arrays of various multimedia objects. They include colors, fonts, images, audio clips, video clips, text areas, URLs and thread objects. The invention includes a run time generation procedure that creates a compressed web site specific customized run time engine program file, with its associated database and a build engine generated HTML shell file.

The invention can include web page scaling technology, so that when the web site/web page is accessed on the WWW, the web pages and all the objects within them can be scaled to the user’s screen resolution and to the then current browser window size.

In one aspect, the invention includes a proprietary multi-level program animation model (threads) that responds to multiple user interactions and time sensitive operations simultaneously.

In one aspect, the invention includes a mechanism for the dynamic resizing of the build engine’s web page size during various editing operations.

In one aspect, the invention includes techniques for creating browser based interface objects that visually and behaviorally are identical to those of the MS Window’s standard.

Aspects of the invention can include one or more of the following features. A browser based build engine is provided that includes a browser based interface. The entire web site build process is WYSIWYG (what you see is what you get), with the web designer working directly on and with the final web page. The data produced by the build engine is processed and ultimately placed into a multi-dimensional array structured database, and stored in an external file. A run time generation procedure creates a compressed program customized run time engine file, with an associated database and a build engine generated HTML Shell File.

When the web site/web page is accessed on the WWW, web page scaling technology can be accessed to generate web pages that are scaled to the user’s screen resolution. A technique is provided so that an applet’s size (height and width) can be set in real time under the control of either the interface or the build engine. At the same time a multi-level program animation model (threads) is activated for user interactions and time sensitive operations.

The browser based interface technologies create a set of interface objects with a look and feel that is identical to that of MS Windows, yet includes technologies that equal or occasionally surpass those of high end word processors, desk top publishers, and image processing software programs, particularly in the areas of interaction, animation, and timeline technologies. The run time engine includes multimedia capabilities often rivaling the digital processing capabilities seen on television and in the movies.

Because of the implementation of a variety of performance and file reduction techniques, the entire run time environment can range from as low as 12K, and no larger than 50K. This depends upon the features selected by the web designer. Although the compressed image, audio, and/or video files must also be downloaded, with a reasonable web site design, web pages should load quickly. The initial run time environment is no larger than 25K, thus the initial

web page should generally load in less than 2 seconds, and subsequent web pages in less than 1 second with a 56K modem, even with numerous image files.

The present invention provides a real time, dynamic linkage between JAVA and HTML including two-way communications, in real time, between JAVA and JavaScript.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing aspects and many of the attendant advantages of the invention will become more readily appreciated through the following drawings and their associated screen shots, referred to throughout the detailed description, wherein:

FIG. **1** is a flow chart depicting a prior art conceptual overview of how a user and a web browser interface.

FIG. **2** is flow chart depicting a conceptual overview of how a user interfaces with a web browser when implementing the present invention to construct a web site.

FIG. **3***a* is a schematic diagram showing the main components of a build tool in accordance with one implementation of the present invention.

FIG. **3***b* is a process flow diagram showing a build process in accordance with one implementation of the present invention.

FIG. **4***a* is schematic diagram showing the main components of a run generation tool in accordance with one implementation of the present invention.

FIG. **4***b* is process flow diagram showing a run time process in accordance with one implementation of the present invention.

FIG. **5** is a flow chart, with its attendant screen shot shown in FIG. **37**, that depicts a detailed view of a build time initialization procedure in accordance with one implementation of the present invention.

FIG. **6** is a flow chart, with its attendant screenshots shown in FIGS. **38–48**, that depicts a detailed view of the build time supported user input techniques and techniques for communication of data and status between the build engine and the interface in accordance with one implementation of the present invention.

FIG. **7***a* is a flow chart that shows an overview of the build time techniques for implementation of pop-up windows (usually called "dialog boxes" in MS Windows), the panel interface, and interface for color selection.

FIG. **7***b* is a flow chart, with its attendant screenshots shown in FIGS. **37–38**, that shows a detailed view of the build time techniques for implementation of panel interface objects, including the menu bar, menus and sub-menus, the tool bars, status fields, interactive fields, and interactive pull down lists, in accordance with one implementation of the present invention.

FIG. **7***c* is a flow chart, with its attendant screenshots shown in FIG. **37** and FIG. **63**, that shows a detailed view of the build time techniques for implementation of tabbed pop-up windows (also called "dialog boxes" in MS Windows).

FIG. **8** is a flow chart that shows a detailed view of the build time techniques for updating the internal databases and the setting of feature flags for run time optimization purposes.

FIG. **9** is a flow chart, with its attendant screenshot shown in FIG. **37**, that shows a detailed view of the build time polling methods used to facilitate communication from the JAVA build engine to the interface.

FIG. **10** is a flow chart that shows a detailed view of the build time techniques for analyzing user input for error checking and data integrity.

FIG. **11** is a flow chart, with its attendant screenshot shown in FIGS. **38–41**, that shows a detailed view of the build time methods for direct text entry at an arbitrary cursor position and text editor implementation methods.

FIG **12** is a flow chart, with its attendant screenshot shown in FIGS. **49–56**, that shows a detailed view of the build time techniques for reading external image files, creating them on a web page, and then manipulating them through either direct mouse interaction or through the interface's panel/windows.

FIG. **13** is a flow chart that shows a detailed view of the build time implementation of text, button and image styles in accordance with one implementation of the present invention.

FIG. **14** is a flow chart that shows a detailed view of the video and audio processing in accordance with one implementation of the present invention.

FIG. **15** is a flow chart that shows a detailed view of the frame, table, forms, and draw objects processing and technology in accordance with one implementation of the present invention.

FIG. **16** is a flow chart that shows a detailed view of the build time methods for supporting various user interactions at run time.

FIG. **17** is a flow chart, with its attendant screenshots shown in FIGS. **57–58**, that shows a detailed view of the build time methods for text button and image object animation.

FIG. **18** is a flow chart, with its attendant screenshots shown in FIGS. **59–60**, that shows a detailed view of the build time methods for text button and image transformations.

FIG. **19** is a flow chart, with its attendant screenshots shown in FIGS. **61–62**, that shows a detailed view of the build time methods for text button and image time lines.

FIG. **20** is a flow chart with its attendant screenshot shown in FIG. **63**, that shows a detailed view of the build time web page transition animations and time lines.

FIG. **21***a* is a flow chart that shows a detailed view of file operations performed in accordance with one implementation of the present invention.

FIG. **21***b* is a flow chart that shows a detailed view of the view operations performed in accordance with one implementation of the present invention.

FIG. **22** is a flow chart that shows a detailed view of a dynamic web resizing process that is activated by the "Open" and "Web Site" commands under the "File" menu and the "Zoom" command under the "View" menu.

FIG. **23** is a screen shot showing a file selection window operation in accordance with one implementation of the present invention.

FIG. **24** is a flow chart showing a detailed view of an external database in accordance with one implementation of the present invention and also shows the security and optimization techniques that can be employed.

FIG. **25** is a flow chart showing a detailed view of a method for creating a customized and optimized run time engine in accordance with one implementation of the present invention.

FIG. **26** is a flow chart showing a detailed view of the methods for creating an HTML shell file in accordance with one implementation of the present invention.

FIG. **27** is a flow chart showing a detailed view of the methods for creating compressed CAB and JAR files in accordance with one implementation of the present invention.

FIG. **28** is a flow chart showing a detailed view of the technology for dynamic web page size creation in accordance with one implementation of the present invention.

FIG. **29** is a flow chart showing a detailed view of the methods for reading the multimedia database and generating the necessary objects in accordance with one implementation of the present invention.

FIG. **30** is a flow chart showing a detailed view of the methods for dynamically scaling the web page object(s) to different screen resolutions and window sizes in accordance with one implementation of the present invention.

FIG. **31** is a flow chart showing a detailed view of the methods for executing a multi-level web page and object thread architecture in accordance with one implementation of the present invention.

FIG. **32** is a schematic diagram that shows a detailed view of the web page transition animation architecture in accordance with one implementation of the present invention.

FIG. **33** is a schematic diagram that shows a detailed view of the parent object time line architecture in accordance with one implementation of the present invention.

FIG. **34** is a schematic diagram that shows a detailed view of the child object time line architecture in accordance with one implementation of the present invention.

FIG. **35** completes the flow chart begun at FIG. **31**.

FIG. **36** is a flow chart showing a detailed view of the methods for responding to user interactions in accordance with one implementation of the present invention.

FIGS. **37–63** are screen shots of the user interface presented by the build process in accordance with one implementation of the present invention.

## DETAILED DESCRIPTION

Referring to FIG. **1**, in a prior art process for creating and displaying a web site, the user either directly writes HTML and Script Code providing user input at **1** or operates a related prior art product at **2**, which generates the HTML and Script Code at **3**. A separate file, with its attendant HTML and Script Code is uploaded for each separate web page in the web site at **4**, which is then interpreted by a browser when accessed at **5**.

FIG. **2** shows a process for creating and displaying a web site in accordance with one aspect of the invention in which, a user operates a build tool at **6**, working directly with one or more of the final web pages in a full WYSIWYG mode. The build tool accepts the user input and creates a multi-dimensional embedded multimedia object database at **7**. A run time generation process is then invoked to create the necessary run time files at **8** (including HTML shell, CAB/JAR files and a customized runtime engine) which are then loaded to a user's web site at **9**. The web page(s), when viewed by a web surfer, are activated by the browser calling the customized run time engine at **10**. The run time engine then begins to read the database and down load image, audio and video files, while simultaneously drawing the first web page for viewing or user interaction at **11**.

Build Tool and Process

FIG. **3***a* shows a build tool **350** at the detailed component level. The build tool includes a build engine **352**, interface **354**, screen sensing mechanism **356**, multi-dimensional array structured database **358**, interface's database **360**, web



page scaling engine **364**, time line engine **366** and installation Program **368**. The operation and use of each of these components is described in greater detail below.

FIG. **3***b* is a flow of the build process executed by the build tool to create a web page/web site. Referring to FIGS. **3***a* and **3***b*, the process begins with an initialization (**12**) and continues through to a point where a web site has been defined and stored in the build engine's internal database (**29**).

The build tool **350** includes plural individual tools that are created and initialized at (**12**). The processes for creating and initializing build tools are described in greater detail below in association with FIG. **5**. After the build tools are created and initialized at **12**, the build tool **350** interacts with the user, receiving user commands (actions), for example, to build a web site. The build tool **350** processes user responses and communicates the same and status information to both the build engine **352** and interface **354** at **13**. The processes for interacting with the user are described in greater detail below in association with FIG. **6**.

In one implementation, the interface includes a panel (and its objects, including a menu bar, menus and sub-menus, tool bars, status fields, interactive fields and interactive pull down lists), pop-up windows (called "dialog boxes" in MS Windows), color and alert message interface technologies, built with HTML, Dynamic HTML (DHTML), JavaScript, and Cascading Style Sheets (CSS). Interface **354** responds to the user input and may display a pop-up window, update the interface objects, or display alert messages, as shown at **15**. The operation of the interface **354** is described in greater detail below in association with FIG. **7***a*, FIG. **7***b* and FIG. **7***c*.

As the build engine **352** receives data and status information, it updates an internal database (part of multi-dimensional array structured database **358**) and sets feature flags at **14**. The processes for updating the internal database and setting flags are described in greater detail below in association with FIG. **8**. To enable effective two-way communication between the interface and the build engine, polling technology is included as shown at **16**. The details of the polling process are described in greater detail below in association with FIG. **9**.

Whenever user input is received, the build tool **350** analyzes the input including error checking at **17**. In one implementation, the input is analyzed and then processed by object type (class). The process for analyzing input to determine type is described in greater detail below in association with FIG. **10**. In one implementation, the number of different object processing technology classes are four, and include direct text entry (**18**), image processing (**19**), video or audio files and links (**21**) and frames, tables, forms and draw objects (**22**). The build tool **350** processes the user input based on class. The processes invoked for direct text entry are described in greater detail below in association with FIG. **11**. The processes invoked for image processing is described in greater detail below in association with FIG. **12**. The processes invoked by the text button, paragraph, and image style technologies are described in greater detail below in association with FIG. **13**. The processes invoked for processing audio and video files and channels are described in greater detail below in association with FIG. **14**. The processes invoked for processing frames, tables, forms and draw objects are described in greater detail below in association with FIG. **15**. When an image, text button or paragraph object is to be inserted in the web page, the current style that is selected in the panel defines the initial settings used when creating the object in the web

page. As such, button, image and paragraph style setting and technology will be invoked at **20** depending on the user input. The processes invoked by the paragraph style setting and technology is described in greater detail below in association with FIG. **13**.

After the input is processed as described above, a check is made to determine if one or more animation or transformation (interaction) techniques are to be invoked at **23**. The run time engine provided in accordance with the teachings of the present invention support various user interactions, including support for numerous animation and transformation techniques, and both web page and object time lines. Depending on the user selections, one or more technologies may be invoked. In the implementation shown, the build tool **350** is configured to check to determine if the input data is related to plural technologies including: user interaction technology (**24**), animation technology (**25**), transformation technology (**26**), object time line technology (**27**) and web page transition animation technology (**28**). The processes invoked for user interaction technology are described in greater detail below in association with FIG. **16**. The processes invoked for animation technologies are described in greater detail below in association with FIG. **17**. The processes invoked for transformation technologies are described in greater detail below in association with FIG. **18**. The processes invoked for object timeline technologies are described in greater detail below in association with FIG. **19**. The processes invoked for web page transition animation technologies are described in greater detail below in association with FIG. **20**.

After the build tool **350** has processed the user input, one or more file operations can be invoked at **29***a*. In one implementation, the file operations are "save", "save as", "new", "close", "open", "apply" and "web site". If "open" or "web site" are selected, the build tool **350** initiates the dynamic web page resizing process at **29***c* (See FIG. **22**). If "save" or "save as" are selected, the build tool **350** initiates a run generation process (See FIG. **4** and FIG. **24**). File operations "close", "open", and "new" can also initiate the run generation process, based on the state of the build process and user action.

At any time during the processing of user input, one or more view operations can be invoked at **29***b*. In one implementation, the view operations supported are "normal", "preview", "play", and "zoom" (at various zoom percentages). If any of the "zoom" levels are selected, the build tool initiates the dynamic web page resizing process at **29***c* (See FIG. **22**). If the "preview" or "play" view operations are selected they will initiate the run time process (See FIGS. **28** through **36**). FIG. **4***a* shows a run generation and runtime tool **370** at the detailed component level. The run generation and runtime tool **370** includes a run generation procedure **371**, web scaling engine **372**, a database **374** and a (web) page size generation engine **376** and run time engine **377** including a runtime user interaction engine **378**, a runtime timeline engine **380** and a runtime drawing, animation, audio, and video engine **382**. In one implementation, run time engine **377** includes plural engines, each of which may in themselves include plural engines.

FIG. **4***b* shows the run processes including methods for creating the run time files, including the external database, the web site specific customized run time engine, the HTML shell file, and the compressed CAB/JAR file. The run processes also include methods for scaling each web page to the web surfer's then current screen resolution and web browser window size. After a web page has been scaled, a run time engine executes a multi-level thread technology, which presents to the viewer web pages that can operate under time lines that may include animated transitions. Associated with the web page time lines can be object time lines that may define entrance, main and exit animations, transformations, and synchronized time lines for child objects. Each object can have multiple object states, responsive to various user interactions, which can result in numerous types of visual and audio responses and actions.

Referring now to FIGS. **4***a* and **4***b*, a run generation process **360** begins by invoking the run generation procedure **377**. The run generation procedure **371** begins by creating the external database (part of database **374**) at **30**. The external database may include references to image, video and audio files, and video and audio channels. The process for creating the external database is described in greater detail below in association with FIG. **24**. A customized and optimized run time engine (run time engine **377**) is created at **31**. The customized and optimized run time engine (run time engine **377**) generates the web pages for the web site and is activated from the user's server. The process for creating the run time engine **377** is described in greater detail below in association with FIG. **25**. The HTML shell file is created at **32**, and then the CAB and JAR files are created at **33***a*. The HTML shell file includes JavaScript Code to activate and interrogate the page size generation engine **376**, and to activate the entire runtime engine. The CAB and JAR files both include the runtime engine and database in compressed executable form. The CAB file(s) will be activated by the HTML shell file if it senses the browser as being Microsoft Explorer, otherwise it will activate the JAR file(s). The processes for creating the HTML shell file and the CAB and JAR files are described in greater detail below in association with FIG. **26** and FIG. **27**, respectively. The run generation process portion of the run processes is completed as the HTML shell file and the CAB and JAR files are uploaded to the user's web site at **33***b*.

After the upload, the run time process **365** portion begins with the run time engine **377** invoking a web page size generation technology (engine) **376** at **34**. The web page size generation technology can be used to determine the screen resolution and the current browser window size. The process for invoking and initializing the web page size generation technology is described in greater detail below in association with FIG. **28**. The external database is read and the necessary objects generated at **35** from their stored external references. These objects include image, audio, and video objects. The processes for generating the necessary objects are described in greater detail below in association with FIG. **29**. A web page generation and scaling technology (web page scaling engine **372**) is then invoked at **36**. The web page scaling engine **372** can be used to reformat and scale objects that had been placed in a web page during the build process. The processes employed by the web page generation and scaling technology are described in greater detail below in association with FIG. **30**. The run time engine then, as necessary, executes a multilevel web page and object thread technology at **37** while the runtime user interaction portion **378** of run time engine **371** responds to user interactions at **38**. The processes invoked by the multilevel web page and object thread technology are described in greater detail below in association with FIGS. **31**–**35**. The processes invoked by the run time engine to respond to user interactions are described in greater detail below in association with FIG. **36**.

Detailed Build Processes

Referring now to FIGS. **3***a* and **5** through FIG. **22** the build tool **350** and its associated build process are described.

Referring first to FIGS. **3***a* and **5**, initialization methods are shown. At **39** the build tools are created as part of the execution of the installation program **368**. They can include:

1: Initial build tool HTML/JavaScript file (IBTF)

2: An initialization engine (IE).

3: A build engine.

4: The build engine parent HTML frame file. (PFF).

5: A "Control Panel and Status Line" HTML/JavaScript File ("panel") for;
  - Controlling the JavaScript database.
  - Calling and initializing all pop-up windows.
  - Reading all pop-up window values, and updating a JavaScript database
  - Calling the build engine and passing all necessary data and status information.
  - Polling the build engine for two-way JAVA/JavaScript communication.
    - Displaying and updating the status of its interface objects.
    - Issuing alert messages.
  - Processing direct user interactions with the panel's interface objects.

6: Numerous HTML/JavaScript files, one for each pop-up window.

7: JAVA applets, embedded in HTML/JavaScript pop-up window files.

8: A build engine HTML definition file that is created and modified dynamically.

The initialization and build engines can be placed in a JAVA wrapper so that JavaScript code may receive and process return values from JAVA methods. The initialization and build engines are also created in a "Signed" CAB file, and assigned the necessary security rights, so that the engines can assert the necessary permissions, if permitted by a given browser's security manager, when read or write operations are required. In one implementation, an installation program is run prior to the first use of the build tools. After installing all of the files, the installation program can install the necessary class libraries required by the run generation process in which the customized and optimized run time engine is created (See FIG. **25**). The installation program can also set the necessary environmental variables and installation options.

At **40** the web surfer points a browser at (i.e. calls) an initial build tool HTML/JavaScript file (IBTF). At **41** the IBTF identifies the current browser type and version number. Presently, each browser has different security manager implementations. In one implementation, the invention supports the following three categories:

1: With appropriate signing and time stamping, and with appropriate assertions of permissions, the browser will permit local read/write operations.

2: With appropriate signing and time stamping, and with appropriate assertions of permissions, the browser will permit local read operations, but write is only legal if sent to a server.

3: Local read/write operations are illegal, but are permitted on the server. The IBTF can include a flag that can be set to indicate which security implementation is supported, so that all subsequent read/write operations will comply with the current browser's security manager.

At **42**, the IBTF causes the browser to execute the IE so as to sense the screen resolution and for adapting the interface to the user's screen resolution. In one implementation, after entering a delay loop and waiting for the IE to report it is fully loaded and initialized, the IBTF calls two IE methods, which return the width and height of the current screen and browser window. The IBTF then checks for the presence and value of a "mode cookie", to determine whether this is an initialization process, a web site open command process, or a dynamic web page resizing process. If the mode cookie is set to initialize, or it doesn't exist, the IBTF calls the IE to generate the build engine's HTML definition file. At **43** the IE then asserts the required security permission and at **44** creates a build engine HTML definition file and writes this file to the local disk (as appropriate). At **45** the IBTF then turns control over to the PFF for activating the "paner" and build engine and displaying the build engine user interface screen.



The build engine user interface screen includes a "panel" portion and a build engine portion, each of which are loaded into their respective frames, after which the web site page(s) build process can begin. Screen shot FIG. **37** shows a representation of the user interface presented by the build tool. The user interface includes a panel **400** and build frame **500**. Panel **400** includes a menu bar **410**, menus **420** and sub-menus **430**, tool bars **440**, status fields **450**, interactive fields **460**, interactive pull down lists **470** and operational pop-up windows **480**. The menu bar **410** can be used for selecting a menu command that will cause a menu to be drawn. The menu (one or menus **420**) can be used to select a feature command that could cause an operational pop-up window to be drawn, a direct user input technique or object manipulation technique to be activated, or a sub-menu **430** to be drawn. A sub-menu (one of sub-menu **430**) can cause the same type of events as that of a menu. The tool bars **440** include various icons that are shortcuts to feature commands that are also available through the menu bar and its menus. In addition, the tool bar **440** can be used to show the current state of a feature. Status fields **450** show the current value of a certain setting. Interactive fields **460** also show the current value of a setting, but can also be directly changed by the user by typing into the field, with the result immediately processed by the build engine **352** and displayed in the build frame **500**. Interactive pull-down lists **470** also show the current value of a setting, but, if selected with a mouse click, will drop down a selection list, which may have an elevator attached. The user can click on an item in the selection list, which will become the current setting with the result immediately processed by the build engine **352** and displayed in the build frame. Operational pop-up windows **480** can have tabs assigned if the number of choices within the pop-up window is large. One or more settings can be changed through a pop-up window, with the results immediately processed by the build engine **352** and displayed in the build frame **500**. These interface techniques are described in greater detail below in the build process.

The build frame **500** is used to present the actual web page as constructed by a user. The user can directly enter text, import images, video and audio for display/playback and create animations and transformations that can be viewed in the build frame. FIG. **6**, with its attendant screen shots FIG. **38** through **48**, shows the user input techniques supported in one implementation of the invention. In one implementation, the user inputs supported include: selection from a JAVA window object (**48**); selection from a JavaScript window (**49**) including selection with dual spin control (**50***a*) or selection from a JavaScript child window object (**50***b*); direct text entry (**51**); page resizing (**52**); direct object manipulation (**53**); and, selection from a JavaScript panel (**54**).

In the implementation shown, of the six user input techniques sensed at **13**, the code for supporting selections from a JavaScript pop-up window at **49** and selections from the "panel" at **54** were implemented entirely in HTML/JavaScript Code, while support for direct text entry at **51** and direct web page object manipulation at **53** were implemented entirely in JAVA (or any other browser-based full featured programming language). In one implementation, code for supporting selections from a JAVA Window object at **48** and dynamic web page resizing at **52** are implemented using both HTML/JavaScript and JAVA. Those of ordinary skill will recognize that, JAVA could have been used more extensively to implement the methods described at **48**, **49** and **54**. However, in order to achieve the most intuitive and MS Windows like interface, and because effective two-way communication between JavaScript and JAVA had been achieved (See FIG. **9**), the languages proposed appear to best support the particular user input technique.

For example, FIG. **23** shows an actual file selection window **2300**, implemented by the invention. This type of file selection window is available in JavaScript/HTML, but not supported by JAVA for applets. File selection window **2300** greatly enhances the interface for the user, as the image, sound clip, or video clip names need not be memorized. File selection window **2300** further eliminates possible operator error when typing in a pathname or filename. The present invention utilized the strengths of JavaScript/HTML with the power of JAVA to create a unique browser based interface solution. In one implementation, the HTML form element "INPUT type=file" was embedded in a JavaScript pop-up window to create the file selection window. The file selection window returns a string value of the image (or other file type) pathname to the pop-up window. The pop-up window's JavaScript then could be used to call a JavaScript function in the panel (panel **400**) which:

1: Reads the pathname value in the pop-up window.

2: Creates a string version of a valid URL by adding the correct URL protocol to the string.

3: Updates the panel's database (interface's database **360**).

4: Calls a JAVA method in the build engine, which casts the string value of the URL into a URL object, creates an image object which is then drawn on the screen, and updates its internal database.

User inputs that are a selection from a JAVA window object (**48**) permit the implementation of a vast array of intelligent user input interface objects, from sliders to dials, which are extremely intuitive and significantly enhance the user's ergonomic experience. In one implementation, user input interface objects are supported as follows. When a selection from a JAVA window is detected, a pop-up window (applet) is presented (associated with the feature being manipulated, e.g., color, volume) and an engine method is called to begin two-way communication (for passing as arguments any necessary status information). The engine begins polling a JAVA abstract object waiting for a static variable's value to change. The pop-up applet processes the value as defined by a user interaction event, and updates the static variable in that same JAVA abstract object with the new value. Upon detecting a change in the polled static variable, the engine calls the necessary methods to process that new value. These methods include can include a brightness filter that is applied to the image bitmap utilizing techniques very similar to that of that employed by the "fade in" and "fade out" animations, described in association with FIG. **33**

User inputs for a selection from a JavaScript pop-up window (**49**) can be made in a manner identical to that of making a selection from a dialog box under MS Windows, including the use of tabbed JavaScript pop-up windows. In one implementation when a selection from a JavaScript pop-up window is detected, the panel's (panel **400**) JavaScript opens a pop-up window. The pop-up window's initial values are set from a JavaScript database defined in the panel or by the panel calling the engine for the current values and then setting the initial values. In a tabbed JavaScript window, clicking on a tab will call the pop-up window's JavaScript in order to change the state and appearance of the tabbed JavaScript window in the expected way. The pop-up window's JavaScript calls the panel's JavaScript when a completion event occurs. The panel's JavaScript reads or the pop-up window's JavaScript writes the pop-up window's field values, causing the panel's database to be updated, and the panel then calls the appropriate build engine **352** method, passing as arguments the necessary data and status conditions. Initializing the pop-up window's values and updating the panel's database upon completion can alternatively be implemented by JavaScript functions executed within the pop-up window's HTML file.

In addition, there are interface extensions that can extend beyond the usual MS Windows implementations. One is support for a selection from a dual spin control at **50**A. Screen shots FIGS. **42**–**45** show a visualization of an implementation of this interface technique. Screen shot FIG. **42** shows the mouse placed over an upper spin control. Screen shot FIG. **43** shows the result after the user clicked once on the upper spin control. Notice that the value has been incremented by 1, and the text button object is now at a larger point size. Screen shot FIG. **44** shows a combo box list selected by the mouse with the user about to select a significantly larger point size. Screen shot FIG. **45** shows the result of that selection, including the effect on the text button object.

In one implementation, dual spin controls are supported as follows. Each spin control has three visual states, so that when the user places the mouse over the control it appears to light up, and when the mouse button is depressed (pressed down), the spin control is modified to give the appearance of being pressed. JavaScript methods are called in the panel (panel **400**) to:

1: process each mouse click event over either spin control,

2: range check as necessary,

3: update the value in the HTML frame object residing in the pop-up window,

4: update the JavaScript (panel **400**) database,

5: call the build engine **352**, if necessary, passing the necessary value and status.

If the mouse is clicked on a combo box, the selection window opens in the usual way. If a mouse click in that window is detected, another JavaScript method in the panel **400** is called to update the JavaScript database, and call the build engine **352**, if necessary, passing the necessary value and status as function call arguments.

Another interface extension is selection from a JavaScript child window at **50**B. This technique helps simplify the number of choices given to the user in a complex pop-up window operation. A selection from a JavaScript child window can be supported as follows. The panel's (panel **400**) JavaScript opens the pop-up window. The pop-up window and its child pop-up windows' initial values are set from the JavaScript database defined in the panel **400**. The pop-up window's JavaScript opens the child pop-up window and sets its initial values. The child pop-up window's JavaScript calls the pop-up window's JavaScript when a

completion event occurs. The pop-up window's JavaScript reads the child pop-up window's values, sets those values to its own internally defined variables, and calls the panel's JavaScript. The panel's JavaScript reads the pop-up window's values (which include the settings for its own fields as well as those of its child windows), updates its database, and calls the appropriate build engine **352** method, passing as arguments the necessary data and status conditions. Screen shots FIGS. **46–47** show a visualization of an implementation of a JavaScript child window. Screen shot FIG. **46** show a change text button style pop-up window. Screen shot FIG. **47** shows the result after the user selected the "Define the Mouse Down Text Button Style" child pop-up window.

Direct text entry is supported at any arbitrary cursor location. In one implementation, "text areas" are utilized in an unconventional way, in order to support full text entry, text editing, text button and paragraph styles, and reformat. Direct text entry can be defined at any arbitrary cursor location, and then text can be dragged to any other arbitrary location.

Text areas are objects that are utilized by JAVA primarily as an interface object for the implementation of a form and are generally "added" to the screen at the initialization time of a JAVA applet. Text areas are decidedly not WYSIWYG. The present invention creates text areas dynamically. Screen shots FIG. **38** through FIG. **41** show a visualization for an implementation of this technique. Screen shot FIG. **38** shows the user selecting a text object from the create text icon object from a tool bar of the panel (panel **400**). When the text icon object is selected, the cursor shape is changed to indicate the selection while the text icon object is in the select state. Screen Shot FIG. **39** shows that the cursor has changed shape and that the user has placed the cursor at an arbitrary location on the web page. Screen shot FIG. **40** shows the result after the user has clicked the mouse. A text insertion point and a selection rectangle are drawn at the arbitrary web page location. Screen shot FIG. **41** shows the result after the user has pressed the letter "W" on the keyboard. As can be seen in screen shot FIG. **41**, a draw method associated with the build process immediately hides the text area. However, text editor methods associated with the build process continue to utilize the text area as a hidden, dynamically resizing frame, whose size is subject to text button or paragraph style settings, by the amount of text, by the text's orientation (vertical or horizontal) and by the text's font style(s) and font size(s). As the build engine **352** detects a relevant mouse event or keyboard event, the build engine **352** updates the necessary variables that are defined as return values in specified build engine methods. Polling technology (see FIG. **9**) retrieves the relevant values and calls the necessary JavaScript method for processing. In one implementation, these same techniques (text area techniques) are used in the scaling technology (See FIG. **30**). Since the direct text entry and editing processes bypass completely the interface and the JavaScript code, the polling technology (See FIG. **9**) is used to pass the text string values back to the JavaScript database, in order for the interface's pop-up windows to be correctly initialized for subsequent text operations.

Direct text processing at **51** begins with the build engine **352** detecting a "Mouse Drag" or a "Mouse Double Click" event. In one implementation of the present invention, if a mouse drag event is detected, the entire initial anchor word (assuming the "mouse down" event placed the text insertion point within a word) is selected as well as the entire closing anchor word. If a double click event occurs over a word, the entire word is selected. If a double click event is detected over a special hot zone (for example, just to the left of a paragraph line), then an integral number of words are selected. Appropriate four-dimensional variables are set, and a draw system is called. The draw system paints the selected line segment in the marked text background and text color. The build engine **352** then sets a return flag to be read by the polling technology (FIG. **9**). A panel JavaScript poller (FIG. **9**) detects this flag and redraws the panel's "Text" menu object showing the choices available when text is selected. In one implementation, the "Text" menu includes choices of "Text Style", "Hot Link", "Preferences", and "Format". The states for the tool bar icon objects of "Bold", "Italic" and "Underline" are set appropriately as is the setting for the point size interactive drop-down list. The panel's JavaScript then calls an appropriate build engine method that resets the flag. If the panel's JavaScript detects the user selecting the "Text Style", "Hot Link", "Preferences" or "Format" choices, it creates the appropriate pop-up window. Upon detecting a user completion event, the panel's JavaScript reads the data settings in the pop-up window, closes that pop-up window, and sends this data to an appropriate build engine method for processing (See FIG. **11**). Dynamic web page resizing at **52** is invoked when the build engine **352** detects a user initiated web page resize event. This could be caused by the "Open" or "Web Site" commands from the "File" menu, or from a "Zoom" command from the "View" menu. This technology is explained in detail below in association with FIG. **22**.



Direct object manipulation at **53** includes dragging of any object, resizing of non-text objects, rotation and other image manipulation functions, as required. The processing for direct object manipulation begins by analyzing the type of object selected and the state of the object, as set by the interface based on a user's panel selection. The build engine **352** then changes the mouse cursor's appearance, and the type of selection rectangle, including which attachment points, if any, should be drawn and activated. (See FIG. **10** for the mouse event processing technology and FIG. **12** for image processing technology). In one implementation, the same direct object manipulation polling technology is used as described above with regard to direct text entry.

If a selection of an interactive field, interactive drop-down list object, or a toll bar icon object from the JavaScript panel is detected at **54**, then the following steps can be invoked, depending on the selection. The point size of a paragraph, a marked text range inside a paragraph or text button object can be changed. The state of an object's 3D frame can be changed. In one implementation, three states for an object frame are supported. The 3D frame can be drawn as a "raised" 3D object, as a "depressed" 3D object, or as a "raised" 3D object that turns into a "depressed" 3D object if a mouse down event is detected over the object to which the 3D frame is assigned. An object's style can be changed. The current web page can be changed. Finally, any other operation that has been defined by a tool bar icon object in the panel can be invoked. This includes the "file" menu choices of new, open and save, the "edit" menu choices of cut, copy and paste, inserting a text, button or image object onto the web page, applying or removing the bold, italic, and underline text attributes for a text or button object, centering or uncentering any web page object, setting the animation for a button or image object, changing the zoom level of the web page, or previewing the web site.

As each new user input is received and processed in accordance with the steps shown in FIG. **6**, at all times the internal databases of the JavaScript panel and the build engine **352** are maintained completely in synchronization.

Synchronization is maintained so that: all status information displayed by the panel is current and correct; all data and status information passed to the build engine **352** from the interface are consistent with the build engine's state at any given time; the values in all pop-up windows are correctly initialized. In order to meet these requirements, all of the variables in the JavaScript panel database are explicitly "typed", to be compliant with the strict variable typing methodology generally imposed in all full featured programming languages such as Java. As JavaScript does not explicitly type anything, where using JavaScript herein, all string, Boolean, and integer variables are typed. Full two-way real time communication support between the JavaScript/HTML interface and the JAVA build engine **352** is provided as described below in association with FIG. **9**.

FIG. **7***a* shows four tools utilized for an implementation of the pop-up window and panel interface technology (**15** of FIG. **3**). The panel and pop-up windows make extensive use of JavaScript mouse events, including onMouseDown, onMouseUp, onMouseOver, onMouseOut, onClick and onchange methods (**56**). The pop-up windows make extensive use of the JavaScript onLoad and onUnLoad methods. In one implementation, when a pop-up window is loaded by the panel, the panel goes into a wait loop, set for 5 times a second using the JavaScript setTimeout method, interrogating in each loop whether the pop-up window's status flag has been set. Meanwhile the pop-up window, when loaded by the browser, executes the onLoad method in order to set a flag in the panel informing the panel that the pop-up window is now loaded. Upon detecting the load event completion, the panel then proceeds to initialize the fields in the pop-up window. The panel will always close a pop-up window after detecting its completion event. However, if the user has closed the pop-up window in a non-standard way, the pop-up window executes the onUnLoad JavaScript method, which sets a flag in the panel notifying it that the pop-up window has been closed.

The JavaScript code in the panel and in all pop-up windows make extensive use of JavaScript method onKeyDown for the following operations:

1: When the focus is on the icon representing completion ("OK" is used in many MS Windows applications) causing the enter key to initiate a pop-up window/panel completion event.

2: When the focus is on the icon representing cancellation ("cancel" is used in many MS Windows applications) causing the Esc key to initiate a pop-up window/panel cancellation event.

3: When the focus is on any pop-up window or panel object, such as a data entry field, a check box, a radio button, a drop-down and scrollable list, a scrollable list, an icon, or a DHTML tab object (discussed below), the navigation keys are captured by the onKeyDown method, a JavaScript function is called, and the appropriate change is made. For all pop-up window and panel objects, when the Tab key or the combination of the Tab key with the Shift key are detected, the onFocus JavaScript method is employed and the focus moves to the appropriate pop-up window object. If the pop-up window or panel object is a data entry field, drop-down list or a scrollable list, all cursor key operations are detected and the insertion point is adjusted accordingly. If the pop-up window or panel object is a check box, radio button a icon, or a DHTML tab object, and a cursor key (up, down, left, right, home and end keys, with or without the Ctrl or Shift keys) is detected, the onFocus JavaScript method is employed and the focus moves to the appropriate pop-up window object.



One methodology for this feature requires that all keyboard events be monitored, at all times. When the scan code for the enter key is detected, the appropriate JavaScript function is called to close a pop-up window and to call the appropriate JavaScript function for processing of the relevant data (updated in the window) and communicating, as necessary, with the build engine **352**. In another implementation, rather than the panel going into a wait loop awaiting notification from the pop-up window for data initialization purposes the pop-up window, when loaded, executes the onLoad JavaScript method, and reads the required data values directly from the panel's database, utilizing the JavaScript "opener.fieldname.value" technique. Similarly, the pop-up window, when detecting its completion event, updates the panel's database with the revised values from its own fields and then calls the appropriate JavaScript function in the panel for further processing. Both implementations, and any combinations, assure that the pop-up windows are correctly initialized, the panel's database is correctly updated, and the data is successfully sent to the build engine **352** for processing.

Extensive use of JavaScript technology is employed to enhance the user interface and for communication between the various HTML frames and/or files, within a given HTML frame or file, between an HTML frame and the JAVA engine, and as a bridge between two different JAVA applets (**57**). Extensive use is made of JavaScript arrays to store the values of all page and object attributes, to initialize the correct values in all pop-up windows, and to pass data and status to the engine. Various JavaScript techniques are employed to "type" all variables (JavaScript does not explicitly type anything as described above) as a prerequisite for passing values to the build engine **352**. Variables that should be typed as strings, integers and Booleans are typed through the use of "Eval" and "New" JavaScript functions. The choice of color, found in most pop-up windows to define one or more color elements, can be implemented utilizing several innovative JavaScript techniques. They include:

1: Defining a complex image map through a JavaScript function utilizing arrays. Screen shot FIG. **48** shows a visualization of an image map. A JavaScript computational loop utilizing arrays can be used to define each individual rectangle in this color palette with its appropriate RGB value and a function call to the appropriate JavaScript method.

2: Limiting the color choices from the image map to only those colors that are designated as safe colors. Safe Colors are the subset of all colors that are browser independent, assuring a consistent color look across all browsers.

3: Supporting a dual color selection technology. The user can be presented with a color palette and can click on a particular color in the color palette. Image map technology can call a JavaScript function, which converts that choice into a RGB numeric definition. This definition updates the RGB values shown in screen shot FIG. **48**, as well as passing those values, though an appropriate function call, to a build engine JAVA method. The build engine **352** will then draw the actual color immediately on the web page. Alternatively, the user can select a value from Red, Green or Blue selection lists, which can be implemented using an HTML drop-down list form object. The value selected is then processed by an appropriate JavaScript function call to a build engine method, which converts the RGB to a JAVA compliant value, and then draws the actual color on the web page.

4: Supporting True Transparency. For appropriate color elements, such as the background for a text button object, the user can choose, either from the color palette by clicking on a "transparency" rectangle, as described above, or by selecting "TIR" from a Red, Green or Blue selection list. This choice is then processed by an appropriate JavaScript function call to a build engine method, that in turn sets a particular flag for the draw system (of the Build Tool) to not draw a background color for that object.

Innovative techniques are used to enable JavaScript to dynamically create HTML code based on real time conditions. Cookies can be used for data communication between HTML frames and HTML files, some of which were created in real time. Many unique combinations of HTML elements, including frames, forms, and tables, enhanced by JavaScript code, are utilized to create a extensions beyond that of the MS Windows interface (**58**). For example, a dual combo box/spin control for both small and large numeric incremental jumps can be implemented by a combination of form and table elements, mouse events, and JavaScript methods.

Extensive use of Cascading Style Sheets (CSS) was employed to create a consistent look for all pop-up windows, and for precision placement of various HTML elements (**59**).

FIG. **7***b* shows a detailed view of the build-time techniques for implementation of panel interface objects, including the menu bar, menus and sub-menus, the tool bars, status fields, interactive fields, and interactive pull down lists, in accordance with one implementation of the present invention (**15** of FIG. **3**). These techniques create panel interface objects that have the same look and feel of those which are implemented under the various MicroSoft Windows Operating Systems. In one implementation of the present invention, the status fields, interactive fields, and interactive drop-down lists are defined as HTML form objects (text boxes and lists) embedded within DHTML objects. The menu bar, menus and sub-menus, and the tool bars can be defined as pure DHTML objects. However, Cascading Style Sheets can be used for all panel interface objects; although more extensively with DHTML objects as will be described below. In an alternative implementation of the present invention, the status fields and interactive drop-down lists are defined as pure DHTML objects.

In one implementation of the present invention the menu bar at **270** is defined as sets of DHTML objects, each set corresponding to a menu command. Each set consists of four DHTML objects with absolute screen positioning, one defining the DHTML object in the Mouse Over state at **278**, the second for the Mouse Down state at **279**, the third for the Active state, and the fourth for the Inactive state. Each state has a different CSS style assigned, which defines the visual appearance of that state. When the build tool is initialized at FIG. **5**, the appropriate menu commands are initialized as active or inactive at **277**. If the menu command is defined to be inactive, that DHTML inactive object is assigned by a JavaScript function to the "visible" style attribute, while the other three DHTML objects are assigned the "hidden" style attribute. Screen shot FIG. **38** shows a visualization of the "Interactions" menu command in the inactive state. In the inactive state all user interactions are ignored. If the menu command is defined to be active, that DHTML active object is assigned by a JavaScript function to the "visible" style attribute, while the other three DHTML objects are assigned the "hidden" style attribute. While in the active state, the JavaScript functions for "onMouseDown", "onMouseUp", "onMouseOver" and "onMouseOut" are implemented. If a Mouse Down user interaction event is detected over an active menu DHTML object at **279**, a menu command specific JavaScript function is called. This function sets the DHTML object for the Mouse Down state to the "visible" style attribute, calls a generalized JavaScript function to reset the visibility states all the other appropriate DHTML objects, set certain status variables, and set the DHTML object which defines the menu associated with that menu command to the "visible" style attribute. Screen shot FIG. **37** shows a visualization of the "Image" menu command after having received a mouse down event, with its associated menu **420** having been set to the "visible" style attribute. If a mouse up user interaction event is detected over an active menu DHTML object at **281**, a generalized JavaScript function is called in which the DHTML object defining the mouse over state is passed as a function call argument. This function sets the DHTML object defining the mouse over state to the "hidden" style attribute thus resulting in the appearance as shown for the image menu command in screen shot FIG. **37**, even when the mouse has been moved off the menu object. If a mouse over user interaction event is detected over an active menu DHTML object at **278**, a generalized JavaScript function is called in which three DHTML objects are passed as function call arguments as well as a menu command name. These DHTML objects are the ones defining the mouse over state, the mouse down state, and the associated menu. This JavaScript function first tests to see if a menu has been activated by a previous mouse down event and is still visible. If so, a generalized "reset visiblity states" function is called, then both the mouse down and associated menu objects are set to visible. Finally the same menu specific function is called as with the mouse down event. If no menu is visible, then the object associated with mouse over state is set to visible. If a mouse off user interaction event is detected over an active menu DHTML object at **281**, a generalized JavaScript function is called in which the mouse over DHTML object and the menu command name are sent as arguments. Logic tests are made to determine which menu command object has been left, as well as whether any menus are currently visible. Depending upon the results, the mouse over DHTML object may be set to hidden.

In one implementation of the present invention the menus and sub-menus at **271** are defined as a set of DHTML objects, one for each menu choice, nested inside an DHTML object that defines the entire menu. Each menu object is given absolute positioning, while the menu items are given absolute positioning relative the menu objects origin. Both the entire menu and each choice are assigned CSS styles to define their visual appearances. For each menu choice the JavaScript functions for "onClick", "onMouseOver" and "onMouseOut" are implemented. If a mouse click event is detected at **280** and no sub-menu is defined, a feature specific JavaScript function is called. First the menu bar and the menus are set to their appropriate visibility states. Then setting their visibility attribute style to "visible" activates the appropriate tool bar icon DHTML objects. Finally the feature specific JavaScript code is executed as discussed herewithin, which may cause a pop-up window to be displayed, the Panel's database to be updated, and/or the build engine **352** to be called. If a mouse over event is detected at **278** and no, sub-menu is defined, a generalized JavaScript function is called in which the menu choice object is passed as an argument. This function first calls a generalized JavaScript function to close any pop-up windows, then set a status variable and finally executes DHTML commands to set the correct text and background

colors for the object. If a mouse off event is detected at **282** and no sub-menu is defined for a menu choice either immediately above or below, a generalized JavaScript function is called in which the menu choice object is passed as an argument. A status variable is set and DHTML commands are executed to set the correct text and background colors for the object. If a sub-menu is defined for a menu choice object, then the same sub-menu specific JavaScript function are called for both mouse click or mouse over events. This function performs the same steps as that of the generalized function that was called for a mouse over event, as well as setting the sub-menu object and its menu choice objects to the visible state. Screen shot FIG. **37** shows a visualization of the menu bar's "Image" command having been activated, the drawing of its associated menu **420**, the selection of the "Enhance" menu choice, and the drawing of the "Enhance" sub-menu **430**. In the event that the cursor is moved to an adjacent menu choice under the "Image" menu, such as "Animation . . . " or "Rotate", then a specific JavaScript function is called which, in addition to the functions executed by the generalized JavaScript mouse over function, also hides the "Enhance" sub-menu.

In one implementation of the present invention, the tool bars at **272** are defined as a DHTML objects, and a set of DHTML objects are defined for a tool icon. The tool is given absolute positioning and is assigned a CSS style in order to define is visual appearance. Each tool icon is assigned a set of three DHTML objects all with absolute screen positioning. The first DHTML object defines the mouse over state at **278**, the second for the mouse down state at **279**, and the third for the active state. Each state has a different CSS style assigned, which defines the visual appearance of that state. For each tool icon active state object the JavaScript functions for "onClick", "onMouseDown", "onMouseUp", "onMouseOver" and "onMouseOut" are implemented. GIF images are defined for the tool bar DHTML objects, and may be always visible. The inactive "grayed out" representations for each toll icon can be drawn on this image. When the build tool is initialized at FIG. **5**, the appropriate tool icon objects are defined as active or inactive at **277**. The inactive state for an tool icon is represented when all three of its associated objects are assigned the visibility style of "hidden". Screen shot FIG. **38** shows a visualization for several inactive tool icons including the icon commands for bold, italic, underline, left and centered. All user interaction events are ignored in the inactive state. If the tool icon, based on the state of the build engine and based on the polling technology described below, is set to an active state, then the tool icon's active state object is set to the visibility style of "visible". If a mouse click event is then detected at **280**, a feature specific JavaScript function is called in a manner identical to that for a mouse click event over a menu choice object as described above. If mouse down or mouse up events are detected at **279** or **281**, then respective generalized JavaScript functions are called, in which the DHTML object defining the mouse down state is passed as a function call argument. If a mouse down event was detected, then the generalized function sets the tool icon's mouse down object to the "visible" state. If a mouse up event was detected, then the generalized function sets the tool icon's mouse down object to the "hidden" state. If mouse over or mouse out events are detected at **278** or **282**, then respective generalized JavaScript functions are called, in which the DHTML object defining the mouse over state is passed as a function call argument. If a mouse over event was detected, then the generalized function sets the tool icon's mouse over object to the "visible" state. If a mouse off event was detected, then the generalized function sets the tool icon's mouse over object to the "hidden" state. Screen shot FIG. **37** shows a visualization of the button tool icon with both its associated the mouse down and active objects set to "visible". Screen shot FIG. **38** shows a visualization of the text tool icon with both its associated the mouse over and active objects set to "visible".

In one implementation of the present invention, the status fields at **273** and the interactive fields at **274** are defined as HTML text boxes. In an alternative implementation status fields are defined as DHTML objects. For both of these panel interface object types, under certain conditions, the panel draws status information into these panel interface objects. This information can result from user input as discussed in FIG. **6**, or through the polling and two-way communication technology between the interface and the build engine **352** as discussed below. In one implementation of the present invention the status fields are:

1: The color of the selected web page object, in which the red, green and blue settings are shown.
2: The animation state of the selected button or image object.
3: The zoom level for the current web page.
4: The point size for the selected text or button object.
5: The horizontal position, in pixels, of the mouse cursor.
6: The vertical position, in pixels, of the mouse cursor.
7: The type of web page object (text, button, image, table, form object, draw object, etc.,) if selected. The type of object that the mouse is over, if no object is selected.
8: The width, in pixels, of web page object (text, button, image, table, form object, draw object, etc.,) if selected. The width of the object that the mouse is over, if no object is selected.
9: The height, in pixels, of web page object (text, button, image, table, form object, draw object, etc.,) if selected. The height of the object that the mouse is over, if no object is selected.

Screen shot FIG. **38** shows a visualization of the status fields in one implementation of the invention **450**. In an alternate implementation using DHTML objects, the status fields will appear two-dimensional rather than the three-dimensional look currently shown.

There is one interactive field defined in one implementation of the present invention. Screen shot FIG. **37** at **460** shows a visualization of the page number interactive field. In addition to the current web page being displayed, either as a number in one implementation or as a user defined name in an alternative implementation, the user can place the cursor into this field and enter the desired page to go to. A click at **280** or Enter Key event will execute this function.

In one implementation of the present invention, the interactive drop-down lists at **275** are defined as HTML form lists. In an alternative implementation, status fields are defined as DHTML objects. For both of these panel interface object types, under certain conditions, the panel draws status information into these panel interface objects. The interactive drop-down lists behave in a manner very similar to that of interactive fields, except that when selected, a selection list drops down for selection. Depending upon the number of entries in the list, an elevator object may be drawn. The operations of selecting the interactive pull down list, the selecting of a list item, or the operation of the elevator is identical to that of comparable MS Windows objects. In one implementation of the present invention the interactive pull down list are:

1: Zoom. This interface object has dual spin controls as described above and is always selectable except when in a preview mode. It shows the current zoom level.

2: Button Style. This interface object is always selectable except when in preview. It shows the button style of the currently selected button, if any. Changing the button style will change the style of the currently selected button, and/or define the style of the next button to be created.

3: Point Size. This interface object has dual spin controls as described above and is selectable when a text or button object is selected. It shows the point size of the currently selected text or button object, if any. Changing the point size will change the point size of the currently selected text or button object.

4: Paragraph Style. This interface object is always selectable except when in preview. It shows the paragraph style of the currently selected paragraph, if any. Changing the paragraph style will change the style of the currently selected paragraph, and/or define the style of the next paragraph to be created.

5: Frame State: The state of the 3D frame (none, raised, pressed or live) of the currently selected text, button, or image object.

6: Image Style. This interface object is always selectable except when in preview. It shows the image style of the currently selected image, if any. Changing the image style will change the style of the currently selected image, and/or define the style of the next image to be created.

Screen shot FIG. **37** shows a visualization of interactive drop-down lists **470**. In an alternate implementation using DHTML objects, the interactive drop-down lists will appear two-dimensional rather than the three dimensional look currently shown.

Tool bar icon objects, status fields, interactive fields, and interactive pull down lists all show feedback of the current build engine state. The technology utilized by one implementation of the invention is described below.

FIG. **7***c* shows a detailed view of the of the build time techniques for implementation of tabbed pop-up windows (**15** of FIG. **3**). These techniques create a pop-up window interface that visually and behaviorally is identical to that which is implemented as dialog boxes under the various MicroSoft Windows Operating Systems. Pop-up windows can be non-tabbed as described in FIG. **7***a*, or can have from two to as many as **10** or more tabs, depending upon the complexity of the choices available to the user for a given feature. In one implementation of the present invention each tab at **283** is defined as a DHTML object at **284**. The tab is given absolute positioning and is assigned a CSS style at **286** in order to define is visual appearance. When a click is detected through the JavaScript "onClick" function, a tab specific JavaScript function at **285** is called within the pop-up window's HTML file. This function sets the display style attribute for the DHTML objects that define the settings for all the non-selected tabs to the display style attribute of "none". The DHTML objects that define the GIF image of the non-selected tab file representations are also set to the display style attribute of "none". The display style attribute for the DHTML objects that define the settings of the currently selected tab and the GIF image that depicts the selected tab file representation is set to the display style attribute of "". If there is to a change of the focus of the selected field within the now to be visible tab specific choices, the focus attribute for that object is executed. Screen shot FIG. **37** shows a visualization of a tabbed pop-up window, and screen shot FIG. **63** shows a collage of four views of a tabbed pop-up window with four tabs. Notice that each state of the tabbed pop-up window has a different tab file representation, showing the selected tab as being in the forefront.

The interface technology of the invention, in addition to its utilization as part of a web-based web site generation tool, can be used to provide a general purpose interface for all web-based applications that want a MS Windows compliant interface.

A process for updating the internal database of the build engine **352** is shown schematically in FIG. **8**. The database is compact and efficient in order to meet the performance requirements for the run time process. The database handles a wide selection of data objects, including multi media objects such as colors, fonts, images, sound clips, URLs, threads, and video. The database supports a multi level animation, transformation, and time line model (discussed in greater detail below). The database complies with the differing rules imposed by the various popular browser security managers.

The process begins by determining the type of data to be updated at **60**. Data that defines generic web site settings (See FIG. **21***a*), screen resolution values (See FIG. **21***a* and FIG. **24**), and the web page high watermark setting (See FIG. **24**) can be stored in a header record as boolean and integer variables and URL and color objects at **62** and **63**. Data that defines web page, paragraph, text button, and image style and text button, image and paragraph high watermark settings can be stored in one-dimensional arrays as boolean, integer and string variables and URL, font, image or thread objects at **61** and **64**. The URL, color, font, image and thread objects can also be created as required at **64**.

Data that defines text button, image, paragraph, or other parent objects and paragraph line high watermark settings can be stored in two-dimensional arrays (by web page and by object number) as boolean, integer, string, floating point variables and URLs at **65** and **66**. Again, the URL, color, font, image, audio clip, video clip, text area and thread objects can also be created as required at **66**. Data that defines a paragraph line and paragraph line segment high watermarks can be stored in three-dimensional arrays (by web page, by paragraph number, and by line number) as Boolean, integer or string variables at **67** and **68**. Again, the URL, color or font objects can be created as required at **68**. Data that defines a paragraph line segment can be stored into four-dimensional arrays (by web page, by paragraph number, by line number and by line number segment) as Boolean, integer or string variables or URL, color and font objects at **67** and **68**. As a data field is added, changed or deleted, a determination is made at **69** on whether a value for a given high watermark needs to be changed. If so, it is updated. As a specific method in the build engine is called, a determination is made at **70** on whether a feature flag needs to be set. For example, if a particular JAVA method is called, which requires an instance of a certain JAVA Class to be executed by the run time engine, then that JAVA Class is flagged, as well as any supporting methods, variables and/or object definitions. The use of these flags is described in greater detail below in association with FIG. **25** and FIG. **27** to create a compact and efficient customized run time environment.

In one implementation, the header record, the style record, the web page record, and the object records, are carefully defined in a specific order, written in that order, and explicitly cast by object type when read by the run time engine. Exception handling can be implemented to recover from any errors. This helps assure that data integrity is maintained throughout the build and run time processes.

FIG. **9** details the polling process (**16** of FIG. **3**). The polling technology is essential for creating the necessary

two-way real time communication between the JavaScript/HTML interface and the JAVA build engine. Since there is no particular difficulty for JavaScript to be able to call and pass values directly to JAVA methods, the technological challenge is to find a reasonable technique to enable JAVA to communicate back to JavaScript. The polling technology is generic, and workable across all the current browsers. The polling technology is flexible, as there are no real constraints as to what data could be communicated from the build engine to the interface, and this communication can occur at any time. The polling technology is reasonably efficient, so that the performance of the build process is not significantly affected.

In one implementation, two different techniques were utilized to implement this capability. The first was to place the build engine inside a JAVA wrapper. The JAVA wrapper accepts direct communication from JavaScript function calls, interrogates a particular JAVA build engine method, and returns that method's return value back to the calling JavaScript function. The second technique was more unconventional. A polling loop is defined in the panel's (panel **400**) JavaScript that creates a near continuous, at least from a human perception point of view, dynamic real time link, in order to monitor events occurring inside the build engine. The result is a real time retrieval (from an ergonomic perception point of view) of necessary data and status settings from the build engine back to the interface.

Upon the loading of the panel HTML file, a JavaScript function at **71** (the poller) is immediately called which initiates a polling loop. In one implementation, the polling loop is set at a poll rate of once every 100 milliseconds or less. The polling routine, operating through the JAVA wrapper, calls the build engine in order to read the current horizontal and vertical coordinates of the mouse cursor, and displays them in the panel's status fields (FIG. **37** at **450**). The polling routine also polls the build engine in order to detect whether the mouse has moved over a valid object or, by inference, whether a mouse single click, or double click event has occurred. The poller is also constantly requesting the JAVA wrapper to return the status of an error flag in order to inform the user, if necessary, of an unrecoverable error condition, and the reason for it. (See FIG. **10**). The poller then calls a panel JavaScript function that, in turn, calls the build engine to reset the flag. The poller constantly requests that the JAVA Wrapper return the status of whether the mouse cursor is over a valid object, and, if so, that object's number, type, height and width. The poller also constantly requests the JAVA wrapper to return the status of whether an object is selected, and, if so, the type and number of that selected object, as well as the objects height, width, and 3D frame state (and the point size of the object's current font if the object is a text button or paragraph object). In addition, if the object is a paragraph, the poller constantly requests the JAVA wrapper to return a flag if a double click or drag mouse event has occurred.

At **72** the polling routine detects a mouse event based on analyzing the return values received. The poller can infer that the mouse has either moved off or moved on to a valid object at **73** if the mouse over object state has changed or the mouse over object number has changed. If so, the poller updates the relevant interface objects of the panel as appropriate and displays them as necessary, and, depending upon whether the object is a text button object, a paragraph, image object, etc., at **75**, begins polling their unique values.

The poller can infer that a single click mouse event has occurred at **74** if the selection state has changed, or the selected object changed. The poller updates the menu bar



(FIG. **37** at **410**) as appropriate, making the appropriate menu commands either active or inactive. The poller also sets the necessary status variables, and, depending upon whether the newly selected object is a text button object, a text object, image object, etc., at **74**, begins polling their unique values. The poller also activates the appropriate menu choice objects inside the "Edit" menu, the "Text" menu, the "Button" menu, the "Image" menu, and the "Interactions" menu objects (FIG. **37** at **420** and **430**), depending upon whether an web page object is selected or not, which type of web page object is selected, or, if the selected web page object is a text object, whether text is marked through a drag or double click event. In a similar manner, the poller also sets the values for the interactive field objects (FIG. **37** at **460**) and the interactive drop-down list objects (FIG. **37** at **470**). More specifically, JavaScript can poll the web page object number. The value of the web page object number can be used to initialize pop-up windows with that object's web page current values, either from the panel's database or, if necessary, by interrogating the build engine's database.

The poller can infer that a double click or mouse drag operation has occurred if the flag indicating a double click or mouse drag operation is detected at **75**. The poller calls a panel JavaScript function that, in turn, calls the build engine to reset the flag. The poller then calls a panel JavaScript function to display the appropriate panel menu choices. For example, if the double click or mouse drag event occurs within a text object, then the "Text Style and "Hot Link" menu choice objects become active under the panel's "Text" menu object.

Depending on the object type (**76**), the polling technology performs various functions. If the object is a text object at **77**, the values for the paragraph style, point size, object height and width, text color, and the 3D frame status are polled and displayed. The panel's menu objects and the menu choice objects within that are active for a text object are set to the active state, and the non-text menu choice objects are set to the inactive state, which visually means they are unavailable and are "grayed out". In addition, polling can be initiated for the creation of a hot link. If the object is a text button object at **78**, the values for the text button style, point size, object height, width, text color, animation state, and 3D frame status are polled and displayed. The menu choice objects inside the panel's menu objects that are active for a text button object are set to the active state, and the non-text button menu choice objects are set to the inactive state, which visually means they are unavailable and are "grayed out". The value of the text button object string is also polled and saved in the panel's database for use when initializing relevant pop-up windows. If the object is an image object at **79**, the values for the image style, object height, width, frame color, animation state, and 3D frame status are polled and displayed. Again, the menu choice objects inside the panel's menu objects that are active for a image object are set to the active state and the non-text button menu choice objects are set to the inactive state. In addition, the results of any relevant direct object manipulation are polled and displayed.

FIG. **10** describes a two level error correction technology (**17** of FIG. **3**) employed by the build process. Initial error checking occurs during the interactions between the user and the interface with the JavaScript error checking code at **80**. Any file name, selected by the user through the file selection window or typed in a file pathname (See FIG. **6** at **49**) is checked by the panel's JavaScript to assure that it has the correct file type suffix (gif, jpg, au, etc.) at **81**.

The panel's JavaScript Code performs range checking at **82** to prevent user error or to prevent the breaking of any internal limits imposed by the build engine. These can include: going to a non-existent web page; exceeding any limit with the dual spin control (i.e. attempting to increment or decrement a point size outside of the legal range, or trying to illegally decrement a value to zero or a minus number; typing in a numeric value that is outside a legal range; and, implicitly creating an object that exceeds a limit imposed by the build engine).

The panel's JavaScript code also checks the file pathname to make sure it contains a valid address, and makes necessary additions or conversions, if necessary, at **83**. For example, if the user selected a file from the local disk, the correct URL protocol is appended to the file name in order to make it a valid string representation of a URL address. Any illegal characters for a pathname or a null file pathname entry are also caught at **83**. In addition to file pathname validity checking there are other validity checking functions that can be employed by the JavaScript at **83**. They include the attempt by the user to enter a non-numeric character into a numeric field, or leaving an essential fill-in field empty.

The panel's JavaScript then passes these values to the build engine though the arguments of a JAVA method function call at **84**. The build engine can utilize the extensive exception handling capability of JAVA at **85** (or that of any other full featured programming language used) to attempt to recover from any processing error. If recovery is not possible, the build engine sets an error flag, utilizing the polling technology (See FIG. **9** at **71**). The poller, upon detecting this flag, informs the user, for example, through an alert JavaScript pop-up message, what non-recoverable error has occurred, from which operation, and what actions, if any, the user should take. For example, if the user had selected a corrupted image file, the exception handling technology can inform the user of this fact so that user corrective action can resolve this very common problem. In one implementation, error handling and exception recovery support is provided for a malformed URL, an input or output error, a security manager violation, and a null pointer error.

FIG. **11** shows a process for text entry and text processing (**18** of FIG. **3**). The process begins when the panel's JavaScript detects the user selecting either "Button" or "Text" icon objects from the panel's tool bar or from their equvalent menu choices under the "Button" or "Text" menus, and calls the appropriate JavaScript function at **86**. The JavaScript function, after performing a range check to assure that no internal limits of the build engine are being broken, updates its database, and sets the necessary status variables. The panel's JavaScript then calls the appropriate build engine method, passing the necessary arguments, including the current board number, the internal number to be assigned to the object, the object type, and the current text button or paragraph style at **87**. The build engine then updates its internal database and sets the necessary status variables. The build engine also changes the mouse cursor shape to that of a text entry symbol. In one implementation, the mouse cursor is shaped like a crosshair, and can be moved onto the web page (the build frame **402**) at an arbitrary location.

The build engine detects a mouse click event through its "mouseDown" method at **88**. This method reports to the build engine the exact horizontal and vertical coordinates of the crosshair mouse cursor at the moment the mouse button is pressed. The build engine places these values into its internal database. The polling process is also supported, as discussed in FIG. **9**, by placing the necessary return values in the appropriate poll enabled methods.



The build engine-creates a dynamically resizable frame utilizing JAVA's "Text Area" object class, whose coordinates and size coincide with that of the draw system for the object as defined below. Other full-featured programming languages, if used by the invention, also possess similar object types. The text area is immediately overdrawn by the draw system's background paint routine. The build engine, utilizing the font metrics as defined by the selected text button or paragraph style, and utilizing the crosshair cursor's coordinates, calls the draw system. The draw system paints the background and then paints an insertion point and a selection rectangle, in the appropriate colors, and with the appropriate height and width, into the appropriate web page location at **89**. If the text button or paragraph style has a 3D frame selected, this intelligent ornamental object would also be drawn, in the appropriate color, dimensions, and thickness. Screen shot FIG. **41** shows a visualization of this process. The text insert point is in black, surrounded by a red selection rectangle, and surrounded by a blue 3D frame, as defined by the selected style. The text editor is then initialized by setting the necessary status variables.

The build engine waits until a keyboard keystroke is detected. The scan code is interpreted, and if it is a text entry key, the text editor's methods are called at **90**. The text editor processes the key event at **91**. The build engine employs frame (Text Area) processing methods and draw methods to implement the text entry and text processing functions. As a keyboard key for a text character is pressed, the build engine passes this value to the editor's text entry method, which updates both the text area's frame definition, and the draw system's database. The width of the text area is dynamically resized as necessary. If the object was a paragraph, a check is made on whether a reformat event should occur, based on the paragraph style's definition and the width of the current line's text string. If so, the appropriate text editor reformat method is called, which may cause the text area's vertical dimension to also be resized. A high watermark variable may also be set, for optimization purposes. After the final state of the text area is determined for the text entry keyboard event, the internal database for the text area, and for the paragraph or text button object, are updated. The draw system is called, and the results of the text entry event are drawn on the web page at **94**.

In one implementation, the build engine also supports the usual text processing functions found in MS Windows or Macintosh based Word Processors or Desktop Publishers at **92** and **93**. For example, if the user single clicks the mouse when over an unselected paragraph or text button object, that object is selected, a selection rectangle is drawn, the mouse cursor shape is changed to a crosshair, and the poller reports the necessary information to the panel's JavaScript. If a mouse click occurs over a selected paragraph or text button object, the editor's "Set Text Insertion Point" method is called. Based on the coordinates of the mouse cursor, and based on a calculation by the build engine as to the nearest line, and the nearest character on that line, the text insertion point can be drawn appropriately, and the necessary status variables are updated. Text entry is then processed as discussed at **91**.

If a double click or mouse drag mouse event is detected over a paragraph, an appropriate "text string selection" method is called (See FIG. **6**). Based on the coordinates of the mouse cursor, and based on a calculation by the build engine as to what text string should be selected, the internal database in updated, appropriate status variables are set, and the draw system is called for marking the text string at **94**. The polling technology is activated as discussed in FIG. **9**.

The build engine's reformat methods for paragraphs can utilize a "Clean Text Stream" model for calculating line breaks and for updating four-dimensional variables utilized by the draw system in order to draw each paragraph, each paragraph line, and each paragraph line segment in the correct location, with the correct font type, font style, font size, font effect, and background and text string color. Font style refers to a font format such as Normal, Bold, Italic, or Bold Italic. Font effect refers to style overrides such as Underline, Double Underline, Small Caps, Cross Out, Superscript, Subscript, etc. The "Clean Text Stream Model" implemented by the build engine maintains multi-dimensional array pointers and records for every paragraph line and line segment external to the text string defined within the text area. Three-dimensional and four-dimensional variables are updated after each text entry or text editing and processing event in order to assure that the pointers into the paragraph text stream, defined in the text area, are current. The three-dimensional variables that the build engine has implemented can include soft and hard line end pointers for each paragraph line. Their values can be the absolute character positions within the text area text string for that line end. Hard line breaks can be created by the user pressing the enter key. Soft line breaks can be created by a reformat method based on a calculation defined below.

The four-dimensional variables can be absolute pointers into the text area text string for the beginning and end of every style override, associated with each paragraph line segment. These style overrides can include hot links, font type, font style, font size, numerous font effects, and text and background colors. For each style override there is an associated style override record that maintains all the font and color settings for that paragraph line segment. Also positional and size data such as start and end pointers into the paragraph text stream, a left offset relative to the paragraph's left origin, a top offset relative to the paragraph's top origin, and the line height. The style override record is created when the build engine detects a mouse drag or mouse double click event within a selected paragraph. When the mouse button is initially pressed, the current paragraph line and current word on that line are calculated in a manner identical to that for calculating the location of the text insertion point on a mouse click operation. The entire word becomes one anchor for the paragraph line segment, while the word defined by the mouse coordinates when the mouse button is released becomes the other anchor. Up to two other paragraph line segments can be implicitly created by the word oriented selection method. If there is text to the left of the first anchor word, and that paragraph line had not previously had a style override defined in it, the text string from the beginning of the paragraph line to the first anchor point has a style override record created for it. The values are set to that of the underlying paragraph.

If style overrides had already been created on that paragraph line, and the anchor word is inside one of them, then that style override's end pointer is adjusted to the start of the anchor word. All other style overrides, if any, to the right of the anchor word are deleted, as overlapping style overrides are not permitted. In a similar manner, the text string, if any, to the right of the last anchor point, up to the line or paragraph end, can also be defined as a style override. If a mouse click occurs before a "text style" operation, then these pointers will be reset. If the panel's JavaScript detects a user selection of "text style" from the "Text" menu, the appropriate pop-up window is drawn and its values initialized from the JavaScript database. Upon detecting a user completion event (i.e., the depressing of the enter key), the panel's JavaScript database is updated and a call is made to an appropriate build engine method, with the necessary data and status information passed as function call arguments. The build engine updates its internal database and calls the reformat method if necessary. The draw system utilizes these four-dimensional variables in order to paint the paragraph line segment style override.

The calculation for the creation or updating of a soft line break begins with the maximum paragraph width, which is set at a percentage of the browser screen width. This percentage is converted to an absolute pixel number based on the web designer's screen resolution. When any text entry or text editing and processing event occurs, a build engine method is called which calculates the width, in pixels, for the current paragraph line, based on the character string in the text area that exists between the previous line end pointer and the current line end pointer. The font definition(s) that are related to this character string are applied, and a string width is calculated. If the string width exceeds that of the maximum paragraph width, an "OverFlow" reformat method is called. The overflow reformat method calls a method to determine the settings for the last word on that line, and that word overflows to the following paragraph line. All pointers for the current line, and subsequent lines are updated as necessary, as are all pointers and records to paragraph line segments. If the string width is less than that of the maximum paragraph width, and the text processing operation was not text entry, then an "UnderFlow" Reformat method is called. The underflow reformat method calls a method to determine the width, in pixels, for the first word on the next line. If that word will fit on the current line it is placed there. As before, all pointers for the current line, and subsequent lines are updated as necessary, as are all pointers and records to paragraph line segments. The word oriented selection technique, and the reformat, database, and draw technologies that support it, greatly simplify the text editor and produce a run time engine that is smaller, faster and more reliable.

FIG. **12** shows the operation of the image processing technology utilized by the build engine (**19** at FIG. **3**). The process begins when the panel's JavaScript detects the user selecting the "Image" icon from the panel's tool bar or the comparable menu choice under the "hnage" menu. The appropriate JavaScript function is called at **95**, which draws the define image pop-up window. The user then selects an image from the file selection window with the browser, types in the image pathname for the image file on the local disk, or types in the URL for the image that exists on a server. The user could also define a 3D frame for the selected image at this time. Screen shot FIG. **49** shows a visualization of a collage for the define image pop-up window and the user's selection choices under each tab setting. The user can complete the selection process by either pressing the Enter Key or clicking on the "Create Image" icbn in the pop-up window. If the Enter Key is pressed, the pop-up window's JavaScript Code utilizes the onKeyDown function, or if a mouse click, the onClick function, as described in FIG. **7**, to recognize the completion event. An appropriate error checking JavaScript function is called, which performs a file name error check, a filename validity check, and a range check to assure that no internal limits of the build engine are being broken. If the error checking tests are successful another JavaScript function is called to update the panel's database, and set the necessary status variables.

The panel's JavaScript then calls the appropriate build engine method, passing the necessary arguments, including the current internal web page number, the internal number to

be assigned to the image object, the object type, and the current image style at **96**. The build engine then updates its internal database and sets the necessary status variables. It also changes the mouse cursor shape to that of an "Image Create" symbol. In one implementation, the mouse cursor is shaped like an arrow. The build engine detects a mouse click event through its "mouseDQwn" Method at **97**. This method reports to the build engine the exact horizontal and vertical coordinates of the arrow mouse cursor at the time the mouse button was pressed, and places these values into its internal database. The polling process is also handled, as discussed in FIG. **9**. The build engine then asserts the necessary security permission for reading from the local disk, if necessary, and attempts to create the necessary image object at the current mouse coordinates at **98**, while checking for any exception conditions as described in FIG. **10**. If no unrecoverable exceptions are reported, the internal database is updated and the draw system is called.

The image processing technology supports direct web page image object interactions at **99**, utilizing the communication technology described in FIG. **6**. The build engine first processes the mouse event as described in FIG. **7**, and places the appropriate values into a poll enabled JAVA method as described in FIG. **9**. There are two types of direct web page image object interactions. s The first occurs by simply selecting the image object with a single mouse click. A red selection rectangle is drawn around the image, as are eight attachment points. When the user has pressed the mouse cursor, the mouse cursor's shape changes to that of an anchor, which is a symbol that can be used when dragging or moving an object. The mouse's location will jump to the origin for the image. In an alternative implementation, the anchor can be defined by the mouse location at the time of the mouse drag operation. In either case, while the mouse is being dragged, the build engine updates its internal database. The build engine also updates its poll-enabled methods for communication with the interface's polling technology at **100**. The JavaScript poller reads these values, updates the panel JavaScript database, and updates the panel's interface objects. In a similar way, placing the mouse cursor over an attachment point and dragging will result in an image resizing operation. Screen shots FIG. **50** through FIG. **52** show a visualization of an image dragging operation. Screen shot FIG. **50** shows the cursor over an unselected image. Screen shot FIG. **51** shows the screen state after the left mouse button has been pressed. Notice that the image is now selected and the cursor shape has changed to the drag state. Screen shot FIG. **52** shows the screen state after the mouse has been dragged to the northwest. Notice that the image stayed selected and moved with the mouse. Screen shots FIG. **53** and FIG. **54** show a visualization of an image resizing operation for a normal image. Notice that all eight-attachment points are drawn and active for the selected image. Screen shot FIG. **53** shows the cursor over the upper left attachment point. Notice that the cursor shape has changed to a northwest to southeast resize cursor shape. Screen shot FIG. **54** shows the result after the left mouse button has been pressed over the upper left attachment point and dragged to the northwest. Notice that the image's upper left corner is still under the cursor, the image has resized, and the cursor shape remained unchanged. For image resizing operations with the mouse over and mouse down objects, only the east, southeast, and south attachment points are drawn and active.

The second type of direct web page image object interaction occurs when the panel's JavaScript code detects that the user has selected an image object interaction feature



from the panel's "Image" menu. The appropriate JavaScript function is called, which sets the necessary status variables, and then calls the appropriate JAVA method, passing the necessary values as arguments. The JAVA method then sets its necessary status variables, changes the mouse cursor shape as appropriate, depending upon the type of direct image operation, and awaits a direct mouse operation on the image object. Image rotation is an example of this type of direct image interaction. In one implementation, direct image object rotation is realized by utilizing the image rotation technology described in association with FIG. **33** below. Screen shots FIG. **55** and FIG. **56** show a visualization of an image rotation for a normal image. Screen shot FIG. **55** shows the user selecting the rotate command from the "Image" menu. Immediately the cursor's shape changes to the rotate (a dual left/right arrow) cursor, and the selected image's attachment points disappear. Placing the cursor on the image and dragging will cause the image to rotate on an east/west and/or north south axis. Screen shot FIG. **56** shows the result after the mouse was dragged on an east/west plane.

Image object interactions are invoked by selecting from the JavaScript panel, selecting from a JavaScript pop-up window, and by selecting from a JAVA window object at **101**, as described in FIG. **6**. The initial values in the pop-up window are set from JavaScript's database. After any user interaction, JavaScript's database is updated and the appropriate method in the build engine is called with the necessary settings. The build engine, after updating its internal database, calls the appropriate image processing method. The image processing routine then calls the required image filter(s), which then perform the necessary processing on the image bitmap at **102**.

An image filter is a body of code, usually consisting of one or more digital image processing algorithms, which operate on an image bitmap, and create a transformed image bitmap. An image observer can be invoked by the image filter, which then reports when the image bitmap processing has been completed. An image observer is a independent process that monitor's a particular image processing event, such as the execution of an image filter or the reading in of an image file, and reports the status of that process when queried. When the image observer reports a successful completion, the image filter can call the build engine's draw system to display the transformed image bitmap. This interaction between the build engine's image processing method, the image filter(s), the image observer, and the draw system can occur many times, depending upon the image processing operation chosen. Image animations and image transformations, which are technologies that rely heavily on image filters, and the image observer are discussed in greater detail below in association with FIG. **16** and FIG. **17**.

FIG. **13** shows a process for implementing text button, image and paragraph style settings (**20** of FIG. **3**). The initial values for all the settings inside a parent pop-up window and associated child pop-up windows, for a particular style, can be set from the JavaScript database at **103**. The settings can include: image object styles, text button object styles and paragraph object styles.

The following settings can be initialized and changed for image object styles. The following settings are initialized for all image object states (Normal, mouse Over, mouse Down) and can be changed:

(1) resize factor.
(2) rotation factor.
(3) main animation type, speed, number of animation steps (resolution) and number of cycles.
(4) image processing factors. (brightness, contrast, etc.)

(5) 3d effects and their color values.
(6) web page centering attribute.
(7) web page scaling attribute.

b) The following actions are initialized and can be changed.
(1) sound effects and audio channels.
(2) video files and video channels
(3) text button and image pop ups and their attributes (See 1.a above and 2.a below.)
(4) click events.

c) The following transformation settings are initialized and can be changed.
(1) the initial delay
(2) up to three transformations can be defined with the following settings:
(a) which image states should the transformation be from and into.
(b) the speed of the transformation.
(c) any delay before the next transformation.
(3) whether the transformation(s) should occur simultaneously with the enter and exit time line animation or after the enter and before the exit animations.

d) The following time line settings are initialized and can be changed.
(1) the initial delay before the image object's appearance.
(2) the enter animation type, speed, and animation resolution.
(3) the delay after the enter animation and the main animation.
(4) the exit animation type, speed, and animation resolution.
(5) the initial delay, after the entrance of the parent object, before the child text button and image object's appearance(s).
(6) the child object(s) enter animation type, speed, and animation resolution.
(7) the delay after the child object(s) enter animation.
(8) the child object(s) exit animation type, speed, and animation resolution. The following settings can be initialized and changed for text button object styles.

e) The following attributes are initialized for all text button object states (normal, mouse over, mouse down) and can be changed:
(1) all font specifications.
(2) vertical state.
(3) all color specifications.
(4) 3d effects and their color values.
(5) web page centering attribute.
(6) font processing attributes (available in java 2)
(7) scale, shear, and rotate (available in java 2)

f) The following actions are initialized and can be changed.
(1) sound effects and audio channels.
(2) video files and video channels
(3) text button and image pop ups
(4) click events.

g) The following transformation settings are initialized and can be changed.
(1) the initial delay
(2) up to three transformations can be defined with the following settings:
(a) which image states should the transformation be from and into.
(b) the delay before the next transformation.
(3) whether the transformation(s) should occur simultaneously with the enter and exit time line animation or after the enter and before the exit animations.



h) The time line settings are the same as those defined for image objects. They also are initialized and can be changed.

The following settings can be initialized and changed for paragraph styles.

The following attributes are and can be changed:

i) all font specifications.

j) all color specifications.

k) 3d effects and their color values.

l) web page centering attribute.

m) the look of hot links, including the text and background colors when the link is active and when the mouse is over the link.

The reference to JAVA 2 under text button object styles refer to the most recent version of JAVA released by Sun Microsystems. This version supports a far more robust two-dimensional processing capability than JAVA 1.6, including significant font processing capabilities and the scaling, shearing, and rotation of objects. Currently, most conventional browsers only support JAVA 1.6. Provisions are made in the invention so that as the then popular browsers support more robust versions of programming languages, those new capabilities can be employed to further enhance the capability of the invention.

Referring again to FIG. **13**, upon detecting the completion of editing an image, text button or paragraph style, the panel's JavaScript calls a build engine method and passes the required values. The build engine updates its internal database and sets any necessary feature flags at **104**. When an image, text button or paragraph object is created, all the style settings for the currently selected style are applied by the build engine as part of the definition for the newly created object at **105**.

If a style is changed, all objects on all internal web pages that are utilizing that style are candidates for being changed to those new values at **106**. Flags are kept for every possible style setting for each object. If a given object is edited through the text button, image, or interaction menus or other interface objects of the panel **400**, the flags are set for any setting that are changed. If that style is subsequently changed, only those settings that have not had their flags set will be changed for any given object.

FIG. **14** describes the video and audio file and video and audio channel processing techniques employed by the build engine (**21** of FIG. **3**). A user can select a video or audio special effect (i.e. user input is provided at **107** that indicates a video or audio special effect). The method for activating a video file or video channel is defined in the text button and image object "mouse over" interactive pop-up windows described later at FIG. **16**. Methods for defining a video object as a pop-up, or a frozen object, are described with reference to the text button and image object "mouse down" interactive pop-up window also described at FIG. **16**. Audio files and audio channels can be defined in both the "mouse over" and "mouse down" interactive pop-up windows also described at FIG. **16**. The pop-up or a frozen object settings for audio are also set in the object "mouse down" interactive pop-up windows discussed therein.

As before, the panel JavaScript code initializes any pop-up windows (where the initial values are set from the JavaScript database), captures a file or channel name (from the user input) and performs file and validity error checking upon detecting a user completion action at **108**. The build engine is then called, receiving the necessary data and status as function call arguments. The build engine determines if the audio and video definition is a file pathname or the URL

of a live channel at **109**, and thereafter initiates its exception handling. If the video or audio definition is a file, the build engine performs the relevant file exception handling checks, and asserts the necessary security permissions. If there were no errors, or the exception handling error was recoverable, the build engine reads and links the video/audio file to the database, and plays the file for user verification at **110**. If the video or audio definition was a channel, the necessary pointers are updated in the database, and methods are assigned for efficient transmission, at run time by the run time engine, at **111**. The ability of the run time engine to play multiple synchronized audio and video files and channels simultaneously will be described at FIGS. **31–35**.

FIG. **15** describes the frames, tables, forms and draw objects technologies employed by the build engine (**22** of FIG. **3**) in one implementation of the invention. When the panel JavaScript code detects a user action to create a "frame", "table", "form" or "draw object" from an appropriate panel interface object, it draws and initializes the appropriate pop-up window at **112**. Upon detecting a user completion action by the pop-up window's JavaScript code, a panel JavaScript function is called to perform the necessary error checking and updating of the panel's database. Panel JavaScript thereafter calls the appropriate build engine method(s) passing the necessary data and status values as function call arguments at **113**.

The build engine updates its internal database, sets the necessary status values, and initializes, as necessary, appropriate methods for run time processing. In one implementation, the build engine includes definitions to map a given object into a relational database. Also available are a full array of database operations. Support for popular databases (such as Oracle, Informix, Sybase and DB2) are available on a real time interactive basis.

The run generation technologies, as described later in FIGS. **24–27**, are also implemented for a given frames, table, form and draw object at **114**. The run time technologies, as described later in FIGS. **28–36**, are also implemented for a given frame, table, form and draw object at **115**. FIG. **16** describes the user interaction settings and technology employed by the build engine (**24** of FIG. **3**). Depending upon the type of object currently selected at **116** (if no object is selected no user interaction choices will be available) the panel JavaScript Code draws an appropriate pop-up window. If the selected object was a text buttoh object at **117**, or an image object at **119**, both "mouse over" and "mouse down" choices will be available from the panel's "Interactions" menu. If the selected object is a paragraph, user interaction definitions can be activated by a double click or a mouse drag event being detected by the build engine at **118**.

More specifically, appropriate values are set in a poll-enabled JAVA routine. The JavaScript poller reads the values, and draws the appropriate panel menu choices. The "Text Style", "Hot Link", "Preferences" and "Format" pop-up windows can be chosen. If the hot link choice under the panel's "Text" menu is selected and executed, the hot link definition for internal or external web pages is captured by an appropriate JavaScript function and file pathname error and validity checking is performed. If either the "Text Style", "Hot Link", Preferences" or "Format" choices under the panel's "Text" menu are selected, the panel's JavaScript draws the appropriate pop-up window. Upon detecting a user completion event, the panel's JavaScript reads the values in the pop-up window and passes the font specification parameters to an appropriate build engine method as function call parameters. The build engine then processes this data, calls



a reformat method, updates its internal database, and sets the necessary four-dimensional variables for communication with the draw system.

The normal and "mouse over" foreground and background colors for the hot link, which were defined in a link look pop-up window (available under the "Text" menu of the panel), are utilized by the build engine to draw the hot link. The build engine performs the necessary exception handling, and then updates its internal database.

Based on the panel's JavaScript Code detecting whether the user chose the "mouse over" or "mouse down" choice under the "Interactions" menu at **120**, as well as based on whether an image or text button object is currently selected, the panel's JavaScript code draws the appropriate pop-up window. Initial values for the pop-up windows are set from the panel's database at **121** and **122**. In one implementation, the following user interaction's for the "mouse over" and "mouse down" states for text button and image objects are supported:

1: 3D Frame, in a specified color, and selected for a specified 3D appearance, can be defined for text button and image object's "mouse over" and "mouse down" states, as well as for their text, image and video pop-ups.

2: The font typeface, font style, font size, font effect(s), text color, and text background color can be defined for a text button object's "mouse over" and "mouse down" states, as well as for the text pop-ups associated from both text button and image objects.

3: Text, image, and video pop-ups can be defined for the text button and image object's "mouse over" state.

4: A sound track (file) can be defined for the text button and image object's "mouse over" state with the following choices:
 a. play once when a "mouse over" event occurs.
 b. play until a click event while on the object.
 c. play until the mouse moves off the object.

5: A sound track (file) can be defined for the text button and image object's "mouse down" state with the following choices:
 a. play once when a mouse click event occurs when over the object.
 b. play until a second click event while on the object.
 c. play until the mouse moves off the object.

6: Both video and sounds can be defined as channels as well as files.

7: The text, image, and video pop-ups can be frozen (i.e. not disappear when the mouse moves off the object after a mouse click event, for both text button and image objects).

8: Text button and image objects can have one of the following click events defined:
 a. go to a specific internal web page.
 b. go to the next internal web page.
 c. return to the parent (calling) web page.
 d. go to an external web age. That web page will replace the current web page.
 e. go to an external web page. That web page will be launched into a new window so that both web pages will be visible and accessible.

After a user completion action is detected, the panel JavaScript code performs the necessary file error and validity checking, updates its database and sets necessary status values, and then calls the appropriate build engine method, passing the necessary data values and status as function call arguments at **123**. The build engine updates its internal

database, sets the necessary status variables, then draws the appropriate "mouse over" or mouse down" text button or image object states. The build engine also plays the sound or video file for user verification. The run time technology behind the user interactions will be described in greater detail in association with FIG. **36**.

FIG. **17** describes the image and text button object animation settings and technology employed by the build engine (**25** of FIG. **3**). The panel's JavaScript code determines which type of object, and which object number, from the currently selected object, as reported by the poller at **124**. When the panel's JavaScript detects a user selection of "Define Image" or "Animate" from the panel's "Image" menu, or a user selection of "Define Button" or "Animate" from the panel's "Button" menu, it draws the appropriate pop-up window and initializes the pop-up window's values from its database at **125** and **126**. Screen shot FIG. **57** shows a visualization of one implementation of the "Text Button Animation Specifications" pop-up window and the animation settings available to the user. Screen shot FIG. **58** shows a visualization of one implementation of the "image animation specifications" pop-up window and the animation settings available to the user.

When a user completion event is detected, the panel's JavaScript code captures the values from the pop-up window for the animation type, speed, resolution, and number of animation cycles at **125** and **126**, respectively, and updates its database at **127**. The panel's JavaScript then calls the appropriate build engine method, passing the necessary data and status values as function call arguments. The build engine updates its internal database and sets the necessary feature flags (See FIG. **8**.) Linkage to the appropriate animation method(s) is also set.

A thread object (a thread is an independent asynchronous program that is multiprogrammed with other threads, are defined and executed by the invention, by a JAVA Virtual Machine and by the browser) is created and executed for user verification at **128**. Values are set to integrate the given animation thread with the object time line technology (See FIG. **19**). Values are set at **129** so that when the thread object is invoked by the run time engine, the appropriate image filter(s) and animation methods are called. The run time technology behind image and text button object animations is described in greater detail in association with FIG. **31** through FIG. **35**.

FIG. **18** describes the transformation settings and technology utilized by the build engine (**26** of FIG. **3**). A transformation is defined as the changing of an object from one state to another based on a timer control, subject to user settings. In one implementation, the available states for text button and image objects are their "normal", "mouse over", "mouse down" and "pop-up" definitions. For text button objects, a transformation is implemented as the instantaneous drawing of one object state while erasing the previous object state. For images, a transformation is the gradual fading out of the previous object state, while, simultaneously, fading into the next object state.

Prior to any user menu selection, the panel's JavaScript code already knows the status of any selected object through the poller mechanism (**124** of FIG. **17**). This includes what type of object and the object's internal identifying number. When the panel's JavaScript detects a user selection of "Transform" from the panel's "Interactions" menu, it draws an appropriate pop-up window and initializes the pop-up window's values from its database at **130**. Screen shot FIG. **59** shows a visualization of one implementation of a "define the transformation for the text button object" pop-up window and the transformation settings available to the user. Screen shot FIG. **60** shows a visualization of one implementation of a "define the transformation for the image object" pop-up window and the transformation settings available to the user. When a user completion event is detected, the panel's JavaScript Code captures the values from the pop-up window based on the object type.

In one implementation, the following settings for text button objects can be specified:

1. The initial delay.
2. Up to three transformations can be defined with the following settings:
   a. Which image states should the transformation be from and into.
   b. The delay before the next transformation.
3. Whether the transformation(s) should occur simultaneously with the enter and exit time line animation or after the enter and before the exit animations.

In one implementation, the following settings for image objects can be specified:

1. The initial delay.
2. Up to three transformations can be defined with the following settings:
   a. Which image states should the transformation be from and into.
   b. The speed of the transformation.
   c. The resolution of the transformation.
   d. Any delay before the next transformation.
3. Whether the transformation(s) should occur simultaneously with the enter and exit time line animation or after the enter and before the exit animations.

The panel's JavaScript updates its database at **131**. The panel's JavaScript then calls the appropriate build engine method, passing the necessary data and status values as function call arguments. The build engine updates its internal database and sets the necessary feature flags (See FIG. **8**.) Linkage to the appropriate transformation method(s) is also set.

A thread object is created and executed for user verification at **132**. Values are set to integrate this transformation thread with the object time line technology (See FIG. **19**). Values are set at **133** so that when the run time engine invokes the thread object, the appropriate image filter(s) and transformation methods are called. The run time technology behind image and text button object transformations is described in greater detail below in association with FIG. **31** through FIG. **35**. FIG. **19** describes the text button and image time lines and technology utilized by the build engine (**27** of FIG **3**). A time line is an independent asynchronous process that defines the existence of a given text button or image object. An object's time line begins at the time a given web page makes its appearance, either through an immediate draw or through a transition animation. In one implementation, an object time line can be created as an instance of a class, which has a threadable interface. This instance has its own data structures, which define the animations, and transitions associated with the time line definition. An image or text button object time line can spawn child time lines, at a designated moment. A complete description of time line technology, and how they integrate the animation and transformation technologies, will be described below in association with FIG. **31** through FIG. **35**.

The build process begins the time line definition process by having the panel's JavaScript determine what is the currently selected object, utilizing the polling technology at

**134**. That is, values for the object' appearance time, animation type, speed and resolution are captured. When the panel's JavaScript detects a user selection of "time line" from the panel's "Interactions" menu, it draws the appropriate pop-up window and initializes the pop-up window's values from its database. Screen shot FIG. **61** shows a visualization of a collage of one implementation of a "define the time line for the text button object" tabbed pop-up window and the time line settings available to the user under each tab. Screen shot FIG. **62** shows a visualization of a collage of one implementation of a "define the time line for the image object" pop-up window and the time line settings available to the user under each tab. When a user completion event is detected, the panel's JavaScript captures the values from the pop-up window based on the object type. The currently available settings, for both text button and image objects, are:

1: The initial delay before the image object's appearance.

2: The enter animation type, speed, and animation resolution.

3: The delay after the enter animation and the main animation.

4: The exit animation type, speed, and animation resolution.

5: The initial delay, after the entrance of the parent object, before the child text button and image object's appearance(s).

6: The child object(s) enter animation type, speed, and animation resolution.

7: The delay after the child object(s) enter animation.

8: The child object(s) exit animation type, speed, and animation resolution.

The panel's JavaScript updates its database at **135**. The panel's JavaScript then calls the appropriate build engine method, passing the necessary data and status values as function call arguments. The build engine updates its internal database and sets the necessary feature flags (See FIG. **8**.) A build engine method then processes all the data related to this object. The object's animation settings, if any, are integrated into the timeline at **136**. The object's transformation settings, if any, are also integrated into the timeline. If an image object, any transformation animation may be executed simultaneously with the appearance and/or exit animations, depending upon the settings. Finally, a multi-level object thread definition is created and executed for user verification. Values are set at **137** so that when the run time engine invokes the thread object, the appropriate image filter(s), animation methods, and transformation methods are called.

FIG. **20** describes the web page transition animations, time line settings and technology utilized by the build engine (**28** of FIG. **3**). When the panel's JavaScript detects a user selection of "Define" from the panel's "Webpage" menu, it draws the appropriate pop-up window and initializes the pop-up window's values for the current web page from its database at **138**. Screen shot FIG. **63** shows a visualization of one implementation of the "define the current web page settings" pop-up window and the web page settings available to the user. In the implementation shown, the choices supported include:

1: The web page delay time (which is the delay, after the completion of the last object time line, to the loading of the next web Page).

2: The transition animation, which can include a random animation choice. This is the animation applied to the web page when it is loaded and to the previous web page as it departs.



3: The number of animation frames per second, which effectively is the resolution of the transition animation.

4: The number of animation frames, which effectively defines the time expected for the transition animation to complete.

5: The web page's background color. This setting will override the generic setting for the web site, defined in FIG. **21***a*.

6: A web page boarder. This boarder, if selected, will also override the setting for the web site, defined in FIG. **21***a*. The boarder can be drawn with a 3D effect, taking the background color, and applying a transformation so that, to the human eye, a lighter and darker shade of that color will be drawn appropriately to create a 3D effect.

7: The web page's background pattern. This setting will override the generic setting for the web site, defined in FIG. **21***a*.

The panel's JavaScript updates its database at **139**. The panel's JavaScript code then calls the appropriate build engine method, passing the necessary data and status values as function call arguments. The build engine updates its internal database and sets the necessary feature flags (See FIG. **8**.). The web page time line is synchronized with its object time lines by an appropriate build engine method at **140**. The web page's appearance delay and transition settings are integrated into the web page time line. Thereafter, a single-level object thread definition is created. Values are set at **141** so that when the thread object is invoked by the run time engine, the appropriate animation methods and object time line threads are called. Again, the run time technology behind web page transition animations and web page time lines is described in greater detail below in association with FIG. **31** through FIG. **35**.

FIG. **21***a* describes the file operations supported by the build engine (**29***a* of FIG. **3**). In one implementation, the file operations supported include:

1: "Save" at **142** or "Save As" at **143**. If the selection from the panel's "File" menu is to "Save" as a web page, the current browser screen height percentage value is sent to the build engine. The build engine updates its internal database and the build process is completed. Thereafter, the run generation process is executed. (See FIG. **24** through FIG. **27**.) If the selection is to "Save As" a template for the run generation process is also executed but the generated files are placed in the template directory. If the selection is to save as a banner or custom application, those absolute screen dimensions are sent to the build engine and its internal database is updated and the run generation process is executed.

2: "New" at **144**. A test is made by the panel's JavaScript code to see if any user input has been processed and not saved. If so, the user is asked whether this data should be saved. If so, and if the selection is to "Save" as a web page, the build process is completed and the run generation process is executed as described above. If the selection is to "Save" as a template the run generation process is executed but the generated files are placed in the template directory as described above. The panel's JavaScript code then reinitializes its database and calls a build engine method that reinitializes the build engine database.

3: "Close" at **145**. A test is made by the panel's JavaScript to see if any user input has been processed and not

saved. If so, the user is asked whether this data should be saved. If so, and if the selection is to "Save As" a web page, the build process is completed and the run generation process is executed. If the selection is to "Save As" a template the run generation process is executed but the generated files are placed in the template directory. The panel's JavaScript then terminates the build process.

4: "Open" at **146**. A test is made by the panel's JavaScript to see if any user input has been processed and not saved. If so, the user is asked whether this data should be saved. If so, and if the selection is to "Save As" a web Page, the build process is completed and the run generation process is executed. If the selection is to "Save As" a template the run generation process is executed but the generated files are placed in the template directory. The panel then initiates the dynamic web page resizing technology as described in FIG. **22** below for the open re-initialization mode.

5: "Apply" at **147**. A template is applied to the existing web site that is being processed by the build engine. The web page and style record definitions of the template replace those of the existing web site. The web page objects of the template are added to the web page objects of the existing web site.

6: "Web Site at **148**. The web designer can define settings that will be applied to all web pages in the web site. In one implementation, the web site applications supported include:

a: web page. The web page height can be set, as a percentage, larger than the browser window for long vertically scrolled web pages.

b: Standard banner sizes.

c: Custom. (The user can define any arbitrary web page size and resolution) Screen shot FIG. **63** shows the generic web site setting choices presented to the user in one implementation of the invention.

FIG. **21***b* describes the view operations supported by the build engine (**29***a* of FIG. **3**). In one implementation, the file operations supported include:

1: "Normal" at **149***a*. This is the default file mode in which the interface and the build engine are processing user input as described in FIG. **5** through FIG. **23** above.

2: "Preview" at **149***b*. The build engine runs the web site off its internal database. The web site will perform in an identical manner as if it had gone through the entire run generation and run time process, but it is being executed on the web designer's computer.

3: "Play" at **149***c*. The build engine runs the web site off an external database in a separate browser window. The web site will perform in an identical manner as if it had gone through the entire run generation and run time process, but it is being executed on the web designer's computer.

4: "Zoom" at **149***d*. The dynamic web page resizing technology (see FIG. **22** below) is first executed. When the engine is fully reinitialized, and the engine has gone to the current web page, the page and all its objects are drawn to the scale as defined by the zoom level. All object coordinates and sizes are automatically scaled appropriately because they are always defined with virtual screen values, even when the web page is being draw in the "normal" view.

FIG. **22** describes the dynamic web page resizing technology supported by the build engine. If a user selection of



the "Open" command from the "File" menu is detected by the panel at **500**, the panel calls an engine method to read selected contents from that web site's external database file.

In one implementation of the invention at **506**, the engine reads the web page width and length fields, as well as the background color or background image definition for the first web page of the Web Site. The engine then creates a build engine HTML definition file based on these specifications, and writes this file either to the local disk or the server, depending upon the origination of the build tool.

At **502**, if a user completion event occurs inside the web site JavaScript pop-up window, which had been activated when the user selected the "Web Site" command from the "File" menu, the panel determines if the web site page size has been changed. If so, the panel calls an engine method for processing.

Similarly, at **504**, if a user selection of a "Zoom" command from the "View" menu is detected by the panel at **504**, the panel also calls an engine for processing.

In both the cases at **502** or **504**, in one implementation of the invention, the engine writes out a checkpoint record at **508** that is similar to that of a "Websitename".dta "database file (See FIG. **24**). But is given the temporary checkpoint Websitename. The engine then creates a build engine HTML definition file based on these specifications, and writes this file either to the local disk or the server, depending upon the origination of the build tool.

In one implementation of the invention at **510** the engine terminates itself, by stopping all of its threads. Meanwhile the interface writes out four cookies onto the local disk which define the following:

1: The re-initialization mode. (Either Open or Checkpoint).

2: The current web page number when the resizing event occurred.

3: The Web Site Name. (The checkpoint name if in checkpoint mode)

4: The zoom level.

The interface then terminates itself by executing the JavaScript "parent.location.href" command, which causes the build engine parent HTML frame file (PFF) to be reloaded (See FIG. **5**).

In one implementation of the invention at **512** the re-initialization process begins. The PFF cause both the panel and the build engine to be reloaded and activated. The panel then reads the mode cookie. If the mode is either open or checkpoint, the interface reads the web site name, page number and zoom level cookies, then resets the mode cookie to the initialize state for subsequent operations. The interface then calls an engine method to read the external database, and then to return the necessary values from that database in order to update the interface's database. Finally the engine calls two engine methods in order for the engine to go to the correct current web page and draw that page at the now current zoom level. Normal processing can then resume.

Run Generation Process

FIG. **24** through FIG. **27** describe the run generation process. This process starts when the build process detects that the user is finished defining the web site (user has saved the web site and invokes the run generation process), and concludes with the actual uploading of all the necessary web site run time files to the user's server.

FIG. **24** describes the techniques employed by the build engine for the creation of the external database, and the security and optimization techniques that support this process (**30** of FIG. **4**).

When the panel's JavaScript Code detects a user selection of "Save" or "Save As" from the panel's "File" menu, it

draws the appropriate pop-up window and initializes the pop-up window's values for the current web page size as had been defined at FIG. **5** and passed to the build engine. The panel's JavaScript in the "save the web page/template" pop-up window detects a user completion event at **150** (i.e., the designation of a user's web site name followed by the enter key), and calls the appropriate panel JavaScript function. More specifically, after completing the appropriate validity checks, the function calls the appropriate JAVA build engine method, passing as a function call argument the user defined "Websitename". The build engine method checks for the existence of a "Websitename".dta file, and, if so, posts that result into a poll-enabled method return value. The poller checks that value, and if set to true, calls a JavaScript function which draws a pop-up window asking the user to confirm whether the existing web site definition should be overwritten or not. This JavaScript function also calls an appropriate build engine method to reset the return value to false in order to be initialized for the next possible "Save" operation.

Once this verification process is completed the build engine begins the external database creation process at **151**, which will vary depending upon the security manager of a given browser at **152**. See FIG. **5** for a detailed description of the browser security manager alternatives. If the browser's security manager allows for local disk file creation, the build engine calls a method, which asserts the necessary security policy permissions to create and write a file. If not, the build engine calls the necessary method to create and write a file on the user's server.

The external database contains, as its first record, a "Header" record, which contains can include the following information:

1: A file format version number, used for upgrading database in future releases.

2: The default screen resolution, in virtual pixels, for both the screen width and height. This is usually set to the web designer's screen resolution, unless overwritten by the user at FIG. **5**.

3: Whether the application is a web site.

4: Virtual web page size settings. A calculation is performed by the build engine method, in order to calculate what the maximum web page length is, after reformatting all paragraphs on all internal web pages, based on the default screen resolution.

5: Web page and styles high watermarks.

6: The Websitename.

The header records are written at step **153**.

During the build process, as new web pages or new objects are created by the user, or as text is added to or deleted from a paragraph, or as new styles are created or deleted, appropriate high watermarks are set, in order to show the current number of each of these entities. Thus, at **154**, the values for the number of active web pages and the number of text button, image, paragraph or other styles are written as high watermarks in the header. The high watermarks for the number of text button, image, paragraph or other objects that exist for each web page, the number of lines for each paragraph object, and the number of line segments for each paragraph line are written within the body of the external database as described at **156**, and used as settings for each of the loops in the four-dimensional data structure. Because no structural limits are set on the number of web pages, objects per web page, styles, or paragraph size, these high watermarks greatly reduce the external database file size, and the time it takes for the run time engine to process the data stored in its database.

The settings for all paragraph, text button and image styles are then written as a style record at **155** based on their high watermark. This data includes Boolean and integer variables, and font and color objects, written as a one-dimensional array, based on the high watermark values for the number of styles that exist. The font and color objects are serialized as is discussed in greater detail below (See **159** below).

The body of the external database is then written at **156**. All Boolean values are written inside a four-dimensional loop at **157**. The outside loop contains the Boolean values used to define web pages (i.e. a one-dimensional array definition) as well as the high watermarks for the number of text button, image, paragraph or other objects per web page, with the loop set at the high watermark which defines the number of existing web pages for this web site structure. The second level consists of three or more two dimensional loops with the loops set to the high watermarks defining the actual number of text button, image, and paragraph or other objects that appear on any given web page and contains the values used to define web page objects ((i.e. a two-dimensional array definition; web page number by object number). Included within the loop for paragraph objects are the high watermarks for the number of lines for each paragraph object. The third loop is set by the high watermark defining the actual number of paragraph lines that for all paragraphs on any web page and contains the values used to define paragraph lines (i.e. a three-dimensional array definition; web page number by object number by paragraph line.) Included within the loop for paragraph lines are the high watermarks for the number of line segments for each paragraph line. The inner most loop is set by the high watermarks defining the number of line segments per paragraph line and contains the values used to define paragraph line segments (i.e. a four-dimensional array definition; web page number by object number by paragraph line by paragraph line segment.).

All integer values are written inside a four-dimensional loop at **158**. Their four loops are controlled by the same high watermark settings as used for the Boolean records, and they describe the same logical entities.

Multimedia objects are written inside a two-dimensional loop at **159**. They include URL, color, and font objects, and can include other types of objects. A URL object is the encoded form of a URL Address, used by a browser or a JAVA method to access files and web addresses. All multimedia objects must be serialized before they can be written. This means that the objects are converted into a common external definition format that can be understood by the appropriate deserialization technique when they are read back in and cast into their original object structure. The outside loop contains web page related objects, and the inner loop contains image, text button, paragraph, etc. related URL, color, and font objects. The outer loop is defined by the web page high watermark and the inner loops by the high watermarks for the actual number of text button, image, paragraph or other objects on a web page.

String records are written inside a four-dimensional loop at **160**. The outer loop may be empty. The second loop can include the string values for text button objects, audio and video filenames, and audio and video channel names. The third loop contains values for paragraph line related data, and the innermost loop contains the values for paragraph line segment definitions. The string records are controlled by the same high watermarks as those used for Boolean and integer records. String records are stored utilizing an appropriate field delimiter technology. In one implementation, a UTF encoding technology that is supported by JAVA is utilized.

Single and double floating-point, and long integer records are written inside a two-dimensional loop at **161**. The outer loop may be empty. The inner loop contains mathematical values required for certain animations and image processing algorithms. The single and double floating-point, and long integer records are controlled by the same high watermarks as those used for Boolean and integer records.

FIG. **25** describes the techniques used to create a customized and optimized run time engine by the build engine (**31** of FIG. **4**). A versionizing program analyzes the feature flags, and only those variable definitions, defined in the "Main" object class, relating to the object classes and methods that will be executed at run time, are extracted at **162**. All references to object classes that will be called at run time are extracted, creating the source code for the run engine "Main" object class that is ready for compilation at **163**.

All external image, video and audio files are resolved at **164**. The external references can be copied to designated directories at **164**, either on the user's local disk or file server. The file Pathnames can be changed to reflect these new locations. During the installation of the build tools, the necessary class libraries from Sun, Microsoft and Netscape are either installed on the local system (See FIG. **5**) or made available on the server where the build tools can be optionally located. The necessary environmental variables are set to permit normal access to the required class libraries.

The customized run engine and a library of the referenced run time classes are compiled and converted into byte code at **165**. Finally, the run time engine for the web site is created at **166**. The required set of class objects required at run time is flagged for inclusion into the CAB/JAR file (See FIG. **27**).

FIG. **26** shows the techniques used to create the HTML Shell File (HSF) (**32** of FIG. **4**). The first step of the process at **167** is to determine whether the dynamic web page and object resizing is desired by testing the application setting, set by the user at FIG. **21***a*, or possibly reset at FIG. **24**. If the application was a web page, and thus requiring dynamic web page and object resizing, virtual screen resolution settings, calculated at FIG. **24** at **153**, are placed in an appropriate HTML compliant string at **168**. If the application is a banner or other customized application, the absolute values for the run time object (applet size) height and width are placed in an appropriate HTML compliant string as absolute width and height values at **169**.

An analysis is made for the background definition for the first internal web page at **170**. If a background pattern is defined, an appropriate HTML compliant string for setting the HTML "background" to the same background image is generated. If the first web page definition is a color instead, then the RGB values from those colors are converted to hexadecimal and an appropriate HTML compliant String is generated setting the "bgcolor" to the required hexadecimal value. This process synchronizes the web page background with the background that will be drawn by the browser when it first interprets the HSF.

Thereafter, a JAVA method generates HTML and JavaScript compliant strings, that when executed by a browser, generate additional sets of HTML and JavaScript compliant strings that are again executed by the browser. More specifically, if the application required dynamic web page and object resizing (See **167**) then JavaScript and HTML compliant strings are generated at **171** so that, when interpreted by the browser at the time the HTML Shell File is initialized, the screen resolution sensing JAVA applet (SRS) will be executed. JavaScript code is generated at **172** in order to enable JavaScript to SRS applet communication. In one implementation, the code is generated by performing the following functions:



1: Determine the current browser type.
2: Load the SRS from either a JAR or CAB File, based on browser type.
3: Enter a timing loop, interrogating when the SRS is loaded.
4: When the SRS returns an "available" status, interrogate the SRS, which will return the current screen and window's actual height and width.
5: Convert the virtual screen resolution settings into appropriate absolute screen width and height values.

Strings defining additional JavaScript code are generated at **173** that perform the following steps at the time the HSF is initialized by the browser:

1: Generate HTML compliant strings that set the run time engine's applet size to the appropriate values.
2: Generate an HTML complaint string that contains a "param" definition for linking the run time engine to the External Database created at FIG **24**.
3: Generate an HTML complaint string, dependent upon the type of browser, which causes the current browser to load either the JAR or the CAB File(s).
4: Generate JavaScript Code compliant strings that create and dynamically write the applet size defining HTML strings utilizing the JavaScript "document.write" function. This dynamically created code causes the browser to execute the run time engine, in the correctly sized window, from the correct JAR or CAB file, and linked to the external database.

At **174**, writing out the above-generated HTML and JavaScript compliant strings creates the HSF. The necessary security policy permissions are asserted, and a "Websitename".html file is created.

FIG. **27** describes the processes for creating the CAB and JAR Files (**33***a* of FIG. **4**). The image objects, if any, which were defined on the first internal web page are analyzed at **175**. If they are set to draw immediately upon the loading of the first web page, then they are flagged for compression and inclusion in the CAB and JAR Files. The feature flags are analyzed at **176** to determine which JAVA classes have been compiled (See FIG. **25**). These class files are flagged for compression and inclusion in the library CAB and JAR Files. Strings that are BAT compliant definitions are created at **177** that will, when executed in DOS, create compressed CAB and JAR Files. These CAB and JAR Files contain the compressed versions of all necessary JAVA class files, image files, the "Websitename".class, customized run time engine file, and the "Websitename".dta database file. In one implementation of the invention, two BAT files are created. The first, when executed, will create a CAB/JAR file with the "Websitename".dta database file and the customized "main" run time engine, excluding all the image and button object animation, transformation, and image processing code. The second BAT file, when executed, will create a CAB/JAR file with all the library of all the referenced image and button object animation, transformation, and image processing code.

The necessary security policy permissions for file creation are then asserted, and "Websitename".bat and "Websitenamelib".bat files are written at **178**. The "Websitename".bat and "Websitename".bat files are then executed under DOS, creating compressed "Websitename".cab and "Websitenamelib".cab files and compressed "Websitename".jar and "Websitenamelib".jar files at **179**. The HTML Shell File and the JAR and CAB files are then, either as an automatic

process, or manually, uploaded to the user's web site. This completes the run generation processes.

Run Time Process

The run time process is shown in FIG. **28** through FIG. **36**.

FIG. **28** shows the web page size generation technology utilized by the run time engine. A web surfer points a browser at the HTML shell file (HSF) at **180**. The browser begins to interpret the HTML and JavaScript code in the HSF that was created (See FIG. **26**). The browser draws either the background color or background image pattern, as defined by the HTML complaint code (See FIG. **26**) at **170**. The browser then executes the HSF's JavaScript initialization code, which "sniffs" the current browser at **181** to determine its type, and then generates the appropriate HTML code for that particular browser to interpret. This code defines whether the executable files and database will be extracted from inside a compressed CAB file or a compressed JAR file and its location.

Based on the user application (defined at FIG. **21***a*, or possibly reset at FIG. **24**), the HSF at **182** will then execute an appropriate JavaScript function (as created in FIG. **26** at **167**). If the application required dynamic resizing of the web page's dimensions, JavaScript code is called which generates HTML code using the JavaScript "document.write" function, which causes the SRS applet to be immediately executed by the browser at **183**. The JavaScript code then goes into a timer loop, checking on when the SRS applet is alive before initiating any communication. After detecting that the SRS has been initialized, a JavaScript function calls the appropriate SRS applet methods at **185**, which return the width and height, in pixels, of the current browser window. JavaScript Code is then called which converts the screen resolution independent window width and height values into absolute pixel values. A JavaScript function is then called which use the JavaScript "document.write" function to generate HTML code that define the run time engine specifications, etc. (see FIG. **26**) and cause the browser to immediately execute the run time engine. If the application had not required dynamic resizing of the web page's dimensions, then a JavaScript function is called which generates HTML code using the JavaScript "document-.write" function that defines the fixed dimensions for the web page size and cause the browser to immediately execute the run time engine at **184**.

FIG. **29** shows the techniques employed by the run time engine to read the external database and to generate the necessary web page objects (**35** of FIG. **4**). The run time engine reads a "PARAM" value at **186**, from HTML Code that was generated above (see FIG. **26**), which points to the "Websitename".dta external database that is compressed into the JAR or CAB File (that was loaded and accessed in FIG. **28**). The run time engine then initiates the read operation. In one implementation, the read technique is always non-privileged. If permitted by the current browser as a non-privileged operation, the "Websitename".dta file will be extracted and read from the CAB/JAR file residing in temporary local storage. If not, the run time engine will read the "Websitename". dta file directly from the server. The header record is read at **187**. Any objects, such as fonts and colors, are cast into their original form. The high watermark values, as they are encountered in the header and in the body of the database, are immediately used for setting the limits for the subsequent multilevel read loops for reading in the style record and the web page(s) and object(s) definitions. The virtual screen resolution values are read for the subsequent dynamic resizing of the web page objects.

The style record is read based on its high watermarks, and processed at **188**. The definitions for all paragraph, text button, image or other styles are read and stored for subsequent initialization and processing of all paragraph, text button, image or other objects. The data representing the values for the first web page and all its objects is read at **189**. The Boolean, integer, string and floating point fields for the first web page are initialized. The serialized multimedia objects for the first web page are read and cast into their final form. (See FIG. **24**)

If external files, such as image, audio and video files, must be read as part of the first web page's generation, exception handling routines are executed at **190**, as necessary, in the event of any processing errors. In one implementation, error recovery at this stage places the highest priority on a graceful operation cancellation, rather than a web page crash. In the worst case, a particular image, sound or video file may not be available to the web surfer. All other aspects of the web page will likely be available even in this error scenario.

Process step **191** is executed simultaneously with the generation of all the other web pages at **192** by means of multiprogramming utilizing thread technology. Thus the first web page will be drawn and active for user viewing and user interaction long before the data for all the other web pages have been read, processed, and initialized. The data representing the values for the subsequent web pages and all their objects are read at **192**. The Boolean, integer, string and floating point fields for these web pages are initialized. The serialized multimedia objects for these web pages are read and cast into their final form. (See FIG. **24**)

FIG. **30** shows the scaling techniques employed by the run time engine for web page generation (**36** of FIG. **4**). The first step in the scaling process is to calculate the coordinates that define the origin for the placement of each object for a given web page. (This is usually the upper left corner of the object, defined in actual screen pixels.) A test is made at **193** to determine if the centering attribute is set for the object. If not, the left and top coordinates are converted from the virtual screen values to the local screen values, based on the local screen window resolution at **194**. In one implementation, multiplying the virtual coordinate by the local screen window resolution and dividing by the virtual screen resolution determine the conversion.

If the centering attribute is on, then a calculation for the object's width is performed. See processes **197**, **198**, and **199** below for a description of this calculation. Based on this calculated width, and based on the local screen window resolution, the left coordinate is calculated at **195**. One algorithm that can be used is to subtract the screen width, as calculated in **197**–**199** below, from the local screen window resolution, and divide that result by 2. The top coordinate is calculated the same as in process **194** above.

Based on the object type, determined at **196**, a different scaling technology is employed. If the object is a text button object at **197**, the text button object itself, including its background, is not scaled. The virtual width and the local screen width remain the same. However, if a 3D Frame effect is defined, it is scaled based on the following algorithm: if the text string's orientation is Left to Right, the inner width of the 3D Frame, and its placement relative to the text string, is calculated as the length of the text string, plus ⅛ of an "n" space on each side, plus an additional offset appended to the right of the inner width to compensate for the italic font style, if defined for the font of that text string. The italic offset can be defined as the font size for the text string, divided by 10, plus 1. The inner height of the 3D Frame can be defined as the font height plus 2 pixels. The font height equals the font's leading plus its ascent plus its

descent specifications. The inner height origin can equal the text string origin. The style of the 3D effect (i.e., either a 3D raised look or a 3D depressed look), plus the inner width and height, is sent to a 3D frame build method for the construction of the 3D frame. The width of the 3D frame in pixels can be calculated as the inner width divided by 10 plus 3.

If the text string's orientation is vertical, the inner width of the 3D Frame is an "m" space. The inner height of the 3D Frame can be calculated as the font height times the number of characters in the text string. Both the left and top placement of the 3D frame can be set to the left and top origin of the text string. The width of the 3D Frame can then be calculated as the inner height divided by 10, plus 3.

If an animation is assigned to the text string, the font size used for the initial calculation of the 3D frame is the same as that used to define the animation's initialization value. If the object is a paragraph at **198**, and the scaling attribute is on, the maximum width for the paragraph can be defined by the attached paragraph style (or paragraph override) as a percentage of the screen width. This screen width percentage can be converted into an actual width in pixels, based on the local screen's window resolution. If the current screen resolution is the same as that used by the web designer, then the paragraph line end values (just read from the external database) are used without adjustment, bypassing the entire paragraph reformat process. If the current screen resolution is different than that of the virtual screen resolution, then a very compact method of reformat is called (relative to the build engine reformat methods at FIG. **6** and at FIG. **18**), and the text for the paragraph is reformatted based on this width.

The run time engine's reformat technology begins by creating one paragraph line for the entire text string assigned to the paragraph text area. All the style overrides are renumbered sequentially with the style records or the non-marked text strings ignored. A simplified "Overflow" reformat method can be called, which chops up the single paragraph line first into paragraph line segments, where each word is defined as a line segment. Because of the word oriented style override architecture, the style overrides have a one-for-one correspondence with the line segments. Each paragraph line break can be calculated by relying on the simplified word oriented style override technology described above. The paragraph line can be built inside a tight word-by-word loop, with a simple logic check for a style override or hard line break. The paragraph width is then derived as the width of the longest line of the reformatted paragraph, while the paragraph height is defined as the font height times the number of lines. If a 3D frame was defined for the paragraph, it can be scaled based on the following algorithm:

The inner width is defined as the same as that of a text string, but the width of the text string for the longest line is used. The same "n" space and italic offset calculations are used. The inner height is calculated as the font height times the number of lines plus 2 pixels.

If the object is a paragraph, and the scaling attribute is off, then the paragraph is treated the same as a text button object, with the only exceptions that there is no vertical orientation, and the height and width of the 3D frame, if defined, is calculated using the same algorithm as was used for the scaled paragraph above.

If the object is an image at **199**, and the scaling attribute is on, the image width can be calculated as the virtual width times the local screen window width divided by the virtual screen width. The image height can be calculated as the virtual height times the local screen widow height divided by the virtual screen height. If the image had been resized or rotated, then the virtual width and height of the image would differ from that of that of the original image. If a 3D frame is defined for the image, it can be scaled based on the following algorithm:

The inner width and the inner height of the 3D frame will coincide exactly with the outer edges of the image, after the image had been scaled. Adding the scaled image height to the scaled image width and dividing the result by **40** and adding **3** can calculate the width in pixels of the 3D frame.

If an animation is assigned to the image, then the animation's initialization values for the image's width and height can be used to calculate and draw the initial 3D frame. The coordinates and sizes for the backgrounds for text button, image and paragraph objects can be calculated using the same algorithms as was employed for the calculation and placement of the inner width and inner height for the 3d frame for each object.



FIG. **31** through FIG. **35** shows the multilevel web page and object thread technology employed by the run time engine. The description includes all the animation technologies, transformation technologies, time line technologies and drawing technologies that support this multilevel architecture.

FIG. **31** describes the initial processes for the invention's multilevel web page and object thread technology employed by the run time engine (**37** of FIG. **4**). Upon the completion of the processing of all the data definitions for the first internal web page (FIG. **30**), the main web page thread is created and executed. This causes the run method for the main run time engine class to be executed simultaneously with the reading, processing, and scaling of the data for the subsequent web pages (See FIG. **29**). In addition, the reading of any image files defined for the first web page is also performed simultaneously, under the control of an image observer (See FIG. **12**). The main run method enters a web page counter loop at **200**, the loop being defined from the first internal web page to the high watermark that was set to the number of existing internal web pages for the web site.

A check is made at **201** to see if the current web page exists. If the web page does not exist, and the current web page number is less than that of the high watermark, then the web page counter is incremented by one and the web page counter loop is reentered. If the current web page number equals the high watermark at **202**, then the web page counter is reinitialized to the first web page, so that the web page loop may repeat itself, from the first internal web page, depending upon the delay setting for the last web page.

A test is then made on all objects defined for this web page at **203**, utilizing a loop whose range is defined by the number of objects per web page high watermarks. More specifically, within this universe of possible objects, if the object exists, and it is defined by a time line in which there is a delayed entrance, then a boolean flag is set for those objects that causes the draw system to suppress drawing these objects during the web page transition as defined below.

A test is then made to determine if the web page has a transition animation defined at **204**. If not, the draw system is called for the first time. The draw system for a given web page utilizes a loop whose range is defined by the number of objects per web page high watermarks. The draw system can also employ technology so that the draw process generates a screen image in one or more off-screen buffers, only drawing to the screen when the screen image, or the clipping area for the screen, has been fully generated. This greatly reduces, if not totally eliminates, any screen flicker, and creates visually smooth animation effects.

The first draw function is to draw the web page background into the primary off-screen buffer. The web page

background color is drawn, as defined initially at FIG. **21***a*, or modified for that particular web page at FIG. **20**. A test is then made to determine if the web page has a background image pattern, as defined initially at FIG. **21***a*, or modified for that particular web page at FIG. **20**. If it does, and the image observer reports that the image is ready to be drawn, a background image draw loop is executed, defined by the height and width of the background image, and the screen resolution of the current browser window. In the unlikely event that the background image pattern is not yet available, there is a delay until the image observer reports the completion of the image processing operation. The tiled background image pattern is also drawn into the primary off-screen buffer, completely overdrawing the background color. The backgrounds for all non-suppressed (See **203**) parent web page text button and paragraph objects are then drawn into the primary off-screen buffer, unless a background transparency flag has been set (See FIG. **7**).

The text strings for non-suppressed parent web page text button and paragraph objects are then drawn into the primary off-screen buffer. These text strings are drawn based on their font name, style, size, effect(s), and color. If a paragraph line string, the string may have multiple string segments, each with their own font name, style, etc. If the text button object has its vertical attribute set to true, then the draw system executes a loop defined by the number of characters defined in the text button object. The top and left origin coordinates were set in the usual way (See FIG. **30**), but the top coordinate is adjusted by the font height for each iteration of this draw loop. The intelligent 3D Frame, if defined, is then drawn into the primary off-screen buffer for the paragraph and text button objects (See FIG. **30**). The primary image objects for the web page are then processed by the draw system. If the image observer reports that the image is ready to be drawn, it is drawn into the primary off-screen buffer, based on the coordinates and size as defined in FIG. **30**. If not ready, there is a delay until the image observer reports the completion of the image processing operation. The Intelligent 3D frame, if defined, is then drawn into the primary off-screen buffer for the image objects (See FIG. **30**).

The draw system is responsive to two other technologies at this stage. The first is user interaction based on the location of the mouse cursor and any user initiated mouse event. This subject will be described in greater detail below in association with FIG. **36**. The second is object animation for non-delayed web page objects. This subject will be described in greater detail below in association with FIG. **33**.

If the web page transition test at **204** was true, then the run time engine's main run method executes the web page transition animation technology at **205**.

FIG. **32** describes the web page transition animation technology. First a lock is placed on this method at **212**, as a safety precaution to prevent any interference from other threads during the animation. A test is then made on whether the transition animation setting (See FIG. **20**) for the web page is random at **213**. If so, a random transition number is generated at **214**. The web page thread then begins a particular animation loop at **215**, depending upon the random number that was generated at **214** or by the transition animation that was set previously (at FIG. **20**). In one implementation, 13 different transition animations plus random are supported including. They are: Fade In, Zoom In, Zoom Out, Zoom to Upper Left, Zoom to Lower Right, Rotate to the Left, Rotate to the Right, Rotate Bottom to Top, Rotate Top to Bottom, Slide to the Left, Slide to the Right, Slide Bottom to Top, and Slide Top to Bottom.



For all web page transition animations, the X and Y animation increment values are calculated by dividing the current browser's screen width and height by the user defined animation resolution at **215**. In all animation and draw loops, the number of loops can equal the number of animation frames as set at FIG. **20**. The timer delay for all animations, in milliseconds, can be calculated by dividing the number of frames per second (See FIG. **20**) into 1,000.

For a description of "Fade In" Technology see FIG. **33**. A "Zoom In" algorithm sets the initial scaled width and height for the current web page image to zero and the prior web page image to its full size. In each animation and draw loop the previous web page's final image state is drawn into a secondary off-screen buffer at **216**. (If this is the first occurrence of the first web page, then the secondary off-screen buffer is set to the background of the first web page.) The upper left hand corner (origin) of the current web page can be calculated based on the following formula: browser screen width minus the scaled width divided by two.

The scaled image of the current web page is then drawn into the secondary off-screen buffer at the calculated origin, using the current scaled width and height for the web page image. This merged image of the prior and scaled version of the current web page is then drawn to the screen. A timer delay then occurs as defined at **215**, after which the X and Y animation increment values are added to the scaled width and height for the current web page image. The animation loop is then repeated to its conclusion at **218**.

The other eleven web page transition animations follow a similar methodology, but have quite different calculations, which are based on the following variables:

1: Order of drawing of the prior and current web pages.
2: Initialization values for the X and Y origin coordinates for the current and prior web pages.
3: The initial values for the scaled width and height for the current and prior web pages.
4: Whether X and Y origin coordinates for the current and prior web pages increment, decrement, or remain the same.
5: Whether the values for the scaled width and height for the current and prior web pages increment, decrement, or remain the same.

For the "Zoom Out" animation, the current page is drawn first and always drawn at 100%. The prior web page is initialized also at 100%, but its X and Y origin coordinates are incremented and its scaled width and height values are decremented, by the appropriate values, for each animation iteration.

For the "Zoom to Upper Left", "Zoom to Lower Right", "Rotate to the Left", "Rotate to the Right", "Rotate Bottom to Top" and "Rotate Top to Bottom" animations, a common data initialization and data increment strategy is implemented.

1: The X and Y variables for page image one is set to zero.
2: The X and Y variables for page image two is set to the right and bottom edges of the browser window.
3: The scaled width and height variables for page image one is set to 100% of the browser window's resolution.
4: The scaled width and height variables for page image two is set to zero.
5: For each loop iteration, the scaled width and height variables for page image one are decremented by the X and Y animation increment values defined at **215**.
6: For each loop iteration, the scaled width and height variables for page image two are incremented by the X and Y Animation increment values defined at **215**.

For the "Zoom to Upper Left" animation, the prior web page is drawn first; with its X and Y origin coordinates always set to zero. (upper left corner of the browser window) Its scaled width and height values are always set to the current values for scaled width and height variables for page image one. The X and Y origin coordinates for the current web page can be calculated by subtracting the current values of image two's scaled width and height variables from the initial values of the X and Y variables for page image two. The scaled width and height values for the current web page can be set to the current values for the scaled width and height variables for page image two.

For the "Zoom to Lower Right" animation, the current web page is drawn first; with its X and Y origin coordinates always set to zero. Its scaled width and height values are always set to the current values for scaled width and height variables for page image two. The X and Y origin coordinates for the prior web page are set to current values of image two's scaled width and height variables. The scaled width and height values for the prior web page are set to the current values for the scaled width and height variables for page image one.

For the "Rotate to the Left" animation, the prior web page is drawn first; with its X and Y origin coordinates always set to zero. Its scaled width value is set to current value of image one's scaled width variable. Its scaled height value is always set to the bottom of the browser's window. The X origin coordinate for the current web page can be calculated by subtracting the current value for image two's scaled width variable from the initial value for image two's X origin coordinate. The Y origin coordinate for the current web page is always set to zero. Its scaled width value is set to current value of image two's scaled width variable. Its scaled height value is always set to the bottom of the browser's window.

For the "Rotate Bottom to Top" animation, the prior web page is drawn first; with its X and Y origin coordinates always set to zero. Its scaled width value is set to the width of the browser window. Its scaled height value is set to current value of image one's scaled height variable. The current web page's X origin coordinate is always set to zero. The Y origin coordinate is calculated by subtracting the current value of image two's scaled height variable from the initial value for image two's Y origin coordinate. Its scaled width value is always set to the right edge of the browser's window. Its scaled height value is set to current value of image two's scaled height variable.

For the "Rotate Top to Bottom" animation, the current web page is drawn first; with its X and Y origin coordinates always set to zero. Its scaled width value is set to the width of the browser window. Its scaled height value is set to current value of image two's scaled height variable. The prior web page's X origin coordinate is always set to zero. The Y origin coordinate is set to the current value of image two's scaled height. Its scaled width value is always set to the right edge of the browser's window. Its scaled height value is set to current value of image one's scaled height variable.

For the "Slide to the Left", "Slide to the Right", "Slide Bottom to Top" and "Slide Top to Bottom" transition animations, a common data initialization and data increment strategy is implemented. The strategy includes

1: The X and Y variables for page image one is set to zero.

2: The X and Y variables for page image two is set to the right and bottom edges of the browser window.

3: For each loop iteration, the X and Y variables for page image one are incremented by the X and Y animation increment values defined at **215**.



4: For each loop iteration, the X and Y variables for page image two are decremented by the X and Y animation increment values defined at **215**.

5: The scaled width and height values always remain at 100% of the browser windows width and height.

For the "Slide to the Left" animation, the prior web page is drawn first; with its X and Y origin coordinates always set to zero. The current web page's X origin coordinate is set to the current value of page image two's X variable. Its Y origin coordinate is always set to zero. For the "Slide to the Right" Animation, the current web page is drawn first, with its X and Y origin coordinates always set to zero. The prior web page's X origin coordinate is set to the current value of page image one's X variable. Its Y origin coordinate is always set to zero.

For the "Slide Bottom to Top" animation, the prior web page is drawn first; with its X and Y origin coordinates always set to zero. The current web page's Y origin coordinate is set to the current value of page image two's Y variable. Its X origin coordinate is always set to zero.

For the "Slide Top to Bottom" animation, the current web page is drawn first; with its X and Y origin coordinates always set to zero. The prior web page's Y origin coordinate is set to the current value of page image one's Y variable. Its X origin coordinate is always set to zero.

After the last animation cycle is completed for any of the transition animations at **218**, the animation process is unlocked, and process step **206** shown in FIG. **31** is then executed.

Returning to FIG. **31**, the main web page thread's run method then executes a text button and image object time line, transformation and animation loop at **206**. This range loop is defined from the first object on the given web page to the high watermark for the number of those objects on a web page for this web site. A test is made on each object on whether an animation, transformation and/or time line has been assigned at **208**.

If so, an "instance" of the time line class for that particular object type is created at **209**. An "instance" of a class is a fundamental aspect of object oriented programming (OOP). Each time, the line class is implemented with a "runnable" interface, so that they can be executed as independent threads. Communication of data, between the "instance" of a class and the main run engine class can be accomplished in OOP using several different techniques. In one implementation, this construction, passed as an argument, is used to permit different objects to address each other's variables and databases. A thread is then created, utilizing a two-dimensional object internal database architecture (web page number by internal object number). This methodology is convenient for permitting all object time lines for a given web page to be managed and synchronized. The object's thread is then "started".

The result of this process at **209** is that an independent thread has been created for each appropriate object on a given web page, all executing simultaneously with each other and with the main run time engine web page thread, subject to the definitions of their independent time lines at **210**. See FIG. **33** for a description of the time line technology. When the main web page thread has finished the text and image loop at **207**, the draw system is activated; the run time engine can now respond to user interactions, and the main web page thread transitions into a "Join" loop at **211**. See FIG. **35** for a description of this process.

FIG. **33** shows the time line technology used by the run time engine. The techniques and algorithms employed to create this technology permit each web page object to have

an independent yet synchronized existence with each other, with the main web page thread, and with child objects that each main or parent object may spawn. Furthermore, each object and each of their child objects are capable of performing multiple animations and transformations, either serially or simultaneously. Database initialization is first accomplished for each object thread. This assures that the object thread's database is set to the correct initial values as required for that particular object, and that the references to the main web page thread's database are established.

A test is then made to determine if the object has a time line definition assigned to it at **219**. If not, a test is made at **220** on certain two-dimensional object definition variables in order to determine which of the following four states have been defined for the object: animation without a transformation; transformation without animation; animation, with the transformation occurring simultaneously with the animation; and animation and transformations occurring in a serial manner.

If the test shows that the object has an animation defined, but no transformation, then certain two-dimensional status variables are set, and an "instance" of the "animation class" for that particular object type is created at **229**. Each "animation class" is also implemented with a "runnable" interface. An object animation thread is then created, utilizing the two-dimensional object internal database architecture (See FIG. **8**). This object animation thread is then "started". Communication between the object animation thread, the parent time line thread, and its parent, and the main web page thread, are accomplished as discussed in process **209**. The object time line thread then executes a "Join" method. This puts the object time line thread in a "wait state". When the thread it is waiting for is completed, this child thread "joins" the parent object time line thread, and the object time line thread then continues its process. Other forms of synchronization between two independent threads could have been implemented as is known in the art.

The techniques employed at **229** to implement object animation vary by object type. In one implementation, for text button object animations, 26 different animations are supported including: Zoom In, Zoom Out, Grow NW, Grow NE, Grow SE, Grow SW, Shrink SE, Shrink SW, Shrink NW, Shrink NE, Enter N, Enter NE, Enter E, Enter SE, Enter S, Enter SW, Enter W, Enter NW, Exit N, Exit NE, Exit E, Exit SE, Exit S, Exit SW, Exit W and Exit NW. In one implementation, for image object animations, 29 different animations are supported including: Fade In, Fade out, Rotate, Zoom In, Zoom Out, Grow NW, Grow NE, Grow SE, Grow SW, Shrink SE, Shrink SW, Shrink NW, Shrink NE, Enter N, Enter NE, Enter E, Enter SE, Enter S, Enter SW, Enter W, Enter NW, Exit N, Exit NE, Exit E, Exit SE, Exit S, Exit SW, Exit W and Exit NW.

As discussed above with regard to FIG. **17** each animation type has a defined speed, resolution, and number of animation cycles. These settings are stored in the main web page class, and are passed to the particular animation thread through a two-dimensional object internal database architecture as discussed in process step **209** above during the animation thread's initialization process. The animation thread then executes, in its run method, a main animation loop that has the number of iterations set to the end number of animation cycles, as assigned to that particular text button object.

Text button animations are currently implemented in three logical groups. Group One includes "Zoom In", "Grow NW", "Grow NE", "Grow SE", and "Grow SW". Group Two includes "Zoom Out", "Shrink SF", "Shrink SW", "Shrink NW", and "Shrink NE". Group Three includes "Enter N", "Enter NE", "Enter E", "Enter SE", "Enter SW", "Enter W", "Enter NW", "Exit N", "Exit NE", "Exit E", "Exit SE", "Exit S", "Exit SW", "Exit W" and "Exit NW".

For Group One text button animations, the animation font size is initialized at a very small value, and in one implementation is set at 4 Points. The animation point size increment can be derived by dividing the resolution (number of animation frames) into the font size for that text button object. The run method then executes a secondary animation loop, which will terminate when the animation font size equals the text button object point size. For each secondary animation loop, the length of the current animated text string is calculated, a new font object is created for the current animation point size, and the font metrics for that new font are created. If the text button object has a vertical orientation, the animated text button object's width is calculated to be the width of an "m" space, in the current animated font. The animated text button object's height is calculated to be current animated font height times the number of characters in the text string. If the text had a horizontal orientation, the animated text button object's width is calculated to be the width of the text string in the current animated font. The animated text button object's height can be calculated to be the font height of the current animated font. The calculations for X and Y coordinates for the animated text button object depend upon which animation was defined within the Group One-text button animations. The X and Y animation increments can be calculated utilizing the height and width, in pixels, of the text button object scaled to the current browser's window, utilizing the text button animation resolution, and considering whether the animating text button object is being centered during the animation ("Zoom Out") or not. These calculations are similar to those for the web page transition animations discussed with regard to FIG. **32**.

The draw system is then called. Based on the values of the two-dimensional status variables that had been set initially, the draw system executes the appropriate animation draw routine utilizing, through the data communication techniques already discussed, the current animation font point size, and the current animation X and Y coordinates. If a text background is to be drawn, the same algorithm as defined in FIG. **31** is used. If a 3D Frame is assigned, the current animated string width and height are passed to the appropriate 3D frame generation method, and the frame is drawn with the same algorithm as defined in FIG. **31**, but utilizing the current animation X and Y coordinates. The text button object's orientation is also handled by the draw system with the same algorithms as defined in FIG. **31**.

The text button animation thread then executes a timer delay, whose value had been defined in FIG. **17**. When the timer reactivates the text button animation thread after the appropriate delay, an animation cycle completion test is made to see if the text button object's point size minus the animation point size is less than the animation point size increment. This type of testing methodology permits the invention to utilize integer values, as opposed to floating point values, for the text button animation. This improves the execution of the animation considerably.

If the above test is true, the animation point size is set equal to the object point size and a final call is made to the draw system for that animation cycle. A test is then made to see if the current animation cycle equals the total number of animation cycles as defined in FIG. **17**. If not, a new animation cycle is initiated, with the animation values reinitialized. If this was the last animation cycle the text

button animation thread calls its "stop" method, which sets the required status variables as appropriate, then terminates itself This causes the parent text button time line thread to be reactivated through the "join" mechanism.

If the results of animation cycle completion test are false, the current animation point size is increased by the animation point size increment. A new font object is created for the now current animation point size, and new font metrics for that new font are created. If the text button object has a vertical orientation, the animated text button object's width is calculated to be the width of an "m" space, in the now current animated font. The animated text button object's height is calculated to be the now current animated font height times the number of characters in the text string. If the text has a horizontal orientation, the animated text button object's width is calculated to be the width of the text string in the now current animated font. The animated text button object's height is calculated to be the font height of the now current animated font. The calculations for the new X and Y coordinates for the animated text button object are then completed, as appropriate, and the draw system is called again.

The algorithms for Group Two text button animations are very similar to those of Group One. The differences are just in what are the initial animation values, and whether the animation point size increments and the animation X and Y coordinate increments are added or subtracted from the then current animation point size and the then current X and Y coordinates for the animating text button object.

For Group Three text button animations, the distance that the text button animation will move is calculated, in pixels, from its initial location to its final location in the current browser window. The X and Y animation increments are calculated by dividing that distance by the resolution of the text button animation. All the other algorithms for Group Three text button animations are generally a subset of those for Group One, and similar to the web page slide transition animations defined with reference to FIG. **31**.

Referring again to FIG. **33**, image animations at process step **229** can currently be grouped into five logical classes. As with text button animations, Group One includes "Zoom In", "Grow NW", "Grow NE", "Grow SE", and "Grow SW". Group Two includes "Zoom Out", "Shrink SE", "Shrink SW", "Shrink NW", and "Shrink NE". Group Three includes "Enter N", "Enter NE", "Enter E", "Enter SE", "Enter S", "Enter SW", "Enter W", "Enter NW", "Exit N", "Exit NE", "Exit E", "Exit SE", "Exit S", "Exit SW", "Exit W" and "Exit NW". In addition, image animations have a Group Four, which includes "Fade In" and "Fade Out". Group **5** image animations include the "Rotate" Animation.

For Group One mage animations, the animation width and height increments are calculated by dividing the image object's width and height by the resolution (number of animation frames) as set in FIG. **17**. The initial animation width and animation height values are set to a very small number, currently equal to the animation width and height increment values just calculated. The calculations for X and Y coordinates for the animated image object depends upon which animation was defined within the Group One text button animations. The X and Y animation increments are calculated utilizing the height and width, in pixels, of the image object scaled to the current browser's window, utilizing the image animation resolution, and considering whether the animating image object is being centered during the animation ("Zoom Out") or not. These calculations are similar to those for the web page Transition Animations discussed above with regard to FIG. **32**.



The run method then executes a secondary animation loop, which will terminate when the animation width equals the image object's width. The algorithms employed by the invention to change the animating object's height, width, X coordinate, and Y coordinate are very similar to those employed for Group One text button animations, and will not be repeated here. The techniques to utilize the draw system for drawing the image animation, the time delay technique, and the post draw logic tests and actions are also very similar.

The algorithms for Group Two image animations are very similar to those of Group One. The differences are just in what are the initial animation values, and whether the animation width and height increments and the animation X and Y coordinate increments are added or subtracted from the then current animation width and height and the then current X and Y coordinates for the animating image object.

For Group Three image animations, the algorithms are identical to those of Group Three text button animations. For Group Four image animations, the "alpha" value of a given image object is utilized in order to implement "Fade In" and "fade Out" animations. The alpha value can range from 0 to 255, depending upon the image strength desired. The value for an alpha animation increment variable can be calculated by dividing the resolution of the animation into 255, after making the necessary adjustments to keep the data in integer form, without losing resolution due to integer rounding errors. For a "Fade In" animation the value of an alpha animation variable is set to zero. The run method then executes a secondary animation loop, which will not terminate until 255 minus the then current value of the alpha animation variable is less than the value alpha animation increment variable. A "Fade In" image filter can be created for each iteration of the animation loop, using the current setting of the alpha animation variable. An image producer can also be created with pointers to the last image bitmap produced for the image object in the last animation loop and to the image filter that has just been created. The image producer, under the control of a media tracker then creates a new image bitmap. The animation thread then "waits" for the completion of this image-processing event using the media tracker. Upon completion, the draw system is called which draws the then current state of the image object. The image animation thread goes into a timer delay of some preset value (in one implementation 500 milliseconds), to permit a smooth visual animation effect. The value for the alpha animation increment is added to alpha animation variable and the loop is then repeated until the loop condition is met. Then the "stop" method is called, certain status variables are set, and the image animation thread terminates itself This causes the parent image time line thread to be reactivated through the "Join" mechanism.

The "Fade Out" animation employs very similar technology, except that:

1: the alpha animation variable is set to zero,

2: the value for the alpha animation increment is subtracted, and

3: the loop termination test is when the value for the alpha animation variable is less than the value for the alpha animation increment.

For the Group Five image rotate animation, a different bitmap for the image object is created for each animation frame through the use of a progression of standard geometrical transformations on the original image bitmap. A secondary animation loop is then executed as defined by the number of animation frames. In each loop iteration, an image object is created from an appropriate image bitmap

selected from among the set just created, the necessary two-dimensional variables are set to communicate with the draw system, and the draw system is then called. The image animation thread then executes a timer delay method based on the delay setting as defined above with reference to FIG **17**. When the timer reactivates the image animation thread after the appropriate delay, the next iteration of the secondary animation loop is repeated until the loop condition is met. Then the "stop" method is called, certain status variables are set, and the image animation thread terminates itself. This causes the parent image time line thread to be reactivated through the "join" mechanism.

Returning to process step **220** shown in FIG. **33**, if the object had a transformation, but not an animation, then certain two-dimensional status variables are set, and an "instance" of the "transformation class" for that particular object type is created at **228**. Each "transformation class" is also implemented with a "runnable" interface. An object transformation thread is then created, utilizing the invention's two-dimensional object internal database architecture. This object transformation thread is then "started". The inter-thread communication technology and the "join" technology employed for object transformations is the same as for object animations.

If the transformation is being applied to a text button object at **228**, then a timer delay method is executed based on the delay setting as described in association with FIG. **18**. When the timer reactivates the text button transformation thread after the appropriate delay, the appropriate two-dimensional status variables are set to inform the draw system which state of the current text button object to draw. The draw system is called and,-based on the settings for the above mentioned two-dimensional status variables, either the "normal", mouse over", mouse down" or "pop-up" states of the text button object's background, if any, the text button object's string, and the 3D frame, if any, are drawn. If additional transformations are defined (FIG. **18**), the above process is repeated, based on the timer delay and object states defined for the subsequent transformations. When the last transformation is completed, the "stop" method is called, which sets the required status variables as appropriate. This causes the parent text button time line thread to be reactivated through the "join" mechanism.

If the transformation is being applied to an image object at **228**, then a timer delay method is executed based on the delay setting (as defined in FIG. **18**). When the timer reactivates the image transformation thread after the appropriate delay, image transformation technology is executed. In one implementation, the image transformation technology utilizes the "alpha" value of a given image object state in order to fade in and fade out images. The alpha value can range from 0 to 255, depending upon the image strength desired. The value for an alpha transformation increment variable is calculated by dividing the resolution of the transformation into 255, after making the necessary adjustments to keep the data in integer form, without losing resolution due to integer rounding errors. The value of an alpha transformation variable is set to zero. Depending upon the settings as defined in FIG. **18**, the bitmap for one image object state is initialized to an alpha value of zero, while another is initialized to an alpha value of 255. The appropriate two-dimensional status variables are set for communication with the draw system.

A transformation loop is then executed, until 255 minus the then current value of the alpha transformation variable is less than the value alpha transformation increment variable. This methodology again keeps all calculations in the form of integers, as opposed to floating point, thus speeding up the transformation process.

Two "Fade In" image filters are created for each iteration of the transformation loop. The first uses an alpha value calculated at the current setting of the alpha transformation variable. The second uses an alpha value calculated at 255 minus the current setting of the alpha transformation variable. Two image producers are also created with pointers to the last image bitmap produced for each image object state in the last transformation loop and to the two image filters that had just been created. The two image producers under the control of two media trackers then create two new image bitmaps. The transformation thread then "waits" for the completion of these two image processing events using the media trackers. Upon completion, the draw system is called which draws the then current state of the two image object states, in the correct order, and in the correct location. The image transformation thread goes into a timer delay of some preset value (500 milliseconds in one implementation), to permit a smooth visual transformation effect. The loop is then repeated until the loop condition is met. Then the "stop" method is called, certain status variables are set, and the image transformation thread terminates itself. This causes the parent image time line thread to be reactivated through the "join" mechanism.

Returning to process step **220** in FIG. **33**, if the object was defined with an animation and transformation that would execute in a serial manner, then certain two-dimensional status variables are set, and an "instance" of the "transformation" class for that particular object type is created at **230**. An object transformation thread is then created, utilizing the two-dimensional object internal database architecture. This object transformation thread is then "started" and the parent object time line thread "waits" to be "joined".

If a text button object, then a primary loop is executed, with the number of iterations set to the number of transformations. After the execution and return from a timer delay event, if any, an "instance" of the text button animation class is created, and then a text button animation thread is created and "started". The parent text button transformation thread then waits to be "joined". This causes the text button animation thread to be executed, in the manner described at **229**. When the text button animation thread completes its execution, it calls its "stop" method, which sets the necessary status variables and then terminates itself. This causes the text button animation thread to "join" the parent text button animation thread, causing that thread to resume processing. The first text button transformation is then executed, in the manner described at **228**. After the execution and return from another timer delay event, if any, another "instance" of the text button animation class is created, and then another text button animation thread is created and "started". The parent text button transformation thread again waits to be "joined". This causes the text button animation thread to be executed again with the animation being executed, based on the definition set at FIG. **18**, on a different text button object state. The loop is then repeated until the last text button transformation is completed. Then the text button transformation thread calls its "stop" method, certain status variables are set, and the text button transformation thread terminates itself This causes the parent text button time line thread to be reactivated through the "join" mechanism.

If an image object, the mechanism of the image transformation thread spawns image animation threads, before each transformation, and is the same as that of a text button object. The actual image transformation process is identical

to that described at **228**. When completed the "stop" method is called, certain status variables are set, and the image transformation thread terminates itself. This causes the parent image time line thread to be reactivated through the "join" mechanism.

Returning to process step **220** in FIG. **33**, if the object was defined with a simultaneous animation and transformation, then certain two-dimensional status variables are set, and an "instance" of the "super transformation class" for that particular object type is created at **231**. In one implementation, the animation, transformation, and super transformation classes are integrated into one structure in order to reduce code size and increase execution speed. Each "super transformation class" is also implemented with a "runnable" interface. An object super transformation thread is then created, utilizing the two-dimensional object internal database architecture. This object super transformation thread is then "started". The inter-thread communication technology and the "join" technology employed for object super transformations is the same as for object transformations.

If a text button object, a calculation is made in order to prorate the text button animation process across the defined text button transformation process. The calculation is driven by the number of text button animation frames, and prorates from that total the number of frames that should be assigned to each transformation state. This can be done by dividing the sum of all the transformation times by each individual transformation time, and multiplying that result by the number of frames, making necessary adjustments to prevent integer rounding error. After these calculations are completed, the text button animation is executed in a similar manner as was defined at **229**. However, when the appropriate number of animation frames had been drawn, certain two-dimensional status variables are set prior to calling the draw system for the next animation frame, so that the correct text button object state is drawn, in the correct size and with the correct coordinates, by the draw system. When the super transformation process is completed the "stop" method is called, certain status variables are set, and the text button super transformation thread terminates itself. This causes the parent text button time line thread to be reactivated through the "join" mechanism.

If an image object, a calculation is made in order to prorate the image animation process across the defined image transformation process. The calculation is driven by the number of image transformation events that would occur (where each one can be set at approximately 500 milliseconds) over the entire animation event. A calculation is performed in order to calculate how many image transformation events should be assigned to each transformation state. This is done by dividing the sum of all the transformation times by each individual transformation time, and multiplying that result by the total number of transformation events, making necessary adjustments to prevent integer rounding error. A calculation is then made to allocate the number of animation frames to each image transformation event. After these calculations are completed, the image animation is executed in a similar manner as was defined at **229**. However, when the appropriate number of animation frames had been drawn, the image transformation technology is called to perform the next transformation event. The alpha transformation increment can be defined by dividing 255 by the number of transformation events assigned to that transformation. The draw system is then called. When the number of image transformation events assigned to a given image transformation is reached, then certain two-dimensional status variables are set prior to calling the draw system for the next animation frame, so that the correct image states, in the correct size and with the correct coordinates, are utilized by the draw system. This entire animation/transformation process will be repeated by the number of image animation cycles. When the super transformation process is completed the "stop" method is called, certain status variables are set, and the text button super transformation thread terminates itself. This causes the parent text button time line thread to be reactivated through the "join" mechanism.

Returning to process step **219** in FIG. **33**, if the object had a time line, then a test is made at **221** on whether an appearance delay had been defined in FIG. **19**. If so, a timer event is set at **222**. When the timer reactivates the object time line thread after the appropriate delay, a test is made on whether an entry animation/transformation has been defined for this object time line at **224**, as described FIG. **19**. If so, based which animation/transformation process was defined, it is created and executed at **228**, **229**, **230**, or **231**. In one implementation, 13 entry animations are supported for both text button and image objects, and an additional "Fade In" entry animation is supported for image objects. The 13 common entry animations supported include Zoom In, Grow NW, Grow NE, Grow SE, Grow SW, Enter N, Enter NE, Enter E, Enter SE, Enter S, Enter SW, Enter W and Enter NW.

If no entry animation/transformation is defined, or when the entry animation/transformation has "joined" the object time line thread, a test is made to determine if any child time lines have been defined at **225**, as described in FIG. **19**, for this parent object time line. If so, an "instance" of the "child time line class" for that particular object type is created at **226**. Each "child time line class" is also implemented with a "runnable" interface. An object child time line thread is then created, utilizing the two-dimensional object internal database architecture. This object child time line thread is then "started". The inter-thread communication technology and the "join" technology employed for object child time lines is the same as for object time lines. Either a text button child time line thread or an image child time line thread, or both, can be spawned at this time. Simultaneous with the execution of any spawned text button child time line threads, the parent object thread then executes the defined main animation and or transformation. As with non-time line object threads, a test is made on certain two-dimensional object definition variables in order to determine which of the following four states have been defined for the object at **227**: animation without a transformation; transformation without animation; animation, with the transformation occurring simultaneously with the animation; and, animation and transformations occurring in a serial manner.

Based on the results of this test, an appropriate "instance" of an appropriate animation, transformation, or super transformation class is created, and an appropriate animation, transformation, or super transformation thread is created and "started". This results in the execution of process steps **228**, **229**, **230**, or **231**, as defined above.

The parent object time line thread then executes a "join" method. This again puts the object time line thread in a "wait state". When the thread it is waiting for is completed, the child thread "joins" the parent object time line thread, and the object time line thread then continues its process. The object time line thread then checks to see if there is a departure delay defined at **232**. If so, it sets a timer event at **233**. When the timer reactivates the object time line thread after the appropriate delay, a test is made at **234** on whether an exit animation/transformation has been defined for this

object time line, as described in FIG. **19**. If so, it is created at **235**, and performed as discussed with reference to processes **228**, **229**, **230**, or **231**. In one implementation, 13 exit animations supported for both text button and image objects, and an additional "Fade Out" exit animation is supported for image objects. The 13 common exit animations include: Zoom Out, Shrink NW, Shrink NE, Shrink SE, Shrink SW, Exit N, Exit NE, Exit E, Exit SE, Exit S, Exit SW, Exit W and Exit NW.

If no exit animation/transformation is defined, or when the exit animation/transformation has "joined" the object time line thread, the parent object time line thread then executes a "join" method if it had spawned any child time lines. This again puts the object time line thread in a "wait state". Finally, when then the child time line threads, if any, "join" the parent object time line, the "stop" method for the parent time line is called. Certain status variables are set, and the parent object time line thread terminates itself This causes the main web page time line that had been in a "join" loop at **211** of FIG. **31**, since the invocation of the object time lines, to be "joined" by this particular object time line thread.

FIG. **34** shows the technology employed by the run time engine for implementing child time lines for text button and image objects. Child text button object time lines and child image object time lines are subsets of their parent object time lines. First a test is made at **237** on whether an appearance delay had been defined (See FIG. **19**). If so, a timer event is set at **238**. When the timer reactivates the child object time line thread after the appropriate delay, a test is made on whether an entry animation has been defined for this child object time line at **239** (as described FIG. **19**). If so, it is created and executed at **240** in a manner identical to that described at process step **229** in FIG. **33**. The same **13** entry animations supported for parent object time lines are also supported for both child text button and image objects, and the additional "Fade In" entry animation is supported for child image objects. The "join" mechanism described in FIG. **33** is employed in an identical manner at **240** to synchronize the child time line thread with its entry animation thread.

After being "joined" and reactivated, the child object time line performs a test at **241** on whether an exit delay had been defined (See FIG. **19**). If so, a timer event is set at **242**. When the timer reactivates the child object time line thread after the appropriate delay, a test is made on whether an exit animation has been defined for this child object time line at **243**, as described in association with FIG. **19**. If so, it is created and executed at **244** in a manner identical to that described above at process step **229** in FIG. **33**. The same **13** exit animations supported for parent object time lines are also supported for both child text button and image objects, and the additional "Fade Out" exit animation is supported for child image objects. The "join" mechanism described above in association with FIG. **33** is employed in an identical manner at **245** to synchronize the child time line thread with its parent object time line thread. As discussed at process step **236** in FIG. **35**, the parent object time lines "wait" until all their child time lines have terminated, before they in turn terminate and "join" the main web page time line at FIG. **35**.

FIG. **35** describes technology employed by the run time engine for the web page and object thread loop. As noted in FIG. **31** at process step **211**, after all the text button and image time line threads for the current web page had been launched, the main web page thread executed a "join" loop, waiting for the completion of all the parent object time line threads. Because each parent object time line thread waited for their child object time line threads to be "joined", as well as any other spawned animation threads, transformation threads, and/or super transformation threads, the effect of this "join" loop at **246** is that the web page thread will not resume processing until all parent time line threads have completed and that of all of their spawned threads.

Upon resuming its processing after the "join" process at **246** has been completed, the main web page thread checks at **247** to see whether the current web page has an automatic termination, based on a timer delay, or whether the web page will wait for a user interaction before terminating. If the web page has a time delay based termination setting, then a timer method is called at **249**, and the web page goes to "sleep" awaiting the completion of the timer event.

When the timer event occurs, the web page thread resumes processing by incrementing the web page counter by one, and the entire web page process, which began at process step **200** in FIG. **31**, is repeated. If the current web page termination setting was to set to wait until user interaction, then web page thread is placed in a "pause" state, and the run time engine waits to respond to any mouse, keyboard or other user initiated event.

FIG. **36** describes the technology employed by the run time engine for responding to user interactions. As mentioned in association with process step **204** of FIG. **31**, as soon as the draw system has been activated, the run time engine will respond to any user interactions that have been defined (See FIG. **16**). This is also true during any object time line events, as with respect to process step **207** of FIG. **31**. The run time engine currently responds to "mouse over" and "mouse down" events for text button, image, and paragraph objects. For form objects, the run time engine will also respond to keyboard events. As the full-featured programming languages supported by browsers evolve, the run time engine may be configured to respond to other user interactions, including but not limited to single and double clicks from both the left and right mouse button, voice commands, eye focusing technologies, touch screen technologies, and push technologies originating from a server.

The run time engine invokes a "dynamic mouse to object recognition" technology at **251** in order to be responsive to the following elements:

1: The location of objects will vary based on the viewer's screen resolution and browser window size as discussed above with regard to FIG. **27**.

2: Objects may move or resize themselves based on time lines and animations.

3: Objects may have different sizes based on the state they are being displayed in based on time lines and transformations.

4: More than one object can occupy the same screen location, and which objects occupy that location may change over time based on time lines, animations, and transformations.

The run time engine maintains, in its internal database, the object's current X and Y origin coordinates, and the object's current width and height, in pixels, based on the current viewer's screen and browser window size. This can be accomplished by first converting all coordinates and sizes to the current viewer environment with the scaling technology as discussed above with regard to FIG. **27**. Every time line, animation, and transformation thread updates, in real time, the run time engine's internal database positional and size variables of the objects they define, utilizing the data communication techniques described above with reference to FIG. **33**.

The run time engine employs mouseEnter, mouseMove, mouseDown, mouseDrag, mouseUp, and mouseExit methods to constantly monitor the state of the mouse at all times. The onClick method (to detect a single click) and a specialized method to detect a double click event are also employed. The onKeyDown method, with processing the returned scan code, permits the run time engine to process all keyboard events. The mouseEnter, mouseMove, mouseDown, mouseDrag, mouseUp, and mouseExit methods return to the run time engine the exact X and Y coordinates of the mouse cursor at the instant that particular mouse event occurred. Thus for each supported mouse based user interaction technique supported by the run time engine, a two-dimensional loop exists (web page number by object number) in which the current bounding rectangle for every object on a given web page is being compared to the current mouse cursor location at all times. The bounding rectangle is simply the current X and Y origin coordinates of an object, extended by its current width and height. In this way, the run time engine is informed if the current mouse cursor location falls within one or more bounding rectangles. Parenthetically, the run time engine also knows when the current mouse cursor falls outside the bounding rectangle of a given object.

Based on the type of mouse user interaction at **252**, the run time engine employs different techniques and executes different methods. If the viewer moves the mouse at **253**, the mouseMove method informs the run time engine immediately of this event and the current mouse cursor coordinates.

If this user mouse move action caused the mouse to move into one or more bounding rectangles of any text button or image object(s) at **254**, or out of one or more bounding rectangles of any text button or image object(s) at **255**, then appropriate two-dimensional status variables are set and the draw system is called. The draw system interprets the relevant two-dimensional variables for the existing text button and image object(s) on the current web page in its draw loop as described above with reference to FIG. **16**, and draws the correct backgrounds, text strings, images, and 3D frames based on the state of each object, as just set by the "mouseMove" computational two-dimensional loop. If the mouse has entered into or out of the bounding rectangles of any image and/or text button object that has a defined text button, image and/or video pop-up object (See FIG. **16**), then the draw system paints or effectively erases the appropriate background, text string, images and/or 3D frame for these pop-up objects. If the location of any of these text button and image objects or child pop-up objects is changing over time because of time line, animation, or transformation threads, the draw system, as described in association with FIG. **33** and FIG. **34**, is aware of these dynamics, and redraws the screen as these real time events occur. If any sound or video events were defined (See FIG. **16**) for any text button or image objects, then the run time engine plays those sound and/or video files or channels as defined. As multiple objects can be defined that each have associated sound (and even video) files, and these objects can be overlaid on each other, either completely or partially, very interesting synchronized multiple sound tracks can be constructed, in which certain designated sounds are played, or stopped, based purely on user mouse movement.

If the viewer moves the mouse into or out of the bounding rectangle for a paragraph hot link at **256**, then appropriate four-dimensional status variables (web page by paragraph number, by paragraph line number by paragraph line segment number) are set or reset and the draw system is called. The draw system paints the background color behind the hot link text string, and the color for the hot link text string in the hot link "mouse over" or the hot link normal colors. The text string may be underlined or in a bold font, depending on the settings.



If the viewer presses a mouse button at **257**, the mouse-down method informs the run time engine immediately of this event and the current mouse cursor coordinates. If the viewer releases the mouse at **259**, the mouse-up method informs the run time engine immediately of this event. Either way, if the original "mouse down" event had occurred inside one or more bounding rectangles of any text button or image object(s) at **258**, then appropriate two-dimensional status variables are set and the draw system is called. The "mouse up" event will cause the run time engine to reset those appropriate two-dimensional status variables, and then call the draw system. If the mouse was inside of the bounding rectangles of any image and/or text button object that had a defined text button, image and/or video pop-up object (See FIG. **16**) with the freeze attribute, the appropriate two-dimensional status variables are set so that the draw system will not erase these pop-up objects when the mouse moves outside the bounding rectangle(s) of the parent text button or image objects. The draw system interprets the relevant two-dimensional variables for the existing text button and image object(s) on the current web page in its draw loop described above with reference to FIG. **16**, and draws the correct backgrounds, text strings, images, and 3D frames based on the state of each object, as just set by the "mouseDown" computational two-dimensional loop.

If the 3D frame had been previously defined (See FIG. **16**) to have the "live" setting, then the 3D effect is changed from a "raised" effect to a "depressed" effect. If the location of any of these text button and image objects or child pop-up objects is changing over time because of time line, animation, or transformation threads, the draw system, as described in association with FIG. **33** and FIG. **34**, is aware of these dynamics, and redraws the screen as these real time events occur, but does not recognize any new "mouse down" or "mouse up" Events. In one implementation, only "mouse over" events are recognized dynamically by the draw system.

If any sound or video events were defined (See FIG. **16**) for any text button or image objects, then the run time engine plays those sound and/or video files or channels as defined. As multiple objects can be defined that each have associated sound (and even video) files, and these objects can be overlaid on each other, either completely or partially, very interesting synchronized multiple sound tracks can be constructed, in which certain designated sounds are played, or stopped, based purely on the user pressing a mouse button.

If a mouse down event as described previously in association with FIG. **16** was defined for one or more effected text button or image objects, only the object that was drawn last will have its event processed. If the event was to go to a different internal web page, then the run time engine sets the web page counter described in association with FIG. **31** for the "current" page to be one less than that of the desired web page. The current web page's object time lines, if any, complete normally, and the desired web page is then executed. If the "mouse down" event was to go to an external web page in a different window, then the run time engine creates a new browser window. In JAVA this can be accomplished with the "getAppletContext( ).showDocument(theURL, "_blank")" method, where "theURL" is the URL address for the external web page. The run time engine, however, continues executing.

If the mouse down event was to go to an external web page in the same browser window, then the run time engine terminates by turning control over to the designated external web page. In JAVA this can be accomplished with the "getAppletContext( ).showDocument(theURL)" method, where "theURL" is the URL address for the external web page.

If the viewer presses a mouse button while inside the bounding rectangle for a paragraph hot link at **260**, then appropriate four-dimensional status variables (web page by paragraph number, by paragraph line number, by paragraph line segment number) are set. If the hot link setting at FIG. **16** was to go to a different internal web page, then the run time engine sets the web page counter described previously in association with FIG. **31** for the "current" page to be one less than that of the desired web page. The current web page's object time lines, if any, complete normally, and the desired web page is then executed. If the hot link setting was to go to an external web page in a different window, then the run time engine creates a new browser window and loads the external web page. The run time engine, however, continues executing. If the hot link setting was to go to an external web page in the same browser window, then the run time engine terminates by turning control over to the designated external web page. This completes the detailed description of the run time process at **261**.

As is obvious from the descriptions of the various features and processes described above, it will be apparent to one skilled in the art that variations in form and detail may be made in the preferred implementation and methods without varying from the spirit and scope of the invention as defined in the claims or as interpreted under the doctrine of equivalents. It should also be clear that terms such as "browser", "mouse", "server", "web", etc., while adequate to describe the current state of interactive systems such as the World Wide Web, may evolve into new and more powerful entities. This evolution of terminology and technology is independent of the preferred implementation and methods of the invention as defined in the claims or as interpreted under the doctrine of equivalents. The preferred implementation and methods are thus provided for purposes of explanation and illustration, but not limitation.

I claim:

**1**. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:

(a) presenting a viewable menu having a user selectable panel of settings describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;

(b) generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;

(c) storing information representative of said one or more user selected settings in a database;

(d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and

(e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

**2**. An apparatus for producing Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said apparatus comprising:

(a) an interface to present a viewable menu of a user selectable panel of settings to describe elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;

(b) a browser to generate a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;

(c) a database for storing information representative of said one or more user selected settings; and

(d) a build tool having at least one run time file for generating one or more web pages, said run time file operating to utilize information stored in said database to generate commands to said virtual machine for generating the display of at least a portion of said one or more web pages.

**3**. The apparatus of claim **2**, wherein said database is a multi-dimensional array structured database.

**4**. The apparatus of claim **3**, wherein said representative information is Boolean data, numeric data, string data or multi-dimensional arrays of various multimedia objects.

**5**. The apparatus of claim **4**, wherein said elements include multimedia objects selected from the group consisting of a color, a font, an image, an audio clip, a video clip, a text area and a URL.

**6**. The apparatus of claim **2**, wherein said elements are selected from the group consisting of a button, an image, a paragraph, a frame, a table, a form and a vector object.

**7**. The apparatus of claim **2**, wherein said one or more web pages of a website is two or more web pages of a website, wherein said elements include web pages, and wherein said description of elements is a transition or an animation between two of said two or more web pages.

**8**. The apparatus of claim **2**, wherein said elements include one or more objects on a web page, and wherein said description of elements are a transition or an animation of at least one of said elements on a web page.

**9**. The apparatus of claim **2**, wherein said elements include a button or an images, wherein said selectable settings includes the selection of an element style, and wherein said build engine includes means for storing information representative of selected style in said database.

**10**. The apparatus of claim **9**, wherein said elements are described by multiple object states.

**11**. The apparatus of claim **9**, wherein said elements are described by a transformation or a timelines of said selected styles.

**12**. The apparatus of claim **9**, wherein at least one of said elements is a child element, and wherein said element style is a child element style.

**13**. The apparatus of claim **12**, wherein at least one of said element is described by timelines of said child elements.

**14**. The apparatus of claim **2**, wherein said elements include buttons or images, wherein said description of elements is a transition or a timeline which is selected according to input from a mouse, and wherein said build engine includes means for storing information representative of said selected description of elements in said database.

**15**. The apparatus of claim **14**, wherein at least one of said description of elements is a timeline or an animation.

16. The apparatus of claim 2, wherein said elements include one or more objects on two or more web page, wherein at least one of said description of elements is a transition or a timeline, and wherein said build engine includes means to synchronize said description of said one or more objects on one web page between said two or more web pages.

17. The apparatus of claim 2, wherein one or more of said elements is a button or an image, wherein said description of elements is a transition, an animation or a timeline, and wherein said build engine includes means to synchronize said description of said one or more elements.

18. The apparatus of claim 2, wherein at least one of said elements is an object elements selected from the group consisting of a button and an image, and web pages as elements of a website, wherein said description of said object elements is a transition, an animation or a timeline, wherein said description of said web pages is a transition or a timeline, and wherein said build engine includes means to synchronize said description of said object elements and said description of said web pages.

19. The apparatus of claim 2, wherein said elements include an object and a child object, wherein said description of said elements is a timeline or an animation, and wherein said build engine activates said description of said elements according to input from a mouse.

20. The apparatus of claim 2, wherein at least one of said elements is a child button or a child object, wherein said description of said elements is a timeline, a transition or an animation, and wherein said build engine includes means for defining said description of said element.

21. The apparatus of claim 17, wherein said elements further includes at least two child object elements, and said means to synchronize includes means for synchronizing said description of at least two of said at least two child object elements.

22. The apparatus of claim 18, wherein said elements further includes a child object element, and said means to synchronize includes means for synchronizing said description of said child elements.

23. The apparatus of claim 19, wherein said description of elements is a transition or a timeline which is selected according to input from a mouse, and wherein said build engine includes means for storing information representative of said selected description in said database.

24. The apparatus of claim 2, wherein said run time files include one compressed website specific, customized run time engine program file and one compressed website specific, customized run time engine library file.

25. The apparatus of claim 24, wherein said run time files include a dynamic web page scaling mechanism, whereby each of said one or more generated web pages is scaled for viewing on said display.

26. The apparatus of claim 2, wherein said run time files includes one compressed website specific, customized run time engine program file and one compressed website specific, customized run time engine library file, wherein said run time files include a dynamic web page scaling mechanism, and wherein the build engine generates an HTML shell file for each set of one or more run time files which instructs said browser to display a background in said browser window identical to that which the run time engine will draw, invokes said dynamic web page scaling mechanism, and invokes said run time engine.

27. The apparatus of claim 2, wherein said run time files include a multi-level program animation model that presents multiple user interactions and time sensitive operations simultaneously.



28. The apparatus of claim 2, wherein at least one of said elements includes individual ones of multiple audio tracks, and wherein said build engine includes means for associating at least one of said individual audio tracks with a web page or an object on a web page and means for synchronizing multiple audio tracks.

29. The apparatus of claim 2, further including file size reduction means for reducing the total size of said run time files to less than approximately 50K and for reducing the total size of said the run time file of the first web page of said website to less than 25K.

30. The apparatus of claim 29, wherein said total size of said run time files is from approximately 12K to approximately 50K.

31. The apparatus of claim 29, wherein said elements include a web page, an object, a paragraph, or combinations thereof, and wherein said file size reduction means includes means for tracking multiple high water marks for said elements to minimize the size of said at least a portion of said database generated by said build tool.

32. The apparatus of claim 29, wherein said file size reduction means includes means for identify website specific run time files.

33. The apparatus of claim 2, wherein said website has a first web page, wherein said run time files includes a main run time file and main database information corresponding to said first web page, and further includes a run time routine for simultaneously obtaining from the Internet and displaying said first web page and processing said database corresponding to others of said web pages.

34. The apparatus of claim 33, wherein at least one of said elements includes one or more images, and wherein the run time files includes an image observer operable to permit said one or more images of said website to be downloaded simultaneously with the execution of said run time files.

35. The apparatus of claim 2, wherein the build engine includes dynamic resizing means operable to redefine a size of a web page upon being display.

36. The apparatus of claim 35, wherein the dynamic resizing apparatus can be invoked in real time during the build process when a new web site file is opened, when the web page size of the existing web site is changed, or when the web page is zoomed to a different size.

37. An apparatus for producing Internet websites having one or more web pages on and for a computer having a browser and a virtual machine capable of generating a display, said apparatus comprising:

(a) an interface configured for building a website through control of website elements, said interface being operable through the browser on the computer to:

present a viewable menu of a user selectable panel of settings, accept a plurality of settings from said user selectable panel of settings to form an assembly of settings, and

generate the display in accordance with said assembly of settings contemporaneously with the acceptance thereof, at least one of said user selectable settings of said panel of settings being operable to generate said display through commands to said virtual machine;

(b) an internal database associated with said interface for storing information representative of one or more of said assembly of settings for controlling elements of the website; and

(c) a build tool to construct one or more web pages of said website having:

an external database containing data corresponding to said information stored in said internal database, and one or more run time files,

where said run time files utilize information stored in said external database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

**38**. The apparatus of claim **37**, wherein said user selectable panel of settings arc selected from the group consisting of construction, manipulation, animation and transition of elements.

**39**. An apparatus to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said apparatus comprising:

(a) means for presenting a viewable menu of a user selectable panel of settings to describe elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs



therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;

(b) means for generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;

(c) means for storing information in a database, said information being representative of a plurality of said one or more user selected settings; and

(d) means for building one or more web pages for generating said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,546,397 B1
APPLICATION NO. : 09/454061
DATED : April 8, 2003
INVENTOR(S) : Rempell



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 66 (Line 48) Claim 9, Line 4, correct “build engine” to read --build tool--.

Column 66 (Lines 63-64) Claim 14, Lines 4-5, correct “build engine” to read --build tool--.

Column 67 Claim 16, Line 4, correct “build engine” to read --build tool--.

Column 67 (Line 10) Claim 17, Line 4, correct “build engine” to read --build tool--.

Column 67 (Line 18) Claim 18, Line 7, correct “build engine” to read --build tool--.

Column 67 (Line 24) Claim 19, Line 4, correct “build engine” to read --build tool--.

Column 67 (Line 29) Claim 20, Line 4, correct “build engine” to read --build tool--.

Column 67 (Lines 42-43) Claim 23, Lines 3-4, correct “build engine” to read --build tool--.

Column 67 (Line 58) Claim 26, Line 6, correct “build engine” to read --build tool--.

Column 68 Claim 28, Line 3, correct “build engine” to read --build tool--.

Column 68 (Line 35) Claim 35, Line 1, correct “build engine” to read --build tool--.

Signed and Sealed this
Thirteenth Day of February, 2018

Andrei Iancu
*Director of the United States Patent and Trademark Office*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2023, I caused **Appellant's Opening Brief** to be electronically filed with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ Robert F. Kramer*
Robert F. Kramer
**KRAMER ALBERTI**
**LIM & TONKOVICH LLP**
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Telephone: 650.825.4300

*Counsel for Appellant Express Mobile, Inc.*