2023-1076

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**In re: EXPRESS MOBILE, INC.,**
*Appellant.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 90/014,615.

# BRIEF FOR APPELLEE, DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

THOMAS W. KRAUSE
Solicitor

AMY J. NELSON
Senior Counsel for Patent Policy and Litigation

PETER J. SAWERT
KEVIN T. RICHARDS
Associate Solicitors

U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

May 22, 2023

*Attorneys for the Director of the U.S. Patent and Trademark Office*

## CLAIM

1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:

   (a) presenting a viewable menu having a user selectable panel of settings describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;

   (b) *generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof*;

   (c) storing information representative of said one or more user selected settings in a database;

   (d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and

   (e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

Appx3332 (emphasis added).

# TABLE OF CONTENTS


I. STATEMENT OF THE ISSUES .......... 1

II. STATEMENT OF THE CASE .......... 2

A. The ’397 Patent .......... 2

B. The Prior Art .......... 8

1. VDM ’316 .......... 8
2. VDM ’362 .......... 15

C. The Board Decision .......... 16

1. Claim Construction .......... 16
2. Obviousness .......... 17

III. SUMMARY OF THE ARGUMENT .......... 25

IV. ARGUMENT .......... 28

A. Standard of Review .......... 28

B. The Board correctly affirmed the Examiner’s rejection of claim 1 as obvious over the combination of VDM ’316 and VDM ’362. .......... 29

1. Express Mobile does not challenge the Board’s construction of “substantially contemporaneously.” .......... 29
2. Substantial evidence supports the Board’s finding that VDM ’316 teaches generating a display “substantially contemporaneously” with a user’s selection of settings is supported by substantial evidence. .......... 30

C. Each of Express Mobile’s arguments lack merit. .......... 31

1. The Board’s finding that VDM ’316 updates the display to reflect a user selection before the user selects the accept button is supported by substantial evidence. .......... 31
2. The Board’s finding that VDM ’316 updates the display to reflect a user selection “at the same time” the user selects a setting is supported by substantial evidence. .......... 38

3. The Board's finding that VDM '316 does not use the word "eventually" to indicate an indeterminate delay before updating the display is supported by substantial evidence....... 40

4. The Board correctly found that there is no evidence to support Express Mobile's argument that the '397 patent's polling architecture is faster or better than VDM '316's processing methodology. ................................................. 45

5. The Board's finding that VDM '316 teaches generating a display "substantially contemporaneously" with a user's selection of privacy settings is supported by substantial evidence........................................................................ 48

V. CONCLUSION ........................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
776 F.2d 281 (Fed. Cir. 1985) .................................................... 43

*In re Berg*,
320 F.3d 1310 (Fed. Cir. 2003) .................................................. 29

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)................................................................ 28

*Gartside, In re*,
203 F.3d 1305 (Fed. Cir. 2000) ............................................. 28, 29

*Jolley, In re*,
308 F.3d 1317 (Fed. Cir. 2002) .................................................. 28

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)................................................................ 28

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) .................................................. 39

*Phillips v. AWH Corp*,
415 F.3d 1303 (Fed. Cir. 2005) .................................................. 16

*In re Rambus, Inc.*,
753 F.3d 1253 (Fed. Cir. 2014) .................................................. 16

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)................................................................ 28

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) .................................................. 28

*Yorkey v. Diab*,
601 F.3d 1279 (Fed. Cir. 2010) ............................................. 43, 45

## Statutes

5 U.S.C. § 706(2)(E) ................................................................ 28

## STATEMENT OF RELATED CASES

Appeal No. 23-1645, which involves the same patent and claim at issue in this case, is presently pending before this court. In addition, Appeal No. 23-1646, which involves a patent resulting from a continuation application of the application that matured into the patent at issue in this case, is presently pending before this court. The Director is not aware of any other appeal in connection with the patent at issue in this case that was previously before this or any other court.

The Director is not aware of any case beyond those appeals above and those identified in Express Mobile's Statement of Related Cases, Br. ix–x, that is pending in this or any other court that will directly affect, or directly be affected by, the Court's decision in this appeal.

## I. STATEMENT OF THE ISSUES

This appeal involves an *ex parte* reexamination of Express Mobile, Inc. ("Express Mobile")'s U.S. Patent No. 6,546,397 ("the '397 patent"). Only claim 1 is at issue as the Examiner previously confirmed the other challenged claims as patentable over the cited prior art. Claim 1 recites a method for producing websites comprising, *inter alia*, providing a browser-based interface for selection of settings, "generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof," storing the settings in a database, and using a virtual machine run time file to build web pages using the settings stored in the database.

The Board concluded that claim 1 is unpatentable as it would have been obvious over the VDM '316 and VDM '362 prior art references. On appeal, only the "substantially contemporaneously" language of the "generating" limitation of claim 1 is at issue. The Board adopted Express Mobile's proposed construction (from a prior district court litigation) of "substantially contemporaneously" as "happening at the same period of time from a human perspective."

Thus, the sole question on appeal is: whether substantial evidence supports the Board's finding that the VDM '316 reference discloses "generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof."

Because substantial evidence supports the Board's finding as to what the VDM '316 reference discloses, this Court should affirm.

## II. STATEMENT OF THE CASE

This appeal arises from the *ex parte* reexamination of the '397 patent claiming a method of producing Internet websites. Appx2–3. The Board affirmed the Examiner's rejection of claim 1 as obvious over the combination of VDM '316 and VDM '362. Appx37.

Express Mobile appealed to this Court. Express Mobile only disputes the Board's finding that VDM '317 discloses generating a display "substantially contemporaneously" with a user's selection of a setting for a web page's design as recited in claim 1.

### A. The '397 Patent

The '397 patent is entitled "Browser Based Web Site Generation Tool and Run Time Engine," and issued from an application filed on December 2, 1999. Appx76. The '397 patent is thus expired. Appx3. The '397 patent broadly relates to designing and building webpages. Appx76 (Abstract).

The '397 patent explains that conventional website-construction tools output HTML (hypertext mark-up language) and script code (*e.g.*, JavaScript) that a browser would then interpret to draw a web page. Appx145 (1:11–15). The '397 patent further explains that conventional web tools were written in full-

featured programming languages (*e.g.*, C++) because the processing limitations of HTML and JavaScript made them ill-suited for writing a web publishing application. *Id.* (1:17–25). However, because the conventional tools were not written in programming languages native to the Internet, they could "offer only a crude preview capability of what a real web page will look like." *Id.* (1:25–31). In addition, the static HTML and JavaScript output by conventional tools meant that web pages were not readily adaptable, e.g., for different screen resolutions. *Id.* (1:32–49).

The '397 patent describes a method that uses a "build tool" to accept user inputs that define the desired webpage and store those inputs in a database. Appx147 (5:52–53). Referencing Figure 3a, the build tool **350** includes a build engine **352**, interface **354**, and multi-dimensional array structured database **358**. *Id.* (5:64–67).




*Fig. 3a*

**BUILD TOOL COMPONENTS**

Appx79. The '397 patent explains that "[i]interface **354** responds to the user input and may display a pop-up window, update the interface objects, or display alert messages." Appx147 (6:27–29).

In addition, run time files, including a customized run-time engine, are generated to allow the webpage to be drawn using the information in the database. *Id.* (5:53–57). To view a completed webpage, an Internet user's browser calls the run-time engine, which uses the database and other run time files to generate the webpage. *Id.* (5:57–62). Using a run time engine instead of static code allows for

the dynamic generation of HTML code based on real-time conditions, such as the size of the browser window. *See, e.g.*, Appx167 (45:4–25).

Returning to the user interface, the '397 patent teaches that the "browser based build engine . . . includes a browser based interface." Appx145 (2:33–34). The browser-based interface mimics "a look and feel that is identical to that of MS Windows, yet includes technologies that equal or occasionally surpass those of high end word processors, desk top publishers, and image processing software programs." *Id.* (2:51–56); *see also* Appx147 (6:21–27) (describing MS Windows-like menus, submenus, toolbars, etc. for the interface but created with web-based tools such as HTML, JavaScript, etc.); Appx150 (11:13–14) (seeking "to achieve the most intuitive and MS Windows like interface").

A screen shot of an exemplary user interface screen from the '397 patent is shown below.




Appx118 (Fig. 37). The user interface above includes a panel **400** and build frame **500**. Appx149 (10:21–22). Changes made in, for example, the menus **420**, tool bars **440**, interactive fields **460**, interactive pull-down lists **470**, and operational pop-up menus **480** are processed by the build engine **352** and displayed in the build frame **500**. *Id.* (10:22–52). By updating the build frame **500** to reflect user inputs in the panel **400**, "[t]he entire web site build process is WYSIWYG (what you see is what you get), with the web designer working directly on and with the final web page." Appx145 (2:34–37). The phrase

"substantially contemporaneously" does not appear in the '397 patent specification.

The only claim at issue in this appeal is claim 1.

> 1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:
>
> (a) presenting a viewable menu having a user selectable panel of settings describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;
>
> (b) *generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof*;
>
> (c) storing information representative of said one or more user selected settings in a database;
>
> (d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and
>
> (e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

Appx3332 (emphasis added).

### B. The Prior Art

#### 1. VDM '316

VDM '316[1] discloses a method and apparatus to allow a user to create a website "diary" of "multimedia references"/"content objects" as a visual record of their interests and web activity, both for the user's reference and as an introduction to other users. Appx451 (1:36–41, 65–67; 2:2–6). VDM '316 explains that the term "diary" was chosen because the customized website preferably allows the user to "save these references in association with dates and/or times." *Id.* (2:12–15). The content objects inserted by a user are displayed "in one of the slots provided by the page design." Appx453 (5:19–21). "A content object can be any type of object, including text, bookmarks, images, programs, movies, etc." *Id.* (5:21–23).

In Figure 1(b), below, VDM '316 illustrates an exemplary system for editing or viewing such a personalized website.

[1] U.S. Pat. No. 6,415,316 (Van Der Meer) ("VDM '316"). Appx427–465.



Fig. 1(b)
An Exemplary Diary Implementation (shows logical connections)

Appx429. VDM '316 teaches that "a user begins viewing or editing a diary by viewing a Web page **113** available from the diary server [**104**]" which "allows the user to indicate that [the user] wishes to view or edit a specified diary." Appx453 (6:57–60). User system **102** (of the diary owner or a different viewer) includes browser **110** that executes diary applet **112** downloaded from the diary server **104**. *Id.* (6:30–40).[2] Diary data for the user may already be in local storage **114** if, for example, the user is the diary owner, or the data may be downloaded from storage **122** on the diary server **104**. Appx454 (8:47–59). Diary data includes an

---

[2] VDM '316 teaches that in the alternative "diary applet **112** could . . . be implemented as a plug-in to browser **110**" or that "[t]he functionality of the diary applet **112** could also be implemented in the browser." Appx459 (18:48–53).

Annotated Universal Address (AUA) database that stores the diary contents. Appx454-455 (8:59–9:1).

VDM '316 goes on to describe the implementation of the diary applet. VDM '316 teaches that diary applet **112** is preferably Java based, but can also include other programs and/or languages such as JavaScript, ActiveX controls, and Visual Basic. Appx453 (6:52–56). Diary applet **112** generates the HTML **111** for the web pages of the user's diary that are displayed by the browser **110** on an output device such as a monitor. *Id.* (6:40–44); Appx454 (7:45–47). "After generating a first page of the diary, diary applet **112** displays a navigator bar or some other appropriate user interface, such as that shown in FIG. 4(a), and thereafter reacts to the actions of the user to view or change the diary . . . ." Appx455 (9:10–14).




Figure 4(a)

Appx433 (Fig. 4(a)). In Figure 4(a), the navigation bar 402 includes eight buttons, **422–436**, for navigating the diary's pages and sections. Appx455 (9:43–46).

VDM '316 further teaches the diary owner may edit the appearance of the diary. For example, buttons **440**–**446** are only available to a diary owner. *Id.* (9:64–66). "Button **440** will pop-up a new window containing the advanced diary operations such as, e.g., moving or copying objects from one section to another," and "[b]utton **442** allows a user to create a 'text' object to be placed in the current section." *Id.* (9:66–10:3). Button **444** provides for backup and button **446** allows access to a property edit function for special (e.g., "cover builder") users. *Id.* (10:3–8). The final button, **438**, will display a new window to control the privacy level of the diary (which elements/pages/etc. may be viewed by non-owners). *Id.* (10:29–41).

VDM '316 illustrates a pop-up window **470** for button **440** (which allows the user to edit the diary) in Figure 4(f). Appx456 (11:14–16).




Figure 4(f)

Appx436 (Fig. 4(f)). From this window, a user can, for example, add a content entry (**471**), add a section (**472**), put the diary in edit mode (**474**), or edit section properties (**475**). Appx456 (11:16–22).

Figure 4(g) illustrates a pop-up window displayed in response to selection of the add content button **471**. *Id.* (11:43–44).




Figure 4(g)

Appx436 (Fig. 4(g). VDM '316 teaches that this window includes buttons **412**–**415** allowing a user to add an image, text, an applet, or embedded object, respectively. Appx456 (11:44–47).

Similarly, VDM '316 illustrates an edit mode window displayed in response to selection of the edit mode button **474** in Figure 4(j), and clicking on a selectable feature of an object in that window, e.g. border **499**, brings up a related window **490** to edit the properties of that object as shown in Figure 4(i). *Id.* (12:12–28).



Figure 4(j)



Figure 4(i)

Appx438 (Fig. 4(j)); Appx437 (Fig. 4(i)). VDM '316 teaches that the position of the object can be changed with buttons **491**–**494**, that the object can be copied, moved, or deleted with button **495**, and that additional properties of the object can be accessed with button **496**. Appx456 (12:19–28).

VDM '316 describes the process for editing an existing content object in greater detail with reference to Figure 4(l). *Id.* (12:44–45).

**Flowchart**

The above operations are implemented through control by means of dynamic HTML generation. A flowchart is given below in figure 11.

- By setting the W3Diary in edit mode, the HTML generator re-generates the page and adds object control handles (in this case of type "edit") to the page
- The user clicks on a control handle. The handle identification is passed on to the HTML generation engine (by JavaScript in the current embodiment)
- Any appropriate action is executed on the object identified by the handle and represented in HTML
- Finally, a new (updated) page is generated and displayed.




HTML Control (Editing content)

**Figure 4(l)**

Appx439 (Fig. 4(l)). VDM ’316 teaches that upon entering edit mode, the first step **250** is that “applet **112** regenerates the pages to add an object control ‘handle’ **499** [Fig. 4(j)] to each content object on the diary page.” Appx456 (12:45–48). In the next “step **251**, when the diary owner clicks on a control handle, the browser initiates executable program code (e.g., Java or JavaScript) that has been generated by applet **112** and added to the HTML edit-mode page being

displayed." *Id.* (12:48–52). This executable code "communicates with applet **112** to tell it which content object has been selected for manipulation," and the applet "then displays appropriate windows . . . to allow the diary owner to manipulate the selected content object." *Id.* (12:52–59). In the third step **252**, "[d]iary applet **112** executes appropriate action(s) on the selected content object identified by handle **499**" according to the diary owner's input. *Id.* (12:59–61); Appx439 (Fig. 4(l)). Finally, "[i]n step **253**, diary applet **112**, regenerates the HTML for the diary page to reflect the edit, after which the HTML is displayed by browser **110**." Appx456 (12:61–64). VDM '316 teaches that this implementation is advantageous because "[t]he method of FIG. 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, at the same time, uses the browser as a vehicle to handle the actual display and diary owner input." Appx457 (13:3–7).

**2. VDM '362**

VDM '362[3] is entitled "System and Method for Generating, Transferring and Using an Annotated Universal Address." Appx466. The U.S. patent application (09/144,717) that resulted in VDM '362 is referenced in VDM '316

[3] U.S. Pat. No. 6,289,362 (Van Der Meer) ("VDM '362"). Appx466–495.

for its description of Annotated Universal Addresses (AUAs). Appx454–455 (8:64–9:1). The teachings of VDM ’362 are not separately at issue in this appeal.

### C. The Board Decision

In this *ex parte* reexamination, the Board affirmed the Examiner’s rejection of claim 1 of the ’397 patent as obvious over the combination of VDM ’316 and VDM ’362. Appx2; Appx60. The only issue on appeal is whether substantial evidence supports the Board’s finding that VDM ’316 teaches “substantially contemporaneously” generating a display in accordance with settings selected by a user. Thus, the discussion of the Board’s decision will be limited to that issue.

#### 1. Claim Construction

The Board began with claim construction. Appx7. As the ’397 patent is expired, the Board applied the standard set forth in *Phillips v. AWH Corp*, 415 F.3d 1303 (Fed. Cir. 2005) in construing claim 1. Appx7–8 (quoting *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014)). As the ’397 has been involved in many prior litigations, the Board adopted a prior construction for “setting,” applied by multiple District Courts, as meaning “an attribute of an object available for selection.” Appx8. The Board also adopted one District Court’s prior construction of “substantially contemporaneously” as meaning “happening at the same period of time from a human perspective,” but concluded the result would be the same if an alternate construction by another District Court

("occurring immediately after") was adopted. Appx8–9. Express Mobile argued before the Board that either construction would be appropriate. Appx9.

### 2. Obviousness

The Examiner found that VDM '316 discloses nearly all of the limitations of claim 1, but does not expressly teach all the details of storing "user selected settings in the database" as required by step (c). Appx48-52. However, the Examiner found that VDM '362 clearly teaches that feature in greater detail, and that it would have been obvious for one of ordinary skill in the art to look to VDM '362 for those details as VDM '362 is incorporated by reference into VDM '316. Appx51. Regarding limitation (b), the Examiner found VDM '362 teaches that the diary applet regenerates the HTML for the diary pages to reflect user edits and passes the updated HTML to the browser for display in real time. Appx50; Appx60–61.

Before the Board, Express Mobile raised three arguments challenging the Examiner's finding that the combination of VDM '316 and VDM '362 (collectively, "VDM") would have rendered claim 1 obvious to one of ordinary skill in the art. Appx6–7. Express Mobile has not maintained the first and third arguments in this appeal, so only the portion of the Board's opinion as to the second argument is reviewed below.

Express Mobile's second argument before the Board, now at issue in this appeal, was that VDM does not teach "generating a display in accordance with one or more user selected settings *substantially contemporaneously* with the selection thereof" as recited in element (b) of claim 1. Appx3; Appx6–7. In support of its position, Express Mobile first argued that the figures of VDM '316, *e.g.*, Figs. 4(h)–(i), show an accept button, suggesting that user selections will not be reflected on the display until the accept button is clicked. Appx20. The Board found that Express Mobile's argument "does not accurately reflect the disclosures of VDM '316." *Id.* The Board acknowledged that an accept button **406** is shown in multiple different figures and described in VDM '316 as allowing a user to "accept any changes . . . made." Appx20 (citing Appx434–435 (Figs. 4(b)–(e)); Appx437 (Figs. 4(h)–(i)); Appx455 (10:13–15)).

But the Board found that VDM '316 "goes on to explain the accept button in more detail later in the disclosure." Appx20. The Board then quoted a portion of the VDM '316 specification describing a move object operation with reference to Figures 4(i)–(n).

> If the diary owner indicates via several presses of button [493[4]] of FIG. 4(i) that the content object is to move to the bottom position,

[4] As the Board explains later in its opinion, VDM '316's reference to button 494 here is most likely a scrivener's error. *See* Appx26. VDM '316 teaches that button 494's function is "move to bottom position," whereas button 493's function is "move one position down." Appx456 (12:18–24). Here, the description of "several button presses" most logically comports with the selection

> applet 112 will eventually regenerate the diary page to look like the diary page in FIG. 4(m). Note that the selected content object has been moved to the bottom right on this diary page (which the cover for this diary has defined as the bottom position of this diary page). Applet 112 communicates with the browser to display the regenerated HTML of the diary page. *Once the diary owner clicks on accept button 406* of FIG. 4(i), applet 112 is caused to *exit edit mode* (via another executable program) *and regenerates the diary page without handle 499 to yield a page such as the page of FIG. 4(n), where content object 401 is again displayed in its new position, but without a handle.*

Appx20–21 (quoting Appx457 (13:22–35)) (Board's emphasis). The Board found that the quoted section "explains that the display is regenerated *multiple* times." Appx21 (emphasis in original). More specifically, "[f]irst, the display is regenerated when an edit is made (e.g., changing the position of an item), which occurs *before* the accept button is pressed and while still in edit mode." *Id.* (emphasis in original). "Second, the display is again regenerated once the accept button is pressed, which will 'exit edit mode' and remove the 'handle' used to edit items while in edit mode." *Id.*

The Board observed that this understanding of the process was reinforced by the drawings which show an image of a smiley face in the upper left at the start,

---

of button 493 because a single press of button 494 would move the object to the bottom position. Express Mobile does not address the Board's finding of a scrivener's error in its Opening Brief.




Figure 4(j)

(Fig. 4(j), Appx438), then show the smiley face in the lower right but still with the edit handle after user input,




Figure 4(m)

(Fig. 4(m), Appx440), and finally show the smiley face in the lower right with no edit handle after the accept button is pressed,



Figure 4(n)

(Fig. 4(n), Appx440). Appx21–22 (citing Appx457 (13:11–16, 22–35); Appx452 (4:5–6, 13–17)). The Board thus determined that Express Mobile's contention regarding the accept button was "contradicted by the record." Appx22.

Express Mobile next argued that the words "applet 112 will *eventually* regenerate the diary page" (emphasis added) in the move object example discussed above demonstrate that the regenerated HTML cannot be displayed "substantially contemporaneously" with the user's move object selection. Appx22. The Board did not agree that the single word "eventually" carried such meaning, particularly in view of the other teachings in VDM '316. The Board observed that VDM '316 teaches that "[t]he method of FIG. 4(l) enables embodiments such as a diary to display and manipulate contents within an HTML document and, *at the same time*, uses the browser as a vehicle to handle the actual display and diary owner input." Appx22 (quoting Appx457 (13:3–7)) (Board's emphasis). The Board further emphasized that VDM '316 teaches an edit mode to change a diary's content and layout in which "[d]iary applet regenerates the

page to reflect the editing changes and passes it to the browser for display." Appx23 (citing and quoting Appx451 (2:57–62); Appx456 (12:61–64)).

The Board then rejected as unpersuasive the argument by Express Mobile's expert that the separation between applet **112** and the browser would slow the update process as reflected by the word "eventually" in the move object example. Appx23–24. Instead, the Board agreed with the Examiner's finding that separation is not necessary. Appx24. In particular, the Board found that VDM '316 specifically teaches that the applet could instead be implemented as a plug-in to the browser or that the applet's functionality could be implemented directly in the browser. Appx24 (citing and quoting Appx459 (18:48–50, 52–53). Thus, the Board determined that Express Mobile's argument that the '397 patent could be distinguished from the prior art by its more unified system was not persuasive. Appx24.

Even considering the separate applet and browser embodiment in VDM '316, the Board found that there is no evidence to support that the time required for the sequential computer operations of (1) identifying the user selection; (2) updating the HTML to reflect that selection; and (3) displaying the updated HTML in the browser "will be significant or noticeable from the *human user's* perspective." Appx25 (emphasis in original). The Board explained that these steps are carried out immediately in VDM '316 whereas the '397 patent discloses

a method of polling for user changes, *e.g.*, once every 100 milliseconds. *Id.* (citing Appx156 (23:29–31); Appx89 (Fig. 9)). Yet Express Mobile did not "provide any substantive analysis of the actual amount of time it would take to regenerate an HTML file and send that file to a browser, let alone how that time compares to the '397 patent's up to 100 milliseconds for polling followed by its own processing time." Appx25. The Board found this point particularly compelling in view of the simple nature of the web pages in VDM '316's examples. Appx25–26.

As discussed above (*see supra* at n.4), the Board found that the most likely explanation for the reference to button 494 (move to bottom position) in VDM '316's move object example was a typographical error (as a reference to button 493 for move down one position would make more sense). Appx26. But the Board went on to find that even if one of ordinary skill in the art would not interpret VDM '316 in this manner, a user would still expect the move to bottom position selection to be completed upon the final mouse click (similar to double-clicking a program icon in Windows). Appx26–27. Thus, the final click would complete the "selection" of the setting as recited limitation (b) of claim 1, but Express Mobile failed to explain why the display update would not be "substantially contemporaneous[]" with that "selection." *Id.* The Board also found that no other example in VDM '316 describes multiple button clicks to

make a selection, so a person of ordinary skill in the art would not expect multiple button presses to be necessary for every selection. Appx27.

The Board found Express Mobile's reliance on the word "finally" in Figure 4(l) of VDM '316 to be even less persuasive. Appx27–28. Read in context, the Board found that the word merely indicates that the display of the updated HTML is the final step in responding to user input. *Id.* The Board found nothing in the use of the word "finally" to suggest that there is any significant or user observable passage of time between a user selection and updating the display in response to that action. Appx28.

Next, the Board addressed two additional arguments that Express Mobile raised with specific regard to the privacy setting in VDM '316. Appx28. First, Express Mobile argued that no changes to the display would be perceptible to the diary owner when the owner changes an object privacy level, but the Board observed that claim 1 does not require a perceptible change in the display as a result of a user selection. Appx29. Instead, the Board found that all that is required is that the display is generated according to the user selection, and VDM '316 teaches that the person viewing the diary must have a permission level that meets or exceeds the privacy level set by the diary owner. *Id.* Thus, the Board found that the display remains "in accordance with" the new privacy level, regardless of whether the diary owner perceives a difference. *Id.*

Express Mobile's second argument about the privacy setting was that in VDM '316 the user is required to enter a password to change the privacy setting. Appx29–30. But the Board found that VDM '316 teaches only that the password must be entered to make certain buttons, including the privacy button, available, and there is nothing to indicate that the password must be entered after a privacy setting change or that the password must be re-entered. Appx30.

For all these reasons, the Board found that VDM '316 discloses limitation (b) of claim 1.

## III. SUMMARY OF THE ARGUMENT

The Board correctly concluded that claim 1 would have been obvious over the combination of VDM '316 and VDM '362, and substantial evidence supports the Board's findings about what VDM teaches. Claim 1 requires "generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof." The Board adopted Express Mobile's proposed construction of "substantially contemporaneously" as "happening at the same period of time from a human perspective," and Express Mobile does not challenge that construction. Substantial evidence supports the Board's finding that VDM '316 teaches "generating a display . . . substantially contemporaneously." The Board rightly found VDM '316 discloses that limitation by teaching that the diary applet immediately responds to a user's edit

by updating the code for the webpage in accordance with the user's selection and sending that update to the browser for display.

Express Mobile is incorrect that a user must click an accept button in the editing windows of VDM '316 in order for the display to be updated according to the user's selection of settings. VDM '316 teaches processing for user selections in edit mode that results in the display being updated immediately in response to a user's selection. VDM '316 also teaches that the accept button is instead used to confirm the user's changes and exit the edit mode.

Express Mobile is incorrect that VDM '316's use of the words "eventually regenerate" in an example of a "move content" operation is evidence of human perceptible delay between the move object selection and the update of the display. Express Mobile improperly reads too much into the single instance of the word "eventually" and ignores the context of iterative user changes to the object position occurring in the example. Express Mobile's interpretation of the example is also belied by VDM '316's general description of the process for responding to user inputs in edit mode.

Express Mobile is incorrect that the Board could not rely upon the plain meaning of the words "at the same time" to support its finding about the "substantially contemporaneous[]" update process for the display in the prior art. VDM '316 discloses that information is immediately passed from the diary applet

build engine to the browser interface (and vice versa) to allow a user selection to be reflected on the display in the same period of time from a human perspective. In context, it is clear that VDM ’316 uses the phrase “at the same time” meaningfully to describe a user’s perception of those processes.

Express Mobile incorrectly argues that VDM ’316 cannot disclose the “substantially contemporaneously” limitation because it does not teach the same polling technique as the ’397 patent. Claim 1 does not include any requirement for polling, or specify any other architectural detail of generating the display, beyond the “substantially contemporaneously” requirement. It not necessary that the prior art disclose unclaimed parts of the ’397 patents methodology. In addition, Express Mobile mischaracterizes the ’397 patent specification and the testimony of its expert lacks a reasoned basis, grounded in the patent and/or other evidence.

Finally, Express Mobile makes an incorrect argument about why VDM ’316’s privacy settings cannot satisfy the “substantially contemporaneously” limitation. Express Mobile argues that the display must be visually altered in response to the diary owner’s change of a privacy setting in order to satisfy the claim language. However, claim 1’s “substantially contemporaneously” language only sets a temporal limit on the time from a user making a selection until the selection is reflected in the display. Claim 1 includes no requirement that the

display must be altered in a manner that the user would notice; instead, it simply requires that the display be updated. Accordingly, this limitation is met even if the update based on the user selection requires no change in the visual presentation of the diary.

## IV. ARGUMENT

### A. Standard of Review

Express Mobile has the burden to show that the Board committed reversible error. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004). This Court upholds fact findings made by the Board that are supported by substantial evidence, 5 U.S.C. § 706(2)(E), and reviews the Board's legal conclusions *de novo. In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Where "two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

Claim construction is a question of law reviewed *de novo*, subject to substantial evidence review of any subsidiary factual findings. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Teva Pharms. USA, Inc. v.*

*Sandoz, Inc.*, 574 U.S. 318, 332 (2015). Although the ultimate determination of obviousness is a legal conclusion, it is based on underlying factual findings. *Gartside*, 203 F.3d at 1316. What the prior art teaches is a question of fact. *In re Berg*, 320 F.3d 1310, 1312 (Fed. Cir. 2003).

### B. The Board correctly affirmed the Examiner's rejection of claim 1 as obvious over the combination of VDM '316 and VDM '362.

The Board rightly affirmed the Examiner's rejection of claim 1 as obvious over the combination of VDM '316 and VDM '362. Appx37. Express Mobile's sole challenge to the Board's findings is with respect to the limitation in step (b), which recites "generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof." Appx3332.

#### 1. Express Mobile does not challenge the Board's construction of "substantially contemporaneously."

Express Mobile does not challenge the Board's construction of "substantially contemporaneously" as "happening at the same period of time from a human perspective." Appx8–9; Br. 26–30. Instead, Express Mobile accuses the Board of misapplying the construction that Express Mobile suggested. Br. 27, 29–30. But, as detailed below, the Board never found the "substantially contemporaneously" limitation to be taught by prior art "in which the screen is static when changes are made, or in which the user must perform some type of 'refresh' command, or even open a separate preview window, to see the effect of

those changes," as suggested by Express Mobile. Br. 29–30. Instead, the Board found that VDM '316 teaches a method and apparatus that generates a display in accordance with a user's selection of a setting "substantially contemporaneously" with the user's selection as recited by claim 1 of the '397 patent.

#### 2. Substantial evidence supports the Board's finding that VDM '316 teaches generating a display "substantially contemporaneously" with a user's selection of settings is supported by substantial evidence.

The Board rightly found that limitation (b,) including the "substantially contemporaneously" requirement, is disclosed in VDM '316. Appx19–30. Referencing the move object example described in VDM '316 with reference to Figures 4(i)-(n), the Board correctly found that VDM '316 teaches regenerating the display as soon as an edit is made. Appx20–22. The Board also correctly found that VDM '316 teaches an alternative embodiment implementing the diary applet's functionality directly in the browser. Appx24. Finally, the Board correctly found VDM '316 teaches that the diary applet acts immediately on user edits by regenerating the HTML code and sending the updates to the browser for display. Appx25–26; Appx27–28.

### C. Each of Express Mobile's arguments lack merit.

#### 1. The Board's finding that VDM '316 updates the display to reflect a user selection before the user selects the accept button is supported by substantial evidence.

The Board correctly rejected Express Mobile's argument that VDM '316's "display is static when selections are made" and remains so until the accept button is clicked. Br. 30. Express Mobile argues that VDM '316's description of moving a content object "undercuts" the Board's finding that VDM '316 teaches "contemporaneous" display rather than supporting it. Br. 31 (referencing the Board's discussion at Appx20–22 of Appx457 (13:22–35)). But all that Express Mobile offers in support of this assertion is a conclusory statement that "WYSIWYG"[5] is different from "regeneration." Br. 31–33. Express Mobile is wrong for multiple reasons, but, before explaining why the Board was correct about moving content objects and the accept button in VDM '316, it will be helpful to establish a point of reference for further discussion.

##### a. The relationship of claim scope to the teachings of the '397 patent and VDM '316.

First, WYSIWYG does not appear in claim 1 of the '397 patent. Express Mobile is attempting to use the term WYSIWYG to reshape the arguments about

[5] As a reminder, WYSIWYG (pronounced "wiz-E-wig") is an acronym for "what-you-see-is-what-you-get."

the claim language in question rather than relying on the construction of "substantially contemporaneously" that it purports to support. The words of the acronym WYSIWYG literally mean that the display of an editing program accurately previews the final output (to a printer, browser, etc.), so, when edits are made by a user, the display is updated to reflect those changes and maintain accuracy of the preview. Common sense dictates that WYSIWYG does not mean that the display is magically updated without any background processes or computer processing to update the display. And calling those background processes or computer processing in VDM '316 "regeneration" does not transform them into something that is not WYSIWYG. Nothing in the language of claim 1 limits how the "generating" step is accomplished beyond the requirement that it must be "substantially contemporaneously with" a user's selection of a setting.

In fact, the basic programming architectures of the '397 patent and VDM '316 share some similarities. The '397 patent's build tool includes a browser-based interface (written in HTML, JavaScript, etc.) and a build engine (written in Java) that work in concert to process and respond to a user's inputs. Appx79 (Fig. 3a); Appx80 (Fig. 3b (**13**)); Appx84 (Fig. 6 (**13**)); Appx91 (Fig. 11 (**86**), (**87**)); Appx92 (Fig. 12 (**95**), (**96**)); Appx145 (1:52–59); Appx147 (6:13–18, 21–36, 38–40). VDM '316 similarly teaches a divided system that works in concert to

process and response to a user's inputs—a diary applet (written in Java) that includes an "HTML generation engine" that works in concert with the browser to identify user inputs, respond to user selections, and update the display in accordance with those user selections. Appx430 (Fig. 1(c) (**110**–**112**)); Appx432 (Fig. 3 (**308**)); Appx439 (Fig. 4(l)); Appx454 (7:1–11); Appx457 (13:3–10).[6] Although there are also some differences, those differences are not reflected in claim 1, so any distinctions in the build architectures of the '397 patent and VDM '316 are not directly relevant to the obviousness of claim 1.

Moreover, as the Board observed, Express Mobile's failed to produce any credible evidence that following VDM '316's teachings would delay display updates to an extent noticeable by a user. Appx25–26. As the Board explained, "[b]eyond conclusory assertions that the '397 patent is 'substantially contemporaneous' but VDM '316 is not, neither [Express Mobile] nor Mr. Weadock provide any substantive analysis of the actual amount of time it would take to regenerate an HTML file and send that file to a browser, let alone how that time compares to the '397 patent's up to 100 milliseconds for polling followed by its own processing time." Appx25. The Board further reasoned that VDM '316

[6] These similarities, in particular VDM '316's use of a Java diary applet, bely Express Mobile's argument that VDM '316 is the same as the prior art criticized in the '397 patent's background section. Br. 38.

includes multiple exemplary figures with only a quick-to-process single diary image, which made Expresses Mobile's conclusory assertion of user-observable-delay even more unreasonable. Appx25–26.

#### b. As the Board correctly found, Express Mobile's assertions about the accept button are contradicted by the teachings of VDM '316.

VDM's initial description of the accept button is straightforward, stating that "[i]n the window of FIG. 4(b) and others of the windows mentioned below, the user can click cancel **405** or accept **406** to cancel or accept any changes . . . made." Appx455 (10:13–15). VDM '316 states that it is the "changes"—not simply the settings—that are canceled or accepted, thus indicating that the display has already been updated to reflect those changes. The plain reading of these words is reinforced by the fact that the sentence describing the cancel and accept buttons immediately follows a statement that "[d]iary applet **112** reads the user's selection and generates HTML for the selected section in accordance with diary information **114**." *Id.* (10:10–12). Thus, VDM '316 teaches that generation of the HTML for the display is triggered by the user's selection, and only after the generation of those changes to the diary is the option to accept or cancel changes available.

VDM '316's more detailed description of other diary operations is in keeping with this understanding. VDM '316 describes the general steps for

editing an existing content object with reference to Figure 4(l). Appx456 12:44–45). First, when the user (diary owner) enters edit mode, the diary applet regenerates the page to add an object control handle to each content object. *Id.* (12:45–48). Second, when the user selects a content object via its control handle, the browser uses the associated code to tell the diary applet which object was selected. *Id.* (12:48–57). Third, based on the handle information, the diary applet displays an appropriate window for manipulation of that content object. *Id.* (12:57–59). Fourth, the diary applet processes the change selected by the user in the edit window for the content object. *Id.* (12:59–61). Fifth, the diary applet regenerates the HTML for the page "to reflect the edit, after which the HTML is displayed by browser 110." *Id.* (12:61–64). There is no mention of the accept button playing any role in, or being necessary to, the editing sequence.

VDM '316 then describes and illustrates a specific example of the edit processing sequence. First, Figure 4(j) shows an example of a diary page in edit mode with the regenerated HTML to display a control handle for the smiley face content object. Appx457 (13:11–14); Appx (Fig. 4(j)). Second, when the user selects the smiley face control handle, the executable code for the handle will communicate to the diary applet that the smiley face has been selected. Appx457 (13:13–19). Third, the diary applet displays an edit window for a picture content object (smiley face) as shown in Figure 4(i). Appx457 (13:17–21); Appx437

(Fig. 4(i)). Fourth, when the user selects the move down button **493**[7] in the Figure 4(i) properties window, the diary applet processes the input. Appx457 (13:22–25). Fifth, the diary applet regenerates the HTML for the page to move the position of the smiley face down (in accordance with the ordering direction set by the page style) and "communicates with the browser to display the regenerated HTML of the diary page." *Id.* (13:22–30). In this manner (i.e., via successive move down button presses each resulting in a regenerated version of the HTML for the page), "applet **112** will eventually regenerate the diary page to look like the diary page in FIG. 4(m)." *Id.* (13:22–25). As with the general description of user-edit processing above, VDM '316 teaches "display[ing] the regenerated HTML of the diary page" without reference to the accept button. *Id.* (13:11–30).

Accordingly, and as the Board correctly found, VDM '316 teaches that the "display is regenerated *multiple* times. [Importantly, f]irst the display is regenerated when an edit is made (e.g., changing the position of an item), which occurs *before* the accept button is pressed and while still in edit mode." Appx21 (emphases in original). Thus, substantial evidence supports the Board's finding

[7] *See* n.4 *supra*. In the alternative, the applet would simply process the "several button presses of button 494" one time (as a single user action) and regenerate the HTML once to move the smiley face to the bottom of the diary page.

that VDM '316 teaches generating a display in response to a user's selection of a setting "substantially contemporaneously" with the selection.

It is only after this description of the move object editing sequence that VDM '316 teaches the function of the accept button.

> Once the diary owner clicks on accept button **406** of FIG. 4(i), applet **112** is *caused to exit edit mode* . . . and regenerates the diary page without handle **499** to yield a page such as the page of FIG. 4(n), where content object **401** [smiley face] is *again* displayed in its new position, but without a handle.

Appx457 (13:30–35) (emphases added). As the Board correctly found, "the display is again regenerated once the accept button is pressed, which will 'exit edit mode' and remove the 'handle' used to edit items while in edit mode." Appx21. Furthermore, by stating that the object "is again displayed in its new position," VDM '316 teaches and emphasizes that the content object has already been displayed in its new position while in edit mode and before the accept button was pressed to exit edit mode.

Express Mobile's assertion that changes to the user's display only happen "periodically or at the user's instruction" (Br. 33, 41, 42) is incorrect. As the very passage that Express Mobile quotes makes clear, it is only updates to the *diary server* information that are "periodic" or "at the user's instruction." Appx455 (9:14–16); *see also* Appx429 (Fig. 1(b)). This has nothing to do with updates to the user's local display in edit mode as discussed in detail above.

For all these reasons, Express Mobile's argument that VDM '316 does not display real time updates to the display in response to a user's selection of settings fails.

**2. The Board's finding that VDM '316 updates the display to reflect a user selection "at the same time" the user selects a setting is supported by substantial evidence.**

Next, Express Mobile takes issue with the Board's reliance on VDM '316's teaching about interaction of the diary applet and the browser to support the Board's finding that VDM '316 teaches the "substantially contemporaneously" limitation. Br. 36–41. VDM '316 discloses that "[t]he method of FIG. 4(l) enables embodiments such as a diary to [1] display and manipulate contents within an HTML document, and, *at the same time*, [2] uses the browser as a vehicle to handle the actual display and diary owner input." Appx457 (13:3–7) (emphasis added). Express Mobile argues that the phrase "at the same time" in this passage is used only in the "figurative" sense (i.e., as a synonym for "as well as" or "in addition") and that it has no "temporal" significance. *See*, *e.g.*, Br. 36, 38–40. Express Mobile's arguments lack merit.

First, the sentence in question begins with a reference to the method of Figure 4(l). As discussed above, VDM's teachings as to the edit mode process with reference to Figure 4(l), and the further example of that process applied to a move content object operation, provide substantial evidence in support of the

Board's finding that VDM '316 teaches generating a display in response to a user setting selection "substantially contemporaneously." *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) (discussing substantial evidence standard).

Second, VDM '316's description of the process indicates that a user's selection of settings and display of the updated page occur "at the same time." The "at the same time" sentence appears just after the description of Figure 4(l) in VDM '316. Appx456–457 (12:44–13:7). VDM '316 describes the edit mode process in Figure 4(l) as including the following communications between the diary applet and the browser: (1) the browser displays the regenerated HTML for the diary page that adds control handles to the content objects sent from the applet; (2) the browser runs the executable code added to the page when a user clicks on a control handle for a content object and communicates the user's content object selection to the diary applet; and (3) the applet responds to user selections in the applet window for the content object by regenerating the diary page HTML to reflect the user's selections and sends it to the browser for display. Appx456 (12:44–64). These interactions between the diary applet and the browser, and their sequence, demonstrate that a user's selection of settings and the display of the updated diary page reflecting those selections are in fact happening "at the same time."

Express Mobile attacks this finding with a mistaken *reductio ad absurdum* argument, stating that these events cannot "literally" occur "at the same time" because the programming needs time to run. Br. 36–37. But "at the same time" does not need to mean literally at the exact same instant within the computer in order to support the Board's finding, only that the functions are occurring at the same period of time from a human perspective. Here, "at the same time" means "at the same time" from a user's perspective, which is the appropriate measure given the construction of "substantially contemporaneously" as "happening at the same period of time from a human perspective."

#### 3. The Board's finding that VDM '316 does not use the word "eventually" to indicate an indeterminate delay before updating the display is supported by substantial evidence.

Express Mobile next rehashes its conclusory assertion that because VDM '316 uses the word "regenerates," it cannot be WYSIWYG. Br. 42–43. Express Mobile's contention that "there is no genuine dispute" that "a human user [would] notice that the HTML is regenerated 'at some point afterwards' and not substantially contemporaneously" in VDM '316, Br. 42, is both incorrect and completely unsupported. Express Mobile offers only attorney argument, unsupported by analysis of the prior art or persuasive evidence, that because VDM '316 "regenerates" the HTML for a diary page, there must be delay apparent to a human user. Br. 42–43.

Express Mobile previously argued that VDM '316's teaching about events "at the same time" cannot be read "literally" because the programming needs actual time to execute after a user selection and before the display is updated accordingly. Br. 36–37. And Express Mobile argued that claim 1 of the '397 patent uses the claim language "substantially contemporaneously" for just that reason—because of "the necessary two-way real time communication between the JavaScript/HTML interface and the JAVA build engine" before the preview can be displayed. Br. 37. Yet just a few pages later, Express Mobile asks this Court to assume from VDM '316's description of a sequence of steps to process a user edit, that the processing is somehow slow enough to be noticeable to a user (not "substantially contemporaneous[]") simply because VDM '316 uses words like "regenerate" and "then." Br. 42–43. "Regenerate" simply indicates processing by the diary applet build engine to update the display because the user has *changed* a setting or modified content. "Then" simply indicates there is a logical (cause-effect) *order* to the steps of the process.

Attempting to build on this empty premise, Express Mobile goes on to argue that the words "eventually regenerate" in the move object example of VDM '316 do "not even suggest substantially contemporaneous from a human perspective." Br. 43. Express Mobile ignores the context in which those words appear. First, in the move object example, VDM '316 describes the processing

steps taken *by the diary applet and browser-based display* to recognize and respond to user editing selections for a content object. Appx457 (13:11–30). The description is thus intended to convey a logical sequence for processing, not a representation of how a user will perceive the process in real time. *See id.* In addition, Express Mobile fails to address that the most reasonable reading of this example is that it calls for "several presses of button [**493**]" (move object down). Thus, the choice of the word "eventually" reflects that the user is moving the content object one position down for each button press, with the display updated in response each time. Appx457 (13:22–25); Appx456 (12:19–23). As a result of the multiple selections, the display will "eventually regenerate the diary page to look like the diary page in FIG. 4(m)," as specifically stated in VDM '316. Appx457 (13:22–25). Even if the reference to button **494** was not a scrivener's error, it is simply reading too much into the word "eventually" in context to suggest that it carries VDM '316's teachings outside the bounds of "substantially contemporaneously."

Express Mobile tries, but fails, to buttress its argument about its loaded meaning of "eventually" with the declaration testimony of its expert, Mr. Weadock. Br. 44–45 (citing Appx1735–1737 (¶¶ 107, 109–111)). As the Board determined, Mr. Weadock's conclusory testimony that "eventually" signifies "delay from additional processing required to rebuild the HTML and display it in

the browser" is unsupported by "any substantive analysis of the actual amount of time it would take to regenerate an HTML file and send that file to a browser." Appx23–24, 25 (referencing testimony at Appx1736). The Board thus found that Mr. Weadock's opinion lacked adequate factual support to be credible or persuasive. Appx26 (citing *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985)). This Court "defer[s] to the Board's findings concerning the credibility of expert witnesses." *Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010).

In addition, the Board determined that Mr. Weadock appeared to base his opinion on the existence of a separate diary applet and browser-based interface in VDM '316, but failed to address the impact of VDM '316's teaching that the applet could be implemented as a browser plug in or implemented in the browser itself. Appx24 (referencing testimony at Appx1735–1736 (¶¶ 107–109); citing Appx459 (18:48–53)).

Furthermore, Mr. Weadock's testimony contradicts the disclosure of the '397 patent and therefore is not credible in attempting to distinguish the '397 patent from VDM '316. Specifically, Mr. Weadock asserts that "[u]nlike the applet and browser in VDM ['316], the ['397] patent's embodiments utilize a WYSIWYG environment with its own interface that is capable of displaying a user's changes immediately from a user's point of view." Appx1736 (¶ 110 citing

Appx155 (22:66–37)[8]). Mr. Weadock then references Figures 42, 44, and 45 of the '397 patent. Appx1736 (¶ 110). He asserts, based on the screen shots alone, that the font size, shown about to be selected with the cursor in Figure 44, is changed in Figure 45 "immediately afterward on the interface, as far as the user is concerned." *Id.* Mr. Weadock does not explain how these static figures indicate the timing in which updating occurs, and so it was within the Board's discretion not to credit his testimony.

Contrary to Mr. Weadock's assertion that the '397 patent's architecture is unified in a way that the architecture in VDM '316 is not, the '397 patent specifically teaches a separate browser-based build engine (preferably written in the Java programming language) and a browser-based interface (preferably written in Hypertext Markup Language (HTML) and its extensions, *e.g.*, JavaScript). Appx145 (1:52–59); Appx147 (5:64–66); Appx79 (Fig. 3(a)). Mr. Weadock is also wrong that the '397 patent interface alone changes the display in response to user selections. The '397 patent discloses that "[t]o enable effective two-way communication between the interface and build engine, polling technology is included as shown at **16** [see Fig. 9]." Appx147 (6:38–41); Appx89

---

[8] To the extent it is not unsupported, this wide-ranging citation (repeated in Express Mobile's brief without correction, Br. 45) to approximately 15 columns of the '397 patent, without further elaboration, did not reasonably direct the Board to the alleged support for Mr. Weadock's opinion.

(Fig. 9 (71) (describing JavaScript polling the build engine which provides cursor position values)). Similarly, the ’397 patent explains that “[i]nteractive fields **460** [in Fig. 37] also show the current value of a setting, but can also be directly changed by the user by typing into the field, with the result immediately processed by the build engine **352** and displayed in the build frame **500**.” Appx149 (10:37–41). In short, the Board rightly rejected the testimony of Mr. Weadock as lacking a credible basis for multiple reasons—a finding to which this Court defers. Appx23-26 *Yorkey*, 601 F.3d at 1284.

For all these reasons, the Board correctly found that the use of the word “eventually” did not undercut VDM ’316’s teaching of updating the display “substantially contemporaneously” with a user selection.

#### 4. The Board correctly found that there is no evidence to support Express Mobile’s argument that the ’397 patent’s polling architecture is faster or better than VDM ’316’s processing methodology.

Next, Express Mobile makes a slight variation on its argument that WYSIWYG is not “regeneration.” Express Mobile asserts that because VDM ’316 does not disclose the ’397 patent’s polling technique, VDM ’316’s display updates cannot be “substantially contemporaneous[].” Br. 46–50. Just as claim 1 says nothing about WYSIWYG, it says nothing about polling. All that claim 1 requires is that generating a display in response to a user selection of a setting “substantially contemporaneously” with the selection.

Nevertheless, Express Mobile wants this Court to infer that an unclaimed difference in processing technique is significant. Express Mobile argues that "VDM '316 never discloses the '397 patent polling technique" and "[i]nstead, VDM '316 expressly taught using the approach of FIG. 4(l), which precludes updating the display 'substantially contemporaneously' with setting selection." Br. 48. The latter assertion is incorrect for the reasons discussed above in reviewing the teachings of VDM '316 as to Figure 4(l). *Supra* § IV(C)(1)(b). In the end, Express Mobile offers nothing more than the assertion that because Figure 4(l) of VDM '316 is allegedly different from polling, VDM '316 cannot teach the disputed claim limitation. As the claims do not require polling, this argument fails.

In addition, Express Mobile's argument is not internally coherent. Express Mobile seems to suggest that the polling technique is the reason the '397 patent has "the panel of settings . . . and build frame display . . . in the same user interface, rather than in a divided applet and browser," like VDM '316. Br. 47–48. But the very portions of the '397 patent that Express Mobile cites in support of that argument demonstrate that polling is necessary due to the divided structure of the '397 patent's system. Br. 48 (citing Appx155–156 (22:66–23:27) (including, in relevant part, that "[t]he polling technology is essential for creating the necessary two-way real time communication between the JavaScript/HTML

interface and the [separate] JAVA build engine."); *see also* Appx152 (15:12–15). The '397 patent elaborates that "[a] polling loop is defined in the panel's (panel **400**) JavaScript that creates a near continuous, at least from a human perception point of view, dynamic real time link, in order to monitor events occurring inside the build engine." Appx156 (23:21–24). Thus, Express Mobile argues that VDM '316 must be slow because of the separate Java diary applet and JavaScript browser, but, contradictorily, points to the polling technique necessitated by the '397 patent's separation of the Java build engine and the JavaScript interface as a reason for its "real time" processing. Once again, Express Mobile has not supplied the necessary evidence to demonstrate that its arguments are accurate, much less persuasive. Express Mobile's failure to "provide any substantive analysis" on this point is why the Board reasonably determined that Express Mobile had made no showing that the '397 patent's update methodology was in any way superior to VDM '316 update methodology. Appx25–26.

Express Mobile's remaining arguments (e.g., references to "eventually" and "regenerate") in this section of its brief, Br. 46–50, are simply restatements of the same incorrect arguments addressed above. Similarly, Express Mobile does not raise any new arguments in the next section of its brief. Br. 50–53.

### 5. The Board's finding that VDM '316 teaches generating a display "substantially contemporaneously" with a user's selection of privacy settings is supported by substantial evidence.

Many of the points that Express Mobile raises to argue that VDM '316's response to a user's privacy setting selection are not "substantially contemporaneous[]" with the selection are the same objections it raises for all of VDM '316's settings in general. Br. 53–59. Those arguments are incorrect for the same reasons discussed above. But Express Mobile raises one new argument specific to the privacy setting. *Id.* Express Mobile's new argument is wrong because, like several of its other arguments, it relies on reading an additional limitation into the language of claim 1.

VDM '316 teaches that a button **438** in the navigation bar **402** (Fig. 4(a)) allows a user to set different levels of privacy for the diary (defining who is able to view it) using a password entered in window **450** (Fig. 4(d)). Appx455 (9:43–45; 10:29–49); *see also* Appx456 (11:24–29) (describing the same function accessed through a different window for advanced functions). But VDM '316 not only teaches a privacy setting for the whole diary, it teaches privacy settings for individual content objects. Appx456 (11:25–29); Appx459 (18:10–28).

Express Mobile's new argument is most easily understood from the viewpoint of the diary owner (although VDM '316 teaches that any user with the correct password can make changes to the privacy settings). Express Mobile

argues that if an owner makes a change to the privacy setting for a content object, then the display generated in response in VDM '316 cannot be "substantially contemporaneous[]" with the selection because the owner is authorized to view all the content of the diary and will not observe any visible change to the diary page.

Express Mobile's argument depends on importing a limitation that is not reflected in the actual language of claim 1. Express Mobile argues that because "substantially contemporaneously" has been construed as "happening at the same period of time from a human perspective," there must be a change for a human to observe in order to judge whether the change happens at the same period of time as the selection.

Claim 1 does not include a limitation requiring a change to the display; it only requires generating a display in accordance with user selections. That display can still be in accordance with a user selection even when the selection does not result in a visible change to the display. And even in the absence of a visible change to the display, the time for generating the display can still be judged according to whether it would correspond to a noticeable delay if there was a change.

This was the Board's analysis. The Board first concluded that "neither the user's perception nor a change in the resulting image is recited in the claim."

Appx29. Then the Board found that the regenerated HTML in VDM ’316 is displayed in accordance with the owner’s privacy selection even without the change because “the HTML is regenerated by comparing the diary owner’s security level with the object’s modified privacy level.” *Id.*

For these reasons, Express Mobile’s argument specific to the privacy level setting should be rejected.

## V. CONCLUSION

For all these reasons, this Court should affirm the Board’s decision that claim 1 of the ’397 patent is unpatentable as obvious over the combination of VDM ’316 and VDM ’362.

May 22, 2023

Respectfully submitted,

/s/ *Peter J. Sawert*
THOMAS W. KRAUSE
Solicitor

AMY J. NELSON
Senior Counsel for Patent Policy and Litigation

PETER J. SAWERT
KEVIN T. RICHARDS
Associate Solicitors

Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

*Attorneys for the Director of the United States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

I certify pursuant to FRAP 32(a)(7) that the foregoing BRIEF FOR APPELLLEE, DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE complies with the type volume limitation. The total number of words in the foregoing brief, excluding the table of contents and table of authorities, is 10,237 as measured by the word-processing software used to prepare this brief.

Dated: May 22, 2023

Respectfully submitted,

/s/ *Peter J. Sawert*

Peter J. Sawert
Associate Solicitor
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035